HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division
JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division
ERIC SELL
Deputy Assistant Attorney General
Civil Rights Division
JEFFREY MORRISON
Acting Chief, Employment Litigation Section
HILARY PINION
Acting Principal Deputy Chief, Employment Litigation Section
CARL D. WASSERMAN (DC Bar No. 459038)
Trial Attorney, Employment Litigation Section
BESA BUCAJ
Trial Attorney, Employment Litigation Section
U.S. Department of Justice
Civil Rights Division
        950 Pennsylvania Avenue NW
        Washington, DC 20530
        (202) 702-8186
        Carl.Wasserman2@usdoj.gov

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (Cal. Bar No. 272742)
Assistant United States Attorney
        300 North Los Angeles Street, Suite 7516
        Los Angeles, CA 90012
        (213) 894-2464
        Julie.Hamill@usdoj.gov

Attorneys for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 2:26-cv-01946 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| REGENTS OF THE UNIVERSITY OF | ) | |
| CALIFORNIA, | ) | |
| | ) | |
| Defendant. | ) | |

1

1

**INTRODUCTION**

2       Swastikas, calls for the extermination of Jews and the Jewish state of Israel,

3  antisemitic violence, and open harassment of Jewish students, faculty, and staff: this was

4  the grim scene at the University of California Los Angeles (UCLA or University)

5  beginning in the 2023 to 2024 academic year. Following the October 7, 2023, (October

6  7) massacre in Israel, UCLA's administration turned a blind eye to—and at times

7  facilitated—grossly antisemitic acts and systematically ignored cries for help from its

8  own terrified Jewish and Israeli employees. Activists at the now infamous encampment

9  at Royce Hall physically excluded Jewish students, faculty, and staff from portions of

10  campus. This Court ruled that conduct to be "unimaginable and so abhorrent to our

11  constitutional guarantee of religious freedom" that UCLA is currently under a permanent

12  injunction banning it and its officers from allowing further exclusions of Jews or

13  religious supporters of Israel from campus or activities.[1] That prior action generally

14  sought to protect the Jewish students at UCLA. But the harm to Jewish and Israeli

15  employees at UCLA goes much deeper. The general atmosphere of antisemitism was,

16  and remains, so severe and pervasive that UCLA's own official Task Force on

17  Antisemitism and Anti-Israeli Bias concluded that the University's failures to protect

18  Jewish staff and faculty constituted a hostile work environment in violation of Title VII

19  of the Civil Rights Act of 1964, as amended. This suit seeks to right these wrongs.

20       Until the United States Department of Justice issued its notice of investigation

21  letter to UCLA in March 2025, *not a single one* of the dozens of civil rights complaints

22  filed by Jewish and Israeli employees since October 7 was properly investigated.

23  UCLA's Office of Equity, Diversity, & Inclusion (EDI Office), tasked with oversight of

24  all discrimination complaints, routinely ignored complaints of antisemitism. And UCLA

25

26  [1] Order Re: Mot. for Prelim. Inj., *Frankel v. Regents of the Univ. of Cal.,* No. 2:24-cv-
04702 (C.D. Cal. Aug. 13, 2024), ECF No. 48; *see also*, Consent Judgment, *Frankel*,
27  (July 29, 2025), ECF No. 207, gov.uscourts.cacd.928715.210.0_2.pdf.

28

continues to mishandle them. Then-interim Chancellor Darnell Hunt testified to the Regents of the University of California (Regents or UC) that UCLA received "hundreds" of antisemitism complaints after October 7 and that "all those cases were taken up" for investigation. Yet not a single student, staff member, or faculty member was ultimately formally disciplined for antisemitic behavior—including those who were arrested for illegal conduct.

Moreover, UCLA's flawed Anti-Discrimination Policy was poorly designed and maintained, making it difficult for victims to report hostile work environment claims. UCLA faculty, staff, and administrators were untrained on the University policy and routinely failed to report antisemitism. The most sophisticated faculty and staff, including members of UCLA leadership, were puzzled by the confusing and ineffective complaint procedures, leaving Jewish and Israeli employees with nowhere to turn. They got UCLA's message that filing an antisemitism complaint was futile.

UCLA violated—and continues to violate—Title VII. The United States will now do what UC has thus far failed to do: protect Jewish and Israeli employees—both actual and perceived[2]—from illegal antisemitic harassment in their workplace based on their race, religion, and national origin.

## JURISDICTION AND VENUE

1.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. *See also* Exec. Order No. 12068, 43 Fed. Reg. 28971 (June 30, 1978) ("Providing for Transfer to the Attorney General of Certain Functions Under Section 707 of Title VII of the Civil Rights Act of 1964, as Amended").

2.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 2000e-5(f)(3) and e-6.

---

[2] References in this complaint to Jews or Israelis include Jews and Israelis and individuals perceived to be Jews or Israelis.

3

3.     The employment practices at issue here were committed within the jurisdiction of the United States District Court for the Central District of California. Therefore, venue is proper in this judicial district under 42 U.S.C. § 1391.

## PARTIES

4.     Plaintiff United States of America (United States) brings this action under Sections 706 and 707 of Title VII, 42 U.S.C. §§ 2000e-5 and e-6.

5.     Defendant Regents of the University of California (Regents or UC) is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b). The University of California Los Angeles (UCLA or University) is a UC campus operated by Defendant.

## ADMINISTRATIVE PROCESS

6.     On June 7, 2024, Andrea Lucas, Chair of the United States Equal Employment Opportunity Commission (EEOC) and then-Commissioner, filed a timely charge of discrimination with the EEOC alleging, among other things, that Defendant subjected Jewish employees to a pattern or practice of harassment based on race, religion, and national origin in violation of Title VII.

7.     Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated Commissioner Lucas's charge of discrimination discussed in paragraph 6 and found reasonable cause to believe that Defendant subjected its Jewish and Israeli employees, including at UCLA, to unlawful harassment based on their race (Jewish), religion (Judaism), and perceived or actual national origin (Israeli/Jewish), in violation of Title VII.

8.     Also based on Commissioner Lucas's charge, the EEOC found reasonable cause to believe that Defendant retaliated against Jewish and Israeli employees at UCLA for engaging in protected activity.

9.     On November 4, 2024, Professor Ian Holloway (Professor Holloway) filed a timely charge of discrimination with the EEOC alleging that Defendant had subjected

4

him to a hostile work environment because of his religion and national origin in violation of Title VII. He filed an amended charge on April 7, 2025, to include a claim of retaliation.

10.     On February 20, 2025, Professor Kamran Shamsa (Professor Shamsa) filed a timely charge of discrimination with the EEOC alleging that UCLA had subjected him to a hostile work environment and disparate treatment based on his race, religion, and national origin, and retaliated against him in violation of Title VII.

11.     Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated the charges of discrimination discussed in paragraphs 9 and 10 and found reasonable cause to believe that Professors Holloway and Shamsa were subjected to unlawful discrimination on the basis of their race, religion, and/or national origin, in violation of Title VII.

12.     The EEOC also found reasonable cause to believe that Professors Holloway and Shamsa were subjected to retaliation in violation of Title VII.

13.     After unsuccessfully attempting to achieve a voluntary resolution of each of the charges discussed in paragraphs 6, 9, and 10 through conciliation with Defendant, the EEOC referred the charges to the United States Department of Justice (DOJ).

14.     On March 3, 2025, DOJ notified Defendant that it was opening an investigation based on Section 707 of Title VII, 42 U.S.C. § 2000e-6, to determine whether Defendant was engaged in a pattern or practice of discrimination at UCLA based on race, religion, and national origin (real or perceived).

15.     On July 31, 2025, DOJ notified Defendant that the United States had determined that Defendant was engaged in a pattern or practice of discrimination against UCLA employees in violation of Title VII as outlined in this complaint.

16.     All conditions precedent to the filing of suit have been satisfied.

**STATEMENT OF FACTS**

**I.    October 7, 2023, and Related Protests**

17.    On October 7, 2023, (October 7) Hamas terrorists attacked Israel and killed more than 1,200 people, most of whom were Israeli and Jewish, and took more than 240 people as hostages. This terrorist attack started a war that has concluded only recently.

18.    After October 7, anti-Israel and antisemitic protests began at college campuses around the United States, including at UCLA.

19.    UCLA experienced a rise in antisemitism and antisemitic harassment following October 7.

20.    Much of the antisemitism and antisemitic harassment was expressed as anti-Zionism.[3]

21.    Zionism is a religious belief that Jews constitute one nation and, therefore, a state for the Jewish people—specifically in their ancestral homeland of Israel—is a necessity. The promise of a home for the Jewish people is foundational to the religious and cultural beliefs and practices of countless people around the world.

22.    Professors Holloway and Shamsa share Zionism as a deeply held religious belief.

23.    Defendant has been aware for over a decade that opposition to Zionism is often "expressed in ways that are not simply statements of disagreement over politics and policy, but also assertions of prejudice and intolerance toward Jewish people and culture."[4] As Defendant's own Working Group on the Principles of Intolerance confirmed in 2016, "Anti-Semitism, anti-Zionism and other forms of discrimination have

---

[3] This Court has acknowledged the prevalence of anti-Jewish and anti-Israeli hostility at UCLA despite attempts to distinguish anti-Zionism from antisemitism. Orders Re: Mots. to Dismiss, Mots. to Stay Discovery, and Appl. to Seal, *Weinberg v. Nat'l Students for Justice in Palestine*, No. 2:25-cv-03714 (C.D. Cal. Jan. 20, 2026), ECF No. 113 at 17-19. [https://perma.cc/U75X-ZAKN].

[4] Final Report of the Regents Working Group on Principles Against Intolerance 2 (Jan. 22, 2016) https://regents.universityofcalifornia.edu/regmeet/mar16/e1attach.pdf [https://perma.cc/6BZV-BTUF].

no place at the University of California."[5] Indeed, the perpetrators of the antisemitic acts that rocked UCLA after October 7 have made unambiguously clear that their hostility toward Jewish people is grounded in their actual or perceived connection to Israel. Agitators chanted "death to Israel" and "death to Jews" interchangeably on multiple occasions.

24.    Defendant was eventually forced to acknowledge the depth of antisemitic hostility towards the Jewish community at UCLA. UCLA's then-Chancellor Block testified to the United States House of Representatives Committee on Education and the Workforce on May 23, 2024, that Jewish students at UCLA "had to confront rhetoric and images on campus that any reasonable person would find repugnant."[6]

## II.    UCLA's Antisemitism Task Force Report

25.    UCLA formed a Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA (Antisemitism Task Force). It issued its Antisemitism Task Force Report in October 2024 substantiating significant antisemitism at UCLA since October 7.[7]

26.    The Antisemitism Task Force Report, as well as numerous other accounts, documents a series of antisemitic events that took place on UCLA's campus after October 7 and throughout the 2023 to 2024 academic year.

27.    The Antisemitism Task Force found that the "incidents, activities, and behavior . . . portray[ed] an environment of harassment, bias, and discrimination against Jews and Israelis on the UCLA campus and in the wake of the events of October 7, 2023."[8]

---

[5] *Id.*

[6] Calling for Accountability: Stopping Antisemitic College Chaos, Hearing before the H. Comm. on Educ. and the Workforce, 118th Cong. (2024) https://www.congress.gov/event/118th-congress/house-event/LC73320/text [https://perma.cc/ZB7T-DN98].

[7] Antisemitism Task Force Report 1 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[8] *Id.* at 69, https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

28.    The Antisemitism Task Force Report included quotes, photos, and video links from UCLA's Jewish and Israeli community, including faculty and staff, of antisemitic and anti-Israeli incidents that permeated the workplace at UCLA.

29.    Regents Chair Janet Reilly said she was "deeply dismayed" at the Antisemitism Task Force's findings, which describe "a situation that should be horrifying to every fair-minded person," and that there was no circumstance under which "faculty and staff should suffer the effects of such toxic bias and discrimination."[9]

30.    California Lieutenant Governor Eleni Kounalakis, also a Regent, said that "students by virtue of their ethnicity or their faith are being held responsible for things they shouldn't be held responsible for," and that the Regents had "quite a bit of work to do going forward" to address the problems identified in the Antisemitism Task Force Report.[10]

31.    Regent Richard Leib commended the report on its thoroughness and said, "[T]his is not a simple problem of enforcing our rules, we need to take stock and do everything in our power to restore our campuses to safe places where students can learn and thrive."[11]

### III.    UCLA Failed to Enforce Established Viewpoint-Neutral Time, Place, and Manner (TPM) Rules, Enabling a Hostile Work Environment

32.    At all relevant times, UCLA had viewpoint-neutral TPM rules regulating freedom of speech to ensure the orderly operation of campus.[12] However, because

---

[9] University of California Board of Regents, *Board 1:00 PM*, at 15:36-16:02 (YouTube, Nov. 14, 2024), https://www.youtube.com/watch?v=6eW3RcuRFL0 [https://perma.cc/4MCH-J3WP].

[10] *Id*, at 32:50-33:05, 33:51-34:58.

[11] *Id*. at 23:29-23:42.

[12] UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties (Sept. 25, 2017) https://sole.ucla.edu/file/4efd2db6-2863-447e-acb3-ca109fa5b33c [https://perma.cc/VYS3-SM36]; *UCLA Interim Policy 850: General Use of UCLA Property*, UCLA Administrative Policies & Procedures (Sept. 4, 2024) *(footnote cont'd on next page)*

UCLA failed to enforce its own TPM rules, and issued little or no discipline for TPM violations, Defendant tolerated the rash of antisemitic incidents endured by Jewish and Israeli faculty and staff, creating a hostile work environment for them.

