John B. Thomas (Bar No. 269538)
Bradley A. Benbrook (Bar No. 177786)
**HICKS THOMAS LLP**
1301 Dove Street, 5th Floor
Newport Beach, CA 92660
(916) 447-4900
jthomas@hicks-thomas.com
bbenbrook@hicks-thomas.com

*Attorneys for*
*Intervenor Plaintiffs*

*(Additional counsel listed on following Page)*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| KIRA STEIN; VIVIEN BURT; NIR HOFTMAN; KAMRAN SHAMSA; IAN HOLLOWAY, SARAH UZAN, RON AVI ASTOR, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendants. | Case No: 2:26-cv-01946<br><br>**PLAINTIFFS' COMPLAINT FOR:**<br>**(1) HOSTILE WORK ENVIRONMENT (TITLE VII)**<br>**(2) RETALIATION (TITLE VII)**<br>**(3) DISPARATE TREATMENT (TITLE VII)**<br>**(4) DISCRIMINATION (FEHA, CA GOV CODE § 12940(a))**<br>**(5) HARASSMENT (FEHA, CA GOV CODE § 12940(j))**<br>**(6) FAILURE TO PREVENT DISCRIMINATION (FEHA, CA GOV CODE § 12940(k))**<br>**(7) RETALIATION (FEHA, CA GOV CODE § 12940(h))**<br><br>**DEMAND FOR JURY TRIAL** |

Jason B. Torchinsky (Admitted *Pro Hac Vice*)
*jtorchinsky@holtzmanvogel.com*
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC**
2300 N. Street NW, Suite 643
Washington, DC 20037
(202) 737-8808

Andrew Gould (Admitted *Pro Hac Vice*)
*agould@holtzmanvogel.com*
Linley Wilson (Admitted *Pro Hac Vice*)
*lwilson@holtzmanvogel.com*
Erica Leavitt (Admitted *Pro Hac Vice*)
*eleavitt@holtzmanvogel.com*
Alexandria Saquella (Admitted *Pro Hac Vice*)
*asaquella@holtzmanvogel.com*
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC**
2555 E. Camelback Road., Suite 700
Phoenix, Arizona 85016
(602) 388-1262

2

Plaintiffs allege as follows:

### **INTRODUCTION**

1.      "In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students [and faculty] were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students* [*and faculty*] *were excluded from portions of the UCLA campus because they refused to denounce their faith*. UCLA does not dispute this."   *Frankel v. Regents of the Univ. of Cal.* ("*Frankel*"), 744 F. Supp. 3d 1015, 1020 (C.D. Cal. 2024) (italics in original) (order granting motion for preliminary injunction).[1]

2.      This is how another court in this District introduced the epidemic of antisemitism that has spread across UCLA's campus.

3.      Following the horrific October 2023 terrorist attacks by the terrorist group Hamas against Jewish *civilians*, in which innocent Jews, including infants and elderly, were murdered, raped, and mutilated, those who harbored antisemitic views suddenly felt emboldened to openly and boldly share them and create a rampant anti-Jewish environment at UCLA.

4.      In the wake of these events, UCLA should have taken steps to ensure that its Jewish students, faculty, staff, and community members were protected from harassment and undeterred in their access to everything UCLA has to offer, including its facilities and employment. Indeed, UCLA has policies, practices, and procedures in place to do so. But instead, UCLA officials routinely turned their backs on its Jewish students, faculty, and staff, affirmatively contributing to a

---

[1] In July 2025, the *Frankel* case was settled after UCLA agreed to make permanent the court's order prohibiting the exclusion of Jewish faculty and students and to pay over $6 million in damages and fees. *Frankel v. Regents of the Univ. of Cal.*, Becket Fund for Religious Liberty, https://becketfund.org/case/frankel-v-regents-of-the-university-of-california/.

COMPLAINT

UCLA-approved culture that has, among other antisemitic actions, allowed rampant use of Nazi symbolism on campus and calls for *the annihilation of Jews*.

5.      There are three inseparable and intersectional components of Jewish identity: Am Yisrael (the people of Israel), Torat Yisrael (the Torah of Israel or religious practices), and Eretz Yisrael (the land of Israel).  Jewish individuals from around the world are tied together through shared history, intergenerational trauma, peoplehood, connection to their ancestral and indigenous land, and their traditions and religion.  Like Jewish communities around the world, Jewish faculty, staff, and students at UCLA come from diverse backgrounds, reflecting the multiethnic and multiracial composition of the Jewish people and the diverse expression of identity.

6.      The origins of the Jewish people trace back thousands of years to the ancient land of Israel, centered in Judea or Zion, where Jewish civilization, religion, and national identity first developed.  Following Babylonian and Roman conquest and expulsion more than two thousand years ago, Jews were forced to scatter across the world. This resulted in the Jewish Diaspora, where Jews live as minority populations in every continent except for Antarctica.

7.      Today, less than one percent (0.2%) of the global population is Jewish, and roughly half of the global Jewish population resides in the United States (representing approximately 1.7% of the national population).[2]

8.      Jewish history includes repeated experiences of discrimination, repression, persecution, expulsion, ethnic cleansing, and genocide under varied political and ideological systems. These experiences include, but are not limited to: Jewish massacres across Europe during the Black Death when Jews were falsely accused of poisoning wells from 1348 to 1350; the Spanish Inquisition in 1492 when Jews were displaced, forced to convert, tortured, and killed; the Holocaust from 1933 to 1945, in which the Nazi regime murdered six million Jews; the Farhud

---

[2] Pew Research Center, *Jewish Population Change* (June 9, 2025), https://www.pewresearch.org/religion/2025/06/09/jewish-population-change/.

in Iraq in 1941 that resulted in pogroms and forced exile; and the Islamic Revolution in 1979 which led to persecution and forced displacement.

9.    Zionism is a religious, ethnic, and cultural belief that Jews constitute one nation and, therefore, a state for the Jewish people—specifically in their ancestral homeland of Israel—is a necessity. The promise of a home for the Jewish people is foundational to the religious and cultural beliefs and practices of countless people around the world.[3]

10.    Antizionism, by contrast, is an ideology that treats the existence of Israel as inherently illegitimate.[4]

11.    Although the International Holocaust Remembrance Alliance's ("IHRA") working definition of antisemitism does not include an explicit independent definition of antizionism, it frames antizionism implicitly as an example of antisemitism by listing "denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a state of Israel is a racist endeavor."[5]   Antizionist rhetoric and attacks against people who affirm the Jewish

---

[3] *See also* Complaint and Jury Demand at 6 ¶ 21, *United States v. Regents of the Univ. of Cal.*, No. 2:26-cv-01946, ECF No. 1 (C.D. Cal. Feb. 24, 2026).

[4] *See* International Holocaust Remembrance Alliance, *Working Definition of Antisemitism* (May 26, 2016), https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism; U.S. Dep't of State, *Defining Antisemitism*, https://www.state.gov/defining-antisemitism/; Cary Nelson, *Israel Denial: Anti-Zionism, Anti-Semitism, & the Faculty Campaign Against the Jewish State* (Indiana Univ. Press 2019); David Hirsh, *Contemporary Left Antisemitism* (Routledge 2017).

[5] International Holocaust Remembrance Alliance, *Working Definition of Antisemitism* (May 26, 2016), https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism.

5

COMPLAINT

state's right to exist are often used as a pretext for antisemitism and discrimination against Jews.[6]

12. In academic and institutional settings, antizionist narratives frequently function not as political criticism but as a discriminatory ideology that targets and stigmatizes Jews based on their shared peoplehood and ethnic, national, ancestral, and religious identity. This, in turn, contributes to a hostile environment for Jewish students and faculty. Universities have a responsibility to address such discrimination within their institutions rather than dismissing it as political expression.

13. Plaintiffs, all of whom are Jewish and hold Zionist beliefs as part of their Jewish identity, were subjected by their employer, UCLA, to a pervasive antisemitic environment marked by ethnic, racial, and religious harassment that created an unlawful hostile work environment and denied Plaintiffs basic human dignity and equal employment protections guaranteed under state and federal laws.

14. UCLA created and fostered an environment in which antizionism was used to deny Jewish self-determination, portray Jewish identity as illegitimate or harmful, justify exclusion and boycotts of Jewish faculty, and retaliate against Plaintiffs for speaking out against antisemitism. Plaintiffs repeatedly reported this discrimination and hostile work environment to UCLA administrators and departmental leadership, including deans, assistant deans, associate deans, department chairs, vice chancellors, chancellors, discrimination prevention offices, human resources, and Regents of the University of California. Yet UCLA, and the University of California, failed to take effective corrective action, and the antisemitic conduct continued. In this setting, antizionist rhetoric and conduct targeted Jews uniquely and collectively, transforming what UCLA dismissed as

---

[6] *Supra* n.4.

COMPLAINT

political discourse into discrimination against Plaintiffs as Jews—a protected class under federal and state laws.

15.    UCLA created, fostered, tolerated and maintained an illegal hostile work environment, subjected Plaintiffs to disparate treatment, and retaliated against them because of their Jewish identity, in violation of Title VII of the Civil Rights Act of 1964. In addition, UCLA subjected Plaintiffs to discrimination and harassment, while failing to prevent such discrimination and harassment, and while also retaliating against Plaintiffs, all in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940, *et seq.* The consequences of UCLA's acts and omissions have had a devastating effect on Plaintiffs, severely damaging them economically, physically, and emotionally, and inflicting long-lasting damage to Plaintiffs' professional careers and physical as well as emotional well-being.

## **JURISDICTION AND VENUE**

16.    This Court has federal question jurisdiction over Plaintiffs' Title VII claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims arising under the Constitution and laws of the United States.  The Court has supplemental jurisdiction over Plaintiffs' state law FEHA claims because they "form part of the same case or controversy . . . ."  28 U.S.C. § 1367(a).

17.    This Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

18.    Venue lies in this District under 28 U.S.C. § 1391(b), because (i) at least one Defendant resides in the Central District of California and all Defendants reside in the State of California, and (ii) "a substantial part of the events or omissions giving rise to the claim occurred" in the Central District of California.

7

COMPLAINT

## PARTIES

**I.    Plaintiffs**

19.    Plaintiff Dr. Kira Stein is Jewish.  She is an assistant clinical professor at UCLA's David Geffen School of Medicine ("DGSOM").  Dr. Stein resides in Los Angeles, California, and resides in this Judicial District.

20.    Plaintiff Dr. Vivien Burt is Jewish.  She is a professor emeritus at UCLA's DGSOM.  Dr. Burt resides in this Judicial District.

21.    Plaintiff Dr. Nir Hoftman is Jewish.  He is a clinical professor at UCLA's DGSOM.  Dr. Hoftman resides in Los Angeles, California, and resides in this Judicial District.

22.    Plaintiff Dr. Kamran Shamsa is Jewish. He is an associate clinical professor in UCLA's DGSOM, Division of Cardiology. Dr. Shamsa resides in this Judicial District.

23.    Plaintiff Dr. Ian Holloway is Jewish.  He was a professor of social welfare at UCLA's Luskin School of Public Affairs ("Luskin School"), and, as of January 1, 2025, is a professor at UCLA's School of Nursing. He resides in this Judicial District.

24.    Plaintiff Sarah Uzan[7] is Jewish.  Her academic appointment is Academic Administrator III in the Department of Community Health Sciences at the UCLA Fielding School of Public Health, and her working title is Director of Field Studies and Applied Professional Training.  She resides in this Judicial District.

25.    Plaintiff Dr. Ron Avi Astor is Jewish.  He is a professor in the Luskin School.  He resides in this Judicial District.

---

[7] Her maiden name, which is how she is known professionally, is Sarah Blenner. Hereinafter, she will be referred to as Director Blenner throughout this Complaint.

8

**II.    Defendants**

26.    Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California, including the University of California, Los Angeles.  The Board of Regents is the governing body for the University of California system and under Article IX, Section 9, of the California Constitution has "full powers of organization and government . . . ."  The Board of Regents has its principal place of operation in Oakland, California.

## FACTUAL BACKGROUND

**I.    UC AND UCLA ADMINISTRATION, POLICIES, & PROCEDURES**

27.    The Regents of the University of California oversee the 10-campus University of California system, which includes UCLA.

28.    UCLA is one of the largest universities in California, with over 46,000 undergraduate and graduate students.

29.    UCLA is located in the Westwood neighborhood of Los Angeles, California, within this Judicial District.

30.    UCLA's campus is located on hundreds of acres of publicly owned land, and as a general matter, it is open to the public.

### *Policies Governing Students & Faculty*

31.    In its own Student Conduct Code, UCLA states that its policies exist to "create and maintain a safe, supportive, and inclusive campus community that engages students . . . ."[8]

32.    UCLA has a policy governing public protests that includes time, place, and manner restrictions.[9]

---

[8]    *Student Conduct Code*, UCLA Office of the Dean of Students, https://perma.cc/G6JD-E9TG.

[9]    *Your First Amendment Rights as a Student at UCLA*, at 3, UCLA Student Affairs,

9

33. The time, place, and manner restrictions state that "speech and assembly on university grounds . . . must not interfere with the orderly operation of the campus and must be conducted in a manner that reasonably protects others from becoming involuntary audiences."[10]

34. The policy further prohibits "block[ing] entrances to or otherwise interfer[ing] with the free flow of traffic into and out of campus buildings;" "knowingly and willfully interfer[ing] with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University;" and "camp[ing] or lodg[ing], except in authorized facilities or locations."[11]

35. UCLA also has a Faculty Code of Conduct.[12]

36. Regarding teaching and students, it states:

The integrity of the faculty-student relationship is the foundation of the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. The unequal institutional power inherent in this relationship heightens the vulnerability of the student and the potential for coercion. *The pedagogical relationship between faculty member and student must be protected from influences or activities that can interfere with learning consistent with the goals and ideals of the University.*

_____

https://perma.cc/FP2Z-8NWC.

[10] *Id.*

[11] *UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties*, 7–8 (Sept. 25, 2017), https://sole.ucla.edu/file/4efd2db6-2863-447e-acb3-ca109fa5b33c.

[12] Univ. of Cal., Academic Personnel Manual (APM) - 015: *The Faculty Code of Conduct* (rev. Jan. 29, 2026), https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-015.pdf.

10

COMPLAINT

(Emphasis added).[13]

37.    The Faculty Code of Conduct features a list of what is considered inappropriate conduct by a faculty member towards students, including "significant intrusion of material unrelated to the course," and "[u]se of the position or powers of a faculty member to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal reasons."[14]

38.    In another section, the Faculty Code of Conduct states what is considered inappropriate conduct by a faculty member towards the UCLA community more generally, including, but not limited to, the following:

    a. Intentional disruption of functions or activities sponsored or authorized by the University.

    b. Incitement of others to disobey University rules when such incitement constitutes a clear and present danger that violence or abuse against persons or property will occur or that the University's central functions will be significantly impaired.

    c. Unauthorized use of University resources or facilities on a significant scale for personal, commercial, political, or religious purposes.

    d. Discrimination, including harassment, against University employees or individuals seeking employment . . . for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), or

---

[13] *Id.* at 4.
[14] *Id.* at 5.

COMPLAINT

service in the uniformed services . . . .[15]

39.     With respect to faculty conduct towards the UCLA community, the Faculty Code of Conduct states that when faculty "'act or speak in their personal and private capacities, they should avoid deliberately creating the impression that they represent the University.'"[16]  Such prohibited behavior by a faculty member includes "[i]ntentional misrepresentation of personal views as a statement of position of the University or any of its agencies."[17]

40.     Similarly, UC Regents Policy 4408 on "Public and Discretionary Statements by Academic Units" requires "[a]ll [p]ublic [s]tatements made by Academic Campus Units" to "comply with applicable laws and University policies, including" those governing anti-violence, anti-discrimination, anti-harassment, and the Faculty Code of Conduct.[18] "Academic Campus Units" include "officially recognized University academic departments or divisions" and "other official academic University entities, including schools, centers, laboratories, institutes, campus divisions of the Academic Senate, and campus University Extension units."[19]

41.     Additionally, the Faculty Code of Conduct details improper conduct by a faculty member towards another colleague that includes, but is not limited to, the following:

    a. Making evaluations of the professional competence of faculty members by criteria not directly reflective of professional performance.

---

[15] *Id.* at 6–7.

[16] *Id.* at 8 (quoting U.C. Academic Council Statement, 1971).

[17] *Id.*

[18] Regents Policy 4408: Policy on Public and Discretionary Statements by Academic Units, https://regents.universityofcalifornia.edu/governance/policies/4408.html (effective July 18, 2024).

[19] *Id.*

b. Discrimination, including harassment, against faculty on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer- related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services . . . .[20]

42.    Regarding faculty enforcement and discipline, the Faculty Code of Conduct recommends that each Division of the Assembly of the Academic Senate "develop and periodically re-examine procedures dealing with the investigation of allegations of faculty misconduct and the conduct of disciplinary proceedings."[21]

43.    In doing so, each Division must adhere to certain principles as stated in the Faculty Code of Conduct, including, but not limited to, the following:

The procedures adopted shall include designation of the following disciplinary sanctions authorized in the University Policy on Faculty Conduct and the Administration of Discipline, of which this Faculty Code of Conduct is an integral part: written censure, reduction in salary, demotion, suspension, denial or curtailment of emeritus status, and dismissal from the employ of the University. The Hearing Committee shall not recommend the imposition of a sanction more severe than that in the notice of proposed disciplinary action. More than one disciplinary sanction may be imposed for a single act of misconduct, e.g., a letter of censure and a suspension.[22]

### *Abusive Conduct in the Workplace Policy*

44.    The University of California maintains a systemwide policy

---

[20] *The Faculty Code of Conduct*, APM - 015 at 8.
[21] *Id.* at 9.
[22] *Id.* at 10.

13

COMPLAINT

addressing abusive conduct in the workplace that "applies to all University employees, unpaid interns, and third parties" across all campuses, medical centers, laboratories, and affiliated units of the University.[23]

45.    The policy prohibits abusive conduct in the workplace and requires the University to respond promptly to reports of such conduct and to take "appropriate action to stop, prevent, correct, [or] discipline [conduct] that violates th[e] policy."[24]

46.    The policy operates alongside existing personnel and disciplinary processes and does not supplant the disciplinary procedures established in the Academic Personnel Manual (*see infra* ¶¶ 53–56) or other applicable University regulations.[25]

47.    The policy defines "Abusive Conduct" as "harassing or threatening behavior that is sufficiently severe, persistent, or pervasive conduct in the [w]orkplace t[o] den[y], adversely limit[], or interfere[] with a person's participation in or benefit from the [University's] education, employment, or other programs or activities . . . ."[26]

48.    The policy further explains that abusive "conduct creates an environment . . . that a reasonable person would find to be intimidating or offensive and unrelated to the University's legitimate educational, employment, and business interests."[27]

49.    In determining whether conduct rises to this level, the University evaluates "the totality of the circumstances," including the relationship between the parties and any power imbalance, the frequency, nature, and severity of the conduct, "whether the conduct was physically threatening," and whether the conduct may

---

[23] Univ. of Cal., *Abusive Conduct in the Workplace*, 1 (effective June 23, 2025), https://policy.ucop.edu/doc/4000701/AbusiveConduct.
[24] *Id.* at 2.
[25] *Id.* at 3.
[26] *Id.* at 2.
[27] *Id.*

14

COMPLAINT

implicate academic freedom or protected speech.[28]

50.    Under the policy, a single act may constitute abusive conduct if it is particularly severe or egregious.[29]

51.    The policy further requires the University to respond promptly to allegations of abusive conduct and directs each University location to adopt implementing procedures identifying responsible reporting and investigative offices, mechanisms for tracking complaints, and available resolution processes.[30]

52.    Under the policy, when a report of abusive conduct alleges facts that may also constitute discrimination, harassment, sexual violence, or retaliation under the University's Anti-Discrimination policy, the matter must be forwarded to the appropriate compliance office, including the Title IX Office or Local Implementation Officer, for coordination with the applicable investigative procedures.[31]

### *Academic Personnel Manual*

53.    Individuals who are academic appointees not covered by UCLA's Faculty Code of Conduct must abide by the Academic Personnel Manual ("APM"), which establishes the governing framework for non-Senate academic appointees and provides both procedural protections and substantive rights in matters involving discrimination, harassment, retaliation, and adverse employment actions.[32]

54.    The University's APM policy prohibits discrimination against and harassment of University employees on the basis of protected characteristics including race, religion, ethnic origin, national origin, ancestry, among others.[33]

---

[28] *Id.*

[29] *Id.*

[30] *Id.*, § V.

[31] *Id.*, § V(C)(4).

[32] Univ. of Cal.*,* APM, https://www.ucop.edu/academic-personnel-programs/academic-personnel-policy/index.html

[33] *The Faculty Code of Conduct*, APM - 015,  II.C.5, II.D.2 (Jan. 29, 2026).

15

55.     When the University receives a "grievance that raises allegations of discrimination, harassment, or retaliation in violation of APM" section 035 involving affirmative action and nondiscrimination in employment, the grievance must be forwarded to the appropriate campus compliance office, and the campus must coordinate the grievance with relevant compliance offices including Title IX, Title VII, ADA, and Equal Employment.[34]

56.     As part of UCLA's shared governance model, each school and department has their own bylaws, which govern procedures on voting and review of dossiers, providing details of how the APM and Senate Faculty policies are implemented.  Department bylaws vary widely by school and Department.[35]

### *Discrimination Prevention Office Procedures*

57.     In addition to the APM, UCLA has adopted procedures administered by the Discrimination Prevention Office ("DPO"), titled Procedures for Handling Allegations of Discrimination, Harassment, or Retaliation, which govern the University's response to complaints of prohibited conduct.[36]

58.     The DPO has jurisdiction over complaints alleging discrimination, harassment, or retaliation when the respondent is a faculty member.[37]

59.     The DPO procedures define discrimination as conduct that adversely affects employment, admission, or access to University programs on the basis of protected characteristics; define harassment as unwelcome verbal, nonverbal, or physical conduct based on protected categories that is sufficiently severe, pervasive, or persistent to create an intimidating, hostile, abusive, or offensive environment;

[34] Univ. of Cal., APM - 140-32(e), https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-140.pdf.

[35] *See* UCLA Academic Senate, *School, Department, IDP, and CII Bylaws*, https://senate.ucla.edu/content/department-bylaws

[36] UCLA, DPO & Title IX Office, *Procedures for Handling Allegations of Discrimination, Harassment, or Retaliation*, § II (Version 3.1 Aug. 8, 2019) https://sexualharassment.ucla.edu/file/e133993a-1eed-4512-b4a9-2d46aba5fb9a.