33.    TPM rules in place during the 2023 to 2024 academic year provided that no one may:

a.    block entrances or interfere with the free flow of traffic into and out of campus buildings;

b.    knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University;

c.    produce amplified or non-amplified sound that disrupts campus activities;

d.    camp except in authorized locations;

e.    engage in physically abusive, threatening, or intimidating conduct toward any person;

f.    fail to comply with the directions of a University official acting in the performance of his or her duties;

g.    refuse to identify themselves to the relevant University officials and present a BruinCard upon reasonable cause;

https://www.adminpolicies.ucla.edu/APP/Number/850.0 [https://perma.cc/T4E8-CDBV]; *UCLA Interim Policy 852: Public Expression Activities*, UCLA Administrative Policies & Procedures (Sept. 4, 2024) https://www.adminpolicies.ucla.edu/APP/Number/852.0 [https://perma.cc/MHG8-PY2C]; *UCLA Interim Policy 860: Organized Events*, UCLA Administrative Policies & Procedures (Sept. 4, 2024) https://www.adminpolicies.ucla.edu/APP/Number/860.0 [https://perma.cc/43KW-FGZX]; *UCLA Interim Policy 862: Major Events*, UCLA Administrative Policies & Procedures (Sept. 4, 2024) https://www.adminpolicies.ucla.edu/APP/Number/862.0 [https://perma.cc/ZC6Q-5HZB].

      h.     put signs, posters, paint, chalk, or ink messages on walls, windows, floors, or other surfaces of campus buildings or structures, streets, or walkways except as set forth in the TPM policy;

      i.     have weapons that could cause bodily injury on campus except as authorized;

      j.     wear a mask or personal disguise or otherwise conceal their identity to intimidate others or escape identification while violating UCLA policies or the law; or

      k.     demonstrate without prior written approval from the UCLA Events Office.[13]

34.    UCLA's Student Conduct Code also requires students to comply with the directions of UCLA officials and public officials acting in the course of their duties on UCLA property and not to resist or obstruct UCLA or public officials when performing their duties.[14]

35.    Protesters have the right to voice their views about Israel. But as described below, over the course of the 2023 to 2024 academic year and beyond, UCLA allowed anti-Israel and antisemitic protests made up of students, employees, and non-affiliates to increasingly violate TPM rules with impunity, emboldening them to deface the campus and commit acts of violence culminating in a nearly week-long encampment. Many of those acts continue unchallenged by Defendant even today.

---

[13] UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties (Sept. 25. 2017) https://sole.ucla.edu/file/4efd2db6-2863-447e-acb3-ca109fa5b33c [https://perma.cc/VYS3-SM36]. At the time of the encampment, the specific rule against demonstrations applied to non-affiliates, and the encampment contained many persons not affiliated with the University.  Moreover, the antisemitic demonstrations nevertheless violated many of the other TPM rules in place. As noted in the footnote above, many of these policies were tightened after the encampment but that has not dampened antisemitic violations of even the new policies as set forth below.

[14] *Student Conduct Code: 102.16 Failure to Comply*, UCLA Office of Student Conduct, https://studentconduct.ucla.edu/individual-student-code [https://perma.cc/G5RN-SYV4].

1
2

IV.    **Antisemitic Taunts, Signs, Graffiti, and Chants Throughout the 2023 to 2024 Academic Year**

3    36.    UCLA's Antisemitism Task Force Report determined that Jewish students,

4  faculty, and staff were forced to tolerate classmates and teaching assistants making

5  Holocaust jokes and at least one professor referring to the Regents as "a bunch of

6  [J]ewish pigs."[15]

7    37.    During the 2023 to 2024 academic year, signs, graffiti, and chants with

8  antisemitic messages such as "die you fucking Jew" and "FUCK ALL Jews" as well as

9  multiple displays of Nazi swastikas were found throughout UCLA's campus, including

10  one swastika carved into a tree.[16] A Jewish star was also drawn on the ground with the

11  words "STEP HERE" written on it. Photos of these displays contained in the

12  Antisemitism Task Force Report follow:[17]

13
14
15
16
17
18
19
20

---

[15] Antisemitism Task Force Report 36 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[16] *Id.* at 27, 31, 34, 35, 40, 63. https://antisemitismreport.org/ [https://perma.cc/S472-CY7J]; Dylan Winward & Catherine Hamilton, *Jewish students express concern over antisemitism on UCLA campus*, Daily Bruin (Nov. 19, 2023), https://dailybruin.com/2023/11/19/iewish-students-express-concern-over-antisemitism-on-ucla-campus [https://perma.cc/94Q4-STWL].

[17] Antisemitism Task Force Report 31. 34. 63 (Oct. 16. 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







38.     The Antisemitism Task Force Report included a photo of two students awaiting class seated next to a chalkboard with a swastika surrounded by the words "Free Palestine."[18]



## V.     Marches and Rallies Throughout the 2023 to 2024 Academic Year

39.     Protesters increasingly staged marches and rallies during the 2023 to 2024 academic year which, in addition to criticisms of Israel's government, included many antisemitic messages.[19] These marches and rallies almost always took place without a permit and violated applicable viewpoint-neutral TPM for protests and marches on UCLA's campus.[20]

40.     These marches and rallies were often loud, and disrupted classes, faculty engaged in research or writing, and staff and administrators doing their work. Protesters

---

[18] *Id.* at 40, n.46. https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[19] *Id.* at 45-46.

[20] *Id.*

engaged in violence, pepper-spraying, using a taser, and physically assaulting individuals who did not seem to share the protesters' views on Israel.

41.    The marches and rallies usually featured antisemitic slogans, stated aloud or on signs, such as "kill the Jews"[21] and "Jews=KKK."

42.    The protesters often wore masks, and by concealing their identities, were able to act with impunity and escape accountability for violating UCLA's viewpoint-neutral TPM rules.[22]

43.    On October 12, 2023, only five days after the October 7 attack, the National Students for Justice in Palestine called for a nationwide "Day of Resistance."[23] At that time, the UCLA chapter of Students for Justice in Palestine (SJP) was a registered student organization. Protestors at UCLA marched through campus, affronting a Jewish community that was already feeling exposed and vulnerable.[24] Hundreds of protesters used amplified sound and wore masks and face coverings, concealing their identities.[25]

44.    The Antisemitism Task Force found that in November 2023, masked protestors took turns bashing a piñata effigy of Israeli Prime Minister Benjamin Netanyahu with a stick while onlookers cheered and one screamed into a megaphone, "Beat that fucking Jew!"[26]

---

[21] *Id.* at 46.

[22] *Id.* at 50, n.81.

[23] National Students for Justice in Palestine (@nationalsjp), Instagram (Oct. 12, 2023), https://www.instagram.com/p/CyTfGVFLDY1/ [https://perma.cc/SX7Y-SE46].

[24] *Israel on Campus: State of Jewish Bruin Life in Light of the War in Israel*, Hillel at UCLA (Oct. 13, 2023), https://uclahillel.org/israel-on-campus/ [https://perma.cc/7SJ8-PJ4G].

[25] Aaron Bandler, *Roundup of SJP Chapters* "'Day of Resistance' Protests," Jewish Journal (Oct. 18, 2023), https://jewishjournal.com/uncategorized/364002/roundup-of-sjp-chapters-day-of-resistance-protests/ [https://perma.cc/SW5E-MCXK].

[26] Antisemitism Task Force Report 49, n.74 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J]; *see also* @AYM_Higher_, X (Nov. 8, 2023, 11:31 pm), https://x.com/AYM_Higher_/status/1722471983823130635 [https://perma.cc/8AFN-GYZL].



45.    In October and November 2023, masked protesters, including some reportedly wielding knives, went to multiple places on campus and tore down posters of Israeli hostages that had been placed on campus bulletin boards with appropriate permissions.[27] This vandalism was acknowledged by then-Chancellor Block.[28]

---

[27] Antisemitism Task Force Report 35, 64 (Oct. 16, 2024). https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[28] Calling for Accountability:  Stopping Antisemitic College Chaos: Hearing Before the H. Comm. on Educ. & the Workforce, 118th Cong. at 2:27:14-2:27:40, YouTube (May 23, 2024), https://www.congress.gov/event/118th-congress/house-event/LC73320/text (statement of Chancellor Block) [https://perma.cc/ZB7T-DN98]; *see also* Antisemitism Task Force Report 64 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

15





46.    During the winter quarter in 2024, UCLA allowed an antisemitic statue of a pig sitting in a fire pit of flames holding a Jewish star and a bag of money to be displayed for a week on campus. The statue invoked the classic antisemitic trope that Jews are greedy.[29] The display violated viewpoint-neutral TPM rules. A photo of the statue from the Antisemitism Task Force Report is here:

---

[29] *Antisemitism in History: The Early Modern Era, 1300-1800,* United States Holocaust Memorial Museum, Washington, DC: Holocaust Encyclopedia, https://encyclopedia.ushmm.org/content/en/article/antisemitism-in-history-the-early-modern-era-1300-1800 [https://perma.cc/7YME-BBVG].



## VI.    Spring 2024: The Encampment

47.    In late April 2024, in violation of viewpoint-neutral TPM rules, protesters set up an encampment in Royce Quad, the "symbol of UCLA" and the "centerpiece" of the UCLA campus.[30] A photo of the encampment from the Antisemitism Task Force Report is here:

---

[30] Cynthia Lee, *Rejoice in Royce Reopening*, UCLA Today (1998), https://web.archive.org/web/20060901092034/http://www.today.ucla.edu/1998/980316royce1.html [https://perma.cc/JTU7-EC4H] (quoting Former Chancellor Charles Young).



48.    Although the encampment was illegal and openly hostile to Jews and Israelis, Defendant allowed it to continue. UCLA Vice Chancellor for Strategic Communications Mary Osako publicly supported the encampment, advising those who were targets of antisemitism to "avoid the area if they wish." Osako stated that student affairs representatives would be stationed near Royce Quad to "redirect" those who

18

wished to avoid the area and to "serve as a resource for their needs."[31]

49.    Participants in the encampment publicized their meeting with a UCLA fire marshal. They discussed ingress and egress at the encampment and other safety concerns, for the purpose of allowing the encampment to remain.[32] Participants publicly stated that the UCLA administration ordered the installation of metal barriers to protect those who were in the encampment and otherwise communicated support for the encampment to various deans.[33]

50.    The encampment featured antisemitic chants, visual images, and posters, as well as physical barriers designed to explicitly block Jews from accessing parts of UCLA's campus—in open violation of the University's TPM rules and federal law. UCLA Chancellor Block nevertheless "allowed it to remain in place," although he himself declared it was "unlawful and a breach of policy." Block determined the purpose of the encampment was "maximizing our community members' ability to make their voices heard on an urgent global issue."[34]

51.    Protesters at the encampment chanted, displayed posters, and chalked graffiti on buildings with slogans such as "Jews are baby killers," comparisons of Jews to Hitler, and displays of Nazi swastikas.

52.    During the encampment, UCLA allowed a van to park and drive around on campus blaring antisemitic rants and displaying a Jewish star with a Nazi swastika in it.

---

[31] *UCLA statement on demonstrations*, UCLA Newsroom (Apr. 26, 2024), https://newsroom.ucla.edu/ucla-statement-on-demonstrations-april-28 [https://perma.cc/85AU-EXFW].

[32] First Am. Compl. ¶ 50, *Blair, v. Regents of the Univ. of Cal.*, No. 24STCV27623, (Cal. Superior Ct., L.A. Cnty. Dec. 9, 2024), https://www.aclusocal.org/app/uploads/drupal/sites/default/files/2024_12_09_first_amended_complaint.pdf [https://perma.cc/7G6Z-7UE3].

[33] *Id.* at ¶¶ 52-53.

[34] UCLA, Office of the Chancellor, *Our community is in deep pain*, (May 2. 2024), https://chancellor.ucla.edu/messages/our-community-is-in-deep-pain [https://perma.cc/S7R2-9NC3].

The van broadcast that Jews were responsible for the death of George Floyd, and writing on the back of the van called Jews "puppet masters" who "decide all U.S. wars," invoking the antisemitic trope that Jews conspire with one another to control the world. The blaring noise violated UCLA's viewpoint-neutral TPM rules. Photos of this van are below:[35]



53.     Protesters also barricaded the doors of Royce Hall and Powell Library with garbage cans, tents, ropes, and bicycle racks, decorated the barricades with signs, such as

---

[35] Antisemitism Task Force Report 65 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J]; *see also* Video posted by @samyebri, Instagram (May 2, 2024), https://www.instagram.com/reel/C6dBXxwLnhZ/?igsh=MzRlODBiNWFlZA%3D%3D https://perma.cc/KGN5-7LKL].

a pig,[36] and vandalized the buildings with spray-painted graffiti, including "IDF ARE NAZIS"[37] and "FUCK ISRAEL,"[38] as shown below.



---

[36] Photo posted by Daily Bruin (@dailybruin), X (May 2. 2024. at 9:30 AM). https://x.com/dailybruin/status/1786025448197222773 [https://perma.cc/XH6E-BZPF]; *see also* NewsNation, *UCLA's iconic Royce Hall destroyed after police breach encampment*, at 00:35 (YouTube, May 2, 2024), https://www.youtube.com/watch?v=I7Weeh5A_bY&t=92s [https://perma.cc/9DS5-AANB].

[37] Video posted by Jeremy Lindenfeld (@jeremotographs), X (May 2, 2024, at 1:10 AM). https://x.com/jeremotographs/status/1785899632650035554 [https://perma.cc/C5K6-PPPM].

[38] Photo posted by Daily Bruin (@dailybruin), X (May 2. 2024. at 9:30 AM). https://x.com/dailybruin/status/1786025448197222773 [https://perma.cc/5NSR-WSU7]; *see also* KTLA 5, *Pro-Palestinian demonstrators leave UCLA buildings vandalized, covered in trash*, at 03:24 (YouTube, May 2, 2024), https://www.youtube.com/watch?v=ZmBk3T935CI [https://perma.cc/J9TH-73NG].

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16
17
18
19
20
21
22



23

54.    The Holocaust included the mass murder of millions of Jews, and comparisons of Jews to Nazis are widely understood to be deeply offensive to most Jewish people.

55.    The slogan "Jews are baby killers" also invokes the historic antisemitic

22

"blood libel" trope of Jews murdering and eating children.[39]

56.    To accommodate the encampment, UCLA administrators provided metal bike racks to the protestors and turned off the sprinklers on Royce Quad,[40] and facilities staff informed University leadership that the sprinklers would stay off for the duration of the encampment.[41]

57.    UCLA's policies do not allow unauthorized protestors to exercise exclusive control over campus facilities or spaces.[42]

58.    UCLA told campus police officers to "hold off" on attempting to identify and remove anyone from the encampment who was not a member of the faculty, staff, or student body.[43]

59.    The encampment impeded Jewish and Israeli employees' access to certain parts of campus because the protesters blocked them from going through the encampment. The protesters blocked individuals wearing yarmulkes or Jewish stars and anyone refusing to denounce Zionism.

60.    At least two Jewish UCLA employees were physically assaulted while on campus during the period of the encampment.

61.    Protesters in the encampment armed themselves with weapons, such as

---

[39] *See Blood Libel*, United States Holocaust Memorial Museum, Washington, DC: Holocaust Encyclopedia. https://encyclopedia.ushmm.org/content/en/article/blood-libel [https://perma.cc/CJ4U-4X9D].

[40] Antisemitism Task Force Report 52 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[41] Republican Staff Report: Antisemitism on College Campuses Exposed, H. Comm. on Educ. and the Workforce, U.S. House of Rep. 24-25 (Oct. 31, 2024), 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf [https://perma.cc/ALQ9-34WK].