[37] *Id.*

16

and prohibit retaliation against persons who report, assist with, or participate in investigations or resolutions of such complaints.[38]

60.    The DPO procedures also encourage prompt reporting, impose mandatory reporting obligations on supervisors, and require the responding office to conduct an Initial Assessment to clarify allegations, "determine whether the report plausibly alleges an act of Prohibited Conduct," and decide whether the matter should proceed to alternative resolution or formal investigation.[39]

61.    If a formal investigation is opened, the respondent must receive a written Notice of Investigation summarizing the allegations, identifying potential policy violations, describing the purpose and procedures of the investigation, providing the expected timeline, and stating that the matter will be decided under a preponderance of the evidence standard.[40]

62.    During the investigation, the investigator is tasked with interviewing the parties and witnesses, reviewing documents and electronic communications, and providing both parties an equal opportunity to submit information and identify witnesses, and may obtain administrative and personnel records subject to confidentiality requirements.[41]

63.    The DPO procedures also permit, in the course of an investigation, consideration of prior or subsequent conduct relevant to "pattern, knowledge, intent, motive, or absence of mistake."[42]

64.    The investigation culminates in a written Investigation Report summarizing the allegations, applicable policies, evidence reviewed, factual findings, credibility determinations, and conclusions regarding whether a policy

---

[38] *Id.* § III(1), (2), (5).
[39] *Id.* §§ VII(A), VIII(B).
[40] *Id.* § IX(B)(2).
[41] *Id.* § IX(B)(4)(a), (c).
[42] *Id.* § IX(B)(4)(d).

17

COMPLAINT

violation occurred under the preponderance standard.[43] Both parties must be provided "a reasonable opportunity to respond to any material allegations or evidence" before the Investigation Report is finalized.[44]

65.     The DPO procedures also impose timing, notice, and decision-making requirements. "For non-Senate academic appointees, following consultation with the [committee], and in accordance with APM-150, the Chancellor or Chancellor's designee" determines what action to take and must "promptly inform the parties" of the final decision and its rationale and report the outcome and any corrective action to the appropriate compliance office.[45]

## II.     ANTISEMITIC INCIDENTS ACROSS UCLA

### *Antisemitic Protests Post-October 7*

66.     On October 7, 2023, the terrorist group Hamas launched a vicious and deadly attack against Israel, in which Israeli civilians were beheaded, raped, butchered, burned alive, and kidnapped.

67.     In the wake of this horrible event, antisemitic protests erupted across the country, frequently on college campuses. One of the themes of these protests is antizionism. Distinguishable from criticism of Israeli government policy, antizionism is an ideology that treats the existence of Israel—and often Jewish collective existence itself—as an inherent crime. *See supra* n.4. Antizionism and attacks against people who affirm the Jewish state's right to exist are often used as a pretext for antisemitism and thinly-disguised hatred and discrimination against Jews. *Id.*

68.     In practice, antizionism often operates as a stand-in for anti-Jewish hostility, using the term "Zionist" as a derogatory label for Jews or those perceived as Jewish or associated with Israel. Such rhetoric commonly relies on longstanding

---

[43] *Id.* § IX(B)(5).

[44] *Id.*

[45] *Id.*, app. B at 23.

antisemitic tropes to stigmatize or target individuals. When people are excluded, harassed, or subjected to adverse treatment on this basis, the conduct constitutes discrimination on the grounds of religion, ethnicity, and/or national origin. *See supra* n.4.

69.    Even former Chancellor Gene Block admitted that UCLA has not been "immune to the disturbing rise of antisemitism across our country since October 7th."[46]

70.    In fact, UCLA was the site of one of the main and more infamous antisemitic demonstrations.

71.    Specifically, as early as October 12, 2023, demonstrators and activists on UCLA's campus chanted "*Itbah El Yahud*," which means "slaughter the Jews" in Arabic.

72.    Police officers from the University of California Los Angeles Police Department ("UCLA PD") were present but did not intervene.

73.    In or around early November 2023, UCLA faculty and professors, including Dr. Stein, Dr. Burt, Dr. Hoftman, Dr. Holloway, Dr. Astor, and Director Blenner, signed the UCLA Faculty Against Terror letter, also known as the "Judea Pearl letter."[47] *See infra* ¶¶ 407, 455, 530.  This letter, covered in the Jewish Journal, notified the UCLA Chancellor that campus rallies celebrating the October 7th terrorist attack were calling for violence and made Jewish students, staff, and faculty "afraid to be on campus, show solidarity with Israel, or practice their freedom of

---

[46] House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos Before the H. Comm. on Educ. & the Workforce*, 118th Cong. at 41:10–41:17, YouTube (May 23, 2024), https://bit.ly/3R8V3FD (statement of Chancellor Block).

[47] Judea Pearl is an Israeli born UCLA computer science professor and president of the Daniel Pearl Foundation, recognized for his work promoting cross-cultural understanding and for honoring the legacy of his son, journalist Daniel Pearl. Daniel Pearl was abducted and beheaded by a Pakistani militant group in 2002.

religion in public."[48]

74.    The Judea Pearl letter asked the administration to denounce Hamas's attack on Israel and rallies on campus that called for violence, characterized Hamas as a terrorist organization, and to enforce UCLA policies to hold student groups and the UCLA community accountable if they participate in inciting violence, and to designate a special envoy to coordinate fighting antisemitism and anti-Israelism.

75.    On November 8, 2023, agitators at UCLA's School of Law held antisemitic signs and chanted "from the River to the Sea,"[49] "there's only one solution," "*intifada*," "death to Israel," and "death to Jews."

76.    At this same protest, the UCLA student group "Students for Justice in Palestine" ("SJP")[50] chanted "beat that fucking Jew" through a megaphone and bashed a pinata bearing the obvious likeness of Israeli Prime Minister Benjamin Netanyahu.

77.    Presumably in response, UC President Michael Drake and the Chancellors of UC Campuses jointly issued a statement on or about November 10, 2023. Rather than responding explicitly to the incident and acknowledging the antisemitic nature of the conduct, the statement referenced anti-hate and tolerance language broadly and coupled antisemitism with Islamophobia despite the incident only evidencing antisemitism. The statement's broad terms and failure to call out

---

[48] Aaron Bandler, *Nearly 300 UCLA Faculty Members Call on University to Denounce Anti-Israel Rallies on Campus*, JEWISH JOURNAL, (Nov. 10, 2023) https://jewishjournal.com/news/365107/nearly-300-ucla-faculty-members-call-on-university-to-condemn-hamas-terror-attack-anti-israel-rallies-on-campus/.

[49] This is "a phrase that can be used to call for the elimination of the State of Israel and/or ethnic cleansing of Jews living there, to be replaced with Palestinian control over the entire territory from the Jordan River to the Mediterranean Sea." American Jewish Committee, *"From the River to the Sea,"* Translate Hate, (last visited Apr. 10, 2026), https://www.ajc.org/translatehate/From-the-River-to-the-Sea.

[50] SJP is a pro-Hamas group. *See* Michael Starr, *October 7 victims sue SJP, AMP for serving as Hamas Propaganda arm*, THE JERUSALEM POST (May 3, 2024, 11:58 AM, Updated: May 5, 2024, 7:39 PM), https://www.jpost.com/israel-news/article-799716.

20

the incident for what it was erased and minimized the specific experiences of Jewish individuals who witnessed or felt threatened by the violence and threats of violence captured in video and shared broadly on social media.

78. In another incident, on or around October and November 2023, Jewish students and faculty reported antizionist activists on campus holding knives.[51]

79. Also during this incident, masked protestors with their faces wrapped in keffiyehs[52] ran around campus with large daggers, aggressively ripping down Israeli hostage posters, defacing UCLA's campus with antisemitic symbols like swastikas and prominent signage, featuring antisemitic slogans like "Free Palestine, Fuck Jews,"; "Fuck Zionists"; "Jews, the new Nazis"; and "Nazionists."

80. On December 6, 2023, the UCLA Police Department instructed a Jewish fraternity to hire extra security for a party it was going to host as a safety precaution.

81. As antisemitism spread on the UCLA campus following the November 2023 publication of the Judea Pearl letter, Dr. Stein, founder and chair of the Jewish Faculty Resilience Group at UCLA ("JFRG") (*see infra* ¶¶ 207–212), sent a written letter with supporting materials on January 12, 2024, to UCLA Chancellor Block and UC President Drake.

82. JFRG's letter documented antisemitic rhetoric, demonstrations, and threatening incidents affecting the Jewish community on campus following the October 7th attacks. The letter requested that University leadership publicly

[51] House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos*, 118th Cong. at 2:27:14–2:27:40, YouTube (May 23, 2024), https://bit.ly/3WYmUfm (statement of Chancellor Block).

[52] The keffiyeh has recently been associated with the pro-Intifada movement. In some contexts, wearing a keffiyeh can reasonably convey support for an antizionist movement that seeks to delegitimize the existence of a Jewish state, marginalize, and terrorize those who support Israel's continued existence. *See* Eric Rozenman, *No Swastikas, No Hoods, No Keffiyehs*, JNS (Aug. 13, 2025), https://www.jns.org/opinion/eric-rozenman/no-swastikas-no-hoods-no-keffiyehs.

COMPLAINT

condemn antisemitism, enforce university time, place, and manner policies, adopt the IHRA definition of antisemitism, and implement antisemitism awareness training for administrators and faculty. The open letter was supported by more than 1,300 signatories from UCLA faculty, students, staff, alumni, parents, and donors.

83.   In February 2024, a scheduled talk at Royce Hall by former Israeli Foreign Minister, Tzipi Livni, hosted by the Younes and Sorayna Nazarian Center for Israeli Studies was moved online due to planned protests and disruptions by antizionist student groups.[53]

84.   JFRG Chair Dr. Stein promptly emailed University officials to object to the decision and to warn that the University was yielding to intimidation directed at a Jewish and Israeli speaker.

85.   Dr. Stein explained that relocating the event from Royce Hall to a virtual format marginalized Jewish voices on campus and signaled that Jewish speakers associated with Israel could not safely appear in person. She urged UCLA administrators to instead provide appropriate security and publicly reject attempts by groups such as SJP and Faculty for Justice in Palestine ("FJP") to silence the event. Dr. Stein further warned that allowing threats or anticipated disruption to dictate whether Israeli speakers could appear on campus would embolden antisemitic intimidation and undermine UCLA's commitment to free expression and equal participation for Jewish faculty and students.

### The March 2024 Regents Meeting & The Antisemitic Statue

86.   On March 20–21, 2024, the Regents of the University of California and its committees held a meeting on UCLA's campus.

87.   During the first day of the Regents meeting, antisemitic protestors placed a statue outside the Meyer and Renee Luskin Conference Center, where the

---

[53] Michael Starr, *Tzipi Livni UCLA talk moved online after anti-Israel protest*, THE JERUSALEM POST (Feb. 28, 2024, 10:16 PM), https://www.jpost.com/diaspora/antisemitism/article-789482.

COMPLAINT

Regents meeting was being held. The statue was placed in a highly visible location near the entrance to the Luskin Conference Center, remaining on campus for at least one week.

88.    Dr. Stein, Dr. Burt, Director Blenner, and Dr. Hoftman observed individuals wearing keffiyehs assembling the statute as they walked from Ronald Reagan UCLA Medical Center to the Luskin Conference Center to deliver public comments to the Regents regarding escalating antisemitism on UCLA's campus.



89.    The statue features a "scale" with a pig holding a money bag in one hand higher than a bird cage with a keffiyeh in its other hand.  At the foot of the statue is a bucket with a Jewish star of David painted on its front in Israeli-flag colors, along with flame imagery.[54]

90.    To anyone familiar with classic antisemitic tropes, this statue invoked classic stereotypes portraying Jews as greedy, corrupt, and subhuman. The pig

---

[54] Photo credit: David Myers, *Op-ed: Antisemitic imagery at UC Regents meeting protest threatens campus discourse*, DAILY BRUIN, (Apr. 2, 2024, 10:22 PM), https://dailybruin.com/2024/04/02/op-ed-antisemitic-imagery-at-uc-regents-meeting-protest-threatens-campus-discourse.

23

imagery in particular echoed the Judensau, a medieval and later Nazi-era motif used to degrade Jews by associating them with pigs, an animal considered ritually impure in Jewish tradition.  The display also incorporated Jewish symbols, including the Jewish Star of David, in a manner that appeared to demean and target Jews, and included the words, "Time Is Running Out." At the time, this phrase had become widely used in public discourse regarding the Israeli hostages taken during the October 7th attacks, including by hostage families, Israeli officials, and international advocates seeking their release. Thus, this phrase carried a widely recognized association with the fate and safety of these hostages.



91.    Given the context of escalating antisemitic incidents on UCLA's campus following the October 7th attacks in Israel, Jewish members of the UCLA community reasonably understood this display to be a hostile, degrading, and threatening message, making them feel unsafe and unwelcome on UCLA's campus.[55]

---

[55] Aaron Bandler, *UCLA Condemns "Ugly Antisemitic" Pig Display*, JEWISH JOURNAL (Mar. 22, 2024), https://jewishjournal.com/community/369554/ucla-condemns-ugly-antisemitic-pig-display/

COMPLAINT

*Lectures and Other Programming on Campus that Propagated Antisemitism and Created a Hostile Environment for Jews*

92. Meanwhile, as antisemitic symbols and protests grew throughout campus, the University allowed discriminatory behaviors to be perpetuated through classes, lectures, and other programming.[56]

*Activist in Residence and "Structural Racism and Health Equity" Lecture*

93. On February 5, 2024, JFRG Chair Kira Stein sent a letter to Vice Chancellor Rhea Turteltaub (copying Chancellor Block), raising concerns about UCLA's decision to host Lisa "Tiny" Gray-Garcia as an "activist in residence" at the UCLA Luskin School.

94. Gray-Garcia is a known pro-Palestine activist who had publicly posted antisemitic content on her social media, including referring to the October 7th massacre on Israel as "justice" and calling Israel "amerikkklan." Dr. Stein warned that promoting Gray-Garcia risked conveying institutional endorsement of extremist antizionist ideology to the public.

95. On March 27, 2024, first-year medical students were required to attend a session titled "Housing (In)justice in LA: Addressing Unhousing and Practicing Solidarity" as part of a mandatory course called "Structural Racism and Health Equity."[57] The DGSOM selected Gray-Garcia as the invited speaker for this mandatory educational session.

96. During the lecture, Gray-Garcia led students in a prayer to "mother earth" and then led the entire class in chants of "Free, Free Palestine," with over half the students reportedly repeating the chant. Faculty and staff present in the

---

[56] The instances of discrimination through classes, lectures, and other programming discussed below represent a non-exhaustive sampling.

[57] Nic White, *UCLA Med School forced first year students to attend 'structural racism' course where screaming pro-Hamas speaker told them to kneel for bizarre woke 'prayer,' while pediatrician DEI boss looked on*, DAILY MAIL (Apr. 3, 2024), https://www.dailymail.co.uk/news/article-13269831/UCLA-Med-School-bizarre-lecture-pro-Hamas-activist-prayer.html.

25

COMPLAINT

classroom did nothing to stop this conduct.  Instead, UCLA staff reportedly recorded the names of the students who declined to participate.

97.    This lecture violated UC Regents Resolution 2301 on Course Content, which forbids the advancement of political indoctrination in educational settings.[58]

98.    On March 29, 2024, Dr. Stein alerted the UCLA administration by email to Chancellor Block and DGSOM Dean Dubinett of this lecture as another egregious example of indoctrination at the DGSOM. Two days later, Chancellor Block responded via email, stating that Dean Dubinett would contact Dr. Stein to discuss corrective steps. Dr. Stein, however, never received a communication Dean Dubinett.

<em>The "Depathologizing Resistance" Lecture</em>

99.    On April 2, 2024, a lecture titled "Depathologizing Resistance" was presented in the UCLA Department of Psychiatry by two psychiatry resident physicians. The lecture was publicly promoted via mass email as a discussion critiquing "the ways in which psychiatry has been used as a tool of oppression," including "pathologizing self-immolation."

100.   The lecture was public, required no registration, and contained no indication of confidentiality.

101.   Approximately thirty minutes into the lecture, the presenters used the self-immolation of a U.S. Air Force servicemember protesting Israel as the central case study to advance antizionist and antisemitic rhetoric.

102.   The lecturers described Israel as having "occupied Palestine since 1948" and criticized the American Psychiatric Association's statement condemning the October 7, 2023 terrorist massacre—the most horrific violence against Jews

---

[58] Univ. of Cal. Board of Regents, *Regents Policy 2301: Policy on Course Content* (approved    June    19,    1970;    amended    Sept.    22,    2005), https://regents.universityofcalifornia.edu/governance/policies/2301.html.

26

since the Holocaust—for failing to "acknowledge the 75 years of colonization of Palestine."

103.   It is well-settled that psychiatric medical training should provide clinically-grounded, evidence-based instruction focused on patient care, professional ethics, and trainee safety, rather than a forum for political advocacy, ideological messaging, or the vilification of any protected group.

104.   Here, the Depathologizing Resistance lecture functioned as discriminatory conduct targeting Jews as a protected class; it denied the legitimacy of Jewish self-determination, normalized and justified mass violence against Jews—including the October 7 massacre—and used the suicide of an active-duty servicemember to advance antizionist and antisemitic narratives. The lecture did not serve any legitimate medical, psychiatric, or pedagogical purpose.

105.   The Depathologizing Resistance lecture also constituted political indoctrination prohibited by UC Regents Resolution 2301 on Course Content, which forbids the advancement of partisan interests and political indoctrination in educational settings.[59] Notably, the lecture was delivered under UCLA institutional auspices during a psychiatry resident physician lunch, co-sponsored by the Psychiatry Ethics, Community and Global Psychiatry, and the Justice, Equity, Diversity, and Inclusion ("JEDI") office, and was presented as instructional content in a medical training setting where political advocacy has no legitimate role.

106.   Even though requested by Jewish faculty, UCLA never issued any formal condemnation of the "Depathologizing Resistance" lecture.

107.   Instead, UCLA later rewarded the presenters and promoted the faculty sponsor of this lecture to an administrative position.

108.   For example, one of the presenters was awarded an Anti-Racism and Mental Health Seed Grant, and the other presenter was assigned to train as a resident

---

[59] *Id.*

27

COMPLAINT

at the UCLA Women's Life Center for the 2025–2026 academic year—the same clinic from which Dr. Stein was summarily suspended (pending an investigation that never took place) and from which Dr. Burt was subjected to antisemitic intimidation such that she was effectively compelled to take leave. *See infra* ¶¶ 237, 297.

109.    On March 31, 2025, the UCLA Psychiatry Department announced that the resident physicians who presented the "Depathologizing Resistance" lecture (*see supra* ¶¶ 99–105) would be the chief residents of UCLA's 2025–2026 Community Global Psychiatry program.

110.    On May 30, 2025, UCLA announced the promotion of Dr. Erika Bath, Director of the DGSOM's JEDI office that co-sponsored the event, to Assistant Dean in the now-renamed Office of Inclusive Excellence.[60]

### *"Revisiting Zionism as a Form of Racism and Racial Discrimination" Programming*

111.    In addition to the antisemitic messaging on UCLA's campus that contributes to a hostile and discriminatory environment, there is a lack of balance in programming that has been institutionalized.

112.    For example, on November 13, 2025, an event was held at UCLA entitled "Revisiting Zionism as a Form of Racism and Racial Discrimination."

113.    The advertisements for this event indicated that the following campus units sponsored the event: (1) UCLA School of Law Critical Race Studies, (2) UCLA School of Law David J. Epstein Program in Public Interest Law & Policy, (3) UCLA College of Social Sciences Center for the Study of Women Barbara Streisand Center, (4) The Promise Institute for Human Rights, UCLA School of Law, (5) UCLA College of Social Sciences Asian American Studies, (6) UCLA

---

[60] *See* UCLA Office of the Chancellor, *Announcing the Office of Inclusive Excellence*, (Oct. 17, 2024), https://chancellor.ucla.edu/messages/announcing-the-office-of-inclusive-excellence.

College Humanities English, (7) UCLA Asian American Studies Center, (8) UCLA Luskin Institute on Inequality and Democracy, (9) UCLA American Indian Studies Center, (10) Consortium for Palestine Studies at UCLA, and (11) Palestinian Student Union at UCLA.[61]

114.   In an effort to try to create balanced opportunities for campus affiliates to learn about Zionism and other aspects of Jewish identity, JFRG organized a complimentary event to take place following the "Revisiting Zionism as a Form of Racism and Racial Discrimination" event.

115.   Specifically, representatives from JFRG reached out to most of the organizations who were listed as co-sponsors to ask for their support in both co-sponsoring the event aimed at promoting dialogue and also disseminating information about the event to their list servs or in the same manner as they distributed information on "Revisiting Zionism as a Form of Racism and Racial Discrimination."

116.   JFRG told each unit that there would be no financial cost to support the program through sponsorship or dissemination.

117.   However, not a single center, department, or unit on campus would provide sponsorship in name or disseminate the event to their communities.

118.   This imbalance of programming and perspective is by design and demonstrates the institutionalization of antisemitic educational content and indoctrination.

---

[61] UCLA College of Social Sciences Center for the Study of Women, *Noura Erakat on Revisiting Zionism as a Form of Racism and Racial Discrimination* (Nov. 13, 2025, 5:30–7:00 PM), https://csw.ucla.edu/event/noura-erakat-on-revisiting-zionism-as-a-form-of-racism-and-racial-discrimination/.

29

COMPLAINT

***Departmental Faculty Executive Committee Meetings (2023–2024)***

119. UCLA has a shared system of governance that involves collaboration between faculty and administration. This collaboration is primarily facilitated through the Academic Senate.

120. Within the Academic Senate, the Faculty Executive Committee ("FEC") is an elected body representing the faculty within various schools, such as the DGSOM and the Luskin School, and functions as an arm of the Academic Senate.

121. The FEC reviews and approves curricular requirements and proposes changes to school regulations.

122. The FEC also consults with faculty and administration on educational resources, academic priorities, and budget issues.

123. Throughout 2023 and 2024, when UCLA Jewish faculty raised concerns regarding antisemitism at departmental FEC meetings, their concerns were dismissed. Instead of addressing the antisemitic incidents, UCLA leadership subjected Plaintiffs to additional acts of discrimination and retaliation.

***The Pro-Palestinian Encampment (Spring 2024 and on)***

124. On the heels of similar pro-Hamas and pro-Intifada encampments at other universities, including the Columbia University encampment in mid-April 2024, a group of activists at UCLA "established an unauthorized physical encampment"[62] on UCLA's Royce Quad, also known as Dickinson Plaza (the "Encampment").

125. Royce Quad is a large, grassy space located between two buildings to its north, one of which is Royce Hall (and thus the name), and two buildings to its south.

---

[62] Gene D. Block, *Affirming our Values in a Challenging Time*, UCLA Chancellor (Apr. 30, 2024), https://perma.cc/T79X-62MZ.

30

COMPLAINT

126.    These four buildings make up the original four buildings of UCLA's campus.

127.    Royce Quad is a common gathering spot for students, frequently used for clubs, fairs, and general socializing.  It is also a major thoroughfare for students and faculty to access the rest of UCLA's campus, including buildings such as the Student Activities Center, and the John Wooden Center, and is a short distance from UCLA's business and law schools.