[42] Defs.'s Answer ¶ 51, *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702 (C.D. Cal. Oct. 1, 2024), ECF No. 97.

[43] Republican Staff Report: Antisemitism on College Campuses Exposed, H. Comm. on Educ. and the Workforce, U.S. House of Rep. 25 (Oct. 31, 2024), 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf [https://perma.cc/ALQ9-34WK].

pepper spray and lumber.

62.    On April 30, 2024, then-Chancellor Block declared the encampment "unauthorized" and added that "activism that harms [UCLA's] ability to carry out [its] academic mission" put many on campus, especially the Jewish community, "in a state of anxiety and fear" and made people "feel bullied, threatened and afraid."[44]

63.    UCLA permitted the spring 2024 encampment to remain for about a week, until the University of California Police Department (UCPD) and the Los Angeles Police Department (LAPD) eventually disbanded it.

64.    UCPD and LAPD arrested 96 students on May 2, 2024, for failure to leave the encampment.

65.    The United States House of Representatives Committee on Education and the Workforce found the entire approach to the spring 2024 encampment "a stunning failure by UCLA administrators to enforce existing policies."[45] UCLA allowed nearly all, if not all, of the 96 UCLA students arrested for failure to leave the encampment to escape any discipline. Of the 96 arrested, 92 signed an agreement with the Office of Student Conduct that allowed them to evade discipline in return for stating that they would refrain from future violations of the Student Conduct Code. It remains unknown whether the remaining four received any discipline.[46]

66.    On May 9, 2024, following the dismantling of the encampment, the UC Office of the President publicized "guiding principles for use by UC campuses in determining disciplinary actions." Notably, this announcement states that "[a]ny member

---

[44] UCLA Newsroom, *Affirming our values in a challenging time*, (Apr. 30, 2024), https://newsroom.ucla.edu/affirming-our-values-in-a-challenging-time [https://perma.cc/B4FC-25JR].

[45] Republican Staff Report: Antisemitism on College Campuses Exposed, Comm. on Educ. and the Workforce, U.S. House of Rep. 24 (Oct. 31, 2024), 10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf [https://perma.cc/ALQ9-34WK].

[46] *Id.*

of the university community who is arrested for unlawful behavior or cited for a violation of university policy *must* go through the applicable review process, such as student code of conduct or employee disciplinary process."[47] (emphasis added). Upon information and belief, no arrestees from the encampment, including arrested faculty at UCLA, were ultimately formally disciplined.

**VII.  Spring 2024: Further Attempted Encampments and Disruptions to Campus Operations**

67.     In the early morning hours of May 6, 2024, UCPD found a group of about 40 people inside Parking Structure 2 wearing masks and in possession of metal pipes, bolt cutters, epoxy adhesive, super glue, padlocks, heavy-duty chains, and documents "encouraging violence and vandalism." A UCLA community member reported the large group of people entering the building. UCPD believed these individuals planned to use their tools to break into, occupy, and vandalize Moore Hall.[48] UCPD arrested 44 people, including 35 students, for conspiracy to commit a crime.[49]

68.     UCLA referred 245 arrests in connection with the encampment and May 6 protest to the Los Angeles City Attorney's Office. The City Attorney declined to file charges for every single referral from UCPD "for evidentiary reasons or due to [the U]niversity's failure or inability to assist in identification or other information needed for prosecution." The University's failure demonstrated its lack of seriousness in addressing

---

[47] *University of California campus guidelines on determining disciplinary actions*, UC Off. of the Pres. (May 9, 2024), https://www.universityofcalifornia.edu/press-room/university-california-campus-guidelines-determining-disciplinary-actions [https://perma.cc/2FT9-NRQY].

[48] UCLA Police Department News Release, *Statement Regarding the Incidents on Monday, May 6, 2024,* https://ucla.app.box.com/v/Statement-240894 [https://perma.cc/DT6F-Z347].

[49] Sharla Steinman, *UCPD alleges plot to vandalize, occupy Moore Hall following 44 arrests Monday*, Daily Bruin (May 9, 2024, 10:20 AM), https://dailybruin.com/2024/05/09/ucpd-alleges-plot-to-vandalize-occupy-moore-hall-following-44-arrests-monday. [https://perma.cc/3DSK-CBDB].

the antisemitic environment on campus.[50]



Metal pipes (left), epoxy adhesive and super glue (top center), padlocks (top center),
bolt cutters (bottom center), heavy duty chains (top right),
documentation encouraging violence and vandalism (bottom right)



Documentation



Epoxy Adhesive / Super Glue



Bolt Cutters



Heavy-Duty Chains

69.    On May 23, 2024, in testimony before Congress, when asked if UCLA had taken substantive steps to eliminate discrimination, then-Chancellor Block admitted that UCLA "need[s] to do more." He also acknowledged that language in the encampment that supported "the explicit glorification and endorsement of a U.S. designated terrorist

---

[50] *LA City Attorney Hydee Feldstein Soto Announces Filing Decisions from 2024 UCLA/USC Mass Protests*, Off. of the City Attorney (Apr. 25, 2025), https://cityattorney.lacity.gov/updates/la-city-attorney-hydee-feldstein-soto-announces-filing-decisions-2024-uclausc-mass-protests [https://perma.cc/B8L6-92C9].

group, which massacred 1,200 innocent Israel civilians on October 7" was "unacceptable."[51]

70.    While the Chancellor was testifying, protesters established a second encampment at the Kerckhoff Hall patio with barricades that disrupted campus operations and moved to Murphy Hall around 1:15 p.m., where security denied them access to the building. They then marched to Dodd Hall where some protesters locked themselves inside while others blocked access from the outside from about 2:00 p.m. to 5:20 p.m.[52] Members of UCLA's Jewish community had to carefully plan their timing and routes to avoid being confronted by activists as they navigated campus.[53]

71.    In May or June 2024, SJP blocked the entrances to two parking structures, disrupting Monday morning traffic at the campus, and Faculty for Justice in Palestine (FJP) shared the following photo on its Instagram story:

---

[51] Calling for Accountability: Stopping Antisemitic College Chaos, Hearing before the Comm. on Educ. and the Workforce, 118th Cong. 2 (2024) 134, https://www.congress.gov/event/118th-congress/house-event/LC73320/text [https://perma.cc/ZB7T-DN98].

[52] Alexandra Crosnoe & Gabrielle Gillette, *Protesters occupy then vacate Dodd Hall following 2nd encampment dispersal at UCLA,* Daily Bruin (May 24, 2024, 2:13 AM), https://dailybruin.com/2024/05/23/protesters-occupy-then-vacate-dodd-hall-following-2nd-encampment-dispersal-at-ucla [https://perma.cc/E9S8-BVCV].

[53] *Israel on Campus: State of Jewish Bruin Life in Light of the War in Israel*. Hillel at UCLA (May 23, 2024), https://uclahillel.org/israel-on-campus/ [https://perma.cc/7SJ8-PJ4G].



72.    On June 10, 2024, protesters made multiple attempts to set up encampments in various locations. According to UCLA, a group of people dyed the water in Shapiro Fountain red, used water-filled barriers and chicken wire to block the area, used amplified sound, and set up tents and canopies. They then moved to the Kerckhoff Hall patio carrying wooden shields. There, the group proceeded to vandalize property with permanent red paint and erected barriers that blocked students and the public from accessing that part of campus. Simultaneously, another group at Moore Hall disrupted final exams. The Kerckhoff Hall patio group later moved to an area near Dodd Hall.

They blocked students from entering classrooms, forcing them to miss finals. Additionally, some students had to be evacuated during their final exams. Throughout the evening, protestors also violently attacked safety personnel and law enforcement, resulting in at least six injuries to UCPD personnel and other safety officers. One security guard was left with his head bleeding after he was struck with an object.[54]

73.    UCPD arrested 27 people based on these protests. Eighteen were UCLA students, two were faculty members, one was a former student, and six were not affiliated with UCLA.[55]

74.    That day, SJP invited non-affiliates to join the conduct described above in paragraph 72, posting on its Instagram, "ALL OUT TO UCLA NOW!" and claiming that law enforcement "trapped" protesters trying to disperse and describing the arrests as taking a "hostage."[56]

---

[54] Press Release, UCLA, Condemning Monday's violence on campus (June 11, 2024), https://newsroom.ucla.edu/condemning-mondays-violence-on-campus [https://perma.cc/GGX5-EPEH].

[55] Jillian Sykes, Holly Yan, & Taylor Romine, *27 protesters arrested after pro-Palestinian encampments formed on UCLA campus, university says*, CNN (June 12, 2024), https://www.cnn.com/2024/06/11/us/ucla-campus-palestine-protests-arrests [https://perma.cc/QWE3-TP39].

[56] Video posted by SJP AT UCLA (@sjpatucla), Instagram. https://www.instagram.com/p/C8D0r2PRNBY/ [https://perma.cc/SZ2M-GQWJ].



## VIII.  Antisemitism Became "Normalized" Following the Attacks on October 7

75.    The Antisemitism Task Force Report highlights the Jewish community's concern that antisemitism had become "normalized" at UCLA. Jewish community members told the Antisemitism Task Force:[57]

> "If it were hate directed against any other minority group, there would be zero tolerance. It is becoming normalized at UCLA."

[57] Antisemitism Task Force Report 24-25. tbl. 5 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

"The antisemitic issues at UCLA campus since I was a student in 1998 and continuing to this day are so upsetting, racist, and pervasive. It makes me ashamed for the first time in my life to be an alum and spending my career (15+ years) at UCLA"

76.    Jewish and Israeli employees saw and heard the antisemitic images and messages at protests throughout the 2023 to 2024 academic year and beyond. UCLA could have reduced or eliminated the negative effects these antisemitic images and messages have on Jewish and Israeli employees, but UCLA failed and continues to fail to take reasonable steps to enforce its own TPM rules.

77.    UCLA's failure to enforce its viewpoint-neutral TPM rules in the face of the antisemitism on campus magnified, and continues to magnify, Jewish and Israeli employees' fear that UCLA endorses antisemitism.

78.    FJP, SJP, and Graduate Students for Justice in Palestine (GSJP), a registered student organization at UCLA, were heavily involved in much of the activity described above.

79.    In February 2025, UCLA finally issued an interim suspension of registered student organization status against SJP and GSJP after the people affiliated with the groups harassed Regent Jonathan Sures and members of his family outside his home, surrounded one of his family member's cars and prevented the person from leaving, and vandalized his home by applying red-colored handprints to the outer walls of his home and hanging banners on the property's hedges.[58]

---

[58] *See* Press Release, UCLA, Office of the Chancellor, A Stand Against Violence in our Community (Feb. 12, 2025), https://chancellor.ucla.edu/messages/a-stand-against-violence-in-our-community [https://perma.cc/8GQN-3ALT]. SJP has long been active at UCLA, including disrupting events. UCLA notoriously welcomed the National SJP conference in November 2018, just weeks after the massacre of 11 Jews at the Tree of Life Synagogue in Pittsburgh. Despite widespread calls that the conference be canceled, then-Chancellor Block insisted UCLA host the event. Although he recognized that SJP's "attempt to ostracize Israeli thinkers, and to declare off-limits even discussion with Israeli academics runs contrary to the values of inclusion, debate and discussion that are crucial to any university," he insisted UCLA host the conference. *See* Gene D. Block, *Op-Ed: The controversial Students for Justice in Palestine conference will go on at UCLA. Here's why*, Los Angeles Times (Nov. 12, 2018),

*(footnote cont'd on next page)*

80.     In March 2025, after the United States opened its investigation, UCLA recommended indefinitely revoking SJP's registered student organization status and suspending GSJP's status for four years.[59] While UCLA did revoke SJP's registered student organization status and suspended GSJP's status, it failed to effectively ban these organization's activities on campus. Throughout 2025, SJP continued to organize and hold demonstrations at UCLA.

81.     Upon information and belief, no student, faculty member, or staff member has been disciplined for their roles in these banned SJP demonstrations.

82.     Upon information and belief, SJP held the following events or protests after the ban went into effect:

    a.     On April 30, 2025, SJP held an event to screen a documentary on the Royce Quad.[60]

    b.     On May 15, 2025, SJP held a protest at Dickson Court North.[61]

    c.     On July 31, 2025, SJP held a demonstration on the UCLA quad.[62]

    d.     On October 7, 2025, SJP held another demonstration, where its

---

https://www.latimes.com/opinion/op-ed/la-oe-block-ucla-students-for-justice-in-palestine-conference-20181112-story.html [https://perma.cc/58YT-3GUW].

[59] Shiv Patel, *UCLA recommends indefinite ban for SJP, 4-year suspension for Graduate SJP*, Daily Bruin (Mar. 29, 2025), https://dailybruin.com/2025/03/29/ucla-office-of-student-conduct-recommends-bans-for-2-pro-palestine-organizations [https://perma.cc/GY94-UCFF].

[60] @melamedtattle, X (Apr. 28, 2025, 9:23 AM), https://x.com/melamedtattele/status/1916845782373646517 [https://perma.cc/3C6L-AWP7] (link to the post); *see also* @EQuest38190, X (May 1, 2025, 1:40 PM), https://x.com/EQuest38190/status/1917997628866085290 [https://perma.cc/R7LR-BTDS] (reposting announcement for SJP event on April 30, 2025).

[61] @thewebbie, X (May 14, 2025, 8:01 PM), https://x.com/thewebbie/status/1922804371005362372 [https://perma.cc/RD7G-P26F]; *see also* @EYakoby, X (May 15, 2025, 4:10 PM), https://x.com/EYakoby/status/1923108861214327177 [https://perma.cc/EPP2-AQUV] (video documenting demonstration).

[62] @NEWSOURCE21, X (July 31, 2025, 6:08 PM), https://x.com/NEWSOURCE21/status/1951042219936456772 [https://perma.cc/4EXW-9859] (video documenting demonstration).

members walked through campus while officials stood by and did not engage. Asked why the police were not enforcing the no masking rules, a UCPD officer responded that he was "not that high up on that totem pole" to make that determination.[63]

e.   On January 20, 2026, SJP held another demonstration outside of Murphy Hall and then proceeded to march and chant through the campus. No University official or law enforcement intervened despite the intimidating nature of the event.[64]

83.   Without effective enforcement of the ban against SJP, UCLA's claims of its efforts to curb antisemitism ring hollow.