128.    Royce Hall, built in 1929, is one of the country's finest concert halls, known for its impeccable beauty and acoustics.  It hosts a number of concerts and events, seating over 1,800 people.

129.    Powell library, another of the four buildings that make up Royce Quad, is UCLA's main undergraduate library.  Because of its stunning rotunda, it is also used for special events, and it hosts impressive collections and programming.

130.    The Encampment was set up near the quad on April 25, 2024, and lasted until May 2, 2024, when the Los Angeles Police Department ("LAPD") finally raided and dismantled the Encampment.

131.    Signage within and around the Encampment included antisemitic slurs such as, "this is the final solution," "fuck Israel," "intifada," "death to the Jews," "from the River to the Sea" and "intifada revolution."

132.    Demonstrators at the Encampment chanted "Itbah El Yahud", which translates to slaughter the Jews, while others chanted "death to Israel" and "death to Jews," "die you fucking Jew," and "FUCK ALL Jews."

133.    Arabic writing appeared in and around the Encampment, demanding Hamas to "burn Tel Aviv to the ground." A Jewish Star of David was also drawn on the ground with the words "STEP HERE" written on it.

31

COMPLAINT

134.    Then-Chancellor Block later admitted in sworn testimony that these slogans are antisemitic and potentially dangerous because of their call to violence.[63]

135.    Antisemitic imagery was also seen throughout the Encampment.  For example, "Free Gaza," "Intifada," and "baby killers" could be seen graffitied on walls and sidewalks.

136.    UCLA allowed barricades to be set up, and the members of the Encampment set up and enjoyed a "Jew Exclusion Zone."



137.    UCLA allowed protestors to set up plywood barricades and then provided metal barricades to further reinforce the perimeter.

138.    To gain entry or pass through the Encampment, a person would have to denounce his or her faith and condemn Israel as committing genocide against Palestinians.

139.    The Encampment also excluded Jewish students and faculty by asking if the person was a "Zionist."  Others Jewish students were excluded if they wore a visible Jewish Star of David necklace.

---

[63] *See* House Comm. on Educ. & the Workforce, *Calling for Accountability: Stopping Antisemitic College Chaos*, 118th Cong. at 3:06:20–3:07:07:10, YouTube (May 23, 2024), https://bit.ly/3WYmUfm (statement of Chancellor Block).

140. UCLA not only encouraged this Encampment, but they hired private security and instructed the UCLA Police Department to prevent Jewish faculty, staff, and students from entering areas controlled by the Encampment. *See Frankel*, 744 F. Supp. 3d at 1020 ("Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. UCLA does not dispute this.") (emphasis omitted).

141. In fact, UCLA sent multiple messages to the campus community supporting the Encampment.

142. For example, referencing the "history of peaceful protest" at UCLA, the administration issued a statement on April 26, 2024 stating: "UCLA's approach to the encampment is guided by several equally important principles: the need to support the safety and wellbeing of Bruins, the need to support the free expression rights of our community, and the need to minimize disruption to our teaching and learning mission."[64]

143. Yet UCLA failed to extend these commitments to Jewish faculty, staff, and students, whom it excluded from portions of campus and denied the very safety, wellbeing, and free expression rights it claimed to prioritize.

144. UCLA even took affirmative steps to protect the Encampment's physical presence on campus. Specifically, "[u]niversity leadership ordered the installation of metal barriers surrounding the encampment . . . ."[65]

145. Thus, while UCLA deployed resources to protect the Encampment and its occupants, it simultaneously facilitated the exclusion of Jewish faculty and students from portions of campus.

---

[64] UCLA Newsroom, *UCLA Statement About Encampment on Campus*, (Apr. 26, 2024), https://newsroom.ucla.edu/ucla-statement-about-encampment-on-campus-april-26.
[65] *See* First Amended Complaint at 9, *Blair v. Regents of the Univ. of Cal.*, No. 24STCV27623 (Cal. Super. Ct. L.A. Cnty.) (filed Dec. 9, 2024).

33

COMPLAINT

146. On May 2, 2024, "UCLA directed the UCLA Police Department and outside law enforcement agencies to enter and clear the encampment." *Frankel*, 744 F. Supp. 3d at 1022.

147. However, the antisemitic protests that violated both UCLA's policies and the law continued even after the Encampment was dismantled.

148. "For example, on May 6," just days after the dismantling of the Encampment, "protestors briefly occupied [other] areas of [UCLA]." *Id.* "And [again,] on May 23." *Id.*

149. Another encampment was set up on June 10, 2024, incorporating water barricades, but included "tents, canopies, [and] wooden shields," causing some students to miss final examinations, and others to be evacuated during finals. *Id.*

150. Then again, during the week of November 18, 2024, another protest attempted to block Jewish individuals from accessing certain portions of campus.

151. In early October 2025, the UCLA FJP posted on social media platforms advertising demonstrations to take place at UCLA on October 6–7, 2025, including a "Vigil for the Martyrs" demonstration at Royce Quad, which is not a permitted location.

152. Notably, October 6 was the final night of the Jewish holy days of Sukkot and the evening before the second anniversary of the October 7th Hamas terrorist attack.

153. On October 6, 2025, JFRG sent two separate emails to Chancellor Frenk warning about the upcoming protests and urging UCLA to enforce its time, place, and manner ("TPM") policy. That same day, demonstrators arrived in front of Royce Hall and protested for several minutes, violating the University's time, place, and manner rules as well as masking rules. UC police and UCLA Student Affairs officers were present at the scene.

154. Police informed Jewish professor Richard Steinberg that Associate Vice Chancellor for Campus and Community Safety, Steve Lurie, was commanding

34

them. Rather than enforce the rules or arrest any demonstrators, Lurie attempted to deescalate, employing what he called a "tiered response," informing the demonstrators that they were in violation of the time, place, and manner rules and asking them to move to the nearby Schoenberg Quad, which was a time, place, and manner-designated location.

155.   While most demonstrators complied and moved to Schoenberg Quad, a handful of individuals remained at Royce Quad, continuing to violate University time, place, and manner rules. However, none of the demonstrators were arrested by police, and none were disciplined or even asked for identification by Student Affairs officers.

156.   As the demonstrators moved from Royce Quad toward Schoenberg Quad, a student demonstrator filmed Professor Steinberg and then physically assaulted him by knocking his iPhone out of his hand, while one of the protesters called him a "motherfucker" or words to that effect.

157.   Many of the protestors moving from Royce Quad toward Schoenberg Quad wore keffiyeh headscarves masking their faces, or medical masks, to conceal their identities.

158.   Professor Steinberg approached Lurie, engaged in a conversation with him about why Lurie was not enforcing University and campus time, place, and manner rules, or the masking rules.  Lurie stated that the masked protesters were not intimidating anyone, and Professor Steinberg mentioned that his phone had been knocked out of his hand by a protester, who was now gone, which Professor Steinberg found intimidating.

159.   A woman approached and interrupted to also ask Lurie why he was not enforcing the campus rules. Lurie threw up his hands, stated that he could address only one issue at a time, and asked both Professor Steinberg and the woman to identify themselves, which they did; the woman said she was a Daily Bruin reporter.

35

The rest of the conversation focused on why Lurie was not enforcing the rules, which was reported on October 7th in the Daily Bruin.

160. Lurie later justified his decision not to enforce the rules on the basis that most of the protesters had agreed to move from Royce Quad after being asked, entirely disregarding the time, place, and manner rules and masking rules that had already been violated.

161. Despite JFRG's warnings, a second, much larger SJP protest occurred on October 7, 2025—the exact two-year anniversary of the Hamas attacks.

162. On October 10, 2025, JFRG sent a letter to Chancellor Frenk documenting UCLA's failure to enforce TPM policies during the protests. Despite clear violations of UCLA's polcies, including TPM policies, in his October 30, 2025 response to JFRG's letter, Vice Chancellor Steve Lurie stated that in his opinion, there was no violation of UCLA's policies.

### *UCLA Cultural Affairs Commission Discrimination*

163. The UCLA Cultural Affairs Commission ("CAC") is one of the fourteen offices within the Undergraduate Students Association Council ("USAC"), funded by mandatory student fees. CAC's mission is to create and promote programming that is culturally, politically, and socially relevant—aiming to foster dialogue, creativity, and community engagement among students.

164. CAC focuses on "edutainment" (education + entertainment) and arts activism, providing inclusive spaces for students to connect and express themselves through various events and initiatives.

165. Starting July 8, 2024, on behalf of JFRG, Dr. Stein and colleagues submitted multiple complaints to UCLA administrators regarding the conduct of CAC. JFRG alleged that CAC misused its official resources and social media platforms to promote anti-Israel messaging and antisemitic tropes, including slogans and materials that incited hostility toward Jewish and Israeli members of the UCLA community. The complaints documented numerous posts and activities,

36

including calls for disruptive protests, dissemination of antisemitic libels, and use of university resources in support of encampments and demonstrations.

166.    Despite these repeated warnings and requests for intervention, UCLA failed to take timely action to address CAC's conduct or its impact on the campus environment.

167.    Ultimately, a Petition for Consideration was filed with the USAC Judicial Board, alleging that Alicia Verdugo, the CAC Commissioner, who held a paid position, discriminated against Jewish students during the Fall hiring process for staff positions.

168.    Specifically, the Petition claims that Commissioner Verdugo "rejected all applicants who identified themselves as Jewish . . . even though their applications did not mention Zionism or Israel," and instructed subordinates to reject them.[66]



---

[66] Benjamin Katz, *Evidence Suggests Jewish Students Denied from Cultural Affairs, Judicial Board Petition Claims*, Ha'Am (Nov. 27, 2024), https://haam.org/evidence-suggests-jewish-students-denied-from-cultural-affairs-judicial-board-petition-claims/ [https://perma.cc/G45T-6F6Y].

37

169. The Petition also a shared document of CAC's policies stating that, "'We reserve the right to remove any staff member who dispels . . . zionism . . . .'" Notably, antisemitism is not mentioned.[67]

***Antisemitic Reports Issued by UCLA-Appointed Task Force (2024-2026)***

170. Around December 2023, Executive Vice Chancellor and Provost Darnell Hunt ("EVCP Hunt") created two task forces, composed of students, academic appointees, faculty, and staff, to "help ensure a welcoming, safe, and inclusive environment at UCLA:" the "Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA" and the "Task Force to Combat Islamophobia and Anti-Palestinian Bias at UCLA."

171. According to EVCP Hunt, task force members were asked that if they joined, they would make a "commitment" to "openness to and curiosity toward deepening understanding and connection between these two groups over time."

172. The two task forces were to convene together under the Dialogue Across Differences Initiative after the groups "had a chance to flesh out its most pressing concerns regarding our campus climate."

173. The stated mission of the Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA was to "examine the recent manifestations of antisemitism and anti-Israeli bias on the UCLA campus" and "provide an opportunity to understand experiences of anti-Jewish and anti-Israeli bias across UCLA's diverse Jewish community." The Task Force sought to "identify factors contributing to anti-Jewish and anti-Israeli behaviors on campus," "gather and evaluate evidence regarding the characteristics and frequency of anti-Jewish and anti-Israeli incidents on campus," and "generate recommendations to combat antisemitism and anti-Israeli bias and promote an inclusive climate on campus."

---

[67] *Id.*

38

174.   The Task Force to Combat Antisemitism and Anti-Israeli Bias further stated its mission was to "carry out its work in a collaborative and timely manner across the course of the Spring 2024 quarter" and "strive to work in a spirit of partnership with the Task Force on Combating Islamophobia and Anti-Palestinian Bias at UCLA" to "improve the campus climate for all members of our diverse UCLA community."

175.   Based on information and belief, the Task Force to Combat Islamophobia and Anti-Palestinian Bias was tasked with a similar mission that was limited in scope to the Spring 2024 quarter.

176.   Based on information and belief, the Task Force to Combat Islamophobia and Anti-Palestinian Bias was similar to the Task Force to Combat Antisemitism and Anti-Israeli Bias, in that the Task Force was to identify factors contributing to Islamophobia and anti-Palestinian Bias on campus, gather and evaluate evidence regarding the characteristics and frequency of anti-Muslim and anti-Palestinian incidents on campus, and produce recommendations to promote an inclusive climate on campus.

177.   At some point, the Task Force to Combat Islamophobia and Anti-Palestinian Bias at UCLA changed its name to the UCLA Task Force on Anti-Palestinian, Anti-Arab, and Anti-Muslim Racism ("AAAR").

178.   Several attempts were made to bring the two task forces together to collaborate and for dialogue.  Notwithstanding the best efforts of the Task Force to Combat Antisemitism and Anti-Israeli Bias and the Dialogue Across Differences Initiative, the AAAR would not collaborate or engage in dialogue with the Task Force to Combat Antisemitism and Anti-Israeli Bias.

179.   The AAAR created a website, on which three AAAR reports and an open letter are published: "Report #1 On Anti-Palestinian, Anti-Arab, and Anti-Muslim Racism at UCLA" (May 2024), "Report #2 The Militarization of Campus" (June 2024), "Report #3 Palestinian Human Rights and the Struggle for Racial

39

Justice in the Medical School" (January 2025 and Corrected in May 2025), and "Open Letter to Chancellor Frenk" (March 2025).

180. The AAAR reports include statements that amplify antisemitism, libels, and antisemitic conspiracy theories, and supply few citations to support its assertions.

181. The AAAR reports use UCLA's name as if they are official University documents.

182. AAAR used its position as a UCLA-appointed body to spread antisemitic rhetoric and target and discredit the JFRG and its members solely for speaking out against antisemitism at the DGSOM.

183. According to EVCP Hunt, "the Islamophobia task force produced the [first] report, which itself was not commissioned by the administration." EVCP Hunt stated: "We are still fact-checking many of the claims made in the report about the encampment and its aftermath, and UCOP's investigation and our own internal investigation will have something to say about this.  The report should not be considered as UCLA's official position on these matters."

184. Despite EVCP Hunt's statement, no steps were taken to clarify UCLA's position to the UCLA community, and departments, including the Department of Community Health Sciences and Fielding School of Public Health, used the AAAR's report as if it were an official UCLA document containing accurate facts. No corrective action was taken to prevent the continued spread of antisemitic rhetoric contained in the AAAR report or its subsequent reports.

185. Likewise, no steps were taken to clarify AAAR's second report, issued around one month after the first report.

186. The failure to clarify AAAR's reports relation to UCLA led to additional harm. AAAR's third report propagated antisemitic conspiracy theories, made false accusations that JFRG committed acts that occurred before JFRG even

40

COMPLAINT

existed, and claimed that Jewish faculty members' reports of antisemitism amounted to "doxxing."

187.   On March 3, 2025, JFRG Chair Dr. Stein asked Chancellor Julio Frenk to publicly disavow the AAAR reports due to its antisemitic targeting of JFRG faculty, but the Chancellor declined.

188.   UCLA has never retracted, repudiated, or corrected the AAAR reports, which continue to be cited by many faculty members, departments, and in the public.

### Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA Report

189.   In October 2024, the Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA released its 93-page report detailing the troubling and disturbing rise of antisemitism on the UCLA campus.[68]

190.   The report was submitted to EVCP Hunt.

191.   Four hundred twenty-eight students, faculty, and staff at UCLA were surveyed.  Among some of the more concerning findings included the following:

   a. Two-thirds of respondents identified antisemitism as a problem or serious problem at UCLA, while three-quarters reported that anti-Israel bias was a problem or serious problem at UCLA.

   b. 70% of respondents perceived the Encampment as a source of antisemitism.

   c. 41% of respondents reported that they had considered leaving UCLA due to antisemitic and/or anti-Israel environment.  This rate was highest among UCLA faculty (53%).

   d. Over 70% of respondents reported that antisemitism at UCLA had a negative effect on their stress levels and overall wellbeing.

[68] The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA, *Antisemitism and Anti-Israeli Bias at UCLA* (Oct. 16, 2024), http://antisemitismreport.org.

41

COMPLAINT

e. Three-quarters of respondents reported that antisemitism is "taken less seriously than other forms of hate and discrimination at UCLA."[69]

### *Antisemitic Protests Continue in 2026*

192. On January 29, 2026, a protest occurred on UCLA hospital grounds, an area closed to the general public and reserved for patients, medical staff, and their families. UCLA permitted approximately 70–80 protesters to assemble directly in front of the medical school's hospital, in close proximity to working physicians.

193. Many protesters wore Palestinian keffiyehs and masks and shouted anti-Israel slogans.

194. Both Dr. Hoftman and Dr. Shamsa were present during the incident and were harassed and threatened by the protesters' conduct. Despite the protest's unauthorized location, duration, and threatening behavior, UCLA campus police, who were stationed nearby, took no action.

195. On February 25, 2026, approximately 30–40 pro-Intifada demonstrators gathered at the UCLA campus to protest a lecture by Ronen Hoffman, a former Israeli diplomat and politician. The UCLA SJP coordinated this protest activity through social media posts demanding the cancellation of the event and labeling the Israeli guest speaker a "war criminal" and "Zionist colonizer." Protesters chanted antisemitic slogans including "Intifada, Intifada" and "from the river to the sea."

### *AMCHA Initiative Report – February 2026*

196. In February 2026, the AMCHA Initiative released a comprehensive report  documenting the faculty-driven hostile antisemitic environment at UCLA and other UC campuses.[70]

---

[69] *Id.* at 81.

[70] "AMCHA" is the Hebrew word meaning "your people." *See* AMCHA Initiative,

COMPLAINT

197.   The AMCHA Report demonstrates that while students are the most visible actors, faculty and academic departments are key institutional drivers of the hostile antisemitic environment on UC campuses.

198.   Comparing the two-year period of July 2021–June 2023 with July 2023–June 2025, the AMCHA Report states that incidents targeting Jewish campus members for harassment, intimidation, threats, exclusion, vandalism, and assault exponentially rose by **3,150%** at UCLA. Likewise, incidents involving antisemitic rhetoric glorifying violence or calling for Israel's elimination increased by **1,175%** at UCLA during the same period.

199.   The AMCHA Report notes that faculty and departments were involved in 40% to 60% of these antisemitic incidents, either as perpetrators, public defenders, or institutional enablers, and their behavior persisted even after UC entered into a resolution agreement with the federal government in December 2024, obligating the university to address antisemitism systemwide.

200.   Additionally, the AMCHA Report notes that at UCLA, at least 115 faculty members had publicly endorsed an academic boycott of Israel, and during the 2023–2025 academic years at least 20 of these faculty members held administrative roles such as department chairs, center/program directors, and associate deans. This effectively gave boycott-aligned faculty direct institutional access to shape unit governance, programming, and academic norms.

201.   Of the 130 incidents involving the targeting of Jewish students or staff for harm documented at UCLA during the 2023–2025 academic years, nearly half

*When Faculty Take Sides: How Academic Infrastructure Drives Antisemitism at the University of California* (Feb. 11, 2026) https://amchainitiative.org/wp-content/uploads/2026/02/When-Faculty-Take-Sides_AMCHA-Report_Feb-2026.pdf; AMCHA Initiative, *Report Summary: When Faculty Take Sides: How Academic Infrastructure Drives Antisemitism at the University of California* (Feb. 11, 2026), https://amchainitiative.org/wp-content/uploads/2026/02/When-Faculty-Take-Sides_Report-Summary.pdf.

43

COMPLAINT

(59) involved faculty members as either perpetrators, public defenders, or institutional enablers of the antisemitic harassment, intimidation, and exclusion of Jewish and Zionist students. Twenty-one of these antisemitic faculty-involved incidents occurred after UCLA had entered into a systemwide resolution agreement with the Office for Civil Rights.

**III.    UCLA'S ANTISEMITIC TREATMENT OF PLAINTIFFS**

*Kira Stein*

202.    Dr. Kira Stein attended UCLA as an undergraduate from 1987 to 1991 and worked as an administrative assistant in the Psychiatry Department during that time. She completed her psychiatric residency at UCLA from 1998 to 2001.

203.    Since completing her UCLA psychiatry residency in 2001, Dr. Stein has served as a volunteer clinical faculty member at the DGSOM, supervising psychiatric residents and patients, lecturing, and contributing psychiatric expertise one half day per week at UCLA psychiatric clinics, including the UCLA Anxiety Disorders Clinic and the UCLA Women's Life Center.

204.    Although UCLA Health has not compensated Dr. Stein with a salary, she is an employee of UCLA under Title VII and FEHA.  Specifically, Dr. Stein has an employee ID number, is required to complete employee trainings, receives access to certain employee benefits, and is covered by the Regents' medical liability insurance. UCLA bills for Dr. Stein's treatment of patients and exercises substantial control of Dr. Stein's work.

205.    Dr. Stein is Jewish and practices traditional Judaism, is a member of an Orthodox Jewish synagogue, and observes the Jewish Sabbath and other Jewish religious practices. She is the daughter of Dr. Vivien Burt, *see infra* ¶ 271, and granddaughter of Holocaust survivors. Numerous members of her extended family were murdered during the Holocaust.

206. Dr. Stein's family history also reflects longstanding Jewish ties to the land of Israel. Her third great-grandfather is buried in Safed, Israel, and she has family members living in Jerusalem and Haifa.

207. In late 2023, following the October 7th attacks in Israel, Dr. Stein founded and served as Chair of the JFRG at UCLA.

208. JFRG is a faculty-led, nonpartisan organization committed to the principle that Jewish faculty, postdoctoral scholars, and staff in higher education deserve the same dignity, protection, and academic freedom afforded to all members of the academic community.

209. JFRG was initially founded as a support group for Jewish faculty, staff, and postdoctoral researchers facing escalating anti-Jewish hate and discrimination at UCLA.

210. JFRG organized peer support groups and created networks through which affected faculty and staff could share experiences and obtain assistance.

211. JFRG quickly evolved to become an advocacy group to educate the UCLA community and the public at large about Jewish identity, history, and Zionism, and to document and counter anti-Jewish hate, including antizionism, on campus.

212. As participation grew, JFRG expanded to include hundreds of active participants, including UCLA faculty, staff, and community volunteers. JFRG has grown to over 350 UCLA members and established an Antisemitism Incident Report system for anonymous reporting and documentation. The organization also maintains a mailing list of a few thousand supporters.

213. Through her role as JFRG Chair, Dr. Stein personally received, reviewed, and documented reports of antisemitism and requested investigation and corrective action from UCLA leadership.

214. Since the Hamas attacks on October 7, 2023, Dr. Stein has endured pervasive antisemitic hostility at UCLA, including antisemitic lectures she has

45

warned UCLA administrators about, false accusations of "doxxing," an indefinite suspension from teaching duties at the Women's Life Center, and the University's persistent refusal to acknowledge or remedy the antisemitic discrimination against her.

215.   Beginning in March 2024, Dr. Stein and other JFRG leaders organized faculty and staff to present public speeches regarding antisemitism to the University of California Board of Regents.

216.   Dr. Stein was one of many Jewish faculty members who observed the antisemitic statue that was erected during the March 2024 Board of Regents' meeting on UCLA's campus. *See supra* ¶¶ 86–91.