84.   This environment of antisemitism at UCLA also extended to campus hiring practices. UCLA's Undergraduate Students Association Council Cultural Affairs Commission (CAC) included in its hiring policies the following language: "We reserve the right to remove any staff member who dispels antiBlackness, colorism, racism, white supremacy, zionism, xenophobia, homophobia, transphobia, sexism, misogyny, ableism, and any/all other hateful/bigoted ideologies."[65]

85.   Alicia Verdugo, the former Commissioner of the CAC, informed her subordinates: "lots of zionists are applying – please do your research when you look at

---

[63] @houmanhemmati, X (Oct. 9, 2025, 12:11 PM), https://x.com/houmanhemmati/status/1976319687077298506 (video documenting demonstration) [https://perma.cc/X2G4-NCWT]; *see also* 2025 10 07 Noon Demonstration at UCLA By Masked "Suspended" SJP Group, YouTube (Oct. 8, 2025), https://www.youtube.com/watch?v=BFuAY4-Ei6Y [https://perma.cc/C44R-6JW7] (video documenting demonstration).

[64] Carolina Barsakov, SJP protest outside of UCLA's Murphy Hall, Daily Bruin (Jan. 20, 2026), https://dailybruin.com/2026/01/20/sjp-protest-outside-uclas-murphy-hall [https://perma.cc/RC77-WC2Z] (including video documenting demonstration).

[65] Benjamin Katz, *Evidence Suggests Jewish Students Denied from Cultural Affairs, Judicial Board Petition Claims*, Ha'Am (Nov. 27, 2025), https://haam.org/evidence-suggests-jewish-students-denied-from-cultural-affairs-judicial-board-petition-claims/ [https://perma.cc/G45T-6F6Y].

33

applicants and I will also share a doc of no hire list during retreat."[66]

86.    Upon information and belief, none of the students who expressed their Jewish identity were hired by the CAC in fall 2024.

87.    In response to this discriminatory policy, a student filed a complaint against Verdugo after being rejected for a position in the CAC. Rather than face a hearing, Verdugo announced she would step down from her role in February 2025, two days before her hearing in front of the Undergraduate Students Association Judicial Board.[67]

88.    The UCLA Medical School was also a hotbed of antisemitic incidents. First-year medical students at UCLA were required to attend a lecture given by a masked Lisa "Tiny" Gray-Garcia who led the class in chants of "Free Palestine!"[68] Further incidents at the medical school included attempts to rebrand a tragic act of suicide as justified martyrdom against Israel. *See* ¶ 280 below.

---

[66] *See supra* n.66.

[67] Shiv Patel, *USAC Cultural Affairs commissioner resigns amid antisemitism allegations*, Daily Bruin (Feb. 5, 2025), https://dailybruin.com/2025/02/05/usac-cultural-affairs-commissioner-resigns-amid-antisemitism-allegations [https://perma.cc/8BX3-4BFZ].

[68] Melissa Koenig, *UCLA med school forced first-year students to attend lecture of Hamas supporter who blasted modern medicine as 'white science,' made them pray to 'mama Earth,'* N.Y. Post (Apr. 4, 2024), https://nypost.com/2024/04/04/us-news/ucla-made-med-students-attend-lecture-given-by-hamas-supporter/ [https://perma.cc/S85X-ZYRS]; Dominic Yeatman, *Half of trainee doctors at UCLA's prestigious medical school 'are failing basic tests after dean who's anti-white ignored affirmative action ban and terrorized staff with DEI rules,'* Daily Mail (May 24, 2024) (including photo of Lisa "Tiny" Gray-Garcia), https://www.dailymail.co.uk/news/article-13454451/UCLA-medical-school-dean-Jennifer-Lucero-DEI-affirmative.html [https://perma.cc/Z3DB-NQHY]



89.     This antisemitic atmosphere also extended to the UCLA Law School. UCLA Law School professor Khaled Abou El-Fadl, promoted by the University for his "scholarly approach to Islam from a moral point of view," publicly belittled the murder of Jewish babies and raped Jewish women.[69]

90.     A UCLA executive informed the EDI Office that Professor El-Fadl was publicly espousing anti-Israeli and anti-Hindu views. For example, that Indian Hindu nationalists were voluntarily fighting in the Israeli Army "for the joy of killing Muslims," and to "rap[e] and kill[] and murder[]" Palestinians.[70] The complaint by the UCLA executive said that Professor El-Fadl's conduct could create a "hostile work environment" and "violate[d] University policy." The EDI Office replied that the matter was "outside our purview" and "appears to be protected speech that would not violate University non-discrimination policies." The EDI Office informed him that "[w]e will not be taking further action on your complaint."

---

[69] @MEMRIReports, X, at 2:09-2:28 (Jan. 1, 2024, 6:51 AM), https://x.com/MEMRIReports/status/1741789258858307875?ref_src=twsrc%5Etfw%7C twcamp%5Etweetembed%7Ctwterm%5E1741789258858307875%7C [https://perma.cc/EF84-6T2U].

[70] *UCLA Professor: 'Hindus serve in IDF to kill Muslims, Israel Broadcasts Porn on Palestinian TV,'* The Jerusalem Post (Jan. 21, 2024), https://www.jpost.com/israel-hamas-war/article-783035 [https://perma.cc/6UU6-JGEM].

91.     Bahar Mirhosseni, a lecturer in law, also participated in the illegal encampment. She published a piece in the UCLA Law Review referring to the encampment as "utopia" and characterized the now-infamous Jew exclusion zone as a "liberated zone."[71]

92.     These antisemitic beliefs have also been publicized by outside faculty invited to give talks at UCLA. Noura Erekat, a professor at Rutgers University who has publicly dismissed rapes committed by Hamas against Israeli hostages, was recently invited to UCLA to deliver a talk on rethinking Zionism as a form a racism, a position renounced by the PLO. This lecture was deliberately intended to evoke hostility to Jews and Israelis.[72]

93.     Although UCLA has made limited changes to address the general hostilities affecting Jewish and Israeli employees that existed on campus during the 2023 to 2024 academic year, UCLA has not sufficiently addressed the systemic ongoing issues related to preventing and correcting individual employee complaints of antisemitism.

IX.    **UC's Policy on Anti-Discrimination Improperly Defines Actionable Harassment, Enables the Mishandling of Complaint Reporting, and Permits the Closing of Complaints Without a Formal Investigation**

94.     In addition to the litany of antisemitic acts endured by Jewish and Israeli employees, UC's flawed Anti-Discrimination Policy allowed, and continues to allow, all campuses, but particularly UCLA, to systematically fail to address employee complaints of antisemitism. UC's policy also discouraged, and continues to discourage, employees

---

[71] Bahar Mirhosseni, *On Palestine, the Preciousness of Life, and Courage*, 7 UCLA L. Rev. 1344, 1351 (2025), https://www.uclalawreview.org/on-palestine-the-preciousness-of-life-and-courage/ [https://perma.cc/H7D4-PG47].

[72] *See* Noura Erekat- Allegations of mass rape on October 7th have been debunked!!!. YouTube (Mar. 24, 2024), https://www.youtube.com/watch?v=5qshRJjd13o [https://perma.cc/82DL-VUF5]; Revisiting Zionism as a Form of Racism and Racial Discrimination: *see also* UNGA Resolution 3379 50 Years Later with Noura Erakat, Consortium for Palestine Studies at UCLA (last visited Jan. 29, 2026), https://uclapalestinestudies.org/forum/2025/11/14/erakat-Zionism-as-Racism.html [https://perma.cc/J92W-DJVD].

from filing such complaints, with employees determining such reporting would be futile at best and result in retaliation at worst. This failure has contributed to an ongoing hostile work environment for UCLA employees subjected to antisemitism.

95.    After October 7, dozens of Jewish faculty and staff filed, or attempted to file, complaints of antisemitism with most campus civil rights offices.

96.    UC's Office of the President had the ability to monitor complaints of antisemitism at each campus.

97.    UCLA's Civil Rights Office (EDI Civil Rights Office), housed within the EDI Office, was responsible for investigating complaints of antisemitism.

98.    As discussed below, out of dozens of complaints registered, not a single complaint was properly investigated. Many complainants were simply told they had no valid complaint before even an intake interview was conducted.

99.    The Anti-Discrimination Policy describes UC's responsibilities and procedures regarding harassment, discrimination, and retaliation. It defines "Prohibited Conduct" and explains the procedures UC uses to resolve reports of Prohibited Conduct.[73]

100.    The Anti-Discrimination Policy prohibits discrimination because of a protected category including race, religion, national or ethnic origin, or ancestry.

101.    The Anti-Discrimination Policy also prohibits "severe, persistent, or pervasive harassment" in the workplace.

102.    Because the Anti-Discrimination Policy's standard for finding a violation of harassment does not indicate that individual instances of harassment can be aggregated

---

[73] Anti-Discrimination Policy, University of California (last visited Jan. 30, 2026), https://ophd.berkeley.edu/sites/default/files/2024_uc_anti-discrimination_policy_accessible.pdf [https://perma.cc/9R8S-JCA7] (UC Anti-Discrimination policy in effect on February 20, 2024); Anti-Discrimination Policy, University of California (last visited Jan. 30, 2026), https://policy.ucop.edu/doc/1001004/Anti-Discrimination, [https://perma.cc/A4FV-XEA7] (UC Anti-Discrimination policy in effect on January 1, 2026).

to create a hostile work environment, the policy effectively prevents victims of harassment from reporting acts that, when aggregated, would violate Title VII.

103.    The Anti-Discrimination Policy provides for an initial assessment of a claim after an employee files a complaint. UC's Anti-Discrimination Policy applies to UCLA; however, UCLA maintains discretion over which complaints it formally investigates, and the policy permits closing a complaint after only a cursory initial assessment.

104.    UCLA implements the Anti-Discrimination Policy through UCLA-specific offices such as its EDI Civil Rights Office, which includes both the Discrimination Prevention Office (DPO), and the Staff Diversity & Equal Employment Opportunity Compliance Office (SD&C).

105.    DPO handles complaints against faculty, and SD&C handles complaints against staff.

106.    The Office of the Dean of Students handles complaints against students.

107.    Since October 7, and in response to the prolific acts of antisemitism described in the preceding paragraphs, the EDI Civil Rights Office received dozens of formal complaints from Jewish and Israeli UCLA employees alleging they experienced antisemitic conduct at work based on their race, religion, and national origin. Most of these complaints were closed without any formal investigation.

108.    The complaints filed with the EDI Office constituted ample notice of the antisemitic workplace conduct experienced by Jewish and Israeli employees. They warranted formal investigations by the offices tasked with conducting such investigations. Moreover, the findings of the Antisemitism Task Force commissioned by UCLA and the overt nature of the antisemitism also constituted ample notice of the antisemitic conduct experienced by Jewish and Israeli employees to warrant formal investigations by UCLA. But UCLA's standard operating procedure has been to ignore complaints of antisemitism, which has thoroughly discouraged employees from complaining of antisemitic discrimination.

**X.  UCLA Faculty and Administrators Routinely Failed to Report Antisemitism Despite Their Requirement to Do So**

109.  Defendant's Anti-Discrimination Policy *requires* supervisors to report all known allegations of discrimination and harassment based on any protected category to a local implementation officer.[74]

110.  Through the Anti-Discrimination Policy, Defendant imposes a mandatory reporting requirement on all "Responsible Employees," including campus police, Human Resources Administrators, Academic Personnel Administrators, Managers and Supervisors, including Deans, Department Chairs, Directors of Organized Research Units, and Faculty Members.

111.  That mandatory reporting requirement extends to any Responsible Employee who learns in the course of employment that any individual affiliated with UC, including at UCLA, may have experienced Prohibited Conduct as defined in the Anti-Discrimination Policy and requires the Responsible Employee to "promptly notify the Local Implementation Officer or designee."

112.  Mandatory reporters at UCLA, including faculty, repeatedly failed to report prohibited acts of antisemitism that they witnessed directly or that were reported to them by other faculty members or students.

113.  UCLA does not provide its employees sufficient anti-discrimination or anti-harassment training.

114.  UCLA does not provide mandatory reporters, including supervisors, managers, and faculty, sufficient training related to their obligations under the Anti-Discrimination Policy or their obligations to prevent, report, and respond to complaints of discrimination and harassment.

---

[74] *Supra* n.74.

39

115.   Defendant does not undertake essential steps to prevent and to correct workplace harassment or to evaluate the effectiveness of its anti-discrimination or anti-harassment policy, practices, or procedures.

**XI.   It Is UCLA's Standard Operating Procedure to Permit the Closure of Complaints of Antisemitism Without Assessing the Merits of the Complaints and Taking Action to Prevent and Correct Discrimination and Harassment**

116.   It is the standard operating procedure of UCLA to prematurely close complaints of antisemitism without adequately assessing and investigating the merits of the complaints.

117.   It is the standard operating procedure of DPO to close a matter rather than to open a formal investigation when an employee alleges antisemitism, if that employee has not filled out a complaint form specific to that office, even when the employee has provided a detailed description of the allegations and provided a significant number of documents supporting the allegations.

118.   Case managers in the EDI Civil Rights Office dismissed antisemitism complaints when they determined the underlying conduct was protected speech. Case managers received no training on the First Amendment and had no basis for rejecting those claims.

**XII.   UCLA's Organizational Structure for Handling Complaints of Discrimination and Harassment Coupled with a Lack of Oversight over the Complaint Filing Process Causes Systemic Failure to Properly Investigate and Redress Antisemitism Complaints**

119.   Numerous UCLA entities have responsibility for investigating and addressing complaints by employees related to antisemitism, including DPO, SD&C, the Office of the Dean of Students, and the Charges Committee, which is the body within the UCLA Academic Senate that recommends discipline for members of the faculty.

120.    In November 2024, UCLA's Interim Chancellor Hunt testified to the Regents that since October 7, UCLA's EDI Office received "hundreds" of antisemitism complaints but not a single student, staff member, or faculty member had been disciplined as a result of any of those complaints.[75] Regent Richard Leib expressed astonishment that the Academic Senate did not recommend for discipline a single faculty member who joined the encampment or violated faculty standards associated with the protests.[76] Jewish employees believed it was that office's standard procedure to ignore antisemitism and to make the complaint system impossible to navigate.

121.    The director of the EDI Civil Rights Office—at the time Chandra Bhatnagar—as well as the UC Office of the President, managed the complaint filing process. But Defendant did nothing to ensure that if an employee complained of discrimination based on antisemitism, and the complaint was filed with the wrong office, the matter was transferred and investigated by the correct office. This unnecessarily resulted in the dismissal of valid complaints.

122.    The lack of a central place for handling complaints of antisemitism, and the lack of oversight to ensure a complaint is investigated once UCLA is on notice of the allegation, has created an unworkable and unreliable system to address such complaints and permitted discrimination and harassment to continue.

123.    And the requirement that a victim know whether the perpetrator is faculty, staff, or a student to file a complaint with the appropriate office is unworkable and infeasible, not only for reporting individual instances of harassment but even more so for reporting instances of harassment that, when aggregated, create a hostile work environment.