217.   Dr. Stein was horrified and physically sickened by the statue. The imagery displayed by the statue immediately brought to mind for her the antisemitic degradation experienced by her own family during the Nazi era.

218.   Specifically, Dr. Stein's great grandparents in Vienna were subjected to antisemitic abuse and were called "Judenschwein," a term historically used to demean Jews by associating them with pigs, as detailed in a letter written by her great-grandfather.

219.   Additionally, Dr. Stein's great grandmother and great aunt were forced by the Nazis to scrub the streets on their hands and knees under threat of the Gestapo before her great-grandparents ultimately fled to Shanghai, China.

220.   Around the same time as the statue incident, *supra* ¶¶ 86–91, Dr. Stein and a JFRG colleague also met in-person with UCLA Chancellor Block, External Vice Chancellor Rhea Turteltaub, and Executive Vice Chancellor Michael Beck in

46

Moore Hall to share concerns about antisemitism and encourage enforcement and education.

221. During the meeting, Dr. Stein expressed her serious concerns that UCLA was not enforcing its time, place, and manner rules and, therefore, the antizionist pro-Intifada protesters were getting more agitated and emboldened, marginalizing and endangering Jews further.

222. Chancellor Block, however, appeared disinterested and stated that, rather than enforce the rules, which might inflame the antizionist protestors further, he preferred to "wait for things to blow over."

223. In response, Dr. Stein pointed out that Jewish history illustrates that such permissiveness risks worsening violence. Dr. Stein requested another follow-up appointment to meet again with Chancellor Bock to ensure there was continued follow-up regarding the issues raised in their meeting and with JFRG; Chancellor Block said he was too busy.

224. On April 2, 2024, Dr. Stein was alerted to the UCLA Psychiatry Department Zoom lecture titled "Depathologizing Resistance." *See supra* ¶¶ 99–110.

225. Upon learning of the lecture, Dr. Stein contacted Chancellor Block, who directed her to contact Interim Psychiatry Chair Dr. Helena Hansen and Vice Chair of JEDI, David McIntosh. In response, Dr. Stein emailed McIntosh, Dean Dubinett, Chancellor Block, and Dr. Hansen, but received no response.

226. After the lecture, Dr. Stein sent a second email to senior UCLA leadership, stating that leadership was warned about the lecture but did not intervene, and that the lecture, in terms of its antisemitic and discriminatory content "surpassed our [Jewish faculty] worst expectations."

227. In April 2024, in light of the ongoing and ever-worsening antisemitic situation at UCLA, Jewish faculty requested that antisemitism be added to the agenda of the April 3, 2024 DGSOM FEC Zoom meeting, and it was added.

47

COMPLAINT

228. Dean Dubinett, Vice Dean Dr. Joaquin Madrenas, Dr. Stein, and other Jewish faculty attended the DGSOM FEC meeting on April 3, 2024.

229. Vice Dean Madrenas was the first administrator to speak after several Jewish faculty presented concerns regarding multiple incidents of antisemitism at the DGSOM. Instead of addressing those concerns, he publicly reprimanded Jewish faculty for recording the "Depathologizing Resistance" lecture, characterized the issues as "differences of political opinion," and stated he was "equally concerned about the deaths of Gazan babies," implying that Jewish faculty were indifferent to the situation.

230. Additionally, as Jewish faculty recounted anti-Jewish hostility, unidentified participants entered the Zoom meeting using fictitious names like "Protect Academic Freedom," "Stop being Racist," and "SS Medical Student." Several of these unidentified participants engaged in disruptive conduct during the meeting, including interruptions and antisemitic comments directed at Jewish faculty, minimizing their concerns, and making antisemitic accusations of racism against Jewish faculty.

231. Dr. Langston Holly, the DGSOM FEC Chair at the time, instructed participants to add their real names to their Zoom profiles within the meeting and activate their cameras or be removed.

232. Initially, a small handful of these unidentified participants were removed from the Zoom meeting; however, Dr. Holly soon stopped enforcing the name-and-camera rule, thereby allowing these participants to remain off-camera and participate in the Zoom meeting without using their real names.

233. Once these participants were allowed to remain in the meeting, they and others started disrupting the meeting by putting antisemitic comments in the Zoom chat, minimizing Jewish trauma, accusing Jewish faculty of "weaponizing antisemitism", calling Jewish faculty "anti-black racists," accusing them of doxxing, and engaging in other unprofessional, hateful, and divisive vitriol.

48

234. Many Jewish professors and faculty left the Zoom meeting early because of the hateful, antisemitic and discriminatory comments made by these participants.

235. Nevertheless, at no time during this April 3rd FEC meeting did the leaders of the DGSOM or the FEC stop or remove these participants from the meeting, despite the threats and antisemitic rhetoric they were unleashing on the Jewish faculty.

236. At the meeting, one of Dr. Burt and Dr. Stein's former psychiatry residents falsely accused Jewish faculty of "doxxing" the lecturers by posting a video recording online. Although the accusations were false—as the video documented a publicly advertised event with invitations and slides that already highlighted the speakers' names—and were indeed a form of antisemitic intimidation, Dr. Stein voluntarily removed the video that same day to de-escalate tensions, with the agreement with UCLA administrators that a dialogue would take place outside the university healthcare setting to improve sensitivity, communication, and inclusion.

237. The next day, on April 4, 2024, Dr. Stein received an email from UCLA Psychiatry Residency Education Director Dr. Jonathan Heldt informing her she had been suspended from teaching duties pending investigation due to allegations of "doxxing" and recording the "Depathologizing Resistance" lecture.

238. Dr. Stein asked Dr. Heldt which policies she was alleged to have violated. He responded, "I am unfortunately not in a position to know about specific policies and regulations."

239. Around that same time, resident physicians petitioned for the removal of Dr. Stein, Dr. Burt, and other Jewish supervisors.

240. Between April 3 and 5, 2024, Director of the UCLA Women's Life Center Dr. Katherine Unverferth informed Dr. Stein that she intended to utilize Dr. Stein's scheduled lecture time to conduct sessions for residents to "process" their

49

feelings of being "unsafe" due to Dr. Stein's alleged "doxxing." Dr. Stein objected on the grounds of impartiality, interference with an ongoing investigation, and the fact that Dr. Unverferth did not appear to be concerned with the underlying antisemitism that rendered it unsafe for Dr. Stein and other Jewish colleagues. Dr. Unverferth refused to reconsider her plan.

241. On April 6, 2024, Dr. Burt spoke with Dr. Unverferth, who revealed that faculty members were targeted by petitioners solely because of their JFRG membership. Dr. Unverferth stated she hoped to save Dr. Burt though Dr. Unverferth "could not save" Dr. Stein.

242. False and defamatory rumors circulated across UCLA DGSOM alleging that Jewish faculty had "doxxed" residents and students. Upon information and belief, UCLA faculty and administrative officials participated in disseminating these allegations. Non-Jewish faculty were not subjected to comparable suspensions or exclusions under similar circumstances.

243. On April 16, 2024, Dr. Stein authored and led the JFRG Advisory Council review and submission of a comprehensive report to the UC Regents documenting systemic antisemitism at UCLA and across the UC system. The report assembled extensive evidence of policy violations, anti-Jewish harassment, and ideological indoctrination affecting Jewish students and faculty on the main UCLA campus, as well as on the DGSOM at UCLA, and analyzed how the University's own rules were being selectively ignored. It concluded with specific recommendations for enforcing existing policies and restoring equal protection for Jewish members of the University community. There was no response from the UCLA administration.

244. On September 3, 2024, Dr. Stein attended a meeting with Dr. Burt, Interim chair of UCLA Psychiatry Dr. Hansen, and other psychiatry department leaders, including Director of the Adult Division in the Department of Psychiatry Dr. Michael Gitlin, Vice-Chair for Clinical Affairs in the Department of Psychiatry

COMPLAINT

Dr. Tom Strouse, UCLA Psychiatry Dept Vice Chair for Education Dr. Katrina De Bonis, as well as organizational psychologists and moderators Drs Gail Karen Young, and Yotam Schachter. Dr. Hansen acknowledged that the "Depathologizing Resistance" lecture contained antisemitic content but stated the department did not wish to publicly characterize it as antisemitic because doing so could "inflame tensions among residents." Other participants agreed the lecture was antisemitic.

245. At the meeting, Dr. Gitlin said if the lecture had been the same but was discriminatory against any other group, no one in the university would have put up with it, but since it was antisemitism, it was met with silence. Dr. Gitlin stated that he was sorry it had been posted since that exposure had become the focus of the problem.

246. Dr. Burt responded that the post was made only after repeated, unsuccessful efforts by JFRG to address the antisemitism through official channels. JFRG had written multiple letters and spoken directly with the Chancellor and other UCLA leaders about prior antisemitic lectures and incidents. In response, JFRG was either ignored, told the situation would resolve on its own, or promised follow-up that never came. Posting was the only remaining way to draw attention to the lecture and antisemitism occurring at UCLA. No one at the meeting disagreed with this.

247. Nevertheless, Dr. Hansen denied Dr. Stein's request for reinstatement, stating that reinstatement could prompt residents to petition again.

248. On September 12, 2024, Dr. Stein and other JFRG leaders met with Dean Dubinett in an effort to rectify longstanding antisemitism in the DGSOM at UCLA.

249. During the meeting, Dean Dubinett stated he did not want to publicly identify anything that had occurred at the DGSOM as antisemitic because it would cause "negative PR." While looking at Dr. Stein, he alleged that Jewish faculty were "doxxing" those with anti-Israel views, when in reality, JFRG was simply reporting anti-Jewish hate.

51

250. On October 12, 2024, Dean Dubinett told Dr. Stein he did not want to publicly address antisemitism because of the "Streisand effect."[71]

251. On December 11, 2024, Dr. Stein had a virtual meeting with other faculty and Dean Dubinett. Dr. Stein reported increased antisemitic incidents, trauma, fear of retaliation, and diminished trust among Jewish faculty. Dean Dubinett described the "Depathologizing Resistance" lecture as "horrible" but only proposed further discussion rather than corrective action.

252. That same day, Dr. Hansen offered to lift Dr. Stein's suspension only on the condition that Dr. Stein would not be allowed to work in any UCLA psychiatry clinic, including the Women's Life Center.

253. Dr. Stein understood this as a continuation of her suspension, based on her perceived Zionist views, and functioning as an antizionist academic boycott.

254. Dr. Hansen also stated that strong teaching evaluations for Dr. Stein would be required going forward. Given the prevailing campus climate, and her history of positive reviews, Dr. Stein perceived this as a warning that biased or retaliatory evaluations could be used against her.

255. Dr. Stein submitted a complaint to the DPO on December 11, 2024. Dr. Stein was interviewed, but upon information and belief, no action was taken on her complaint.

256. In January 2025, Dr. Stein and other JFRG-affiliated faculty met with Chancellor Frenk.

257. During the meeting, Dr. Stein provided Chancellor Frenk with written documentation describing antisemitic incidents reported within the DGSOM.

---

[71] Named after Barbra Streisand, the "Streisand effect" describes a situation in which attempts to hide, remove, or suppress information unintentionally draw greater public attention to it. *See, e.g.*, Sue Curry Jansen & Brian Martin, *The Streisand Effect and Digital Age Publicity*, 9 INT'L J. COMMUNICATION 2994 (2015), 656–671 https://ijoc.org/index.php/ijoc/article/view/2498/1321.

52

COMPLAINT

258.   On February 10, 2025, Dr. Hansen emailed Dr. Stein stating she was welcome to return to volunteer teaching duties but did not articulate if this included Dr. Stein returning to the Women's Life Center. Dr. Stein inquired in writing whether this included full restoration of her prior duties and privileges. Dr. Hansen did not confirm that Dr. Stein's specific prior duties at the Women's Life Center would be restored.

259.   In April 2025, UC Regent Richard Leib requested Dr. Stein assemble faculty members who had experienced antisemitism so they could "avoid what was [at the time] happening to Columbia University." JFRG subsequently prepared and submitted detailed recommendations to University leadership regarding measures that UCLA could take to address antisemitism.

260.   Dr. Stein attended the lecture by Ronen Hoffman on February 25, 2026. *See supra* ¶ 195.

261.   After the lecture, she had to walk through the protest area to reach Parking Lot 4, where demonstrators' chants and conduct created a distressing, intimidating, and hostile environment toward Jews.

262.   Dr. Stein reported her discomfort to UCLA's Student Affairs Risk and Compliance Manager, who was walking alongside her towards the parking structure, who reported that the University was allowing the protest to proceed—despite many protesters being keffiyeh-masked and outside the permit-designated area—to protect their free speech unless threats were directed at specific individuals.

263.   Dr. Stein documented this event extemporaneously but did not report it to the UCLA Civil Rights Office because she had already spoken to the administrator responsible for managing protests and it was clear that a report would be futile given the University mandate to prioritize pro-Intifada protestors over discrimination and harassment of Jewish faculty and staff convening to listen to a pro-peace Israeli diplomat.

264.   As of March 10, 2026, despite decades of service to UCLA, and in retaliation for Dr. Stein's opposition and reporting of anti-Jewish, including antizionist, discrimination and hostile working conditions at UCLA, Dr. Stein remains suspended from teaching resident physicians at the UCLA Women's Life Center.

265.   Dr. Stein filed a charge of discrimination with the EEOC. On June 25, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA and UCLA Health subjected Dr. Stein to an unlawful hostile work environment and different terms and conditions of employment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), in violation of Title VII. *See* Exhibit A.

### *Vivien Burt*

266.   Dr. Burt is Professor Emeritus of Psychiatry in the Department of Psychiatry and Biobehavioral Sciences at DGSOM. She has been on the UCLA DGSOM faculty since 1988, where she has held positions as Director of the Adult Outpatient Department and Associate Director of Residency Psychiatry Education.

267.   She is also the founder and former director of The Women's Life Center of the Resnick UCLA Neuropsychiatric Hospital.

268.   She has more than 30 years of experience in adult and reproductive psychiatry and has authored numerous articles and book chapters in the field of women's psychiatry, including the first author of The Clinical Manual for Women's Mental Health, published by the American Psychiatric Press. She has also been a recipient of the Distinguished Service Award of the UCLA Neuropsychiatric Institute and Hospital and an Outstanding House Staff Teaching Award.

269.   Dr. Burt is Jewish and the daughter of Holocaust survivors. Her daughter is Dr. Kira Stein. *See supra* ¶ 205.

54

270. Many members of Dr. Burt's family were murdered in the Holocaust. Her aunt, to whom she was closely connected, was expelled from medical school in Vienna because she was Jewish.  Her grandparents escaped to Shanghai.  Her father was imprisoned in Nazi Germany. Her parents fled Nazi Germany and Austria in fear for their lives. Dr. Burt's lived experience was shaped by growing up in a family profoundly scarred by the trauma they suffered as a direct result of antisemitism.

271. Since the Hamas attacks on October 7, 2023, Dr. Burt has been subjected to a hostile and discriminatory environment at UCLA, including being explicitly denied entry to the campus Encampment (*see supra* ¶¶ 124–147) because she was Jewish, facing a coordinated academic boycott by medical residents who labeled her a "Zionist," having her professional responsibilities reduced, and ultimately being constructively discharged from the institution she helped build.

272. Dr. Burt, like Dr. Stein, was present at the "Depathologizing Resistance" lecture and witnessed the antisemitic and discriminatory content of that lecture. *See supra* ¶¶ 99–110.

273. Dr. Burt, whose career has been devoted to protecting and preserving life, was deeply disturbed by the lecture's premise that self-immolation could be justified as a form of martyrdom for political causes such as "Free Palestine."  The lecture conveyed the message that Jews who support Israel's right to exist are oppressors who endorse genocide and colonialism. Because the lecture framed support for Israel as inherently oppressive—and because many Jews, including Dr. Burt, understand belief in the Jewish State of Israel as integral to their faith—the content was both antisemitic and antizionist.

274. The lecture profoundly affected Dr. Burt by what she perceived as an attack on her Jewish identity by members of her own department, including the resident presenters and attendees who expressed support for the lecture. Particularly troubling was the presence of senior faculty administrators who neither intervened during the lecture nor addressed its content afterward.  Their continued

silence reflects institutional approval and complicity in the antisemitism within the Department of Psychiatry.

275.   Dr. Burt attended the April 3, 2024 DGSOM FEC meeting. *See supra* ¶¶ 228–236.  At that meeting, she was falsely accused directly and explicitly of doxxing others related to the recording of the "Depathologizing Resistance" lecture.

276.   Many of the antisemitic statements made at the FEC meeting were directed at her personally, where she was baselessly accused of using false accusations of antisemitism as pretext for being racist.

277.   On April 6, 2024, Dr. Burt spoke with Dr. Unverferth, the Director of the UCLA Women's Life Center—the position Dr. Burt had held for at least twenty-five years. Dr. Unverferth informed Dr. Burt that there was a petition circulating in the department about Dr. Burt and other Jewish faculty because they were members of the JFRG.

278.   Dr. Unverferth said she hoped but was not sure she could "save" Dr. Burt from being ousted from the clinic. *See supra* ¶ 241.

279.   Dr. Burt was appalled that Dr. Unverferth, the psychiatrist who had taken over the very clinic she had founded and directed for almost 30 years, was now suggesting that she needed to be "saved" from expulsion because she was Jewish, a member of the JFRG, and had spoken up in approved official venues about a departmental lecture sponsored and attended by UCLA DGSOM faculty that was clearly antisemitic and political.

280.   Dr. Unverferth also told Dr. Burt that the residents did not feel "safe" with Dr. Burt because she was a member of JFRG and because she had spoken up about the "Depathologizing Resistance" lecture. Dr. Unverferth clearly supported the discriminatory actions of the residents, explaining it was her job to keep the residents "safe" from Dr. Burt, a Jewish professor.

281.   Dr. Burt has never made public statements about her belief in the right of Jewish self-determination, also known as Zionism. Rather, she only expressed

56

concern over the "Depathologizing Resistance" lecture through appropriate channels.

282. On April 30, 2024, Dr. Burt decided to visit the Encampment with her husband because she wanted to talk to some of the protestors to understand their positions and why they were protesting.

283. On her way and around the perimeter of the Encampment, she noticed images of swastikas positioned above the Jewish Star of David and above the pictures of Israeli hostages kidnapped on October 7, 2023.

284. When she got to the Encampment barricades, she showed her UCLA ID to the protestors at the edge, announced that she was Jewish, and stated that she wanted to have a dialogue.

285. When she was denied entry, she asked why, and the protestors yelled "Divest!" and repeatedly told her that she could not enter. She was explicitly refused entry by the protestors because she was Jewish.

286. When Dr. Burt asked why she could not enter, the protestors told her to "look up SJP." She responded that she wanted to hear the basis for their protest from them.

287. The protestors replied that they were not allowed to speak and that there is "somebody in there [in the Encampment]" who is in charge and "giving orders" that protestors cannot speak because they might "misspeak or say the wrong thing."

288. Shortly thereafter, Dr. Burt learned of a meeting between a group of medical school residents and Dr. Heldt.

289. Dr. Burt was informed that these residents told Dr. Heldt (whom she had never met and still has never met) they did not feel comfortable receiving instruction from Dr. Burt in the Women's Life Center because she is a "Zionist" and therefore a "micro aggressor" and they intended to boycott her lectures.

290.    Upon information and belief, Dr. Heldt agreed that if the residents feel uncomfortable with Dr. Burt's presence, they should see him for permission to leave the Women's Life Center clinic. Dr. Burt was shocked that, driven by antisemitism and antizionism, these residents were asking to be given permission to abandon their patients by leaving the clinic.  By entertaining their requests, Dr. Heldt effectively became complicit in the spread of antisemitic hostility.

291.    On a phone call with the Dr. Unverferth, Dr. Burt received confirmation that this meeting in fact took place and that her alleged "Zionism" was indeed the concern of these residents.

292.    At the end of June 2024, UCLA also discriminated against Dr. Burt by reducing her responsibilities.  For example, upon information and belief, at the direction of administrative leadership, Dr. Unverferth implemented a system requiring that all faculty attendings receive her approval or her assistant's approval before entering the Women's Life Center clinic because residents allegedly felt "unsafe" with Dr. Burt's presence.

293.    In short, Dr. Burt, a Jewish physician and professor, was to be monitored by UCLA administration to ensure that the residents would not feel threatened by her based on her ethnic and religious status.

294.    On June 20, 2024, Dr. Burt met with faculty and departmental leadership, including Dr. Hansen and Dr. Katrina DeBonis, Vice-Chair of Residency Education, and expressed that the "Depathologizing Resistance" lecture was antisemitic and egregious, emphasizing her distress that faculty allowed it to proceed, failed to speak out afterward, and held no one accountable.

295.    At the June 20 meeting, Dr. Hansen stated that antisemitism had been going on at UCLA even before October 7, 2023. The attendees at this meeting further acknowledged that antisemitism had been spreading in the Department of Psychiatry, and one attending physician bemoaned "the residents are running the show" in the Department.

58

296.   Nevertheless, Dr. Hansen implied that she was limited by what her superiors in the UCLA administration allowed her to address the concerns of Dr. Burt. She asked Dr. Burt to be patient given her limited ability to provide remediation. When Dr. Burt requested the opportunity to enter into dialogue with the residents in a neutral space outside of a classroom setting, perhaps with a trained moderator, she was told by Dr. Hansen this was not possible because "the climate is too hot." Dr. DeBonis vigorously concurred with Dr. Hansen's assessment.

297.   In light of these actions, on June 28, 2024, Dr. Burt took a leave of absence, explaining that the reason for her leave was due to the antisemitism that was running rampant and unchecked within both the Psychiatry Department and the Women's Life Center. Three other faculty and staff (two Jewish and one non-Jewish) also took a leave of absence in solidarity with Dr. Burt.

298.   Although other members and administrators (including Drs. Hansen and Unverferth) expressed their appreciation for Dr. Burt's many contributions to the Department, the Women's Life Center, her patients and trainees, they did not address the antisemitic harassment and discrimination she gave as the basis for her leave of absence.  Thus, once again, UCLA faculty and administration refused to speak up about the injustice of antisemitic activities in the Department of Psychiatry at the DGSOM.

299.   On August 19, 2024, Dr. Burt received a notice from the Discrimination Prevention Office of UCLA (DPO), which stated that the Office had received a report of discrimination against her from an unidentified source.

300.   DPO provided a link for Dr. Burt to file a complaint, which she did on August 25, 2024.

301.   Dr. Burt met with a DPO attorney in November 2024 and testified in detail about the antisemitic activities directed against her.  To date, no discipline or action has been taken on her complaint.

59

302. Despite being away from campus, Dr. Burt has continued her efforts to address antisemitism within the Psychiatry Department and at the Women's Life Center, but to no avail.

303. For example, on September 3, 2024, Dr. Burt along with Dr. Stein, met with the leadership of the Psychiatry Department, including Dr. Hansen, Dr. Katrina DeBonis, Dr. Strouse, and Dr. Gitlin. *See supra* ¶ 244. Also present were members of a leadership consulting firm, Cultivating Leadership.