---

[75] University of California Board of Regents, *Board 1:00 PM*, at 35:02-37:27 (YouTube, Nov. 14, 2024), https://www.youtube.com/watch?v=6eW3RcuRFL0 [https://perma.cc/4MCH-J3WP].

[76] *Id.* at 28:00-30:21.

1  **XIII.  UCLA Has Failed to Address Complaints of Antisemitism in the Workplace**

2  124.  Complaints filed after October 7 with the EDI Office alleging antisemitism

3  include the following allegations:

4      a.  Jewish and Israeli UCLA employees have been threatened and subjected to

5        antisemitic chants on campus.

6      b.  Protesters have interrupted Jewish and Israeli employees' academic talks

7        and classes.

8      c.  Jewish and Israeli employees have experienced negative professional

9        consequences because of their religion or national origin.

10      d.  Jewish and Israeli faculty have seen antisemitic graffiti and posters

11        displayed in violation of UCLA's viewpoint-neutral TPM rules.

12      e.  Students and faculty have ostracized Jewish and Israeli faculty members

13        because they are Jewish and Israeli.

14      f.  Protesters have blocked entrances to UCLA facilities, preventing Jewish

15        and Israeli employees from accessing these areas and facilities.

16  125.  The Antisemitism Task Force surveyed hundreds of Jewish and Israeli

17  members of UCLA who experienced antisemitism on campus.[77]

18  126.  Of those who responded to the Antisemitism Task Force's survey, over 50

19  Jewish and Israeli faculty and staff stated they were victims of vandalism and dozens

20  stated they personally witnessed or were subjected to physical threats or attacks based

21  on antisemitism and anti-Israeli bias, with 164 witnessing vandalism, 122 witnessing

22  physical threats, and nearly 100 witnessing physical attacks on Jewish and Israeli

23  individuals.

24  127.  Despite the severe and pervasive nature of antisemitic acts on campus, the

25  Antisemitism Task Force Report overwhelmingly found that respondents had little or no

26

27

28  [77] Antisemitism Task Force Report11 (Oct. 16, 2024), https://antisemitismreport.org/
[https://perma.cc/S472-CY7J].

confidence that reporting antisemitism would result in effective action.[78] Moreover, the Report stated some faculty were fearful of reporting antisemitic incidents[79] and had been discouraged by deans or others from initiating discipline against those engaged in antisemitic acts.[80]

128.    According to the Antisemitism Task Force Report, there "is a perception that campus offices responsible for enforcing such rules are indifferent or resistant to complaints related to antisemitism or anti-Israeli bias. The enforcement responsibilities for such rules are also spread across multiple campus units, making it difficult to know where to file complaints, and sometimes require multiple complaints across different units for a single incident."[81]

129.    Faculty and staff at UCLA are often unaware of campus or University procedure for filing complaints, seeking enforcement of rules, or pursuing remedies.[82]

130.    The Antisemitism Task Force reported that "not one respondent indicated that the campus handled their complaints efficiently, compassionately, clearly, or effectively" while some reported that they were "deterred from filing complaints due to fear of retaliation."[83]

131.    The EDI Civil Rights Office was led by Chandra Bhatnagar, the Assistant Vice Chancellor for Civil Rights, who was also UCLA's Local Implementation Officer for the UC Anti-Discrimination Policy. Bhatnagar was therefore ultimately responsible for overseeing the handling and investigation of antisemitism complaints.

---

[78] *Id.* at 2.

[79] *Id.* at 11.

[80] *Id.* at 66.

[81] *Id.* at 75.

[82] *Id.*

[83] *Id.* at 37.

132.    UCLA's website explicitly directed such incidents to be reported to Bhatangar's office[84]:

■ **Office for the AVC-CR ("OAVC-CR"), AVC-CR Chandra Bhatnagar** | https://equity.ucla.edu/report-an-incident/ | (310) 825-3935

133.    Yet, Bhatnagar's spouse, UCLA Law Professor Sunita Patel, was a vocal advocate of, and participant in, the unlawful encampment. Professor Patel publicly recommended that no discipline be administered to any activist arrested in the encampment.

134.    Professor Patel's frequent and aggressive social media postings against Israel and against campus law enforcement discouraged Jewish and Israeli employees from complaining of antisemitism to the office run by Professor Patel's spouse. Many of these employees reasonably believed that reporting antisemitism through UCLA's EDI Civil Rights Office was futile.

135.    Professor Patel boasted of her own masked participation at the infamous UCLA unlawful encampment and in her own "restraint" in not confronting those who disagreed with her:

---

[84] Civil Rights Protections at UCLA, UCLA Equity, Diversity, & Inclusion (last visited Jan. 29, 2026), https://equity.ucla.edu/civil-rights/ [https://perma.cc/NSJ7-LUHZ].



Professor Patel also openly praised the now-banned SJP:

136.    Because the EDI Civil Rights Office was unresponsive to complaints of antisemitism, Jewish and Israeli employees who feared retaliation and reputational harm

45

from reporting to UCLA sent complaints to the Jewish Faculty Resilience Group at UCLA (JFrg).

137.   JFrg is a community of UCLA Jewish and non-Jewish faculty, postdoctoral researchers, and staff dedicated to supporting the Jewish community on UCLA's campus.

138.   For example, one UCLA employee complained to JFrg that the abuse and hatred he was being subjected to while on campus was making it difficult to focus on work:

> As I was entering Pritzker, a student-aged protestor in a keffiyah was yelling "Gas the Jews!" and "Yeah, UCLA will do it!"

139.   The Antisemitism Task Force determined that the antisemitic and anti-Israeli behaviors and events that happened post-October 7 "indicate[d] a pattern of an adverse and discriminatory climate towards Jews and Israelis at UCLA" and found "substantial evidence of actions by students, faculty, and staff of the University, University and campus leadership, and non-affiliates, that contravened University or campus rules and policies, state or federal law, or the U.S. Constitution and resulted in reprehensible antisemitic and anti-Israeli outcomes."[85]

140.   The Antisemitism Task Force Report concluded that UCLA's failure to protect Jewish faculty and staff from antisemitic conduct at UCLA constituted a hostile work environment under Title VII of the Civil Rights Act of 1964.[86] But UCLA's flawed civil rights apparatus took no action.

---

[85] Antisemitism Task Force Report 44 (Oct. 16, 2024), https://antisemitismreport.org/ [https://perma.cc/S472-CY7J].

[86] *Id*. at 69.

### XIV. Ongoing Harm Raised by Jewish and Israeli UCLA Employees

141.    Jewish and Israeli UCLA employees do not feel safe in their workplaces because of the antisemitism they have experienced and witnessed on campus and because UCLA has not effectively redressed their complaints.

142.    Jewish and Israeli UCLA employees have reduced their time spent on campus because of their fears of antisemitic harassment.

143.    Jewish and Israeli employees fear coming forward with their complaints of harassment and discrimination, particularly those who do not yet have tenure.

144.    Jewish and Israeli UCLA employees continue to experience professional consequences such as ostracism, exclusion from meetings, and disparate treatment in the terms, conditions, and privileges of their employment because of antisemitism.

145.    Jewish and Israeli employees have suffered, and continue to suffer, physical and emotional distress because of the harassment they have experienced and UCLA's failure to redress it.

146.    Jewish and Israeli employees have little confidence in UCLA's internal complaint system because of the responses they have received after filing complaints.

147.    UCLA has not addressed or resolved employees' complaints of discrimination and harassment as described above.

### XV. UCLA Subjected the Named Charging Parties and Other Aggrieved Jewish and Israeli Individuals to an Antisemitic Hostile Work Environment

148.    UCLA subjected Professors Holloway and Shamsa (Named Charging Parties) and other aggrieved Jewish and Israeli employees to antisemitic harassment. In response to the Named Charging Parties' and other aggrieved individuals' complaints, UCLA failed to take any action to investigate or meaningfully remedy the work environment and retaliated against the Named Charging Parties.

### XVI. Professor Ian Holloway

149.    Ian Holloway was a Professor of Social Welfare in the Luskin School from

47

July 1, 2012, until January 1, 2025. Since January 1, 2025, Professor Holloway has been a professor and Director of Research and Innovation at the UCLA School of Nursing.

150.    During his employment in the Luskin School, Professor Holloway reported to the Chair of the Social Welfare Department. The Chair of the Social Welfare Department reports to the Dean of the Luskin School.

151.    Professor Holloway is Jewish and, as part of his Jewish identity, holds the Zionist belief that Israel is the Jewish people's ancestral homeland and therefore has a right to exist.

152.    After October 7, Professor Holloway was subjected to antisemitic harassment and discrimination by students and other faculty because he is Jewish and has Zionist religious beliefs. That treatment included, but is not limited to, antisemitic threats, negative professional consequences, and ostracism by other faculty and students.

153.    In addition, after October 7, and particularly during the spring 2024 encampment period described in paragraphs 47 to 56, Professor Holloway's workplace at UCLA has been permeated with antisemitic activity, which he found offensive. Professor Holloway was also aware of pervasive antisemitism on campus.

**A.    *Professor Holloway Experienced an Antisemitic Threat, Negative Job Consequences, and Ostracism by Other Faculty***

**i.    Antisemitic Intimidation on Chalkboard**

154.    On November 3, 2023, an open letter, "UCLA Faculty Against Terror," was composed and made available for public signatures.[87] As discussed below, individuals who signed this letter, including Professor Holloway, became targets for antisemitic harassment.

155.    The letter notified UCLA Chancellor Block that campus rallies celebrating the October 7 attack were calling for violence, and made Jewish students, staff, and

---

[87] Letter from UCLA Faculty Against Terror to UCLA leadership. https://sites.google.com/view/uclafacultyagainstterror [https://perma.cc/XE7C-HYSY].

faculty "afraid to be on campus, show solidarity with Israel, or practice their freedom of religion in public." The author and first signatory to this letter was UCLA faculty member Judea Pearl, whose son Daniel was murdered by jihadist terrorists after Daniel proclaimed his Jewish identity. The letter asked the University administration to denounce Hamas's attack on Israel as well as rallies on campus that called for violence. The letter asked the University to characterize Hamas as a terrorist organization and to enforce UCLA policies to hold student groups and the UCLA community accountable if they participated in inciting violence. It further invited UCLA's EDI program to "fight antisemitism in all its insidious manifestations, including anti-Israelism, by designating a special envoy to coordinate this fight."[88]

156.    On November 6, 2023, the UCLA Faculty Against Terror letter was published in the Jewish Journal.[89]

157.    On or about November 8, 2023, Professor Holloway saw a video of people on UCLA's campus taking turns beating a piñata of Israeli Prime Minister Benjamin Netanyahu while one person screamed, "Beat that fucking Jew!" *See* ¶ 44 above. This incident took place outside the LGBTQ Campus Resource Center where Professor Holloway performs a portion of his work and made him feel unsafe there.

158.    As a result of seeing this video, Professor Holloway signed the UCLA Faculty Against Terror letter that very day.

159.    After Professor Holloway signed the UCLA Faculty Against Terror letter,

---

[88] Aaron Bandler, *Nearly 300 UCLA Faculty Members Call on University to Denounce Anti-Israel Rallies on Campus*, Jewish Journal (Nov. 10, 2023), https://jewishjournal.com/news/365107/nearly-300-ucla-faculty-members-call-on-university-to-condemn-hamas-terror-attack-anti-israel-rallies-on-campus/ [https://perma.cc/59LG-JQQT].

[89] Letter from UCLA Faculty Against Terror to UCLA leadership, https://sites.google.com/view/uclafacultyagainstterror [https://perma.cc/XE7C-HYSY]; Aaron Bandler, *Nearly 300 UCLA Faculty Members Call on University to Denounce Anti-Israel Rallies on Campus*, Jewish Journal (Nov. 10, 2023), https://jewishjournal.com/news/365107/nearly-300-ucla-faculty-members-call-on-university-to-condemn-hamas-terror-attack-anti-israel-rallies-on-campus/ [https://perma.cc/59LG-JQQT].

students and faculty targeted him for antisemitism.

160.    On November 14, 2023, Professor Holloway arrived to teach his 8:00 a.m. class and found that someone scrawled a message on his chalkboard for all his students to see informing them that he had signed the UCLA Faculty Against Terror letter. The message, pictured below, said, "Look up Jewish Journal 300+ profs against terror." There were already students present in the classroom when Professor Holloway arrived. Wanting to document the message, Holloway left it up for the entire class and took a picture of it. Professor Holloway reasonably understood this message was an attempt to intimidate him.



161.    Professor Holloway's colleague at the Luskin School, Professor Ron Avi Astor who is also Jewish, also signed the UCLA Faculty Against Terror letter. Someone wrote the same message on Professor Astor's chalkboard, which he saw when he arrived to his class.

**ii.** **Pervasive Antisemitism at the Luskin School Causes Significant, Negative Job Consequences for Professor Holloway**

162.    In early 2024, Holloway was told that a Jewish staff person at the Luskin School heard a student say the antisemitic slur "kike" in the Luskin School.

163.    On April 24, 2024, as the encampment was being planned, a Jewish colleague at the Luskin School discovered a swastika in the Luskin School elevator. This colleague forwarded Professor Holloway a photograph of the swastika.

164.    Professor Holloway and other Jewish professors repeatedly raised their concerns about antisemitism on campus and within the Luskin School at faculty meetings.

165.    During Luskin School faculty meetings, non-Jewish professors repeatedly questioned and rejected Jewish professors' experiences of antisemitism.

166.    Professor Holloway became the elected Chair of the Faculty Executive Committee (FEC) in September 2023, the beginning of the academic year.

167.    During an FEC meeting, Professor Holloway raised his concerns about the palpable antisemitism he experienced at UCLA. One of his colleagues, the Director of Practicum Education, told Professor Holloway that because he is "white," he could not be a victim of discrimination. Professor Holloway replied that he was at a loss that his colleagues would not respect his perspective as a Jewish person as they would the experiences of any other marginalized group.

168.    During a Social Welfare Department faculty senate meeting that Professor Holloway attended, a senior faculty member stated that professors who had signed the UCLA Faculty Against Terror letter could not be trusted to impartially peer review their colleagues for promotions and step increases. The only professors in the Social Welfare Department who signed the UCLA Faculty Against Terror letter were Jewish.

169.    The same senior faculty member, an endowed chair and director of a research center, repeatedly insinuated that there was a conspiracy of Jewish professors in

power because Jewish professors held administrative positions within the Luskin School.

170.  Because of the open hostility of his colleagues toward his Jewish identity, Professor Holloway believed it was necessary to resign as the FEC Chair.