304. In that meeting, Dr. Hansen acknowledged to the Jewish professors that the "Depathologizing Resistance" lecture was antisemitic, but that she had to be careful before taking any action to address antisemitism that might "inflame" the residents.

305. Dr. Hansen explained that UCLA leadership had not permitted her to take substantive actions to address the antisemitism and related turmoil in the Psychiatry Department.

306. Dr. DeBonis stated that it was her job as Vice-Chair of Residency Education to ensure that all residents in the department graduate. In a manner that ignored and was tone-deaf to the antisemitism and antizionism in the lecture, Dr. DeBonis then expressed her concern about the future job opportunities of the residents that had delivered the lecture, "Depathologizing Resistance."

307. Tellingly, and despite her conduct in the subject meeting and failure address the antisemitic discrimination against Dr. Burt, UCLA later *promoted* Dr. DeBonis in October 2025 to Associate Director in the Adult Division of Psychiatry at DGSOM.

308. At the end of the September 3, 2024, meeting, Dr. Hansen asked Dr. Stein and Dr. Burt if they were willing to participate in a working group facilitated by the Cultivating Leadership consultants.

309. Despite Dr. Hansen's refusal to reinstate Dr. Stein, and her statement that she was not in a position to address the concerns raised by Drs. Stein and Burt,

COMPLAINT

both Drs. Stein and Burt nevertheless expressed their willingness to engage in constructive dialogue in an effort to foster a healing atmosphere within the Department of Psychiatry.  However, no follow-up meetings were ever offered or conducted.

310.   Following the September 3 meeting, Dr. Burt and Dr. Hansen spoke via phone a few days later.  Dr. Hansen acknowledged that antisemitism was a problem at the Women's Life Center and, in particular, among the residents. However, she believed more meetings and "time" would solve the academic boycott that Dr. Burt was experiencing.

311.   As a result of the academic boycott, and UCLA's failure to address it as well as the overall antisemitic hostile work environment fostered by UCLA, Dr. Burt was subjected to a de facto constructive discharge based on her national origin and religion that has prevented her from returning to campus.

312.   Dr. Burt filed a charge of discrimination with the EEOC. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA and UCLA Health subjected Dr. Burt to an unlawful hostile work environment and different terms and conditions of employment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), in violation of Title VII. *See* Exhibit B.

### *Nir Hoftman*

313.    Dr. Nir Hoftman is a Jewish Israeli-American anesthesiologist who teaches at the UCLA DGSOM.

314.   His teaching is overseen by the Department of Anesthesiology, and he has over 25 years of clinical experience.

315.   Dr. Hoftman is openly Jewish and proudly identifies with his Israeli heritage.

61

316. Since the Hamas attacks on October 7, 2023, Dr. Hoftman has experienced severe and pervasive antisemitic harassment at UCLA, including being physically assaulted at the Encampment, blocked from accessing portions of campus, publicly attacked and harassed at faculty meetings for exposing antisemitism, and being subjected to UCLA's complete failure to protect Jewish faculty or hold perpetrators accountable.

317. Beginning in October 2023 and continuing through at least March 2024, Dr. Hoftman sent emails and had regular meetings with the DGSOM Dean, Steve Dubinett, regarding his concerns about antisemitism at UCLA following the Hamas terrorist attack.

318. On February 12, 2024, a special panel discussion was hosted by the medical school's JEDI office, titled "Compassion, Empathy, and our Hippocratic Oath: A Conversation about Difficult Dialogues." The purpose of this emergency session, which the Dean had agreed to host, was to discuss antisemitism with medical students as part of their education and to help stem the tide of antisemitic hostility after the October 7th massacres.

319. Unfortunately, the panel became a forum for hateful and discriminatory antisemitic statements.

320. For example, during the panel discussion, one faculty member suggested that those who objected to the antisemitic rhetoric expressed by some pro-Palestinian supporters were suppressing free speech and opposing freedom-seeking individuals.

321. This same faculty member "explained" antisemitism to the audience by telling them that "antizionism is not antisemitism."

322. Another panelist argued that the genocidal chant "from the River to the Sea" means "different things" to different people thereby minimizing its clearly antisemitic and threatening nature to Jewish students and faculty.

COMPLAINT

323. While Dr. Hoftman was not present for the panel discussion, he received recorded clips of the panel from a concerned student.

324. On February 13, 2024, the day after the panel, Dr. Hoftman sent a note with the recorded clips to the JEDI Vice Dean McIntosh, expressing his deep concern over the comments made during the event.

325. Vice Dean McIntosh responded the next day, dismissing Dr. Hoftman's concerns by characterizing the antisemitic statements as evidence of "compassionate or empathetic communication."

326. Rather than addressing the substance of Dr. Hoftman's concerns, Vice Dean McIntosh shared Dr. Hoftman's note and recordings with Vice Dean of Faculty Joaquin Madrenas.

327. Vice Dean Madrenas then warned Dr. Hoftman that the recordings were "unauthorized" and that sharing them "may constituted a violation of University policy and the Faculty Code of Conduct." At no point did Vice Dean Madrenas express any concern about the antisemitic content of the remarks themselves.

328. On March 18, 2024, in a meeting with Dean Dubinett, Dr. Hoftman sought to discuss the rise of antisemitism on the UCLA campus.

329. Instead of addressing these concerns, Dean Dubinett accused Dr. Hoftman of being the reason why prospective Jewish medical students were showing less interest in DGSOM.

330. In support of this baseless accusation, Dean Dubinett cited an interview that Dr. Hoftman had conducted on an Israeli-American TV station where he discussed antisemitism at UCLA.

331. In that same meeting, Dean Dubinett defended antisemitic content posted by another doctor on her social media because she came from a good "Harvard pedigree" and was a friend of Dr. Medell Briggs-Malonson, then Chief of Health Equity, Diversity, and Inclusion at UCLA Health.

63

COMPLAINT

332. On April 3, 2024, Dr. Hoftman attended the DGSOM's FEC meeting. *See supra* ¶¶ 228–236.

333. During this meeting, Vice Dean Madrenas publicly accused Dr. Hoftman of improperly and illegally recording and transmitting videos of panel discussions, despite the fact that Dr. Hoftman did not record the video clips and only transmitted the videos to his superiors to express concern about the comments.

334. Notably, Vice Dean Madrenas made no mention of the antisemitic contents of the subject videos.

335. Dr. Hoftman was also excoriated during the meeting because of his interview exposing antisemitism.

336. The unknown participants (*see supra* ¶¶ 228–236) who improperly injected themselves with antisemitic comments into the April 3, 2024, DGSOM FEC Zoom meeting publicly accused Dr. Hoftman of "endangering the lives of black faculty and students" even though he had not mentioned anyone in particular during the interview.

337. The comments attacking him were so severe and so clearly directed at him personally that Dr. Hoftman considered hiring private security after the meeting.

338. Through communications with his colleagues, as well as his own observations, Dr. Hoftman became aware of the conditions at the Encampment and the treatment of Jewish individuals who approached it.

339. On April 26, 2024, Dr. Hoftman visited the Encampment. Like so many other Jews, he was told by both protestors and UCLA's private security that he could not enter, and he was physically blocked from doing so.

340. When he expressed his frustration to UCPD, an officer confided in him that, although the protestors and the Encampment itself violated the law, UCPD received its directives from UCLA administration and had been specifically directed not to engage the protestors.

64

341. On April 28, 2024, Dr. Hoftman helped organize and participated in a pro-Israel rally with major Jewish groups.

342. During this peaceful demonstration, several individuals were physically assaulted by pro-Palestinian protestors and required medical attention.

343. Security and police stood by and did nothing to protect the Jewish participants.

344. In fact, at one point during the rally, security and police tried to block off the entrance to the rally so that other Jews could not join or participate in the pro-Israel demonstration.

345. On April 28, 2024, Dr. Hoftman was asked to do an interview with Fox News on April 29, 2024. On the morning of April 29, before the interview went live, Dr. Hoftman left a meeting at Geffen Hall and walked toward his car.

346. As Dr. Hoftman was looking at his phone to prepare for the Zoom interview and walking in the general direction of the Encampment, two large men who appeared to be protestors from the Encampment (one was wearing a vest and the other was wearing a keffiyeh) blocked his path. As Dr. Hoftman walked around them, another protestor forcefully shoved him from behind.

347. The protestor hit him so hard that it knocked Dr. Hoftman off balance, gave him whiplash, and knocked one of his Airpods out of his ear. The protester then stole the Airpod.

348. Although there were private security guards employed by UCLA nearby who witnessed the assault, they did not intervene, nor did they check on Dr. Hoftman's wellbeing.

349. Immediately after being assaulted, Dr. Hoftman went to the UCPD station on campus to report the attack, but the station was completely empty.

350. He then called 911, and the dispatcher instructed him to return to UCPD, who would take a report of the incident.

COMPLAINT

351. He did so, but no efforts were made by any enforcement officer, agency, or security personnel to confront or arrest Dr. Hoftman's attacker, even though Dr. Hoftman could show law enforcement where the attacker was located within the Encampment because Apple technology allowed him to track the precise location of his stolen Airpod.

352. On May 1, 2024, Dr. Hoftman reported all of these incidents alleged above (the exclusion from campus areas, the assault, and the law enforcement failures) to both the UCLA Chancellor and Vice Chancellor.

353. On May 31, 2024, the DGSOM held its graduation ceremony.

354. UCLA permitted a known Pro-Palestinian graduating medical student to participate in the ceremony by reading a medical oath in Arabic.

355. During this UCLA officially sanctioned address, the speaker made hostile statements against Israel. Dean Dubinett stood directly behind the student and did nothing to intervene or end her remarks.

356. In response to these remarks, multiple faculty members in attendance cheered and applauded.

357. The endorsement of antisemitic speech at a formal University event by UCLA faculty created an intimidating and hostile environment for Jewish faculty members, including Dr. Hoftman, and caused them significant discomfort and distress based on their Jewish identity.

358. From June 2024 and continuing to the present, Dr. Hoftman sent emails and had regular meetings with the DGSOM Dean regarding his concerns about antisemitism following the graduation ceremony and other incidents, including those alleged above.

359. These meetings failed to produce any meaningful institutional response or corrective action by DGSOM or UCLA.

360. In December 2024, Dr. Hoftman filed a complaint with UCLA's Discrimination Prevention Office ("DPO") regarding the antisemitism he had

66

experienced. To date, no discipline or action has been taken by DPO in response to this complaint.

361.   Dr. Hoftman continued to experience and observe antisemitic activity on UCLA's campus, including the January 29, 2026, protest at the Ronald Reagan UCLA Medical Center outdoor quad and the February 2026 protest regarding Ronen Hoffman's lecture. *See supra* ¶¶ 192–194.

362.   Dr. Hoftman filed a charge of discrimination with the EEOC. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA and UCLA Health subjected Dr. Hoftman to an unlawful hostile work environment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), in violation of Title VII. *See* Exhibit C.

### *Kamran Shamsa*

363.   Dr. Kamran Shamsa's ties to UCLA span nearly three decades. He has spent 28 of the last 32 years at the University, first as a student, then as a research assistant, a physician in training, and ultimately a faculty member for the past 15 years.

364.   As part of the clinical faculty, Dr. Shamsa serves as an Associate Clinical Professor in the DGSOM, Department of Medicine, Division of Cardiology.

365.   Dr. Shamsa is Jewish. He immigrated to the United States from Iran at age eleven with his family to escape religious persecution against Jews. His belief in Israel's right to exist, also known as Zionism, is rooted in his religion's traditions, prayers, and holidays and is central to his Jewish identity.

366.   Since the Hamas massacre on October 7, 2023, Dr. Shamsa has been subjected to pervasive antisemitic conduct and harassment at UCLA including antisemitic programming, a physical assault, denial of access to campus buildings,

67

COMPLAINT

intimidation, and the University's refusal to address or meaningfully respond to the foregoing.

367.  On February 8, 2024, Dr. Shamsa attended a DEI Grand Rounds lecture by Dr. Karthi Sivashanker, who spent at least half of his presentation promoting pro-Palestinian and anti-Israel messages, including cartoons portraying Israel and Jewish people as the cause of Palestinian suffering, and one showing tunnels under a hospital in Gaza. Staff had previously objected to inviting Dr. Sivashanker due to his history of public anti-Israel social media posts.

368.  It was customary for all Grand Rounds lectures to be recorded and posted online for attendees to obtain continuing medical education credit, but this lecture was not posted online. It was also customary for Grand Rounds lectures to include an opportunity for questions and answers, but no open dialogue was allowed during Dr. Sivashanker's lecture. In fact, Dr. Shamsa submitted a question via the Zoom platform to inquire why the lecture was one-sided and did not address the October 7th Hamas massacre or the hostages held in captivity, but Dr. Shamsa's question was ignored.

369.  The next day, Dr. Shamsa emailed Executive Vice Chair Dr. Jodi Friedman to present his objections to the antisemitic lecture. In response, Dr. Friedman insincerely apologized that Dr. Shamsa was "disappointed" in her for not challenging the speaker's views.

370.  On February 12, Dr. Shamsa responded that UCLA was masking antisemitism under the "guise of DEI" and advised that Jewish faculty were drafting a formal letter to address the same.

371.  Despite these concerns, on March 27, 2024, UCLA hosted another mandatory lecture for first year medical students, which contained antisemitic content. *See supra* ¶¶ 93–98.

372. In April 2024, Dr. Shamsa twice observed Nazi swastikas and other antisemitic graffiti on the walls of Royce Hall. UCLA left this graffiti visible for several hours before removing it.



373. During the Spring of 2024, Dr. Shamsa witnessed masked activists wearing keffiyehs who established an Encampment on Royce Quad.

374. During the Encampment, activists blocked Dr. Shamsa from entering the encampment area and subjected him to antisemitic signs and chants including: "Intifada is the solution," "From the river to the sea," "Jews are baby killers," "Jews = [swastika]," "Zionism is genocide," "Free Palestine from the hands of Jews," "Death to America," and "Tel Aviv will burn to the ground."

375. On April 25, 2024, activists blocked Jewish individuals, including Dr. Shamsa, when he was walking on a main pedestrian path (the Bruin Walk) from the hospital toward an event across from the Encampment. When Dr. Shamsa said he was not "pro Palestine," they shouted, "Zionist go away" and surrounded him, forcing him to flee while UCLA security did not intervene.

69

376. On April 28, 2024, the harassment escalated to physical violence. As Dr. Shamsa approached the Encampment to attend a nearby pro-Israel rally, activists screamed at him, chanting "All Zionists will die."

377. A masked man wearing a keffiyeh rushed him and knocked him to the ground while at least twelve security guards watched without acting. While being ignored by security, Dr. Shamsa laid on his back for twenty to thirty seconds.

378. Thereafter, he collected himself and proceeded approximately 100 feet before a UCLA security guard shoved him and denied entry. Only after Dr. Shamsa displayed his faculty badge did other guards instruct the first security guard to let him pass. Dr. Shamsa recalls trembling for about 30 minutes afterward.

379. On April 30, as violence escalated at the Encampment, Dr. Shamsa repeatedly called LAPD and UCPD begging for help. Both agencies told him they could not intervene without instructions from UCLA's administration, and no such orders had been issued. UCLA's lack of response led to numerous physical altercations, trauma from projectiles, and chaos, with many protestors and counter-protestors injured.

380. On May 3, 2024, Dr. Shamsa sent an email to then-Chancellor Gene Block, the Executive Vice Chancellor, the Associate Vice Chancellor of the Medical School, the Chief of Cardiology, the DGSOM Dean, and two other University administrators detailing his concerns about the antisemitism and harassment on campus and UCLA's failure to respond.

381. Dr. Shamsa's email included a three-page attachment describing the antisemitic DEI trainings, the "Zionist go away" incident, and his April 28 assault. He stated that as a Jew, he did not feel "welcome or safe" in conferences, meetings, the hospital, or on campus.

382. All recipients of this email were responsible for the safety, security, and well-being of Dr. Shamsa as an employee under UCLA's anti-discrimination policy and should have referred the email to the DPO. However, on March 12,

70

COMPLAINT

2026—nearly two years later—Dr. Shamsa's complaint was closed with no action taken.

383.   None of the recipients, who held administrative and supervisory position with UCLA, responded, and upon information and belief, none reported his concerns.

384.   Dr. Shamsa did not formally file a complaint with the DPO about these incidents because he was unaware of the process for doing so; however, his superiors and University administrators were aware of the antisemitism he faced and failed to remedy it.

385.   Since 2020, Dr. Shamsa had served as the de facto office leader for the UCLA Cardiovascular Center in Westwood, advocating for staffing, administration, and resources throughout the pandemic, and performing all core functions of the Cardiology Clinic Lead.

386.   Despite having performed the role for five years, and following UCLA's complicity in the antisemitic discrimination and harassment against Dr. Shamsa alleged above. UCLA did not post the position and instead appointed another doctor as Clinical Lead in November 2024. Dr. Shamsa learned in January 2025 that he was passed over. He remains the only physician at his level without a director-title role and was paid roughly $50,000 less than comparable peers.

387.   In June 2025, the DGSOM increased billing requirements from 13,400 to 15,200 RVUs[72], making it nearly impossible for Dr. Shamsa to meet the billing threshold after his reduced clinical duties and the addition of new faculty. This change produced an almost $100,000 salary reduction that colleagues with director roles could offset but he could not.

---

[72] A Relative Value Unit (RVU) is a standardized, three-part metric used by Medicare and private payers to determine reimbursement for physician services. This is the equivalent of Dr. Shamsa's billable requirement.

COMPLAINT

388.   In August 2025, the Chief of Cardiology instructed Dr. Shamsa to vacate his office of twelve years and move to a much smaller space to accommodate new staff, even though similarly situated peers were not required to relocate.

389.   On April 30 and June 13, 2025, Dr. Shamsa met with a UCLA Civil Rights Office investigator regarding allegations that Drs. Abel, Fonarow, and Friedman had retaliated against him by denying him the Cardiology Division Leadership position because of, among other things, his involvement in the *Frankel* litigation. *See supra* ¶ 1.

390.   On August 4, 2025, DPO responded, and the Civil Rights Office issued a Notice of Investigation. As of the filing of this complaint, no action has been taken by UCLA.

391.   In February 2025, Dr. Shamsa witnessed a large protest of 300–400 people outside the Medical Center displaying the same antisemitic messages used during the Encampment, creating noise disturbances audible in patient exam rooms, and blocking access to the hospital parking lot.[73] This delayed several of his patients by up to thirty minutes.

392.   That same month, he learned that UCLA's SJP, which is known for its antisemitic rhetoric and conduct, vandalized the nearby home of Regent Jonathan "Jay" Sures, harassing his family, painting red "bloody handprint" graffiti, and, upon information and belief, hanging threatening banners containing antisemitic messages, yet neither UCLA nor the Regents sought criminal charges. Although UCLA issued an interim suspension to SJP, the same students continued to gather and disrupt campus operations.

393.   These incidents were followed by further displays of antisemitic hostility. On March 23, 2025, Dr. Shamsa found a pro-Palestine bag in the ICU break room marked with the borders of Israel replaced by the Palestinian flag, a

---

[73] Similar protests occurred outside Westwood Cardiology fifteen to twenty times since October 7, 2023, with building access blocked on multiple occasions.

72

symbol frequently used to intimidate Jewish faculty and students since the October 7th attacks.

394.   In October 2025, masked activists staged a "Week of Rage" with antisemitic signs, repeated violations of campus protest rules, and no security response. The activists also erected a one-day encampment on October 21 with similar harassment.

395.   From November 18–20, 2025, activists again blocked campus areas and harassed the UCLA community during a Regents meeting.

396.   The pervasive pattern of antisemitism continued into 2026. For example, on January 29, Dr. Shamsa observed protesters outside the DGSOM's hospital. Some were masked and wearing keffiyehs, while shouting anti-Israel slogans as UCLA police again took no action. *See supra* ¶¶ 192–194.

397.   A charge of discrimination was filed with the EEOC for Dr. Shamsa. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA and UCLA Health subjected Dr. Shamsa to an unlawful hostile work environment, denial of promotion, and different terms and conditions of employment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), as well as retaliation for complaining of discrimination, in violation of Title VII. *See* Exhibit D.

### *Ian Holloway*

398.   Dr. Ian Holloway was a tenured full professor in the Department of Social Welfare at the Luskin School, and later transferred to the School of Nursing, where he is currently on medical leave. *See infra* ¶ 443.

399.   He is a licensed clinical social worker whose research examines health disparities among sexual and gender minority populations, and he co-directs the Southern California HIV/AIDS Policy Research Center.

400.   Dr. Holloway is Jewish and has openly expressed his Jewish identity throughout his tenure at UCLA.

401.   Since the Hamas attacks on October 7, 2023, Dr. Holloway has faced pervasive and targeted antisemitic harassment at UCLA. This conduct included classroom vandalism identifying him as a signatory of the Judea Pearl letter (*see supra* ¶¶ 73–74) and colleagues publicly declaring that Jewish faculty could not be trusted in personnel decisions, for which no disciplinary or protective action was taken. Dr. Holloway was also excluded from departmental activities based on his Jewish identity, and experienced resulting panic attacks requiring medical accommodation.

402.   The hostile environment and retaliation, coupled with the absence of meaningful institutional response, ultimately forced Dr. Holloway to transfer out of the Luskin School to the School of Nursing.  On January 1, 2026, Dr. Holloway went on medical leave, which required him to re-assign all of his grant-funded research to another Principal Investigator and forced Dr. Holloway to incur significant professional and financial hardships.

403.   The events that occurred at UCLA after the October 7th Hamas massacre demonstrate how this hostile environment unfolded. On October 9, 2023, Dr. Holloway and other Jewish faculty sought to circulate a departmental message of support for Israel and all victims of the attack, consistent with the Department of Social Welfare's established practice of issuing statements following events of national and international significance, including events involving discrimination and violence against protected minority groups.

404.   That day, when discussing this request during a regularly-scheduled faculty meeting, Professor Carlos Santos (affiliated with Faculty for Justice in Palestine) strongly objected, characterizing the situation as "complicated." Additionally, another tenured professor stated that "the world had not changed" because of the October 7th atrocities committed against Israel.

74

405. After this meeting, the Department Chair did not issue any departmental statement to address the October 7th attacks on Israel. This decision was inconsistent with the department's established practice.

406. The differential treatment of the October 7th attacks compared to other events for which the department had previously issued statements signaled to Dr. Holloway and other Jewish faculty that their concerns would not receive equal consideration.

407. Dr. Holloway signed the Judea Pearl letter in early November 2023, condemning the October 7th attacks and advocating for peace on campus and beyond. *See supra* ¶¶ 73–74.