171.  Professor Holloway resigned as FEC Chair two days later, at the end of the fall quarter in December 2023.

172.  As detailed below, Professor Holloway sought and was granted administrative leave so that he could avoid an increasingly hostile work environment.

173.  Nevertheless, as a full professor, Professor Holloway was fully entitled to participate in and vote on personnel cases for his colleagues' promotions and step increases. Unwilling to challenge the department's anti-Jewish bias, the Vice Chancellor for Academic Personnel and the Associate Vice Chancellor for Academic Personnel told Professor Holloway that they wanted him to stop voting on personnel cases.

174.  Professor Holloway perceived this as an order to stop voting in personnel cases and abstained from personnel reviews until he officially left the Luskin School due to its hostile work environment.

**B.**     ***Antisemitic Conduct Against Other Jewish Faculty Exacerbated the Hostile Work Environment Professor Holloway Experienced***

175.  Professor Holloway is a member of JFrg described above in paragraphs 136 to 138.

176.  Through JFrg, social media, and the news, Professor Holloway continued to learn of incidences of antisemitic harassment of other Jewish faculty at UCLA.

177.  Professor Holloway was aware of all the antisemitic incidents that other Jewish faculty and staff experienced at the Luskin School, some of which are set out in paragraphs 241 to 267 below.

178.  One of those significant incidents involved an unregistered student group called "Luskin Students for Justice in Palestine" (LSJP). On or about February 14, 2024, LSJP sent a letter to UCLA and Luskin School leadership denouncing "instances" where

"department members have displayed their callousness towards the Palestinian lives destroyed by the genocide" in Gaza. Professor Astor was specifically named as a "biased" faculty member, but the letter also clearly referenced Professor Holloway.

179.    A Luskin School professor helped students write the LSJP letter even though the professor admitted knowing the inflammatory allegations in the letter were false.

180.    Nevertheless, the Chair of the FEC who succeeded Professor Holloway forwarded the scurrilous letter to all faculty in the Social Welfare Department. The letter was then forwarded to many faculty members of other universities around the country.

181.    As a direct result of these actions, the leading candidate for a full professoriate position in the Social Welfare department dropped her candidacy.

C.    ***Professor Holloway Sought Reasonable Accommodation to Avoid the Stress of the Antisemitic Conduct in the Luskin School***

182.    On or about February 20, 2024, Professor Holloway requested accommodation because of the harassment at the Luskin School. He asked, and was permitted, to continue his research but to be exempt from attending faculty meetings and teaching so he could avoid harassment from faculty members and students. He remained on accommodation through the end of December 2024.

183.    During the 2023 to 2024 academic year, at least two of the four Jewish professors in the Social Welfare Department stepped down from academic leadership positions and received reasonable accommodations to remove themselves from the department because of stress. Upon information and belief, at least one additional Jewish staff member also sought and received reasonable accommodation due to the antisemitic environment.

184.    Although Professor Holloway had not regularly come to campus since he was on accommodation, it was believed he might attend graduation, along with Professor Astor and two other Jewish faculty members from his department. Prior to the Luskin

School graduation, which took place on June 14, 2024, Professor Holloway was informed by a fellow faculty member that students did not want "Zionist" faculty to read the names of students, shake hands with them, or sit in the front row. As a result, Professor Holloway did not attend graduation. Professor Astor and another Jewish colleague also chose not to attend given these sentiments.

185.    Nevertheless, several Luskin School faculty members boycotted the official graduation ceremony and held an alternative graduation, chanting "disclose, divest, we will not stop we will not rest!"[90]

### D.    *Professor Holloway Faced Further Antisemitic Harassment and Retaliation in His Attempts to Transfer Away from the Luskin School*

186.    Professor Holloway continued to be subjected to antisemitic conduct and harassment when he tried to transfer from the Luskin School to a different school within UCLA in a further effort to distance himself from the harassment he was experiencing in his department.

187.    The Dean of the Luskin School resisted Professor Holloway's efforts to transfer from the Luskin School, ostensibly because Professor Holloway would take his research grants with him to a different school within UCLA.

188.    Professor Holloway tried to transfer to UCLA's Fielding School of Public Health (Fielding School).

189.    Typically, faculty in a UCLA department vote on whether to allow a faculty member to transfer into their department.

190.    A Fielding School professor told Professor Holloway that Fielding School faculty had discussed blocking his transfer to the Fielding School because Professor Holloway was affiliated with the Jewish organization JFrg and that he was "weak" to

---

[90] @PplsCityCouncil, X (Jun. 14, 2024 at 6:43 PM), https://x.com/PplsCityCouncil/status/1801747322185126079 [https://perma.cc/WF6D-MGL2] (social media post including video of students and faculty walking out and chanting at graduation).

leave the Luskin School because of discrimination.

191. On January 1, 2025, Professor Holloway transferred to the UCLA School of Nursing.

192. Transferring to the School of Nursing to avoid harassment disrupted Professor Holloway's career advancement. Professor Holloway had been in administrative roles in the Luskin School for the last approximately ten years with the intent to seek future promotions in that school. Starting anew in a different discipline and department than the one in which he had built his career for over a decade negatively impacted his career advancement.

193. Transitioning from the Luskin School to the School of Nursing created a significant burden and loss of income for Professor Holloway. The move required resolving staff allocation and relocating five grant-funded staff members from five offices at the Luskin School into a single office. Professor Holloway was required to transition email accounts, establish HIPAA-compliant data storage, and coordinate with financial services to transfer grants without institutional support. These demands forced Professor Holloway to halt his research and grant-writing activities to facilitate the move. Additionally, the transition from a nine-month contract to an eleven-month appointment resulted in a net decrease in compensation, forcing him to negotiate a stipend to offset financial harms.

E. ***Professor Holloway Lodged Several Types of Complaints of Antisemitism to Different Offices and Officials, and UCLA Failed to Adequately Investigate and Respond to These Complaints***

194. Professor Holloway filed four complaints with UCLA's Civil Rights Office about the harassment—in November 2023, December 2023, February 2024, and May 2024—and also complained to several UCLA officials and filed complaints with other UCLA offices.

195. In filing these complaints, Professor Holloway directly experienced the

difficulties with UCLA's complaint process detailed above, such as (a) lack of clarity on where or how to file, (b) the barriers created when a faculty member attempting to file a complaint is passed from one office to another, (c) the fact that sometimes multiple complaints to different offices about one incident are required to address all facets of the complaint, and (d) UCLA's system closes antisemitism complaints without assessing the merits.

196.    On November 15, 2023, Professor Holloway emailed the Chair of the Social Welfare Department, the Luskin School Dean, and the Luskin School Director of Human Resources about the chalkboard incident. He was told there was nothing they could do about it because the message was anonymous.

197.    He also filed a complaint with the EDI Civil Rights Office about the chalkboard incident. In this complaint, Professor Holloway described the incident and stated that it made him concerned for his personal safety and that students may be biased against him when filling out student evaluations. Professor Holloway requested an investigation, a safety assessment, statements about the Luskin School's free speech expectations, and measures to limit retaliation in personnel decisions.

198.    On November 15, 2023, the EDI Civil Rights Office received another complaint on behalf of Professors Holloway and Astor about the chalkboard incident. The complaint stated that Professors Holloway and Astor "perceive it to be a form of targeted intimidation." Their complaint was forwarded to DPO.

199.    The following day, DPO closed the complaint and emailed Professor Holloway that "DPO only investigates incidents where the alleged perpetrator is a UCLA faculty member" and provided resources for counseling, including the Office of Ombuds Services, the Whistleblower Hotline, and UCLA Police Department.

200.    On December 8, 2023, Professor Holloway filed a similar complaint with the EDI Civil Rights Office. The complaint was closed on January 4, 2024, without resolution.

201.   On February 23, 2024, Professor Holloway filed a complaint with the EDI Civil Rights Office about the Luskin School's response to the LSJP letter and noted that his previous EDI Civil Rights Office complaint had gone unanswered.

202.   Professor Holloway also verbally complained to his superiors, including the Dean of the Luskin School and the Executive Vice Chancellor and Provost, with whom he and Professor Astor met on March 1, 2024. Neither the Dean, nor other officials in management, took further action to correct the hostile work environment, nor does it appear that they reported it to the University's EDI Office.

203.   On March 4, 2024, Professor Holloway spoke with DPO officials and explained he was confused about what happened to his EDI Civil Rights Office complaint and assumed the complaint would be investigated.

204.   On March 21, 2024, DPO notified Professor Holloway it was closing the matter because he did not submit a DPO-specific complaint form. Professor Holloway replied that he was working on his complaint and accompanying documentation and asked them to leave the complaint open. He stated that he understood from his phone conversation with the office on March 4, 2024, that he had up to three months to submit a DPO complaint form after filing the initial report. DPO replied that its internal procedures provide three weeks from outreach to file a formal complaint before DPO closes the matter but that he could submit his complaint anytime to re-initiate the process.

205.   Receiving no assurance that their complaints would be handled seriously, on March 31, 2024, Professors Holloway and Astor jointly filed an Abusive Conduct complaint with the UCLA Academic Affairs and Personnel Office against the Department of Social Welfare and the Luskin School for their lack of response to multiple antisemitic incidents.

206.   After the removal of the encampment, on May 6, 2024, the Luskin School's Social Welfare Department released a departmental statement that was intended to be a

formal condemnation of the removal. Jewish faculty were given no opportunity to engage and express minority viewpoints, nor the opportunity to express their minority viewpoints on the same platform as the departmental statement. Professor Holloway complained to the EDI Civil Rights Office, requested an investigation, and asked that the Social Welfare Department refrain from issuing public letters until all faculty had a chance to discuss. Professor Holloway received a response from DPO requesting that he fill out a complaint form specific to that office. Professor Holloway submitted the new form the following day, noting that the situation had been steadily deteriorating in his department for months. DPO acknowledged receipt of his complaint form and stated that it "may take up to 30 days for us to contact you with next steps." Over two months later, DPO emailed Professor Holloway, stating that his DPO complaint "has moved through the queue and is currently in assessment."

207.   On January 31, 2025, DPO sent Professor Holloway a notice of case closure stating "the evidence is insufficient to demonstrate a violation of University nondiscrimination policy" and DPO was therefore "unable to initiate a formal investigation."

208.   Professor Holloway understood from a conversation with the then-Interim Vice Chancellor of EDI that the two Luskin School faculty members named in his May 6, 2024, complaint refused to be interviewed, and the office decided to close the matter.

209.   On May 7, 2024, Professor Holloway submitted another complaint to the EDI Civil Rights Office regarding a message he received from LSJP in which he noted LSJP "included threatening language to faculty who they say do not support their cause, including the phrase 'WE SEE YOU.'" Professor Holloway considered this to be a veiled threat. But the complaint was closed the same day, and Professor Holloway was informed that "DPO only investigates incidents where the alleged perpetrator is a UCLA faculty member." He was referred to the Office of Student Conduct and told he could file his complaint with that office.

210.   Professor Holloway informed multiple UCLA officials of the antisemitic harassment he faced and filed at least four complaints with the EDI Civil Rights Office, and several entities at UCLA ostensibly tasked with handling anti-discrimination complaints were aware of Professor Holloway's complaints, including the Chancellor's Office, the Luskin School Dean, the Director of Human Resources, and DPO. Despite all of Professor Holloway's attempts, UCLA failed to adequately respond to, fully investigate, or remedy the antisemitism.

211.   Before October 7, Professor Holloway was part of campus life and went to UCLA's campus often. He later limited significantly the time he physically spent at UCLA because he felt unsafe on campus due to the antisemitic harassment he faced. Now, he rarely goes on campus because of anxiety and discomfort.

212.   After Professor Holloway filed a charge of discrimination with the EEOC, an email went out to all faculty in his department asking them to preserve any emails relating to him due to him filing a charge. This "preservation" email unnecessarily indicated that Professor Holloway had filed a charge of discrimination about antisemitism, constituted retaliation in and of itself, and put Professor Holloway at risk for retaliation from other colleagues.

213.   Because of the discrimination that Professor Holloway faced at UCLA and the University's failure to remedy it, Professor Holloway has experienced pecuniary and non-pecuniary losses.

## XVII. Professor Kamran Shamsa

214.   Professor Kamran Shamsa has worked at the UCLA David Geffen School of Medicine (Medical School) continuously since June 2004. He completed his internship in Medicine/Pediatrics in 2005, residency in Internal Medicine/Pediatrics in 2008, and fellowship in Adult Cardiovascular Disease in 2011. He has been a member of the clinical faculty since 2011. He is currently an Associate Clinical Professor in the Department of Medicine's Division of Cardiology. From 1994 to 1998, he attended

UCLA as an undergraduate student, and he worked as a research assistant at UCLA from 1998 to 2000.

215.   Professor Shamsa is Jewish. As part of his Jewish faith, Professor Shamsa attends services at a synagogue.

216.   Professor Shamsa immigrated to the United States from Iran at the age of 11 with his family to escape religious persecution against Jews.

217.   Professor Shamsa's belief in Israel's right to exist is part of his Jewish faith and identity. This belief, also known as Zionism, is rooted in his religion's traditions, prayers, and holidays.

218.   Since October 7, Professor Shamsa has been subjected to antisemitic conduct and harassment by students and other faculty because he is Jewish, including at least one physical assault, antisemitic taunts, denial of access to UCLA buildings, restriction to his freedom of movement throughout the campus, and disruptions to his workplace talks by protesters. Particularly during the spring encampment period described in paragraphs 47 to 56, Professor Shamsa's workplace at UCLA was permeated with antisemitic activity.

A.   ***Professor Shamsa Directly Experienced Antisemitism at UCLA, Including at Least One Physical Assault, Antisemitic Taunts, Denial of Access to University Buildings, and Disruption to His Workplace***

219.   In or around April 2024, Professor Shamsa twice saw Nazi swastikas on the walls of Royce Hall. He observed that it took the University several hours to remove antisemitic graffiti, consisting mainly of swastikas.

220.   In April 2024, protesters set up a large encampment on Royce Quad, a major walkway through campus, directly in front of Powell Library as described in paragraphs 47 to 56.

221.   At least two or three times a week in April 2024 during his work breaks, Professor Shamsa would walk through Bruin Walk to Powell Library before returning to

the hospital. During one of these walks, student protesters obstructed Professor Shamsa from moving across Royce Quad and preventing him from entering Powell Library through the main entrance.

222.    On or around April 25, 2024, while Professor Shamsa was walking toward Royce Quad near the encampment, a masked protester asked if he was "pro-Palestine." When Professor Shamsa replied "no," the protester started yelling "Zionist go away." Upon hearing the shouting, approximately six or seven other protesters started walking towards Professor Shamsa and shouting at him, which made him so uncomfortable he fled the scene.