408. An article was published in the Jewish Journal on November 10, 2023 discussing the Judea Pearl letter.[74]

409. On November 14, 2023, Dr. Holloway arrived at his classroom and found a message scrawled on the chalkboard: 'Look up Jewish Journal 300+ profs against terror." The words "300+ prof" were underlined. This message appeared to be a direct reference to the Judea Pearl letter Dr. Holloway had signed in early November 2023, and the article published in the Jewish Journal on November 10, 2023.



[74]*Supra* n.48.

410.   Dr. Astor, the only other Jewish professor teaching an 8:00 a.m. class in the Department of Social Welfare, confirmed the identical message appeared in his classroom. *See infra* ¶ 531.

411.   After checking other classrooms, Dr. Holloway and Department Manager Shelly Brooks found no other chalkboards had been vandalized, demonstrating the message only targeted the two Jewish professors in the Department.

412.   At this point, Dr. Holloway viewed this as an attempt to intimidate him based on his Jewish identity and felt his personal safety was threatened.

413.   On November 15, 2023, he filed a formal incident report with the Director of Human Resources for the Luskin School, Pamela Harris, Dean Anastasia Loukaitou-Sideris, and the Department Chair, and submitted a complaint through the UCLA Equity, Diversity & Inclusion ("EDI") portal. In that complaint, he expressed multiple safety concerns, expressed concern that student hostility could affect his teaching evaluations and personnel decisions and requested clarification of the student and faculty code of conduct

414.   The Dean responded that because the conduct was anonymous, nothing could be done. The complaint was eventually closed without investigation.

415.   In late October through November 2023, a counter-letter opposing the Judea Pearl letter circulated among faculty, characterizing concerns about antisemitism as threats to academic freedom.[75]

416.   In November 2023, during a faculty personnel meeting attended by full professors in the Department of Social Welfare, including Dr. Holloway, Professor Ananya Roy questioned the integrity of Jewish faculty. Professor Roy stated that faculty who had signed the Judea Pearl letter could no longer be trusted to be ethical in personnel decisions, characterizing the Judea Pearl letter as creating

---

[75] Available here.

COMPLAINT

"intimidation" and "fear" among students and reframing Jewish faculty's protected expression as harmful.

417. As the discussion continued, Professor Roy openly questioned colleagues' experiences of antisemitism and asserted that Jewish faculty could not fairly judge the work of others. When challenged, Professor Roy denied that her statements were antisemitic and reiterated her position that Jewish faculty who had signed the Judea Pearl letter could not be trusted to participate ethically in personnel matters. Dr. Holloway suggested that Professor Roy should memorialize her concerns in writing to the extent she desired this issue to be placed on the Department's FEC agenda.

418. In December 2023, during a departmental FEC meeting attended by Professors Roy, Susan Lares Nakaoka (Director of Practicum Education), and Judith Perrigo, and Department Manager Brooks, Director Lares Nakaoka told Dr. Holloway that as a white privileged male, he did not have a right to complain about antisemitism.

419. The discussions continued to escalate to the point that Dr. Holloway became visibly distressed as colleagues dismissed his Jewish identity and invalidated his experience of antisemitism.

420. On December 7, 2023, during his final class session of the fall quarter, two students harassed and intimidated Dr. Holloway by confronting him about the Judea Pearl letter. One student wore a keffiyeh that she had never worn to class before; another, Andrew Flores (a signer of the SJP letter), dressed entirely in black with sunglasses. Neither student had exhibited this behavior previously.

421. On December 8, 2023, Dr. Holloway filed a second formal complaint with the Department Chair, HR Director Harris, Dean Anastasia Loukaitou-Sideris, and Associate Vice Chancellor of Academic Personnel Erika Chau about negative student evaluations. Subsequently, his prior concerns about biased evaluations proved warranted because some evaluations from his students that quarter contained

COMPLAINT

negative references to the Judea Pearl letter.

422.   The same day, after consulting with a psychiatrist who advised him to reconsider his work situation due to the emotional distress he was experiencing, Dr. Holloway resigned from his position as Chair of the Department of Social Welfare FEC.

423.   Dr. Holloway was interviewed by the Dean of Students regarding the Fall 2023 classroom incidents but was informed that he would not be told of any outcomes from these proceedings.

424.   Dr. Holloway returned to work in the winter quarter of 2024 without teaching duties, but he continued as the Co-Chair of the Masters of Social Welfare Admissions Committee.

425.   Antisemitic, hostile communications continued to circulate within the department, including emails that included the phrase "WE SEE YOU," which Dr. Holloway perceived as a threat, or a warning that he and other Jewish professionals were being watched and targeted for their Jewish identity and their willingness to speak out against antisemitism.

426.   As a result, Dr. Holloway started having panic attacks.  Because of this antisemitic, hostile work environment, Dr. Holloway filed additional EDI complaints and began discussions regarding workplace accommodations.

427.   On February 20, 2024, Dr. Holloway submitted a formal request for reasonable accommodation through June 30, 2024, supported by medical documentation stating he "has a medical condition that substantially limits his ability to concentrate, think, and communicate" and experiences physical symptoms "when placed in group settings, specifically when and where he feels threatened and/or harassed."

428.   On the same date, February 20, 2024, Dr. Holloway sent an email to Anastasia Loukaitou-Sideris to raise formal concerns about how the Luskin School handled concerns brought forth by students, staff and faculty related to antisemitism

COMPLAINT

and the conflict in Gaza. Specifically, he stated "Your endorsement of the FEC's 'taking this initiative' to lead a departmental faculty meeting on this issue, without proper safeguards in place to protect the wellbeing of all faculty, establishes your willingness to support and facilitate a hostile work environment. The full breadth of safety concerns I have raised since November 15, 2023 after I exercised my right to free speech have gone unanswered."

429.   On April 4, 2024, a swastika was found graffitied in an elevator at the Luskin School of Public Affairs building, which is the very building where Dr. Holloway worked. The incident was reported to campus police the same day (Report #24-0635). No perpetrator was identified.

430.   Jewish faculty colleagues reported additional incidents including swastikas in buildings and parking areas and a staff member overhearing an antisemitic slur ("kike"). Although the swastika appeared in Dr. Holloway's workplace, the University treated it as an isolated incident rather than part of a pattern. The Dean sent an email titled "A Hateful Symbol," but no meaningful action followed.

431.   During the Encampment, Jewish students were blocked from campus areas, harassed, and physically confronted. *See supra* ¶ 139. Dr. Holloway was subjected to increased antisemitic conduct on campus. For example, Dr. Holloway observed offensive antisemitic signs and graffiti and multiple displays of Nazi swastikas throughout UCLA's campus.

432.   On or around May 3, 2024, Professor Laura Wray-Lake, the departmental FEC Chair, circulated a letter regarding the Encampment that appeared to come from the Department of Social Welfare, yet Jewish faculty— including the Department Chair—were systematically excluded from the drafting process.

433.   The letter regarding the Encampment contained demonstrably false claims and failed to address antisemitism.

79

434.   Dr. Holloway wrote to departmental FEC Chair Wray-Lake and Dean Loukaitou-Sideris asking why Jewish faculty were excluded from drafting the letter; he learned that Dr. Wray-Lake had solicited signatures one-by-one but did not approach Jewish faculty.

435.   On May 7, 2024, Dr. Holloway filed a formal DPO complaint documenting the pattern of antisemitic discrimination. Thereafter, Dr. Holloway and Professor Astor met with Darnell Hunt (Executive Vice Chancellor and Provost), who told them he was "waiting for the temperature to come down." Additional meetings with Mike Levine (Vice Chancellor of Academic Personnel), Erika Chau (Associate Vice Chancellor of Academic Personnel), and Mitch Chang (Interim Vice Chancellor of EDI) yielded no concrete action.

436.   On July 23, 2024, more than two months after filing his DPO complaint, Dr. Holloway was informed that his complaint was still being assessed.

437.   The investigation was delayed because faculty members, who had harassed Dr. Holloway, refused to be interviewed. Ultimately, his DPO complaint was closed with no findings in January 2025.

438.   Meanwhile, Dr. Holloway continued under the same accommodation and was excused from faculty meetings while still participating in personnel reviews.

439.   Dr. Holloway was assigned to review an assistant professor with another tenured professor. He submitted a fair and professional review. Dr. Holloway was later informed that Professors Carlos Santos, Laura Wray Lake, and Ananya Roy characterized his review as "retaliatory" during full faculty meetings that he did not attend. These were the same individuals who had previously targeted him for his Jewish identity. He was given no opportunity to respond to or defend himself against these accusations. These accusations in the presence of tenured faculty further damaged his professional reputation.

440.   Mike Levine (Vice Chancellor for Academic Personnel) and Erika

80

Chau (Associate Vice Chancellor for Academic Personnel) asked Dr. Holloway to stop voting in Social Welfare personnel matters, despite his continuing rights as a member of the Academic Senate. No finding of misconduct was ever provided to justify this exclusion.

441. While Dr. Holloway's accommodation was extended through December 31, 2024, he proactively sought a faculty appointment in another UCLA department.

442. However, he learned that faculty in other departments raised concerns because he was considered a "Zionist" and had signed the Judea Pearl letter, thereby effectively gravely damaging his reputation across departments.

443. Dr. Holloway began working at the UCLA School of Nursing on January 1, 2025, having effectively been forced out of the Luskin School because of the hostile environment towards Jews. However, Dr. Holloway's appointment to the School of Nursing remained in limbo through the spring of 2025 because the appointment would not be official until July 1, 2025.

444. During the appointment process, he was required to interview again, undergo a new personnel process, transfer his grants and staff, and move from a nine-month to a twelve-month appointment. As a result, he experienced a pay cut, loss of research center funding, and was listed as an "affiliate" in email systems for approximately six months.

445. Dr. Holloway's career, which he had built over years of dedicated scholarship, was dismantled as a direct consequence of the antisemitic harassment he had endured and UCLA's failure to protect him.

446. Dr. Holloway accepted the Director of Research role at the School of Nursing and completed onboarding. He was assigned to co-teach two courses, the first time he had ever been given a co-teaching assignment. Dr. Holloway was also assigned to teach two courses on subject matter outside his area of expertise. He raised concerns about the subject matter of the courses, but his concerns were not

81

adequately addressed.

447.   Dr. Holloway filed a charge of discrimination with the EEOC, as well as an amended charge thereafter. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA subjected Dr. Holloway to an unlawful hostile work environment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), and retaliation for engaging in protected activity, in violation of Title VII.  *See* Exhibit E.

448.   Effective January 1, 2026, based on the pervasive and repeated discrimination he experienced at UCLA, Dr. Holloway initiated formal medical leave through June 30, 2026, which required him to reassign leadership of all research grants and contracts and to lose the associated salary support.

### *Sarah Blenner*

449.   Sarah Blenner is an Academic Administrator III and Director of Field Studies and Applied Professional Training in the Department of Community Health Sciences at the UCLA Fielding School of Public Health, with an appointment through June 30, 2027. She holds a Juris Doctor and a Master of Public Health, and her grant writing has secured over $3.5 million in funding since 2016. Since fall 2019, she has served as instructor of record for 42 courses with more than 1,100 students enrolled. Although teaching is not required for academic administrators, since 2021 she has taught approximately six to eight four credit hour courses annually, exceeding the teaching load of tenure track teaching faculty in the Department.

450.   In the Fall of 2023, Director Blenner applied for a position at UCLA, a position for which she was personally recruited.

451.   The hiring committee included Dean of the Fielding School, Ronald Brookmeyer, Senior Associate Dean, Sudipto Banerjee, and Associate Dean of Public Health Practice and former Associate Dean of EDI, Alina Dorian. Upon

COMPLAINT

information and belief, Dean Brookmeyer ultimately made the final hiring decision.

452.   During the application process, the Hamas terrorist attack occurred on October 7, 2023. Four days later, on October 11, 2023, Director Blenner was notified that she was not selected despite being more qualified than the selected candidate. The selected candidate lacked a doctorate equivalent degree and teaching experience, both of which were required or strongly preferred, and was not Jewish, whereas Director Blenner possessed both qualifications, and is Jewish. Upon information and belief, the selected candidate was unable to independently perform the role and later left the University.

453.   Around this same time, Director Blenner invited a guest speaker, who identified as Israeli, to a class with many diverse speakers present. The speaker's role was unrelated to Israel or current events and was consistent with the course's practice of featuring diverse speakers from various professional disciplines and faith communities. Despite this, some students grieved to administration, and Director Blenner's course evaluations began to worsen.  One student wrote, "[W]hen I learned that a Zionist was invited to speaking during the Thursday professional consultations, that made me feel like the class was less of a welcoming environment."

454.   Not long after this lecture, someone placed threatening signs in another language and in English on her classroom doors before class started.  Director Blenner looked at other classrooms in the building and did not observe any signs on those doors.

83

COMPLAINT



455.   A QR code on the sign linked to a statement that asserted a genocide is occurring in Gaza, referenced the Judea Pearl Letter signed by Director Blenner, and stated that faculty who signed the "Faculty Against Terror" letter acted contrary to the University's JEDI commitment to combat inequities and racism.

456.   The signs were harassing and intimidating. Director Blenner felt that her safety was threatened and that she was targeted because of her religion, ethnicity, and ancestral heritage, her signature on the Judea Pearl Letter, and her inclusion of an Israeli speaker.

457.   From fall 2023 through 2024, during multiple faculty hiring processes, Director Blenner observed discriminatory decision making across four positions based on race, ethnicity, national origin, religion, and antisemitism.

458.   In one instance, Chair Gee opposed a more qualified Jewish candidate because she was not Latina, and Director Blenner was excluded from candidate

discussions despite being invited to attend.

459. In another incident, faculty indicated that a highly qualified Jewish candidate would not be hired because she appeared Jewish rather than Black or African American.

460. In a third incident, the Department voted against the most qualified candidate in favor of a less qualified non-Jewish candidate of a different minority identity, but Dean Brookmeyer overruled the vote and extended the offer to the Jewish candidate.

461. In a final example, Dr. Holloway sought a transfer to her Department after reporting antisemitism in his own Department. The transfer initially had general support, but that shifted once it was disclosed that antisemitism was the reason for the request.

462. No corrective action was taken to address conflict of interest and bias in hiring, even when the Department, Fielding School, and Discrimination Prevention Office were on notice. For example, Director Blenner filed a complaint with the Discrimination Prevention Office regarding hiring of Angie Otiniano Verissimo for Teaching Professor, because the discrimination against the more qualified Jewish candidate who interviewed was so alarming. To Director Blenner's knowledge, no investigation was opened.

463. Following the October 7th terrorist attacks, discussions about Gaza and Palestine arose in most faculty meetings during the 2023–2024 academic year, despite little course content in the Department relating to Gaza. One senior faculty member, Randal Kuhn, also routinely injected his political and discriminatory views into faculty discussions and disparaged those who disagreed. On one occasion, he remarked, "I try to use my Jew card, but that does not seem to get me far anymore," which Director Blenner understood as antisemitic and tokenism.

464. In February 2024, Director Blenner traveled to Israel with UCLA faculty. Before the trip, she notified Chair Gee and asked whether any advance steps

85

were required. Chair Gee directed her to contact the administrative team for approval, and Director Blenner did so and received confirmation that she was cleared to travel and work remotely for part of the trip.

465.   Scrutiny of Director Blenner's work intensified while she was in Israel and continued after her return. She received emails from Office of Public Health Practice staff, overseen by Associate Dean Dorian, which complained about response times and directed her to copy a junior staff member on correspondence with partners that she had been developing for a decade.

466.   On March 8, 2024, shortly after returning from Israel, Director Blenner met with Chair Gee regarding alleged student concerns based on a video circulating online. The video showed Director Blenner only in the background while lawfully traveling in Israel with UCLA approval. Chair Gee expressed concern that students might believe she would not fairly evaluate their work and asked her to send an announcement assuring students that she would not discriminate, particularly in grading.

467.   Director Blenner understood this request as questioning her academic fairness and integrity because she is Jewish. She told Chair Gee that it felt like a request for an apology for being Jewish, but that similar apologies would not be required of similarly situated non-Jewish faculty. She proposed that the Department instead reaffirm its collective commitment to fair grading, but Chair Gee declined and continued to press for an individual statement. Director Blenner stated that such communications were typically the responsibility of the chair and that she would not send the email absent a written directive. Chair Gee stated that he would consult with a Chinese, Jewish friend. Director Blenner feared retaliation and needed Chair Gee's support for grant proposals; she reported these concerns to Dean Brookmeyer and others.

468.   Following this event in March 2024, Director Blenner experienced severe anxiety and depression due to workplace stress and antisemitic

86

discrimination, and her physician recommended medical leave.

469. As the workplace became increasingly hostile toward Jews with connections to Israel, Director Blenner and others met with Dean Brookmeyer and Senior Associate Dean Banerjee to raise concerns about antisemitism in the Department.

470. Director Blenner requested that the Dean implement safeguards for an upcoming webinar called "Health Impact Projections for the Gaza Crisis" to ensure that antisemitism, including antizionism, were not infused in the webinar. She also requested an additional speaker to provide an alternate perspective on the problems of the Hamas-run Ministry of Health statistics being presented or offer additional programming at a later date that could address health impact on Israelis post October 7.

471. To her knowledge, there has been no school-sponsored webinars or other educational programming on the health impact post-October 7 to Jews or Israelis. Although Dean Brookmeyer and Senior Associate Dean Banerjee stated that Director Blenner had the right to file a complaint, they asked for time to consider a course of action. No action was taken.

472. Kuhn proposed and Chair Gee agreed to cancel a faculty meeting because it conflicted with the "Health Impact Projections for the Gaza Crisis" webinar that students had "experienced trauma" in securing school sponsorship and that CHS faculty were obligated to show "solidarity for the community." The faculty meeting was rescheduled, curtailing regular Department business. Faculty, particularly junior faculty, felt pressure to attend. Director Blenner attended and asked questions about the validity of the dataset and model during the session, Dean Brookmeyer, who served as the moderator, did not ask any of her questions to the guest speaker.

473. In another instance, Director Blenner was appointed by Executive Vice Chancellor and Provost Hunt to sit on the Task Force to Combat Antisemitism and

COMPLAINT

Anti-Israeli Bias at UCLA. *See supra* ¶ 170. Because of this request, she asked her department if it was possible to change the time that her course was scheduled to meet to minimize time conflicts. Her request was denied.

474.   As Director Blenner balanced her commitments to UCLA, Chair Gee requested that she meet with him during Passover to discuss concerns. Director Blenner had scheduled time off for the observance of Passover and asked that he email instead.

475.   In the email, Chair Gee relayed that her Teaching Assistant (TA) had complained that Director Blenner's participation on the Task Force interfered with student learning. Chair Gee accused Director Blenner of violating the TA contract by requiring the TA to teach and work beyond permitted hours. He suggested that Director Blenner step down from the Task Force and that she expressly tell the TA she would not retaliate.

476.   It was unclear whether the TA had filed a formal complaint or had merely made a passing comment to other Fielding School employees. Issues concerning TA contract compliance are typically handled by HR, but Chair Gee addressed the matter himself. Director Blenner understood this as retaliation for her participation on the Task Force and prior reports of Chair Gee's antisemitic conduct made to Dean Brookmeyer.

477.   At a later meeting about the course, the TA stated that she had not exceeded, and did not expect to exceed, 10 hours of work per week, consistent with her appointment. After reviewing the course structure and student activities, the TA also acknowledged that she was not engaged in teaching, had misunderstood aspects of the class, and agreed that the course learning objectives were being met with no negative impact on student learning.

478.   Director Blenner was repeatedly targeted by students based on her Jewish identity. Rather than addressing the fact that she was targeted based on her protected identity, Chair Gee and then Vice Chair May Sudhinaraset relied on minor

COMPLAINT

grievances to subject Director Blenner to progressive discipline and pervasive micromanagement. This level of scrutiny had never occurred during her decade-long career at UCLA. She now spends substantial time responding to grievances and defending her work despite consistently meeting and exceeding expectations throughout her 10-year career at UCLA.

479. Since October 7, 2023, the Department has repeatedly planned to discuss Director Blenner and her work without adequate notice or first raising concerns with her, including notifying her 45 minutes before a meeting during Passover, while she was out of the office, that concerns about her would be discussed at a faculty meeting.

480. Director Blenner's required classes were also omitted from the departmental Google sheet tracking who taught core courses over time. When Director Blenner requested that her teaching load and core courses be added to the Google sheet, Chair Gee decided instead to change the name and purpose of the tracking document.

481. Director Blenner witnessed students creating the antisemitic pig statue placed outside the Regents meeting in March 2024, as well as tents and antisemitic signs in the vicinity. *See supra* ¶¶ 86–91.

482. Although Director Blenner did not go to the Encampment, it was close enough to her office that she could hear chants such as "from the river to the sea." She also observed antisemitic symbols on campus, including swastikas, the antisemitic symbol of a red inverted triangle, and "Zionist" used as a slur, and saw videos of individuals with weapons shouting "fuck the Jews." Director Blenner feared for her safety, kept her office locked, and was afraid to leave her office.

483. In a departmental statement about canceling classes due to the Encampment, signed by Chair Gee and then Vice Chair Sudhinaraset, the protests were compared to historical student movements such as the Civil Rights protests and the Vietnam War demonstrations, emphasizing the importance of student protest

COMPLAINT

and free speech.

484. Although Chair Gee and Vice Chair Sudhinaraset stated that they were speaking in their individual capacities, the statement was issued through their official roles at UCLA. Director Blenner understood the statement as minimizing the trauma experienced by Jews after the October 7th massacre, invalidating the lack of safety she felt on campus, and appearing to endorse antisemitic activity, including threats and violence against Jews.

485. On or about May 15, 2024, the department's Academic Personnel Coordinator and Assistant to the Chair, sent an email to the Faculty and Academic Appointee's in the department on behalf of Associate Dean Courtney Thomas Tobin circulating AAAR Task Force Report No. 1. *See supra* ¶ 179. Emails sent to the Department list serv "on behalf of" leadership are typically understood as official departmental announcements.

486. Director Blenner responded to Associate Dean Thomas Tobin asking whether the report reflected an official Fielding School position or a personal one and requesting that a second report describing the experiences of Jewish and Israeli individuals related to the Encampment also be shared.

487. Rather than addressing the request, Associate Dean Thomas Tobin sent a five-page response accusing Director Blenner of being "intellectually disrespectful" and "intellectually irresponsible" and asserting that her request for clarity and additional viewpoints undermined collegiality and could suppress input from other faculty.

488. Director Blenner holds one of the most vulnerable positions in the Department. Although she has worked at the Fielding School for more than a decade, she is an academic-appointee with two-year appointments, does not hold a faculty appointment, and cannot vote on Department matters.

489. Associate Dean Thomas Tobin concluded her letter by stating she would share her concerns about the exchange with faculty. Director Blenner

90

understood this as an actionable threat given Associate Dean Thomas Tobin's senior leadership role and record of influence on employment outcomes. Dean Brookmeyer and Chair Gee were copied on the exchange and, to her knowledge, neither responded nor took action.