223.    On April 28, 2024, Jewish faculty and students set up a counterprotest directly across from the encampment.

224.    At one point during the encampment, after Professor Shamsa finished his rounds at the hospital, he walked from the Ronald Reagan UCLA Medical Center (Medical Center) toward Royce Quad, where the encampment was. As he neared the encampment, a large man with a face mask and keffiyeh rushed him and knocked him to the ground. Several UCLA security guards stood nearby, witnessed the incident, and did nothing. Professor Shamsa laid on his back for about 20 to 30 seconds, but not one security guard offered to help Professor Shamsa or attempted to apprehend the man who had shoved him to the ground. The man walked away, and Professor Shamsa got up and collected himself. Upon information and belief, the man attacked Professor Shamsa with antisemitic intent. Moreover, given the circumstances, Professor Shamsa reasonably understood that the man shoved him because Professor Shamsa is Jewish.

225.    Professor Shamsa walked about another 100 feet, and a UCLA security guard approached him, pushed Professor Shamsa's chest with both hands, and told him no one could cross the plaza.

226.    Professor Shamsa displayed his faculty badge, and the security guard allowed him to proceed.

61

227.   That same day, Professor Shamsa saw a 17-year-old Jewish girl bleeding from her head after being kicked while picking up an Israeli flag.

228.   In or around January or February 2025, Professor Shamsa also observed 300 to 400 individuals protesting outside of his workplace, the Medical Center, for approximately three hours. The protest involved banging and loud noise and patients could hear the noise in their exam rooms. The protesters also blocked the entrance to the medical plaza and hospital parking lot. Because of this, several of Professor Shamsa's patients notified him that it would sometimes take them more than an hour to enter the Medical Center.

229.   Professor Shamsa estimates that similar protests have occurred outside of his workplace at least 15 to 20 times since October 7, and that protesters have repeatedly blocked access to his building.

230.   Upon information and belief, protesters were chanting and displaying the same antisemitic messages common during other protests on UCLA's campus.

**B.    *Professor Shamsa Complained to Several UCLA Officials About the Antisemitism on Campus and UCLA's Lack of Response, and UCLA Failed to Redress Professor Shamsa's Complaints***

231.   Professor Shamsa never formally filed a complaint with DPO about the antisemitism and harassment he experienced because he did not know the process for doing so; however, his department superiors and University administrators were aware of the antisemitism he faced but failed to remedy it.

232.   On April 30, 2024, Professor Shamsa called the UCPD and requested that police go to the encampment due to escalating violence.

233.   UCPD told Professor Shamsa they would intervene only if UCLA's administration instructed them to do so, and that they had not received such orders.

234.   On May 3, 2024, Professor Shamsa emailed the then-Chancellor, the Executive Vice Chancellor, the Associate Vice Chancellor of the Medical School, the

Chief of Cardiology, and the Dean of the Medical School, as well as at least two other University administrative supervisors, detailing his concerns about the antisemitism and harassment on campus and UCLA's failure to adequately respond.

235.   Among other things, he reported that a masked protester from the encampment shouted "Zionist go away" at him and protesters moved toward him to the point where he felt unsafe and fled the scene; that he had been physically assaulted by a protester on April 28, 2024; and that he did not feel safe in meetings or the hospital or on campus as a Jewish faculty member.

236.   All the University officials who received this email were responsible for reporting the allegations of antisemitism and should have reported Professor Shamsa's email to the appropriate EDI office. None of them have responded to Professor Shamsa's email, and it is believed that none referred his email for investigation.

**C.    *Professor Shamsa Continues to Experience a Hostile Work Environment Based on Recent Antisemitic Conduct on Campus***

237.   In February 2025, Professor Shamsa learned that members of SJP vandalized the home of a Jewish member of the Regents. The University issued a suspension to the student group, but, according to Professor Shamsa, the students in SJP still come to campus to protest and disrupt University operations.

238.   Because of the discrimination at UCLA that Professor Shamsa faced and the University's failure to remedy it, Professor Shamsa has experienced pecuniary and non-pecuniary losses, including loss of promotional opportunities as a result of his complaints of antisemitism.

**XVIII. Other Similarly Situated, Aggrieved Individuals**

239.   Jewish and Israeli employees in addition to the charging parties suffered harassment because of their race, religion, and national origin.

240.   The Antisemitism Task Force Report documented incidences of antisemitism among some of the Jewish and Israeli faculty and staff at UCLA. As

63

discussed in paragraph 126, of those who responded to the Antisemitism Task Force's survey, over 50 Jewish and Israeli faculty and staff stated they were victims of vandalism and dozens stated they personally witnessed or were subjected to physical threats or attacks based on antisemitism or anti-Israeli bias, with 164 witnessing vandalism, 122 witnessing physical threats, and nearly 100 witnessing physical attacks on Jewish and Israeli individuals. This harassment included exposure to antisemitic images and messages at protests on UCLA's campus which violated viewpoint-neutral TPM rules. Similar acts of antisemitism against Jewish or Israeli faculty have been pervasive on campus, continuing until today.[91]

A.  *Luskin School Faculty*

i.  **Another Professor of Social Welfare is harassed by colleagues and students for signing the UCLA Faculty Against Terror Letter; takes medical leave**

241.   The Luskin School alone had numerous incidents of antisemitism in addition to those suffered by Professor Holloway. Another Professor of Social Welfare (Professor of Social Welfare) has been the target of repeated attacks after signing the UCLA Faculty Against Terror letter.

242.   Like Professor Holloway, the Professor of Social Welfare was targeted for signing the UCLA Faculty Against Terror Letter and harassed. He discovered the same message on his chalkboard as Professor Holloway. The Professor of Social Welfare asked the Luskin School Dean and other administrators multiple times to respond to the chalkboard incident. Neither the Dean nor any other administrator ever put out a statement, nor did they report this incident to the EDI Office themselves, although they were required to do so under the University's mandatory reporting requirement.

243.   The Professor of Social Welfare was later explicitly denounced in the LSJP letter referenced in paragraph 178 above for displaying "callousness towards the

---

[91] *Supra* § VIII.

Palestinian lives destroyed by the genocide" and accused of bias.

244.   On February 16, 2024, the Professor of Social Welfare emailed the Luskin School Dean raising his concerns about the LSJP letter described above, stating that it "falsely targets me on an array of activities and issues that are core to my Jewish Identity." The Dean did not report, as required, the serious allegations of antisemitism to the appropriate office. Instead, she dismissed the seriousness of the issue stating that this was simply a matter of "faculty complaining against other faculty" and was very difficult on her as a Dean.

245.   The same day, the Professor of Social Welfare again complained to the Dean that the antisemitic harassment was making his work environment was unsafe:

> It's personal and I don't feel safe having been demonized publicly because I believe as a Jew that Israel has the right to exist. Ignoring that I do peace work/ or co-exitance work and have called for a peace perspective all along.  Framing this as pro-Palestinian or pro-Israel is such a distortion. No one on our faculty is anti-Palestinian.  No one is willing to listen to the Jewish faculty to even hear this, even after many attempts to make ourselves and student feel safe and heard. Demonizing us in such a way, with this language is not only about freedom of speech, but also difficult emotionally, and physically draining for months and months to come to such a workplace and have insults hurled at me or because of my identity. In such a letter, so publicly, without a condemnation of the falsehoods by anyone on faculty or administration. I should not be left now to defend myself in a meeting after others have publicly demonized me with falsehoods because of my Jewish identity.
>
> This is not about discussion at this point. It's about clarity on what makes faculty feel safe. I don't feel safe. I am/ was targeted. Not clear what's being done to remedy this.

246.   On February 17, 2024, the targeted Professor of Social Welfare forwarded to the UCLA Chancellor the LSJP letter that asserted false claims about him. He expressed his concern about the letter and antisemitism on campus. He stated, "I don't feel safe with these faculty and students, especially with the lack of response by the university to this. [I am] reaching out to you since there has been no real response to my concerns that are urgent and now."

247.   On February 26, 2024, the Professor of Social Welfare filed another

complaint with DPO regarding the LSJP letter. DPO did not conduct an intake interview, and seven months later simply told him that "the evidence is insufficient to demonstrate a violation of University nondiscrimination policy" and that DPO was "unable to initiate a formal investigation" and "formally closed this matter."

248. On February 29, 2024, the Professor of Social Welfare emailed the Luskin School Dean, Social Welfare Department Chair, and UCLA's Executive Vice Chancellor a copy of UC's Abusive Conduct in the Workplace Policy, which he believed the LSJP letter violated. UC's Abusive Conduct in the Workplace Policy prohibits the "spreading false information or malicious rumors" in "electronic[] or written communication."

249. Although his colleagues acknowledged the untrustworthiness of the LSJP letter, it caused tangible damage. The leading candidate interviewing for a faculty position at the Luskin School at the time withdrew her name from candidacy, privately citing hostility towards Jewish faculty and specifically pointing to the LSJP letter. On March 8, 2024, the Dean of the Luskin School acknowledged the "rumors" that the candidate withdrew from consideration because of the letter.

250. The following day, the Professor of Social Welfare stepped down from chairing the search committee for that chair position because he felt he could no longer discharge his duties due to the LSJP letter's fallout.

251. That same day, and at the previous advice of Provost Darnell Hunt, the Professor of Social Welfare went on medical leave because of the harassment at the Luskin School. He remained on medical leave from approximately March 10, 2024, until July 2024.

### ii.    Disrupted research presentation; no action by the University

252. Returning to campus in the 2024 to 2025 academic year, the same Professor of Social Welfare sought to conduct a research lecture with a faculty member from the Hebrew University of Jerusalem.

253. On November 8, 2024, the Professor of Social Welfare invited Professor

Mona Khoury to UCLA for a research talk. Professor Khoury is an Arab Israeli who teaches at Hebrew University in Israel. Because of Professor Khoury's Israeli national origin, many students affiliated with SJP disrupted the academic talk with unrelenting chanting and epithets.



254.   The Professor of Social Welfare asked both the Dean of the Luskin School and the Vice Chancellor for Safety to call the police. They refused, even though the disruption violated UCLA's viewpoint-neutral TPM rules and was a professional embarrassment to the professors, with Professor Khoury coming from Israel just to deliver this talk.

255.   Ironically, the subject of the talk was "Supporting Peace, Democracy, and Cultural Identity." No official apology was ever sent by the UCLA administration to Professor Khoury. Instead, she was greeted with shouts of "traitor" by SJP members.

256.   On November 13, 2024, the Professor of Social Welfare attempted to file a complaint alleging the disruption to his research talk violated UCLA's TPM rules.

257.   On December 9, 2024, DPO called the Professor of Social Welfare and advised him that the outreach was regarding the disruption to his research talk. DPO advised that he "could submit all allegations to DPO" and that "DPO does not generally investigate viewpoint discrimination but [had] no way to determine if [the Professor's] support for Zionism would be considered viewpoint" or religion.

258.   On December 17, 2024, the Professor of Social Welfare asked to speak with the Administrative Vice Chancellor by phone because "I file reports and never hear back from anyone[,] and nothing seems to change despite the new [time, place, and manner] rules."

259.   On December 23, 2024, the Administrative Vice Chancellor replied by email, "I am not the best person to assist with these issues, as I am not responsible for the accountability questions/concerns that you have. I can assist with reporting incidents if that is helpful, but hopefully you won't have any additional issues." The Professor of Social Welfare asked to whom he should report his complaint.

260.   On December 23, 2024, the Administrative Vice Chancellor told the Professor of Social Welfare: "Any future lectures associated with your research should be coordinated through the Events Office so we can make sure we have Student Affairs and security available to assist you." The Professor of Social Welfare replied that the research talk had been coordinated through UCLA's Dialogue Across Difference Initiative, which partners with Student Affairs, and that the Luskin School Dean "did not want security."

261.   In another incident, this Professor of Social Welfare called in a report with

UCPD because he feared for his personal safety after a group of students, referencing his Zionist beliefs, heckled him as "complicit with genocide" as he walked to his car. He requested that a security guard or police officer escort him to and from his car. UCPD refused to provide him protection but told him to "be vigilant" when walking on campus.

262.   The Professor of Social Welfare was repeatedly exposed to antisemitic flyers and literature that violated the University's TPM rules. He sought to remedy the antisemitic harassment he experienced by complaining to various UCLA offices and officials.

263.   In total, this Professor of Social Welfare informed—some several times—the Vice Chancellor, the Provost, the Dean of the Luskin School, and DPO of the antisemitic harassment he faced. He filed complaints with at least three different offices. Despite all the Professor of Social Welfare's attempts, UCLA failed to adequately respond to, fully investigate, or correct these complaints.

264.   Moreover, after the Professor of Social Welfare filed a charge of discrimination with the EEOC, an email was sent to all faculty in his department asking them to preserve relevant emails involving him. This preservation email unnecessarily indicated that the Professor of Social Welfare had filed a charge of discrimination about antisemitism and put him at risk for retaliation.

265.   Additionally, the Professor of Social Welfare's ability to receive further promotion in the Luskin School is subject to peer review. Upon information and belief, all or almost all Luskin School professors who hold the authority to promote him are open signatories to the "Boycott, Divest, and Sanction" (BDS) movement. BDS endorses the full severance of academic relationships with Israel. Even if all BDS supporters are excluded from reviewing him, whose work involves relationships with Israeli faculty, there is no adequate review group remaining, and, upon information and belief, this will deny him an opportunity for promotion.

266.   Because of the antisemitic discrimination that the Professor of Social

Welfare has faced at UCLA and the University's failure to remedy, he has experienced pecuniary and non-pecuniary losses. He decided to return from medical leave in July 2024 because he felt that if he, as a tenured professor, could not tolerate being at UCLA, there was no place for any Jews on campus.

267.   Another member of the Social Welfare Department, its Chair, was also subject to several antisemitic acts. Those acts culminated in a veiled death threat against the Chair by a student prior to the Luskin School commencement ceremony in 2025. A complaint was filed with the EDI Office about this threat. Yet, upon information and belief, the student returned to the Luskin School even after sending the threat. Concerned for her own safety, the Chair began to work remotely and did not attend graduation that year.

### B.   *Other UCLA Faculty Victims of Antisemitism*

268.   A Professor of Anesthesiology at UCLA Medical School (Professor of Anesthesiology) both witnessed and has been subjected to several instances of antisemitic behavior. In February 2024, he led a faculty mission to Israel and gave statements to the press that detailed the antisemitic atmosphere at UCLA. Following this trip, he had a meeting with the Dean of the Medical School, Steven Dubinett, to discuss his concerns about antisemitism on campus. During this meeting, Dean Dubinett told the Professor of Anesthesiology he was contributing to the hostile work environment by speaking to the press about antisemitism.