490. By this time, Director Blenner was experiencing severe anxiety and depression due to escalating workplace stress and antisemitic discrimination. She notified HR representative Eric Malmquist of her concerns, including statements made by Chair Gee, and took medical leave from mid-May through early-September 2024. Her employer sponsored disability insurer indicated that the condition appeared consistent with a workers compensation claim because it arose from workplace conditions.

491. On September 9, 2024, shortly after returning from medical leave, Director Blenner met with Chair Gee at his request. During the meeting, Chair Gee stated that he "takes antisemitism seriously" and, as a "scholar of inequities," understood that her experience was not an "Oppression Olympics."

492. Further contributing to the antisemitic environment, Professor Kuhn proposed a course titled "If I Must Die: Public Health, Power, and Palestine," with a syllabus containing antisemitic tropes and linking to a list targeting Jewish faculty, including Director Blenner, who signed the Judea Pearl Letter. The Department unanimously voted in favor of the course.

493. The course was blocked by the Fielding School FEC, but emails were sent advertising webinars that promote antizionist narratives from Department personnel as if the events were official department webinars with the subject line: "If I Must Die." Director Blenner found these departmental emails distressing. On April 8, 2025, Director Blenner wrote to DPO Investigator Linda Cardenas: "I find it triggering and distressing to receive these emails as official emails from the department and request that they stop."

494. When the Department sent another "If I Must Die" email in January or

91

February 2026, Director Blenner replied inquiring whether the course was condoned by UCLA. Her email went unanswered. On information and belief, university resources were and continue to be used for this effort.

495. On information and belief, Kuhn continued efforts to organize the "If I Must Die" course at FSPH by mobilizing undergraduate students and using his UCLA email and title to advocate for the course. In March 2026, emails circulated nationally that reached Director Blenner and created the impression that the course was endorsed by UCLA.

496. In September 2024, Director Blenner filed a complaint with the UCLA Discrimination Prevention Office after first raising concerns with Dean Brookmeyer, Senior Associate Dean Banerjee, Associate Dean Thomas Tobin, and Human Resources. Although warned the process could be ineffective and lead to retaliation, she proceeded and submitted written evidence in October 2024.

497. On or about October 23, 2024, Director Blenner shared a copy of the Task Force to Combat Antisemitism and Anti-Israeli Bias report (*see supra* ¶¶ 189–191) to Dean Brookmeyer and Senior Associate Dean Banerjee. She suggested that the report be shared widely and expressed her hope that it would spark change. Dean Brookmeyer and Senior Associate Dean Banerjee acknowledged receipt and thanked her for her service, but to her knowledge the report was not disseminated to faculty, staff, or academic appointees in a similar manner that the AAAR report was.

498. Around October 2024, students attempted to disrupt her class by interrupting course content to rant about the genocide in Gaza. The students wore shirts with pigs dressed up as police officers, Keffiyahs, and Arabic writing. Director Blenner understood this to be an intentional coordinated effort to disrupt student learning and intimidate her because of her Jewish heritage, and she felt threatened. One student scheduled office hours at one point in the quarter to apologize for the way his classmates treated Director Blenner.

92

COMPLAINT

499.   In November 2024, Director Blenner applied for an Open Rank Professor position but did not advance. Associate Dean Thomas Tobin, who chaired the search committee, stated that she screened applications before forwarding them to the committee. Upon information and belief, Director Blenner's application was screened out by Associate Dean Thomas Tobin before it reached the committee, preventing full consideration.

500.   Around December 2024, Director Blenner referred a student academic integrity concern to the Dean of Students, and during the investigation, which concluded around April 2025, the student made statements she understood as an effort to remove her because she is Jewish. She reported this to the Assistant Dean, who indicated it should be referred to the DPO, but although DPO investigator Cardenas and the DPO were aware of this incident, they failed to investigate or take corrective action.

501.   Director Blenner was notified that she was up for merit review while on medical leave.  During the review process, Director Blenner expressed concerns that bias could affect the evaluation of her file and asked that faculty be given guidance because her administrative role differed from positions typically reviewed by faculty committees.

502.   During faculty discussions about her merit review, Otiniano Verissimo allegedly shared false and biased statements about Director Blenner and voiced strong opposition to her advancement. Director Blenner understood these statements to be based on bias related to her Jewish identity, ethnicity, religion, and national origin.

503.   Despite contributions exceeding her role, including co-authoring the Antisemitism Task Force report, teaching numerous courses, and securing new grants, Director Blenner's request for promotion to Academic Administrator IV, Step 11 was denied, with Chair Gee recommending advancement only to Academic Administrator III, Step 15. Human Resources stated in June 2025 that the

93

Department was not required to base promotion decisions on performance and could rely on any factors. Director Blenner appealed in March 2025, identifying procedural errors, inaccuracies, and discriminatory bias and submitting a detailed self-appraisal. Administration later determined the Department failed to conduct a required vote and returned her dossier, which was reconsidered in April 2025 with a third-party observer present.

504. Director Blenner later received a second letter from Chair Gee reporting the vote results and again recommending against advancement to Academic Administrator IV. Director Blenner submitted a rebuttal identifying inaccurate and discriminatory statements and reiterating concerns that antisemitic bias had influenced the review.

505. Director Blenner's requests for corrective action were ignored, and no remedial action was taken. During this period, DPO investigator Linda Cardenas informed Director Blenner that faculty votes based on information presented to them would not constitute discrimination even if the information originated from discriminatory conduct.

506. The department initially indicated that they would send a specified term letter to Director Blenner extending her appointment, but then later changed course indicating that they would put her reappointment to a vote. Based on information and belief, this was not done when her appointment was renewed before October 7, 2023. Director Blenner understood this to be retaliation for her request to reconsider her promotion. Director Blenner ultimately received and signed a specified term appointment renewing her position through June 30, 2027.

507. Director Blenner repeatedly sought a faculty or adjunct appointment that would allow her to serve as a principal investigator and receive recognition for her teaching but has not been granted even a no-cost adjunct role, despite similarly situated employees holding such appointments. On information and belief, Chair Gee and others discouraged her application by withholding instructions, warning of

94

institutional "pushback," suggesting adverse pay consequences, attempting to cancel her job talk, and engaging in dismissive conduct during the presentation. In June 2025, she was advised that she could pursue an ad hoc committee review, but she understood the discussion as discouraging. Although she formally requested such review in October 2025 and Malmquist confirmed receipt, her application has not progressed.

508. At the CHS faculty retreat in May 2025, Chair Gee gave a presentation on the budget. It was part of an overview of the poor financial health of the Department. Director Blenner was singled out and had her own budget line highlighted during the presentation, which showed that there was a major increase in the cost of her line item the year that she took medical leave. There was no increase in the prior year when Director Blenner took parental leave for a similar amount of time at a similar time of the year. When a faculty member asked why the budget drastically increased on Director Blenner's line item, Chair Gee looked directly at Director Blenner and his response implied that it was because of Director Blenner's medical leave.

509. Upon information and belief, Director Blenner's work was used without credit when Otiniano Verissimo and the Women of Color in Public Health group submitted a February 2025 grant proposal to the UCLA Teaching and Learning Center on a topic overlapping with Blenner's funded initiatives, using information from her prior report. Despite her subject matter expertise, prior offer to develop related workshops, and invitation to participate, she was excluded from the proposal and subsequent meetings.

510. In April or May 2025, Dean Brookmeyer reduced Director Blenner's teaching responsibilities for a 400-level course based on student evaluations that included antisemitic comments, including statements invoking stereotypes about Jews and money. Director Blenner had previously reported antisemitism in evaluations to Brookmeyer and the DPO. In fall 2025, she was required to co-teach

the course with an associate dean and develop new curriculum to address student satisfaction concerns.

511. Although the DPO was on notice for months, Investigator Linda Cardenas did not contact Director Blenner until December 2024. Investigator Cardenas then conducted interviews with Director Blenner and her counsel in January, March, April, and May 2025, totaling approximately eight hours without opening an investigation. During these meetings Director Blenner provided detailed testimony and supporting materials.

512. Director Blenner filed a charge of discrimination with the EEOC. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA subjected her to a hostile work environment based on race or ethnicity (Jewish), perceived or actual national origin or ethnicity (Israeli or Jewish), and or religion (Judaism), in violation of Title VII. *See* Exhibit F.

513. In September 2025, after months of inactivity, Investigator Cardenas requested additional information and indicated that DPO would investigate only some of the allegations. In October 2025, more than a year after the complaint was filed, Investigator Cardenas issued a Notice of Investigation and a status update excluding numerous allegations and containing inaccuracies regarding Director Blenner's claims, including those directed at Thomas Tobin, whose position as Associate Dean of EDI falls under the same office as DPO.

514. In December 2025, Director Blenner's attorney sent a detailed letter correcting the record, appealing the exclusion of allegations, and providing additional examples of discrimination. Investigator Cardenas acknowledged receipt.

515. In January 2026, Investigator Cardenas stated that written complaints, attorney letters, and other documentation were not considered evidence, required additional interviews before including allegations, and expressed concern that

COMPLAINT

Director Blenner had raised too many incidents of antisemitism.

516. In January 2026, Chair Gee circulated an announcement highlighting Otiniano Verissimo, and in February 2026, when Director Blenner requested a similar announcement regarding her grant and an upcoming event, Chair Gee instead questioned how her work benefited the Department and ultimately included her update only within a general "faculty and staff highlights" email, which he had not previously issued. Director Blenner understood this as minimizing her contributions and diminishing her role to "staff".

517. Around February 2026, during an admissions committee meeting, a faculty member justified an applicant recommendation based on race, ethnicity, or national origin rather than merit, and Chair Gee and other senior faculty did not address the comments. Director Blenner understood this exchange to reflect that decisions across the Department, including hiring, merit, and promotion, are influenced by demographic considerations.

518. Around February or March 2026, Senior Associate Dean Banerjee asked whether Director Blenner would teach PH 401 again and indicated former Associate Dean Dorian would be unavailable. Director Blenner agreed and expressed interest in applying for a curriculum development grant, and requested a meeting, but Senior Associate Dean Banerjee indicated that he would not immediately be available to discuss. Director Blenner drafted the proposal to facilitate a more expedited discussion, since the deadline for submission was approaching.

519. On March 13, 2026, an assistant dean informed her that PH 401 would be discontinued after Fall 2026, replaced with a new course developed by Associate Dean Dorian, and that Director Blenner would be assigned a co-instructor, none of which Senior Associate Dean Banerjee had disclosed. These decisions were based on earlier antisemitic evaluations rather than more recent feedback. The discontinuation of PH 401 and her exclusion from curriculum planning

COMPLAINT

fundamentally alter her role and, absent intervention, will deprive her of a substantial portion of her responsibilities.

520. In a March 23, 2026, meeting about PH 401 updates, Dean Brookmeyer and Senior Associate Dean Banerjee, made statements that suggested that policies and practices were being applied differently to Director Blenner than other faculty and courses.

### *Ron Avi Astor*

521. Dr. Ron Avi Astor held the Marjorie Crump Chair Professorship in Social Welfare at the UCLA Luskin School of Public Affairs from approximately July 2019 until July 2025, with a joint appointment in the UCLA School of Education and Information Studies.

522. Dr. Astor's scholarship examines school violence, bullying, harassment, and discrimination, including research on strategies for peaceful coexistence among Israeli, Arab, Muslim, Palestinian, Druze, and Bedouin students.

523. Dr. Astor is Jewish and openly displays signs of his faith on campus, and he holds Zionism as a deeply held religious belief rooted in his Jewish identity.

524. Since the Hamas massacre on October 7, 2023, Dr. Astor has experienced severe, persistent, and pervasive antisemitic targeting at UCLA, including classroom vandalism, defamatory letters falsely accusing him of supporting genocide, students refusing to attend his events because he is Jewish and a Zionist, course cancellations, disruption of his research activities, and UCLA's consistent failure to investigate or address his complaints.

525. On October 26, 2023, after the October 7th massacre, Dr. Astor co-hosted a "Healing Group" event open to all students and faculty, featuring readings from multiple faiths to mourn innocent civilian lives lost in Israel and Gaza.

526. After the event, a student caucus group stated to the faculty member who co-hosted the Healing Group event that they did not attend because Dr. Astor was Jewish and a Zionist.

527. When Dr. Astor raised the students' boycott due to Dr. Astor's religious beliefs at a faculty meeting, he was challenged by a colleague who questioned whether the students' boycott of the event was antisemitic.

528. Despite Dr. Astor bringing attention to the matter, there was no response from other faculty, the Department Chair, or Dean Loukaitou-Sideris regarding what role faculty should assume when students engage in antisemitic rhetoric or acts.

529. Some faculty advocated a permissive attitude toward antisemitism, claiming those students "were still developing and learning." Ultimately, the outcome of the meeting was that the students would not be educated about the antisemitic nature of their boycott.

530. In or around early November 2023, Dr. Astor signed the Judea Pearl letter. *See supra* ¶¶ 73–74.

531. On November 14, 2023, Dr. Astor discovered that someone had vandalized his classroom chalkboard with a message identifying him as a signatory of the Judea Pearl letter. Dr. Astor learned that the same vandalism had occurred in Dr. Holloway's classroom. *See supra* ¶ 410.

532. On November 15, 2023, Dr. Astor and Dr. Holloway jointly submitted a report to HR, the Department Chair, and Dean Loukaitou-Sideris, requesting an investigation and safety assessment.

533. Their complaint was closed without investigation, and when Dr. Astor and Dr. Holloway raised this with the DPO, the DPO responded that it only investigates incidents involving faculty perpetrators.

534. Despite repeated requests, UCLA never sent a message to students that targeting faculty for signing the Judea Pearl letter was unprotected speech.

535. Throughout the 2023–2024 academic year, Dr. Astor and other Jewish faculty who signed the Judea Pearl letter were labeled as Zionists and harassed, with one student telling Dr. Astor, "Don't worry, we just hate Zionists and not Jews."

99

536. Around the same time, Dr. Astor's elective course was cancelled after students withdrew in response to the public circulation of the Judea Pearl letter.[76] Dr. Astor raised his concerns about student bias in enrollment with his Department Chair, but these concerns were dismissed and not investigated.

537. On February 14, 2024, an unregistered student group called Luskin Students for Justice in Palestine ("LSJP") sent a letter to UCLA leadership containing defamatory statements falsely characterizing Dr. Astor as supporting genocide—contrary to his career researching peace and coexistence.

538. The letter falsely claimed his Healing Group event was "primarily tailored to Jewish students" when in fact it was open to all faiths. The letter also falsely asserted that Professor Astor's performance as the Search Committee Chair for the Social Welfare Faculty was biased because he did not include student and faculty input. The letter was widely circulated across many university departments with dozens of faculty and student signatories, including Luskin School faculty, who knew of the falsehoods and defamatory statements in the letter. The letter went viral in the academic community.

539. A Luskin faculty member admitted at a faculty meeting that he helped write the letter knowing it contained inaccuracies about Dr. Astor and later apologized.

540. The departmental FEC acknowledged the letter contained "personal attacks and inaccurate claims" but took no corrective action against the faculty member who helped draft it. Dr. Astor repeatedly requested that UCLA publicly refute the letter; it has never done so.

541. On February 15, 2024, students heckled Dr. Astor as he walked to his car while screaming that Dr. Astor is "complicit with genocide"; when he requested police protection, he was told to "be vigilant."

---

[76] Dr. Astor is a popular teacher with consistently high student ratings and decades of strong enrollment in his elective courses.

100

542.  On February 26, 2024, Dr. Astor filed a DPO complaint regarding the LSJP letter.

543.  Without conducting an intake interview or undertaking an investigation, DPO closed the matter on September 13, 2024, claiming insufficient evidence.

544.  In early March 2024, a top candidate for the Social Welfare Faculty Chair withdrew and told Professor Astor, who was the Search Committee Chair at the time, that she did so because of the hostility she observed from faculty and students toward Jewish Faculty through the LSJP Letter, specifically referencing Professor Astor and the Department Chair.

545.  On March 9, 2024, Dr. Astor stepped down from chairing the Search Committee because he believed the false allegations made against him would jeopardize the department's chair search. He asked the Dean and the Chair of the Faculty Executive Committee to meet with students to correct the false assertions and educate them that targeting him because he is a Jewish Zionist was antisemitic. The Dean and Committee Chair met with the students and corrected the inaccurate statements, but they refused to educate the students about their antisemitic conduct toward Dr. Astor.

546.  Thereafter, at the recommendation of the Provost, Dr. Astor went on medical leave after experiencing severe physical and psychological symptoms brought on by the stress of antisemitic harassment and the lack of response by administrators and leadership to directly address or educate the students about antisemitism. Dr. Astor believed if he as a tenured professor could not physically or psychologically tolerate being at UCLA, there was no place for Zionist Jews on campus.

547.  On March 31, 2024, Dr. Astor submitted a formal abusive conduct complaint to UCLA Academic Affairs on behalf of himself and Dr. Holloway, documenting the pattern of antisemitic hostile conduct and the university's failure

101

to respond meaningfully to their concerns. After months without updates, they were told the investigation was deferred to DPO, even though DPO declined to investigate.

548. At the June 2024 graduation, some students requested that "Zionist" faculty not read names, shake hands, or sit in the front row; Dr. Astor chose not to attend rather than suffer the clear antisemitic harassment and indignity of such actions.

549. When Dr. Astor returned from medical leave in July 2024, he found an environment that had grown more antisemitic and hostile towards Jews.

550. On November 8, 2024, Professor Astor brought his co-Principal Investigator, Professor Mona Khoury-Kassabri, the Vice President of Hebrew University of Jerusalem and an Arab Israeli scholar, to campus for a research talk. Notably, Professor Mona Khoury-Kassabri flew in from Israel to UCLA to present with Professor Astor on their joint research findings.

551. More than a dozen individuals disrupted the research presentation by chanting for roughly twenty minutes, halting the presentation.



COMPLAINT

552.    Although the Department Chair and Luskin School Dean, who were present, attempted to deescalate the situation, no one contacted UCLA Police, and the event proceeded without institutional support. This harmed the UCLA-Hebrew University partnership and effectively blocked Professor Astor and Vice President Khoury Kassabri's only chance to present their research findings at UCLA after the October 7th attacks.

553.    Immediately after the event, Professor Astor requested the Luskin School Dean and Vice Chancellor Beck to send out a clarifying letter to Luskin faculty and students explaining that disrupting a research presentation violates time, place, and manner restrictions and will not be tolerated in the future. Administrators refused to do so.

554.    On November 13, 2024, when Professor Astor tried to file a complaint, he discovered UCLA had no place to report time, place, and manner violations via their website nor were there instructions on how to report. Professor Astor called Vice Chancellor Beck's executive assistant, and even she was surprised to learn no reporting mechanism existed on the website. Because there was no location to report, Professor Astor was instructed to email his complaint and photos of the research talk disruption to the executive assistant to pass along to Vice Chancellor Beck.

555.    After weeks of no response, Professor Astor then directly contacted Vice Chancellor Beck, who was in charge of handling time, place, and manner violations, to follow up on his complaint sent to his executive assistant. Vice Chancellor Beck claimed he never received the complaint and did not know about the disruption. Professor Astor again sent the Vice Chancellor photos documenting the November 8 disruption.

556.    When Professor Astor asked to speak by phone because he was repeatedly filing reports with no response, Vice Chancellor Beck said he was "not the best person to assist" and was not responsible for the "accountability questions."

103

This contradicts Vice Chancellor Beck's own admission that he was the one responsible for addressing time, place, and manner violations.

557.    Despite the fact that the research lecture was formally sponsored by the Luskin school and the University-wide UCLA Dialogue Across Difference Initiative, Vice Chancellor Beck nevertheless advised routing future research lectures through the Events Office for security. Beck's statement misleadingly suggested that the University had not been aware of the presentation, even though it was officially sponsored.

558.    Separately, after receiving a complaint from the Luskin School Dean regarding the research talk disruption, DPO sent Professor Astor only a generic intake form and a list of counseling resources.

559.    Thereafter, Professor Astor initiated a call with DPO and spoke with a representative about the research talk disruption. In another follow-up call, a DPO representative noted it generally did not investigate viewpoint discrimination and questioned whether support for Zionism would qualify as a protected religious identity.

560.    Thereafter, DPO sent a letter indicating it would not investigate the matter.

561.    Only after the EEOC submitted its Letter of Determination, approximately six months after the research talk, did UCLA decide to investigate the research talk disruption.

562.    Months later, Professor Astor was informed that the lead SJP disruptor at the research talk was scheduled to have a hearing by the Office of the Dean of Students. Although Professor Astor was initially invited and willing to testify at the hearing, the Chair ultimately refused to allow his testimony on the day of the hearing because he had not provided written confirmation, despite the fact that he had already confirmed his attendance by phone.

563.    In December 2024, during finals, antizionist and antisemitic flyers,

104

depicting dead Palestinians and accusing Israel of genocide, were posted throughout the Luskin School in violation of time, place, and manner rules. *See supra* ¶¶ 31–34.

564. After Professor Astor reported these flyers to the Provost Michael Levine, Dean Anastasia Loukaitou-Sideris, and Vice Chancellor Beck, they failed enforce the original time, place, and manner rules and instead modified the rules to allow the flyers to stay on bulletin boards.

565. Even though addressing time, place, and manner violations was Vice Chancellor Beck's responsibility, instead of asking Facilities Management to remove the flyers himself he instead only suggested that someone else call and request their removal.

566. Between the research talk disruption and the antisemitic flyers incident, on November 22, 2024, Dr. Astor filed an EEOC charge alleging hostile work environment, disparate treatment based on religion and national origin, and retaliation in violation of Title VII.

567. Following this filing, UCLA emailed all department faculty about preserving emails, unnecessarily indicating Dr. Astor had filed an antisemitism discrimination charge and exposing him to retaliation.

568. In December 2024, another member of the SJP, who was part of the research talk disruption, submitted a broad FOIA request targeting Professor Astor's research project asking for the details about Professor Mona Khoury, student researchers, funders, and all other information about the research project. This was a clear effort to boycott, divest, and sanction against any Israel research and cultural exchanges with UCLA. During the November 8 disruption, protestors specifically conveyed these goals.

569. In response, Professor Astor had a meeting with Provost Michael Levine, Dean Anastasia Loukaitou-Sideris expressing his concerns that the FOIA request fell under to important exemptions: 1) it could cause harm to participants,

COMPLAINT

and 2) it was an unpublished research project. As context for his concern, one of Professor Astor's Principals was assassinated in his research project in Israel. Additionally, another Principal had his car and home firebombed. Given this, Professor Astor has serious concerns about research participants' exposure and safety. Both the Provost and Dean agreed that UCLA should support academic freedom and refuse the FOIA request due to the exemptions and clear BDS intent.

570. However, when Professor Astor and his attorneys met with the UCLA FOIA lawyers expressing the same concerns and requesting an exemption, UCLA refused. Ultimately, UCLA released sensitive data to the FOIA requester, despite concerns and the exemption, explaining not doing so would cause UCLA potential harm.