269.   On April 3, 2024, the Professor of Anesthesiology attended an FEC meeting on Zoom, which was infiltrated by numerous unknown masked individuals that began to troll the Zoom chat with antisemitic statements. Dean Dubinett was present for this meeting and is a Responsible Employee required to report "Prohibited Conduct" as defined in UC's Anti-Discrimination Policy. Dean Dubinett did nothing to prevent or stop the harassment, nor did he report it as required.

270.   On April 26, 2024, after the encampment had been set up on campus, the

Professor of Anesthesiology was blocked from entering campus by students who created a human wall. A security guard also berated him when he tried to enter the encampment.

271.    On April 28, 2024, the Professor of Anesthesiology attended a pro-Israel counterprotest, which was given a permit by UCLA to be set up across from the encampment. Unknown masked individuals came out of the encampment and started verbally and physically assaulting the counter-protesters, including the Professor of Anesthesiology who was smashed into a stage. He directly witnessed two individuals in the approved pro-Israel counterprotest who sustained head injuries during the melee.

272.    On April 29, 2024, the Professor of Anesthesiology was physically assaulted outside of the encampment. While walking through campus and preparing for an interview with the press, a few people approached him and attempted to block his path. The Professor of Anesthesiology tried to move around them, but one of the individuals tackled him from behind and stole his earbud. The Professor of Anesthesiology reported this incident to UCPD and filed at least three formal complaints with UCLA about the harassment. He directly complained to numerous administrators, all of whom are Responsible Employees required to report "Prohibited Conduct" under UC's Anti-Discrimination Policy. Not one reported the conduct to the EDI Office.

273.    A Professor in the Political Science Department (Professor of Political Science), signed letters that expressed support for Jewish students and faculty after October 7 and was then subjected to antisemitic targeting. For example, a pamphlet titled "MEET YOUR UCLA PROFS ENABLING GENOCIDE" featured the Professor of Political Science and other UCLA professors who signed the UCLA Faculty Against Terror letter.[92] A complaint was filed with the EDI Office regarding the pamphlet, but ultimately no action was taken based on the complaint.

274.    On November 14, 2023, a flyer with an image of a Star of David covered in

---

[92] Meet Your UCLA Profs Enabling Genocide (last visited Feb. 6, 2026), https://bayes.cs.ucla.edu/DPF/06072024-pamphlet.pdf [https://perma.cc/6LFB-7FXC].

blood and titled "Murdered by Israel" was taped onto the Professor of Political Science's classroom door. She found the flyer deeply offensive and perceived it to be a death threat. No other door had anti-Israel or antisemitic flyers taped onto them. She subsequently reported this incident to the then-Vice Chancellor of EDI, Mitchell Chang, after being advised to do so by Darnell Hunt. Hunt is a Responsible Employee under the Anti-Discrimination Policy and was required to report this incident to the Local Implementation Officer, as the antisemitic conduct complained of falls under "Prohibited Conduct." Hunt did not file a report with the EDI Office.

275. Two days later on November 16, 2023, the Professor of Political Science found a long trail of flyers that said "GENOCIDE" leading from the elevator to her office. She removed the posters following UCPD instructions. She filed a complaint with DPO related to the flyers, but DPO ultimately closed her complaint because it determined the issues on the flyers were "protected as free speech."

276. The Professor of Political Science was also pressured and intimidated by a colleague who suggested she should not "subject a colleague to an onerous and essentially frivolous DEI investigation by reporting him for speech [she] kn[e]w is protected speech."

277. The Professor of Political Science filed multiple complaints of antisemitic harassment, the first four of which were lost for four months because Interim Chancellor Hunt directed her to submit complaints to an email address that no one checked. Even after the email address issue was remedied, every subsequent complaint she filed was dismissed without investigation.

278. Ultimately, the Professor of Political Science filed for medical leave because the incidents and overall campus climate of antisemitism had a severe impact on her health.

279. In yet another incident of antisemitism, on or around April 30, 2024, a lab assistant and employee in the Department of Chemistry and Biology was terminated

shortly after informing his supervisor that he was unable to make it into the lab during the encampment. He specifically reported, "I'm scared to walk around my own school campus and that I have to fear being myself and wearing my pride on my chest" and was terminated from his job immediately afterwards.

280.　A psychiatrist and founder of the Women's Life Center at the Medical School was forced to take a leave of absence after she condemned a presentation glorifying a suicide by a troubled veteran in front of the Israeli embassy as "martyrdom." The psychiatrist, a daughter of Holocaust refugees, stated that the presentation, "Depathologizing Resistance," was not related to medical scholarship but rather a forum for "antisemitic indoctrination." The presentation included references to "Occupied Palestine" and genocide.

281.　Upon information and belief, several other faculty members took leaves of absence after that presentation, and faculty ostracized other faculty who supported efforts to oppose antisemitism.

282.　Shortly after the October 7 massacre, a UCLA executive made a request of the UCLA administration to use Royce Quad to project images of the Israeli hostages. His request was denied, and he was directed to use a different location instead, as Royce Quad "is reserved for events that involve the Chancellor or events that are considered a campus-wide event." The administration nevertheless made Royce Quad available for the antisemitic encampment the following spring.

283.　This same executive later personally witnessed antisemitic statements outside the encampment and was told Zionists were not permitted near the encampment. He informed other University leaders of the violent nature of the encampment in an email with the heading, "Is this 1934 or 2024?!"

284.　This same executive informed a Regent as early as November 2023 that "our EDI systems are flawed and hollow," and that not only was training lacking, but he believed "Jews are not considered a minority that requires protection."

285.  Jewish and Israeli faculty are even more vulnerable as numerous faculty-led organizations on campus have called for academic boycotts of Israel and to end all connections to Israeli universities. This boycott includes study abroad programs, fellowships, seminars, and research collaborations. Upon information and belief, this has disrupted research, scholarship, and interfered financially with grants and employment opportunities.

**COUNT I**

**PATTERN OR PRACTICE IN VIOLATION OF**

**SECTION 703(a)(1) OF TITLE VII**

286.  The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285, above.

287.  Defendant has, and continues to be, engaged in a pattern or practice of discrimination against Jewish and Israeli employees at UCLA because of their race, religion, and national origin, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), by failing to prevent and correct antisemitic workplace discrimination and harassment of which Defendant knew or should have known since October 2023 for which employees sought redress or were discouraged from seeking redress.

288.  It is Defendant's standard operating procedure through its policies and practices not to sufficiently investigate complaints of antisemitic harassment or to correct harassment and discrimination about which UCLA employees have complained.

289.  UCLA employees complained of antisemitism at UCLA to numerous faculty members, managers, Chairs, Deans, Vice Chancellors, and the Chancellor.

290.  UCLA employees complained of antisemitic conduct at UCLA to the University's designated officials and offices responsible for investigating and addressing complaints of antisemitism, including UCLA's EDI Office. The employees complained that the workplace conduct included multiple forms of harassment and discrimination based on race, religion, and national origin and that the conduct was unwelcome.

291.   The allegations the employees made were sufficient to put Defendant on notice that the conduct was severe or pervasive enough to materially alter UCLA Jewish and Israeli employees' working conditions, create an objectively hostile and abusive work environment that a reasonable person would find hostile or abusive, and affect the terms, conditions, and privileges of their employment.

292.   Defendant was on notice of the harassment and discrimination through numerous complaints, UCLA's own commissioned Antisemitism Task Force Report, and overt acts on campus.

293.   Defendant was, and remains, negligent in its response to the harassment by failing to take prompt and effective action to correct the hostile work environment for Jewish and Israeli employees at UCLA.

294.   For the foregoing reasons, Defendant has discriminated against Jewish and Israeli UCLA employees who sought redress by failing to prevent and correct the discrimination and harassment for which Defendant and UCLA were on notice in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

295.   In failing to correct the harassment after notice, Defendant has adopted the harassing conduct as its own acts and is therefore liable for this harassment.

296.   Defendant's failure to prevent and correct UCLA employees' complaints of antisemitic harassment and discrimination, such as those detailed above and reported in the Antisemitism Task Force Report, has subjected Jewish and Israeli UCLA employees who sought redress for their complaints, or who were discouraged from seeking redress, to a hostile work environment because of their race, religion, and national origin.

297.   The Attorney General has reasonable cause to believe that Defendant has discriminated against Jewish and Israeli UCLA employees by subjecting them to a hostile work environment based on race, religion, and national origin by failing to prevent and correct the discrimination and harassment for which Defendant was on notice.

298.   The Attorney General has reasonable cause to believe that Defendant's discrimination against Jewish and Israeli employees violated Section 703(a)(1) and is a "pattern or practice of resistance to the full enjoyment of" the rights of UCLA employees to equal employment opportunities without discrimination because of race, religion, or national origin. *See* 42 U.S.C. § 2000e-6(a).

299.   The United States, through the United States Department of Justice, has notified Defendant of the United States' determination that Defendant's pattern or practice of discrimination described herein is unlawful.

## COUNT II

### HOSTILE WORK ENVIRONMENT
### BASED ON RELIGION AND NATIONAL ORIGIN
### IN VIOLATION OF SECTION 703(a)(1) OF TITLE VII
### (ON BEHALF OF PROFESSOR IAN HOLLOWAY)

300.   The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285, above.

301.   Professor Holloway was subjected to a hostile work environment by UCLA, including antisemitic harassment, based on his religion and perceived national origin in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

302.   As described in paragraphs 149 through 213, Professor Holloway was subjected to antisemitic harassment because of his religion and perceived national origin, including threats, defamatory statements, negative job consequences, humiliating differential treatment, and a disruption to his academic work on campus that was unwelcome. That harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment.

303.   Defendant knew or should have known about the harassment Professor Holloway faced and failed to take immediate and appropriate corrective action to prevent or deter the harassment.

**COUNT III**

**RETALIATION BASED ON PROTECTED ACTIVITY**

**IN VIOLATION OF SECTION 704(a) OF TITLE VII**

**(ON BEHALF OF PROFESSOR IAN HOLLOWAY)**

304.   The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285, above.

305.   Defendant retaliated against Professor Holloway in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3, when it unnecessarily informed all faculty in his department that he filed an EEOC charge.

**COUNT IV**

**HOSTILE WORK ENVIRONMENT**

**BASED ON RACE, RELIGION, AND NATIONAL ORIGIN**

**IN VIOLATION OF SECTION 703(a)(1) OF TITLE VII**

**(ON BEHALF OF PROFESSOR KAMRAN SHAMSA)**

306.   The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285, above.

307.   Professor Shamsa was subjected to a hostile work environment by UCLA, including antisemitic harassment, based on his race, religion, and perceived national origin in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

308.   As described in paragraphs 214 through 238, Professor Shamsa was subjected to antisemitic harassment because of his race, religion, and national origin, including threats, at least one physical assault, denial of access to University buildings, and disruption to his workplace on campus that was unwelcome. That harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment.

309.   Defendant knew or should have known about the harassment Professor Shamsa faced and failed to take immediate and appropriate corrective action to prevent or deter the harassment.

## COUNT V

### RETALIATION BASED ON PROTECTED ACTIVITY
### IN VIOLATION OF SECTION 704(a) OF TITLE VII
### (ON BEHALF OF PROFESSOR KAMRAN SHAMSA)

310.   The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285 above.

311.   Defendant retaliated against Professor Shamsa in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3, when it denied him promotional opportunities after he filed an EEOC charge.

## COUNT VI

### HOSTILE WORK ENVIRONMENT
### BASED ON RACE, RELIGION, AND NATIONAL ORIGIN
### IN VIOLATION OF SECTION 703(a)(1) OF TITLE VII
### (ON BEHALF OF OTHER AGGRIEVED INDIVIDUALS)

312.   The United States realleges and incorporates by reference the allegations set forth in paragraphs 1-285, above.

313.   Defendant discriminated against other aggrieved Jewish and Israeli UCLA employees by subjecting them to a hostile work environment based on their race, religion, and national origin in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

314.   As described above in paragraphs 239 to 285, these aggrieved individuals were subjected to harassment, including protest activity which violated viewpoint-neutral time, place, and manner rules where offensive antisemitic messages and images were displayed.

315.   Defendant knew or should have known about the harassment these aggrieved individuals faced and failed to take immediate and appropriate corrective action to prevent or deter the harassment.

**PRAYER FOR RELIEF**

For the foregoing reasons, the United States respectfully requests that this Court enter an order:

316.  Enjoining Defendant from subjecting Jewish and Israeli employees to, and tolerating, a hostile work environment based on race, religion, and national origin in violation of Title VII arising out of Defendant's failure to prevent and correct discrimination and harassment related to antisemitism and from retaliating against employees who engage in activity protected under Title VII;

317.  Requiring Defendant to modify and enforce its anti-discrimination and anti-retaliation policies and procedures to effectively prevent and correct antisemitic discrimination and retaliation at UCLA, including:

    i.     Ensuring all complaints of discrimination, harassment, and retaliation related to antisemitism are properly investigated and addressed;

    ii.    Providing training for employees and supervisors on all anti-discrimination and anti-retaliation policies that apply to UCLA and on their roles and responsibilities regarding the policies;

    iii.   Implementing accountability, monitoring, and evaluation mechanisms;

318.  Awarding damages to the Named Charging Parties to compensate them for pecuniary and non-pecuniary losses and economic harm caused by Defendant's discriminatory conduct, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a;

319.  Awarding damages to other aggrieved Jewish and Israeli UCLA employees who were subjected to a hostile work environment based on their race, religion, or national origin;

320.  Awarding damages to other aggrieved Jewish and Israeli UCLA employees harmed by Defendant's pattern or practice of failing to properly address complaints of

harassment based on race, religion, or national origin;

321.   Ordering any further relief necessary to make Professors Holloway and Shamsa whole;

322.   Ordering any further relief necessary to make other aggrieved Jewish and Israeli UCLA employees whole;

323.   Awarding any applicable costs and fees; and

324.   Granting all such other additional relief as the interests of justice may require.

### JURY DEMAND

The United States demands a jury trial for all issues so triable under Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Dated:  February 24, 2026                    Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division
JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division
ERIC SELL
Deputy Assistant Attorney General
Civil Rights Division
JEFFREY MORRISON
Acting Chief, Employment Litigation Section

_/s/ Carl D. Wasserman_
HILARY PINION
Acting Principal Deputy Chief
CARL D. WASSERMAN
Trial Attorney
BESA BUCAJ
Trial Attorney
Employment Litigation Section
Civil Rights Division

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

_/s/ Julie A. Hamill_
JULIE A. HAMILL
Assistant United States Attorney

_Attorneys for Plaintiff_
_United States of America_