571. UCLA failed to protect Professor Astor by requiring him to search for and produce hundreds of documents in response to the FOIA request, despite the fact that the research project was exempt from disclosure because it was unpublished and because releasing any identifying information risked severe harm, even death, to its participants in Israel. By forcing Professor Astor to respond to the FOIA request, UCLA interfered with his research and academic freedom, and imposed a substantial burden, which contributed to an already hostile work environment.

572. Between March and April 2025, Dr. Astor emailed UCLA administrators detailing the University's failure to provide security, enforce TPM rules, or issue consequences for the November 8, 2024, research talk disruption. UCLA declined to protect his Israel-based research project from informal Boycott, Divestment, and Sanctions ("BDS") efforts against Israel and required disclosure of sensitive unpublished research materials despite prior exemption assurances.

573. Professor Astor also raised concerns about biased evaluation and promotion processes, given that many faculty on the evaluation committees had signed open letters, participated in events, and openly supported union demands that

COMPLAINT

included research and academic boycotts of any projects related to Israel or Israeli Universities or Professors.

574. Because a significant portion of Professor Astor's research involves partnerships with Israeli institutions, the participation of faculty who publicly endorsed and participated in events that encouraged academic BDS undermines any assurance of an objective and impartial evaluation of his work. Even if external reviewers are used to avoid this bias problem, the evaluation and promotion process still requires an anonymous department-wide vote by all of the faculty of equal or higher rank, even those excluded for potential bias. Thus, an external review does not resolve the bias problem because the final, anonymous vote for or against the promotion or merit increase is still made by the same biased faculty. The University has no policy, procedure, or remedy to prevent such bias from occurring.

575. Given the sustained activism, protests, and BDS-related targeting directed at Dr. Astor, it is unreasonable to expect that faculty can objectively assess Professor Astor's work. Furthermore, pro-Palestinian faculty suggested, *see supra* ¶ 360, that Jewish Zionists who signed the Judea Pearl Letter should be excluded from evaluating other faculty. Consequently, Dr. Astor is now in a position where he can neither evaluate colleagues nor be fairly evaluated himself due to the antisemitic bias held by other faculty members.

576. In May or June 2025, a death threat from an SJP member was made against a Jewish faculty colleague because of her Jewish/Zionist identity. The student was excluded from campus for two weeks and then reinstated. Due to safety concerns, the Jewish faculty member requested to work from home for the remainder of the year. That faculty member, as well as Professor Astor and Professor Holloway, chose not to attend the 2025 graduation ceremony due to safety concerns related to this death threat.

577. In late 2024 through 2025, a trustee managing a donor gift contacted Professor Astor regarding a bequest of approximately $400,000 to $460,000 for the

COMPLAINT

Luskin School, left by his deceased mother who was a UCLA social work graduate and proud Jewish woman.

578.   Given events at the Luskin School since October 7, 2023, the trustee formally requested that the funds honor her legacy by supporting Jewish-focused initiatives: Dr. Astor's Israel-Jewish/Palestinian youth peace project, his California K-12 anti-bias work, and $100,000 specifically for research examining whether art, music, food, and photography depicting diverse Jewish communities and celebrations could positively impact student attitudes toward Jews on campus. The trustee pointed to successful similar programs at UC San Diego and Columbia University and requested that Dr. Astor lead the study.

579.   Professor Astor met several times with the Luskin School Dean and development directors to discuss the donation and the trustee's proposal on research about art depicting positive Jewish life.

580.   The Dean denied the research proposal, asking Dr. Astor how he would feel about a similar exhibit on Palestinian culture. Professor Astor found this comparison troubling given the proposal mentioned only Jewish customs and diversity worldwide, not Israel.

581.   When Dr. Astor questioned whether $100,000 would be refused for comparable research on other ethnic or cultural groups, the Dean claimed she would disallow such research for any group and therefore the denial was not antisemitic. Administrators then suggested redirecting the $100,000 to non-research entities like Hillel or, alternatively, redistributing it to existing research categories (the Amal Jewish-Arab dialogue program and K-12 antisemitism work).

582.   This refusal to permit research using art and diversity to assess the impact of positive Jewish campus events and activities, research that is Dr. Astor's primary function, was antisemitic in nature. It also deprived both Dr. Astor and the trustee of the academic freedom normally afforded researchers when donors designate funds for specific projects.

108

583. Ultimately, in October 2025, the first installment of approximately $250,000 was received and allocated to the Amal program and K-12 anti-bias work rather than the donor's requested research on Jewish diversity and positive Jewish life events. Another approximately $210,000 is expected this year, yet administrators have again restricted these pending funds to the existing two projects, directly impinging Dr. Astor's ability to conduct research that is important to his research agenda, and conflicts with a Jewish donor wishes. This discriminatory restriction remains ongoing.

584. Dr. Astor filed a charge of discrimination with the EEOC. On May 23, 2025, the EEOC issued a Letter of Determination finding reasonable cause to believe that since at least October 7, 2023, UCLA subjected Dr. Astor to an unlawful hostile work environment based on race/ethnicity (Jewish), perceived or actual national origin/ethnicity (Israeli/Jewish), and/or religion (Judaism), and retaliation for engaging in protected activity, in violation of Title VII. *See* Exhibit G.

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

585. Plaintiffs timely filed charges against Defendants with the Equal Employment Opportunity Commission.

586. The EEOC made its determination and completed conciliation as required by 42 U.S.C. § 2000e-5(b).

587. Thereafter, on March 11, 2026, all seven Plaintiffs were issued right-to-sue letters pursuant to 42 U.S.C. § 2000e-5(f)(1). *See* Exhibit H (right-to-sue letters as to Dr. Stein, Dr. Burt, Dr. Hoftman, Director Blenner, and Dr. Astor).

588. The right-to-sue letters issued to Dr. Holloway and Dr. Shamsa were subsequently rescinded on March 12, 2026. Unlike the other plaintiffs named in this complaint, because Dr. Holloway and Dr. Shamsa were named plaintiffs in the U.S. Department of Justice's Complaint pending before this Court in Case No. 2:26-cv-01946. Accordingly, right-to-sue letters are unnecessary as to Dr. Holloway and Dr. Shamsa because Section 2000e-5(f)(1) contemplates the necessity of a right-to-sue

109

letter only when the Attorney General has not filed suit on an aggrieved person's behalf. *See* 42 U.S.C. § 2000e-5(f)(1). Specifically, when

> the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . .

42 U.S.C. § 2000e-5(f)(1).

589. Accordingly, all Plaintiffs have complied with, and exhausted, all administrative remedies, and now seek a trial in this district court de novo.

## CLAIMS FOR RELIEF

### Count I

### 42 U.S.C. § 2000e-2(a)

### Title VII of the Civil Rights Act of 1964 – Hostile Work Environment

590. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

591. Title VII prohibits employment discrimination based on race, color, religion, sex, and national origin. Title VII gives employees a private cause of action against their employer.

592. Under Title VII, a hostile work environment exists when the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment and create an abusive working environment.

593. UCLA knowingly fostered and tolerated an environment against Jewish faculty.

594. This hostile work environment included, but was not limited to, a form of anti-Jewish hate – antizionism – that was used to deny Jewish self-determination, portray Jewish identity as illegitimate or harmful, justify exclusion and boycotts of Jewish faculty, and retaliate against Plaintiffs for speaking out against antisemitism. In this setting, antizionist rhetoric and conduct targeted Jews uniquely and collectively, transforming what UCLA characterized as political discourse into discrimination against Plaintiffs as Jews, a protected class under Title VII.

595. UCLA knew or should have known of the antisemitic harassment and hostile work environment and failed to take prompt and effective remedial action. Despite notice to administrators and departmental leadership, UCLA permitted the unlawful conduct to continue, thereby ratifying and perpetuating the hostile work environment in violation of Title VII.

596. This conduct was severe and pervasive, altered the terms, conditions, and privileges of Plaintiffs' employment, and created a hostile work environment that would have interfered with the ability of a reasonable Jewish employee to perform professional duties free from intimidation, exclusion, and identity-based hostility.

597. Plaintiffs each reported this discrimination to UCLA administrators, to their leaders within their departments, including deans, assistant deans, department chairs, and vice chancellors. But the antisemitism and discrimination did not stop.

598. As a direct and proximate result of Defendants' violation of Title VII, Plaintiffs have suffered severe emotional distress, anguish, humiliation and emotional pain and suffering. Therefore, Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life, as well as pre-judgment and post-judgment interest. For those Plaintiffs who have been

111

constructively discharged, they also request backpay and front pay as permitted by applicable law.

<strong>Count II</strong>

<strong>42 U.S.C. § 2000e-3(a)</strong>

<strong>Title VII of the Civil Rights Act of 1964 – Retaliation</strong>

599. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

600. Title VII also makes it unlawful for an employer to take a negative action, or to retaliate, against a person because they complained about discrimination.

601. All Plaintiffs engaged in protected activity by complaining about antisemitic discrimination to UCLA administrators, filing formal complaints, and participating in efforts to document and address antisemitism at UCLA and participate in other efforts to oppose conduct that they reasonably perceived to violate Title VII. In response, all Plaintiffs suffered materially adverse employment actions.

602. Dr. Stein repeatedly complained of antisemitism through formal and informal channels, including complaints to UCLA leadership. In retaliation, Dr. Stein was suspended from teaching duties, targeted by a petition for her removal, and remains excluded from her prior position, including exclusion from core responsibilities and professional standing while the University has taken no steps to correct the reputational harm it has caused her.

603. Upon information and belief, Dr. Stein's Jewish identity and her leadership in the Jewish Faculty Resilience Group in opposing antisemitic discrimination at UCLA were substantial motivating factors in this ongoing retaliatory and disparate treatment.

604. Dr. Burt raised concerns about antisemitic content through appropriate channels. In retaliation, Dr. Burt had her professional responsibilities reduced, was

112

subjected to heightened monitoring, and was ultimately constructively discharged.

605. Dr. Hoftman reported antisemitic incidents to DGSOM leadership and spoke publicly about antisemitism at UCLA. In retaliation, Dr. Hoftman was accused of policy violations for documenting antisemitic conduct, was publicly attacked for his advocacy, and was blamed for negative perceptions of the institution.

606. Professor Shamsa complained of antisemitism in writing to senior UCLA administrators, including the Chancellor. In retaliation, Professor Shamsa was denied a leadership position he had effectively performed for years, subjected to increased billing requirements resulting in significant salary reduction, and forced to relocate from his office.

607. Dr. Holloway filed multiple formal complaints documenting antisemitic discrimination. In retaliation, Dr. Holloway was publicly accused of bias in personnel matters, excluded from departmental activities, had his professional reputation damaged, and was effectively forced to transfer departments with resulting pay cuts and loss of funding.

608. Director Blenner served on UCLA's Task Force to Combat Antisemitism and filed a formal DPO complaint. In retaliation, Director Blenner's participation on the Task Force was discouraged, her teaching responsibilities were reduced, she was systematically excluded from departmental activities, and she was denied a promotion.

609. Professor Astor filed DPO complaints, an abusive conduct complaint, and an EEOC charge regarding antisemitic discrimination. In retaliation, Professor Astor's complaints were ignored or closed without investigation, his research activities were disrupted without institutional response, and he was exposed to further targeting after filing his EEOC charge, which UCLA unnecessarily emailed all department faculty about.

113

610.    These acts or omissions would dissuade a reasonable employee from making or supporting a charge of discrimination or engage in other protected activity.

611.    As a direct and proximate result of this retaliation in violation of Title VII, Plaintiffs have suffered severe emotional distress, anguish, humiliation and emotional pain and it has taken away from their time, attention, and focus on their teaching and research. Therefore, Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life, as well as pre-judgment and post-judgment interest.    For those Plaintiffs who have suffered constructive discharge, they also request back pay and front pay as permitted by applicable law.

**Count III**

**42 U.S.C. § 2000e-2(a)(1)**

**Title VII of the Civil Rights Act of 1964 – Disparate Treatment**

612.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

613.    Title VII prohibits employers from treating employees differently based on their race, religion or national origin.

614.    Whenever similarly situated individuals of a different race, sex, religion, or national origin group are accorded disparate treatment in the context of a similar employment situation, it is reasonable to infer, absent other evidence, that discrimination has occurred.

615.    Dr. Stein was, and continues to be, treated differently from her similarly situated non-Jewish colleagues in numerous respects, including but not limited to being placed on indefinite suspension without a proper investigation while non-Jewish faculty were not subjected to comparable treatment. The EEOC found reasonable cause to believe UCLA subjected Dr. Stein to different terms and conditions of employment based on her Jewish identity. Upon information and

114

belief, her identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

616.    Dr. Burt was, and continues to be, treated differently from her similarly situated non-Jewish colleagues in numerous respects, including but not limited to being subjected to a professional boycott, having her responsibilities reduced, and being subjected to monitoring requirements not imposed on similarly situated non-Jewish faculty. The EEOC found reasonable cause to believe UCLA subjected Dr. Burt to different terms and conditions of employment based on her Jewish identity. Upon information and belief, her identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

617.    Dr. Hoftman was, and continues to be, treated differently from his similarly situated non-Jewish colleagues in numerous respects, including but not limited to being warned about policy violations for documenting antisemitic conduct while the antisemitic conduct itself went unaddressed. The EEOC found reasonable cause to believe UCLA subjected Dr. Hoftman to an unlawful hostile work environment based on his Jewish identity. Upon information and belief, his identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

618.    Professor Shamsa was, and continues to be, treated differently from his similarly situated non-Jewish colleagues in numerous respects, including but not limited to being denied a leadership position, being subjected to compensation reductions, and being required to relocate his office while similarly situated peers were not. The EEOC found reasonable cause to believe UCLA subjected Professor Shamsa to denial of promotion and different terms and conditions of employment based on his Jewish identity. Upon information and belief, his identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

619.    Dr. Holloway was, and continues to be, treated differently from his similarly situated non-Jewish colleagues in numerous respects, including but not

115

limited to being excluded from personnel matters, having his professional judgment questioned, being effectively forced to transfer departments and ultimately constructively discharged while faculty who engaged in discriminatory conduct faced no consequences. The EEOC found reasonable cause to believe UCLA subjected Dr. Holloway to an unlawful hostile work environment and retaliation based on his Jewish identity. Upon information and belief, his identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

620. Director Blenner was, and continues to be, treated differently from her similarly situated non-Jewish colleagues in numerous respects, including but not limited to being asked to assure students she would not discriminate against them, having her teaching responsibilities reduced, being systematically excluded from departmental activities, and being denied promotion. The EEOC found reasonable cause to believe UCLA subjected Director Blenner to an unlawful hostile work environment based on her Jewish identity. Upon information and belief, her identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

621. Professor Astor was, and continues to be, treated differently from his similarly situated non-Jewish colleagues in numerous respects, including but not limited to having his complaints closed without proper investigation, having his research activities disrupted without proper institutional response, and being subjected to burdensome document requests. The EEOC found reasonable cause to believe UCLA subjected Professor Astor to an unlawful hostile work environment and retaliation based on his Jewish identity. Upon information and belief, his identity as a Jew was and continues to be a substantial motivating factor in this disparate treatment.

622. As a direct and proximate result of this disparate treatment in violation of Title VII, Plaintiffs have suffered severe emotional distress, anguish, humiliation and emotional pain and it has taken away from their time, attention, and focus on

116

their teaching and research. Therefore, Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life, as well as pre-judgment and post-judgment interest. For those Plaintiffs who have suffered constructive discharge based on this disparate treatment, they also request back pay and front pay as permitted by applicable law.

## Count IV

## Cal. Gov. Code § 12940 *et seq.*

## California Fair Employment & Housing Act ("FEHA") – Discrimination Based Upon National Origin & Religion

623. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

624. California Government Code § 12940(a) makes it unlawful employment practice for any employer to, on the basis of national origin or "religious creed," discriminate against a person in compensation or in terms, conditions, or privileges of employment.

625. Moreover, FEHA protects an employee against unlawful discrimination with respect not only to ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely or materially affect an employee's job performance or opportunity for advancement in his career.

626. FEHA also imposes a negligence standard for harassment by an employee other than an agent or supervisor. When an employer knows or should have known of offensive conduct, the employer will be deemed to have adopted the offending conduct and its results quite as if they had been authorized affirmatively as the employer's policy. *State Dep't of Health Servs. v. Sup. Ct.*, 31 Cal. 4th 1026, 1041 (2003). This same negligence standard applies to harassment by nonemployees, including students. An employer may be liable where it knows or

117

should have known of the conduct and fails to take immediate and appropriate corrective action. Cal. Gov't Code § 12940(j)(1).

627. Defendants violated this prohibition by discriminatory acts or omissions based upon Plaintiffs' national origin or religion or both when, since October 7, 2023, Plaintiffs have been subjected to antisemitic comments, actions, harassment, events, encampments, signs, symbols, graffiti, protests, chants, letters, lectures, social media, and inaction, including failures to investigate, failures to discipline, and failures to protect, that, especially in light of Hamas' terrorist attacks, are sufficiently pervasive to adversely or materially affect the conditions of Plaintiffs' employment or opportunity for advancement. Much of this conduct was directed or controlled by Defendants, or allowed by them.

628. As alleged more fully above, the EEOC issued a Letter of Determination for each Plaintiff finding that Defendants had created a racially hostile work environment for each of them. (A true and correct copy of these Letters of Determination are attached as Exhibits).

629. By virtue of the fact that Defendants and each of them, were aware of the discrimination against Plaintiffs because they are Jewish as alleged above, and repeatedly ignored Plaintiffs' objections and complaints about the racially hostile work environment, Defendants are liable to Plaintiffs for creating a racially hostile workplace in violation of FEHA.

630. Defendants also failed to investigate complaints of the racial harassment which actually occurred, giving rise to an independent cause of action under FEHA for failing to investigate complaints of racial harassment.

631. As a direct and proximate result of Defendants' violation of FEHA, Plaintiffs have suffered emotional distress, anguish, humiliation and emotional pain and suffering, and has taken away from their time, attention, and focus on their teaching and research. Therefore, the Plaintiffs are entitled to recover compensatory

118

damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life.

## Count V

## Cal. Gov. Code § 12940 *et seq.*

## California FEHA – Harassment Based Upon National Origin & Religion

632. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

633. California Government Code § 12940(j) makes it unlawful employment practice for any employer to harass an employee on the basis of national origin or religious creed.

634. Defendants violated this prohibition against harassment based upon Plaintiffs' national origin or religion or both when, since October 7, 2023, Plaintiffs have been inundated with antisemitic comments, actions, harassment, events, encampments, signs, symbols, graffiti, protests, chants, letters, lectures, social media, and inaction, including failures to investigate, failures to discipline, and failures to protect, that, especially in light of Hamas' terrorist attacks, are sufficiently pervasive to adversely or materially affect the conditions of Plaintiffs' employment or opportunity for advancement. Much of this conduct was directed or controlled by Defendants, or allowed by them.

635. As a direct and proximate result of Defendants' violation of FEHA, Plaintiffs have suffered emotional distress, anguish, humiliation and emotional pain and suffering, and has taken away from their time, attention, and focus on their teaching and research. Therefore, the Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life.

COMPLAINT

## Count VI

## Cal. Gov. Code § 12940 *et seq.*

## California FEHA – Failure to Prevent Discrimination, and/or Harassment

636. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

637. California Government Code § 12940(k) makes it unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

638. Defendants violated this section by failing to prevent the discrimination and harassment, or by failing to enforce their own policies to prevent the discrimination and harassment, as outlined in the allegations above.

639. As a direct and proximate result of Defendants' violation of FEHA, Plaintiffs have suffered emotional distress, anguish, humiliation and emotional pain and suffering, and has taken away from their time, attention, and focus on their teaching and research. Therefore, the Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life.

640. Defendants, through their supervisors' participation and knowledge, intentionally engaged in the above-described racial harassment with malice and/or reckless indifference to California law. Additionally, Defendants' supervisors intentionally or recklessly disregarded numerous objections and verbal complaints from the Plaintiffs about the racial harassment and the racially hostile work environment. Accordingly, Plaintiffs are entitled to an award of punitive damages against Defendants. Plaintiffs seek relief as set forth below.

641. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

120

COMPLAINT

## Count VII

## Retaliation in Violation of California's Fair Employment and Housing Act – California Government Code § 12940(h)

642. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

643. FEHA prohibits "any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov. Code § 12940(h). By "this part," the statute includes racial harassment.

644. Plaintiffs engaged in the protected activities by making formal complaints concerning the racially hostile work environment to, among other people, Defendants' management and supervisors, as is set forth more fully above.

645. As detailed above, in a relatively short time period after Plaintiffs lodged complaints about racial harassment against Defendants, Defendants took retaliatory actions against Plaintiffs.

646. As a direct and proximate result of Defendants' violation of FEHA, Plaintiffs have suffered emotional distress, anguish, humiliation and emotional pain and suffering, and has taken away from their time, attention, and focus on their teaching and research. Therefore, the Plaintiffs are entitled to recover compensatory damages for past and future non-pecuniary losses, emotional distress, anguish, pain, suffering, humiliation and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that Defendants have violated Title VII of the Civil Rights Act of 1964, and California Government Code § 12940 ("FEHA"), as set forth above.

121

COMPLAINT

B.    Award Plaintiffs compensatory and nominal damages for the loss of their rights under federal and state law, as well as back pay and front pay for those who have suffered constructive discharge.

C.    Further, absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions. Therefore, Plaintiffs request this Court (1) issue preliminary and permanent injunctive relief prohibiting Defendants' discrimination of Plaintiffs in violation of Plaintiffs' statutory rights, and (2) order and enjoin Defendants to enforce Defendants' policies to prevent discrimination of Plaintiffs in violation of Plaintiffs' statutory rights, and to enact policies to protect Plaintiffs' statutory rights.

D.    Award Plaintiffs the costs of this action and reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k) and Cal. Gov't Code § 12965(b).

E.    Award such other and further relief as the Court deems equitable and just.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted on May 19, 2026.

By: _/s/ John B. Thomas_
John B. Thomas (Bar No. 269538)
Bradley A. Benbrook (Bar No. 177786)
**HICKS THOMAS LLP**
1301 Dove Street, 5th Floor
Newport Beach, CA 92660

122

COMPLAINT

Jason B. Torchinsky*
*jtorchinsky@holtzmanvogel.com*
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
PLLC**
2300 N. Street NW, Suite 643
Washington, DC 20037
(202) 737-8808

Andrew W. Gould*
*agould@holtzmanvogel.com*
Linley Wilson*
*lwilson@holtzmanvogel.com*
Erica Leavitt*
*eleavitt@holtzmanvogel.com*
Alexandria Saquella*
*asaquella@holtzmanvogel.com*
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
PLLC**
2555 East Camelback Road
Suite 700
Phoenix, Arizona 85016
(602) 388-1262

*Attorneys for Intervenor Plaintiffs*

*\*Admitted Pro Hac Vice*

123

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of May 2026, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

/s/ John B. Thomas

*Attorneys for Intervenor Plaintiffs*

124

COMPLAINT