ADAM KARR (S.B. #212288)
akarr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2811
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

K. LEE BLALACK II (*pro hac vice*)
lblalack@omm.com
MEAGHAN VERGOW (*pro hac vice*)
mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
JENNIFER SOKOLER (*pro hac vice*)
jsokoler@omm.com
ANTON METLITSKY (*pro hac vice*)
ametlitsky@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant*
*The Regents of the University of California*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendant. | Case No. 2:26-cv-01946-CAS-AS<br><br>**DEFENDANT'S MOTION TO DISMISS THE UNITED STATES' COMPLAINT AND THE INTERVENOR PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Christina A. Snyder<br>Courtroom: 8D<br>Hearing: February 1, 2027, 10:00 a.m. |

## TABLE OF CONTENTS


Page

INTRODUCTION ... 1

BACKGROUND ... 5

A. UCLA Condemned the October 7 Terrorist Attacks on Israel and Antisemitic Activity on Campus ... 5

B. UCLA's Response to the Spring 2024 Encampment Resulted in Increased Efforts to Ensure Campus Safety While Protecting Expressive Activity ... 7

C. UCLA's Ongoing Efforts to Combat Antisemitism ... 10

D. The *Frankel* Litigation ... 13

E. Procedural History ... 14

LEGAL STANDARD ... 15

ARGUMENT ... 16

I. PLAINTIFFS LACK STANDING TO SEEK INJUNCTIVE RELIEF ... 16

A. Plaintiffs Fail to Allege an Imminent Likelihood of Future Injury ... 17

B. Plaintiffs Do Not Allege Facts Clearly Demonstrating that UCLA Will Cause Them Any Future Injury ... 20

II. THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE HOSTILE WORK ENVIRONMENT CLAIMS (COUNTS II, IV, AND VI OF FEDERAL GOVERNMENT COMPLAINT; COUNTS I AND III OF IP COMPLAINT) ... 20

A. UCLA Is Not Liable Under Title VII for Harassment by Students and Unknown Third Parties ... 21

1. Title VII requires plausible allegations that UCLA itself intended to discriminate, which plaintiffs cannot plead ... 21

2. The Complaints fail to plausibly allege that UCLA was negligent in response to actionable harassment ... 24

B. Dr. Shamsa's Hostile Work Environment Claim Is Also Barred by the *Frankel* Release (Federal Government Count IV; IP Counts I and III) ... 26

**TABLE OF CONTENTS**
**(continued)**

**Page**

C. The Complaints Fail to Allege that Drs. Shamsa and Holloway Experienced Actionable Harassment (Federal Government Counts II, IV; IP Counts I and III) .......... 27

1. Dr. Shamsa fails to allege actionable harassment in his workplace (Federal Government Count IV; IP Counts I and III) .......... 28

2. Dr. Holloway fails to allege actionable harassment in his workplace (Federal Government Count II; IP Counts I and III) .......... 30

D. The Federal Government Fails to Allege a Hostile Work Environment Claim on Behalf of a Class of "Other Aggrieved" Employees (Federal Government Count VI) .......... 31

III. THE FEDERAL GOVERNMENT FAILS TO ALLEGE A PLAUSIBLE PATTERN-OR-PRACTICE CLAIM (FEDERAL GOVERNMENT COUNT I) .......... 33

A. The Federal Government Cannot Bring Pattern-or-Practice Claims Based on Alleged Deficiencies in an Employer's Response to Harassment by Third Parties .......... 34

B. The Federal Government Does Not Plausibly Allege a Pattern-or-Practice Claim .......... 36

IV. DRS. SHAMSA AND HOLLOWAY'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW (FEDERAL GOVERNMENT COUNTS III, V; IP COUNTS II AND V AS TO DR. HOLLOWAY) .......... 39

V. TWO OF THE REMAINING INDIVIDUALS' CLAIMS LIKEWISE FAIL AS A MATTER OF LAW BECAUSE THEY ARE NOT UC EMPLOYEES (IP COUNTS I, III, IV) .......... 41

VI. THE IPS' FAILURE-TO-PREVENT DISCRIMINATION CLAIM UNDER FEHA SHOULD BE DISMISSED BECAUSE THEY DO NOT ASSERT UNDERLYING DISCRIMINATION CLAIMS (IP COUNT IV) .......... 43

CONCLUSION .......... 43

## TABLE OF AUTHORITIES


Page

**CASES**

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025) ..... 15

*Americopters, LLC v. FAA*,
441 F.3d 726 (9th Cir. 2006) ..... 16

*Apsley v. Boeing Co.*,
691 F.3d 1184 (10th Cir. 2012) ..... 38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 16

*Ashcroft v. S. Cal. Permanente Med. Grp.*,
763 F. Supp. 3d 1133 (S.D. Cal. 2025) ..... 40

*Bility v. Univ. of Pittsburgh*,
2024 WL 1156625 (W.D. Pa. Mar. 18, 2024) ..... 22

*Bivens v. Zep, Inc.*,
147 F.4th 635 (6th Cir. 2025) ..... 23

*Bradley v. Pfizer, Inc.*,
2011 WL 13168986 (N.D. Ga.), *R. & R. adopted*, 2011 WL 13175434 (N.D. Ga.), *aff'd*, 440 F. App'x 805 (11th Cir. 2011) ..... 40

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) ..... 21, 23

*Campbell v. Haw. Dep't of Educ.*,
892 F.3d 1005 (9th Cir. 2018) ..... 24, 25, 27, 33

*Candelore v. Clark Cnty. Sanitation Dist.*,
975 F.2d 588 (9th Cir. 1992) ..... 29

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..... 16

*Connor v. Off. of Atty. Gen. of Tex.*,
2015 WL 1004304 (W.D. Tex. Mar. 5, 2015) ..... 40

*Cooper v. Fed. Reserve Bank of Richmond*,
467 U.S. 867 (1984) ..... 38

*Craik v. Minn. State Univ. Bd.*,
731 F.2d 465 (8th Cir. 1984) ..... 38

*Cronin v. Martindale Andres & Co.*,
159 F. Supp. 2d 1 (E.D. Pa. 2001) ..... 29

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) .......... 5

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .......... 22

*Dickson v. Burke Williams, Inc.*,
234 Cal. App. 4th 1307 (2015) .......... 43

*EEOC v. BNSF Ry. Co.*,
150 F.4th 948 (8th Cir.), *reh'g denied*, 2025 WL 3085999 (8th Cir. Nov. 5, 2025) .......... 32

*EEOC v. Burlington Med. Supplies, Inc.*,
536 F. Supp. 2d 647 (E.D. Va. 2008) .......... 36

*EEOC v. Carrols Corp.*,
2005 WL 928634 (N.D.N.Y. Apr. 20, 2005) .......... 39

*EEOC v. Gen. Tel. Co. of Nw., Inc.*,
599 F.2d 322 (9th Cir. 1979), *aff'd*, 446 U.S. 318 (1980) .......... 37

*EEOC v. Goodyear Aerospace Corp.*,
813 F.2d 1539 (9th Cir. 1987) .......... 26

*EEOC v. Il Fornaio (Am.) LLC*,
2024 WL 4003318 (C.D. Cal. Apr. 3, 2024) .......... 31

*EEOC v. Int'l Profit Assocs., Inc.*,
2007 WL 3120069 (N.D. Ill. 2007) .......... 36

*EEOC v. Jefferson Dental Clinics, PA*,
478 F.3d 690 (5th Cir. 2007) .......... 26

*EEOC v. Joe's Stone Crab, Inc.*,
220 F.3d 1263 (11th Cir. 2000) .......... 35

*EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*,
990 F. Supp. 1059 (C.D. Ill. 1998) .......... 34, 36

*EEOC v. U.S. Steel Corp.*,
921 F.2d 489 (3d Cir. 1990) .......... 26

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) .......... 26

*Folkerson v. Circus Circus Enters., Inc.*,
107 F.3d 754 (9th Cir. 1997) .......... 21

*Foster v. Bd. of Regents of Univ. of Mich.*,
982 F.3d 960 (6th Cir. 2020) .......... 22

## TABLE OF AUTHORITIES
## (continued)


**Page**

*Francis v. Kings Park Manor, Inc.*, 992 F.3d 67 (2d Cir. 2021) .... 22

*Funke v. Sorin Grp. USA, Inc.*, 147 F. Supp. 3d 1017 (C.D. Cal. 2015) .... 16

*Garrett v. City Univ. of N.Y.*, 2025 WL 3096550 (S.D.N.Y. Oct. 10, 2025) .... 28

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) .... 28

*Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531 (9th Cir. 1982) .... 35

*Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318 (1980) .... 31

*Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015) .... 5

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) .... 21

*Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211 (4th Cir. 1993) .... 41

*Hall v. Millersville Univ.*, 22 F.4th 397 (3d Cir. 2022) .... 22

*Hughes v. Pair*, 46 Cal. 4th 1035 (2009) .... 21

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .... 35, 37, 38

*James v. State of La. Legis. Fiscal Off.*, 822 F. Supp. 349 (M.D. La. 1993) .... 29

*Kama v. Mayorkas*, 107 F.4th 1054 (9th Cir. 2024) .... 39, 40

*Khan v. Johnson*, 65 F. Supp. 3d 918 (C.D. Cal. 2014) .... 16

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .... 42

*King v. Gen. Elec. Co.*, 960 F.2d 617 (7th Cir. 1992) .... 38

## TABLE OF AUTHORITIES
## (continued)


Page

*King v. Laborers Int'l Union of N. Am., Union Loc. No. 818*,
443 F.2d 273 (6th Cir. 1971) ........ 35

*Kortan v. Cal. Youth Auth.*,
217 F.3d 1104 (9th Cir. 2000) ........ 29

*Landau v. Corp. of Haverford Coll.*,
789 F. Supp. 3d 401 (E.D. Pa. 2025) ........ 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 22

*Lunn v. City of Los Angeles*,
629 F. Supp. 3d 1007 (C.D. Cal. 2022) ........ 20

*Manatt v. Bank of Am., NA*,
339 F.3d 792 (9th Cir. 2003) ........ passim

*Martin v. Bd. of Trs. of Cal. State Univ.*,
97 Cal. App. 5th 149 (2023) ........ 43

*Mathirampuzha v. Potter*,
548 F.3d 70 (2d Cir. 2008) ........ 30

*Maxon v. Fuller Theological Seminary*,
549 F. Supp. 3d 1116 (C.D. Cal. 2020) ........ 19

*Mayfield v. United States*,
599 F.3d 964 (9th Cir. 2010) ........ 16

*McAvoy v. Dickinson Coll.*,
115 F.4th 220 (3d Cir. 2024) ........ 22

*Mendoza v. Town of Ross*,
128 Cal. App. 4th 625 (2005) ........ 41, 43

*Millennium Lab'ys, Inc. v. Allied World Assurance Co. (U.S.), Inc.*,
165 F. Supp. 3d 931 (S.D. Cal. 2016), *aff'd*, 726 F. App'x 571 (9th Cir. 2018) ........ 14

*Miller v. Dep't of Corr.*,
36 Cal. 4th 446 (2005) ........ 39

*Moyo v. Gomez*,
40 F.3d 982 (9th Cir. 1994, amended Nov. 14, 1994) ........ 40

*Murray v. Principal Fin. Grp., Inc.*,
613 F.3d 943 (9th Cir. 2010) ........ 41

*Nelsen v. King County*,
895 F.2d 1248 (9th Cir. 1990) ........ 17

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864 (9th Cir. 2001) ........ 29

*O'Neill v. Trs. of Univ. of Pa.*, 2025 WL 3047884 (E.D. Pa. Oct. 31, 2025) ........ 23

*Paramount Contractors & Devs., Inc. v. City of Los Angeles*, 805 F. Supp. 2d 977 (C.D. Cal. 2011), *aff'd*, 516 F. App'x 614 (9th Cir. 2013) ........ 14

*Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir. 1998) ........ 42

*Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468 (2d Cir. 1999) ........ 43

*Raines v. Byrd*, 521 U.S. 811 (1997) ........ 17

*Reed v. Avis Budget Grp., Inc.*, 472 F. App'x 525 (9th Cir. 2012) ........ 39

*Reges v. Cauce*, 175 F.4th 1014 (9th Cir. May 14, 2026) ........ 28

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2010) ........ passim

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008) ........ 20

*Saroya v. Univ. of Pac.*, 503 F. Supp. 3d 986 (N.D. Cal. 2020) ........ 5

*Serrano v. Cintas Corp.*, 699 F.3d 884 (6th Cir. 2012) ........ 36

*Shephard v. Loyola Marymount Univ.*, 102 Cal. App. 4th 837 (2002) ........ 41

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........ 16, 17, 20

*Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025) ........ 25, 28

*Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395 (2d Cir. 1981) ........ 38

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013) ........ 22

## TABLE OF AUTHORITIES (continued)

Page

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) ........ 15

*United States v. City of New York*,
359 F.3d 83 (2d Cir. 2004) ........ 42, 43

*United States v. City of New York*,
717 F.3d 72 (2d Cir. 2013) ........ 35

*United States v. Jacksonville Terminal Co.*,
451 F.2d 418 (5th Cir. 1971) ........ 35

*United States v. President & Fellows of Harvard Coll.*,
2026 WL 2343193 (D. Mass. Aug. 13, 2026), *appeal filed*, No. 26-1978 (1st Cir. Sept. 2, 2026) ........ 4, 17

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........ 16, 19

*United States v. S.D. Dep't of Soc. Servs.*,
344 F. Supp. 3d 1055 (D.S.D. 2018) ........ 37

*Vasquez v. County of Los Angeles*,
349 F.3d 634 (9th Cir. 2003) ........ 27

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 38

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ........ 16

*Woodson v. California*,
2016 WL 6568668 (E.D. Cal. Nov. 4, 2016) ........ 43

*Wright v. Serv. Emps. Int'l Union Loc. 503*,
48 F.4th 1112 (9th Cir. 2022) ........ 16, 17

**STATUTES**

42 U.S.C. § 2000e(b) ........ 21

42 U.S.C. § 2000e-2(a)(1) ........ 21

42 U.S.C. § 2000e-6(a) ........ 34

**OTHER AUTHORITIES**

110 Cong. Rec. 14,270 (1964) ........ 34

**RULES**

Fed. R. Evid. 201(b) ........ 5

## TABLE OF AUTHORITIES
(continued)

Page

**REGULATIONS**

29 C.F.R. § 1604.11(e) ........ 22

## INTRODUCTION

There is no home for antisemitism at the University of California, Los Angeles ("UCLA" or the "University"). Administrators across the University work tirelessly to maintain a safe and inclusive environment for the entire campus community, including Jewish and Israeli students and faculty. In alleging that UCLA systematically discriminates against its Jewish and Israeli employees, the U.S. Department of Justice (the "Federal Government") and Intervenor Plaintiffs ("IPs") (collectively, "Plaintiffs") try to tell a different story principally by omission: they ignore the substantial steps taken by the University to ensure its Jewish and Israeli employees can thrive at UCLA as they have done for decades. But the Court can consider that critical context in determining whether Plaintiffs have identified a basis for enjoining any action by UCLA going forward. And that context demonstrates that UCLA has made substantial strides in combatting the scourge of antisemitism. Even without considering this additional evidence, however, Plaintiffs' allegations fail to state claims against UCLA as a matter of law.[1]

There is no question that some University employees were exposed to antisemitism on campus. The Complaints describe incidents perpetrated by third parties that are incompatible with the values that bind the University community together. UCLA has responded—and will continue to respond— to antisemitism, regardless of the outcome of this lawsuit. But the legal claims raised in this litigation are flawed for numerous reasons and should be dismissed.

---

[1] On behalf of its Los Angeles campus, The Regents of the University of California ("The Regents") move to dismiss Counts I, II, III, IV, V, and VI of the Federal Government's complaint. In addition, The Regents move to dismiss the following claims in the IPs' Amended Complaint: (1) First Claim with respect to Drs. Shamsa, Holloway, Stein, and Burt; (2) Second Claim with respect to Dr. Holloway; (3) Third Claim with respect to Drs. Shamsa, Holloway, and Burt; (4) Fourth Claim for Failure to Prevent Discrimination on behalf of all IPs; and (5) Fifth Claim with respect to Dr. Holloway.

The Federal Government brings hostile work environment claims under Title VII of the Civil Rights Act of 1964. Its Complaint concentrates on the experiences of two UCLA faculty members but also attempts to bring claims on behalf of a class of other, unnamed "aggrieved individuals," including a pattern-or-practice claim asserting, erroneously, that discrimination against Jewish and Israeli employees was part of UCLA's standard operating procedure. Whatever imperfections the Federal Government and the IPs allege in UCLA's response to antisemitism, neither Complaint plausibly pleads that UCLA intentionally refused to address systematic harassment of its Jewish and Israeli employees, which is an assertion that UCLA categorically denies.

The Federal Government first brings a **Pattern-or-Practice Claim (Count I of the Federal Government Complaint)** alleging that UCLA had a pattern or practice of negligently responding to a hostile work environment created by third parties and thereby violated Section 707(a) of the Civil Rights Act. Section 707(a), however, requires *intentional* discrimination. The Federal Government's allegations of purported negligence in responding to third-party conduct are thus insufficient as a matter of law. Moreover, the Federal Government does not plausibly allege that Jewish and Israeli UCLA employees generally would find their work environment to be systemically hostile based on the spring 2024 encampment and other discrete incidents featured in the Federal Government's Complaint. Those allegations do not show systematic harassment, much less that UCLA has willfully turned a blind eye to systematic harassment.

The Federal Government's and the IPs' **Hostile Work Environment Claims (Counts II, IV, and VI of the Federal Government Complaint; Counts I and III of the IP Amended Complaint with respect to Drs. Holloway and Shamsa)** suffer from similar defects. Under well-settled agency principles, UCLA is not legally liable for the conduct of any third-party protesters who independently harassed UCLA community members. As a legal matter, because UCLA is a public and

generally open campus, it is limited in how it controls visitors and outsiders, and it cannot restrict speech that is protected by the First Amendment. And UCLA has undisputedly responded to antisemitic incidents as they came to light—Plaintiffs simply take issue with *how* UCLA chose to respond. Courts have readily dismissed claims that, like these, seek to hold an employer liable for third-party harassment without showing that the employer itself *intended* the harassment and failed to take any reasonable action. The hostile work environment claims have other problems, too—some of the alleged incidents did not occur in the *workplace*, or they did not amount to legally actionable harassment at all. And, as with the Federal Government's pattern-or-practice claim, Plaintiffs have failed to satisfy their heavy burden of pleading a pervasive and hostile work environment that applied to UCLA's Jewish and Israeli employees as a group.

Because the Federal Government does not allege any legally viable retrospective claim, it follows that the Federal Government cannot obtain **Prospective Injunctive Relief**. But the Federal Government (and the IPs) also lack standing to seek forward-looking relief for another reason: they have not demonstrated an imminent likelihood of future harm, requiring dismissal under Federal Rule of Civil Procedure 12(b)(1). As noted, the Complaints focus almost exclusively on events more than two years ago while strategically avoiding mention of the University's substantial efforts since to strengthen its response to disruptive protest activity and to address concerns about the climate for Jewish community members. A plaintiff's standing to seek an injunction is a jurisdictional question, and the Court must thus evaluate it in full view of UCLA's efforts since 2024, including the University's changes to its time, place, and manner rules, and its robust initiative to combat antisemitism. These actions foreclose any showing that, absent an injunction, UCLA's Jewish and Israeli employees would *certainly* suffer a future injury that is *caused by the University*. Indeed, a district court recently dismissed the Federal Government's analogous claims for injunctive relief against Harvard

University, holding that stale allegations about the 2023 academic year did not support a "plausible inference that any institutionalized noncompliance with [federal civil rights law] persists." *United States v. President & Fellows of Harvard Coll.*, 2026 WL 2343193, at *1 (D. Mass. Aug. 13, 2026), *appeal filed*, No. 26-1978 (1st Cir. Sept. 2, 2026).

Plaintiffs' remaining claims are legally meritless as well. The claims of **Retaliation Against Dr. Kamran Shamsa and Dr. Ian Holloway (Counts III and V of the Federal Government Complaint; Counts II and V of the IP Complaint)** fail for several reasons, including that the Federal Government does not allege any adverse employment action against Dr. Shamsa that resulted from his complaints about antisemitism, and that the Federal Government does not identify any actionable harm against Dr. Holloway caused by UCLA. Dr. Holloway's own Complaint fails to cure the deficiencies in the Federal Government's Complaint, and tellingly, Dr. Shamsa does not assert any retaliation claim of his own.

As for the other **IP Title VII and California's Fair Employment and Housing Act ("FEHA") Claims** brought by five individuals in addition to Drs. Shamsa and Holloway, two cannot be maintained because the individuals are not UCLA employees, and all fail to allege any failure to prevent actionable discrimination by UCLA. Moreover, the cross-cutting problems in the Federal Government's liability theories pervade these claims as well.

* * *

As UCLA Chancellor Julio Frenk has explained, antisemitism is "characterized by its persistence across time and space" and its "adaptability to different contexts." Frenk Decl. Ex. 4.[2] UCLA has been unflinching in confronting that challenge. The Complaints' efforts to hold the University liable under Title VII and FEHA fail as a matter of law.

---

[2] Frenk Decl. Ex. 4 (Frenk, Initiative to Combat Antisemitism (Mar. 10, 2025)).

## BACKGROUND[3]

With over 49,000 students, 43,000 staff members, and 5,700 faculty, the UCLA campus of the University of California is the largest in California. Teleanu Decl. Ex. 1[4]; Hunt Decl. ¶ 3; *see also* Intervenor Plaintiffs' First Amended Complaint ("IPAC") ¶ 27. UCLA's main campus spans 419 acres with hundreds of campus buildings supporting the UCLA College and UCLA's 12 professional schools. Hunt Decl. ¶ 3. UCLA Health also operates five hospitals across Los Angeles, including the renowned Ronald Reagan UCLA Medical Center roughly half a mile away from the center of UCLA's main campus. *Id.* ¶ 15. Notwithstanding this, the Complaints allege that all of UCLA constitutes a hostile work environment for UCLA's Jewish and Israeli employees.

### A. UCLA Condemned the October 7 Terrorist Attacks on Israel and Antisemitic Activity on Campus

On October 7, 2023, Hamas perpetrated horrific terrorist attacks on Israel. Federal Government Complaint ("U.S. Compl.") ¶ 17; IPAC ¶ 38. The UCLA Chancellor at the time, Gene Block, quickly denounced the "largest one-day killing of Jews since the end of the Holocaust." Teleanu Decl. Exs. 2–3.[5]

---

[3] This background is drawn from the Complaints and, where relevant to standing, evidence the Court may consider in resolving UCLA's 12(b)(1) motion.

[4] Teleanu Decl. Ex. 1 (UCLA Newsroom, About UCLA: Fast Facts). The Court may take judicial notice of this fact, as it is "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The fact is from a publicly available website of a public institution. *Saroya v. Univ. of Pac.*, 503 F. Supp. 3d 986, 994 (N.D. Cal. 2020); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015).

[5] Teleanu Decl. Ex. 2 (Block, University Statements on Violent Attacks Abroad (Oct. 9, 2023)); *id.* Ex. 3 (Block, Reflections at the Close of a Difficult Week (Oct. 13, 2023)).

The Complaints detail allegations about incidents on campus in the winter and early spring of 2024, including marches, rallies, signs, and graffiti, U.S. Compl. ¶¶ 36–46; *see also* IPAC ¶¶ 41–51, as well as lectures, faculty meetings, and classroom interactions, *see, e.g.*, U.S. Compl. ¶¶ 88, 92, 160; IPAC ¶¶ 52–55, 232–40; 290–96. Most of these incidents involved individuals exercising First Amendment rights on a public university campus. *See* U.S. Compl. ¶¶ 32–35; *see also* IPAC ¶¶ 401–04. Many involved individuals whose identities were unknown to the University. Protesters "often wore masks" to "conceal their identities" and "escape accountability." U.S. Compl. ¶ 42; *see also id*. ¶ 43; IPAC ¶¶ 46, 326. And many of the individuals responsible for the incidents were not affiliated with UCLA and thus were not subject to the University's disciplinary authority. *See, e.g.*, U.S. Compl. ¶ 33 n.13 ("the encampment contained many persons not affiliated with the University"); *id*. ¶¶ 73–74; IPAC ¶ 7.

Over this period, the University repeatedly and unequivocally condemned antisemitism, and encouraged victims of antisemitic harassment to contact UCLA's Civil Rights Office ("CRO"). Teleanu Decl. Exs. 2–6; Hunt Decl. ¶ 5, Ex. 1.[6] UC implemented a new Anti-Discrimination Policy ("A-D Policy") and launched the Systemwide Office of Civil Rights to promote the policy's uniform implementation across campuses. Teleanu Decl. Exs. 7–8; Freedman Decl. ¶ 6, Ex. 3[7]; *see also* U.S. Compl. ¶¶ 99–101, 103; IPAC ¶ 420. UCLA promptly removed antisemitic graffiti

---

[6] Teleanu Decl. Ex. 2 (Block, University Statements on Violent Attacks Abroad (Oct. 9, 2023)); *id*. Ex. 3 (Block, Reflections at the Close of a Difficult Week (Oct. 13, 2023)); *id*. Ex. 4 (UCLA Newsroom, Resources to support safety (Oct. 27, 2023)); *id*. Ex. 5 (Block, Standing Against Bigotry (Nov. 10, 2023)); *id.* Ex. 6 (UCLA Newsroom, Campus condemns antisemitic caricature (Mar. 28, 2024)); Hunt Decl. Ex. 1 (Drake et al., UC president, 10 campus chancellors issue statement (Nov. 10, 2023)).

[7] Teleanu Decl. Ex. 7 (Drake, President Drake announces new SOCR (Feb. 20, 2024)); *id*. Ex. 8 (UCOP, SOCR Website); Freedman Decl. Ex. 3 (UC A-D Policy (Jan. 1, 2026)).

and an antisemitic figure placed on campus. U.S. Compl. ¶ 219; Teleanu Decl. Ex. 6[8]; Hunt Decl. ¶ 10. UCLA joined the entire UC system to "actively work against [bigotry]," including through "systemwide initiatives" to "address the current university climate." Teleanu Decl. Ex. 5; Hunt Decl. Ex. 1.[9] UCLA formed a Task Force to Combat Antisemitism and Anti-Israeli Bias (the "Task Force") to examine campus climate and recommend reforms. U.S. Compl. ¶ 25; IPAC ¶ 72; Hunt Decl. ¶¶ 11–12. And throughout, UCLA furnished counseling resources for Jewish and Israeli community members. Teleanu Decl. Exs. 2–4[10]; Hunt Decl. ¶ 7.

### B. UCLA's Response to the Spring 2024 Encampment Resulted in Increased Efforts to Ensure Campus Safety While Protecting Expressive Activity

In April 2024, pro-Palestinian protesters across the country formed encampments on college campuses. Teleanu Decl. Ex. 9.[11] On April 25, protesters erected tents in Royce Quad, at the center of UCLA's campus. IPAC ¶ 56; *see also* U.S. Compl. ¶ 47. With UCLA's approval, counter-protesters established a pro-Israel rally directly opposite the encampment. U.S. Compl. ¶ 223; IPAC ¶ 376. At least two of the IPs participated in counter-protests. IPAC ¶ 376 (Hoftman); *id.* ¶ 332 (Shamsa). As with other protest activity on UCLA's open campus, many participants on both sides were "not affiliated with the University." U.S. Compl. ¶ 33 n.13; *see also* IPAC ¶¶ 7, 27.

---

[8] Teleanu Decl. Ex. 6 (UCLA Newsroom, Campus condemns antisemitic caricature (Mar. 28, 2024)).

[9] Teleanu Decl. Ex. 5 (Block, Standing Against Bigotry (Nov. 10, 2023)); Hunt Decl. Ex. 1 (Drake et al., UC president, 10 campus chancellors issue statement (Nov. 10, 2023)).

[10] Teleanu Decl. Ex. 2 (Block, University Statements on Violent Attacks Abroad (Oct. 9, 2023)); *id.* Ex. 3 (Block, Reflections at the Close of a Difficult Week (Oct. 13, 2023)); *id.* Ex. 4 (UCLA Newsroom, Resources to support safety (Oct. 27, 2023)).

[11] Teleanu Decl. Ex. 9 (UCLA Newsroom, Affirming our values in a challenging time (Apr. 30, 2024)).

The Complaints describe UCLA's staged response to the encampment, alleging that UCLA:

- Initially refrained from calling law enforcement, U.S. Compl. ¶¶ 48, 50 (quoting Teleanu Decl. Exs. 10–11[12]);
- Deployed "student affairs administrators near Royce Quad to 'redirect' those who wished to avoid the area and to 'serve as a resource for their needs,'" U.S. Compl. ¶ 48 (quoting Teleanu Decl. Ex. 10[13]);
- Authorized counter-protest activity expressing opposing views, U.S. Compl. ¶¶ 223, 271; IPAC ¶ 376 (same);
- Installed metal barriers around the encampment for safety and protection, U.S. Compl. ¶¶ 49, 56; IPAC ¶ 62, and increased the security presence in the area, including by hiring private security, IPAC ¶ 63; Teleanu Decl. Ex. 9[14];
- Declared the encampment "'unauthorized,'" U.S. Compl. ¶ 62; and
- Proceeded with law enforcement removing the encampment, U.S. Compl. ¶¶ 63–64, resulting in more than 200 arrests, which UCLA referred to the LA City Attorney's Office, U.S. Compl. ¶ 68.

In the wake of the Royce Quad encampment, UCLA dedicated significant resources to enhancing its capacity to respond to protests, including by: creating the Office of Campus and Community Safety ("OCCS"), led by an Associate Vice Chancellor ("AVC") reporting directly to the Chancellor, and hiring Rick Braziel—

[12] Teleanu Decl. Ex. 10 (UCLA Newsroom, UCLA statement on demonstrations (Apr. 26, 2024)); *id*. Ex. 11 (UCLA Newsroom, Our Community is in Deep Pain (May 2, 2024)).

[13] Teleanu Decl. Ex. 10 (UCLA Newsroom, UCLA statement on demonstrations (Apr. 26, 2024)).

[14] Teleanu Decl. Ex. 9 (UCLA Newsroom, Affirming our values in a challenging time (Apr. 30, 2024)).

who had over 30 years of law enforcement experience—as its inaugural AVC, Teleanu Decl. Ex. 12[15]; Lurie Decl. ¶¶ 2, 5; and transitioning oversight and management of the UCLA Police Department ("UCLA PD") and the Office of Emergency Management to the newly created OCCS, Teleanu Decl. Ex. 12[16]; Lurie Decl. ¶ 5.

And, as acknowledged in the Federal Government Complaint, "UCLA [uses] viewpoint-neutral TPM [Time, Place, Manner] rules regulating freedom of speech to ensure the orderly operation of campus"—content-neutral rules that govern when, where, and how speech and expressive conduct may occur on campus. U.S. Compl. ¶¶ 32–33. UCLA strengthened its TPM policies after the encampment. *See id*. ¶ 34 n.13 ("[M]any of these policies were tightened after the encampment[.]"); *see also* Lurie Decl. ¶¶ 4, 13, 18, Exs. 7–10; Teleanu Decl. Ex. 13[17]; U.S. Compl. ¶¶ 33–34 nn.12–13. The revised policies explicitly prohibit unauthorized encampments, activities restricting free movement of individuals on campus, and concealing one's identity (e.g., by masking) to evade identification when violating University policies or applicable laws. Teleanu Decl. Ex. 13; Lurie Decl. Exs. 7–10.[18] Based on violations of its TPM policies, UCLA revoked the statuses of Students for Justice in Palestine ("SJP") and Graduate Students for Justice in Palestine ("GSJP") as registered student organizations. Frenk Decl. ¶ 11.c; Gorden Decl. ¶ 7; *see also* U.S. Compl. ¶¶ 79–80.

---

[15] Teleanu Decl. Ex. 12 (UCLA Newsroom, Changes to campus security operations (May 5, 2024)).

[16] *Id*.

[17] Lurie Decl. Ex. 7 (UCLA Policy 850); *id*. Ex. 8 (UCLA Policy 852); *id*. Ex. 9 (UCLA Policy 860); *id*. Ex. 10 (UCLA Policy 862); Teleanu Decl. Ex. 13 (UCLA, Bruin Post: Finalized TPM Policies (Sept. 19, 2025)).

[18] Teleanu Decl. Ex. 13 (UCLA, Bruin Post: Finalized TPM Policies (Sept. 19, 2025)); Lurie Decl. Ex. 7 (UCLA Policy 850); *id*. Ex. 8 (UCLA Policy 852); *id*. Ex. 9 (UCLA Policy 860); *id*. Ex. 10 (UCLA Policy 862).

UCLA's efforts to reduce disruptive protest activity have been successful. Since the Royce Quad encampment was removed, there has been no encampment—or anything remotely like it—on UCLA's campus. Lurie Decl. ¶¶ 5, 14, 20–22; Gorden Decl. ¶ 10; *see also* IPAC ¶ 70 (alleging that subsequent protests occurred "sporadically"). Within weeks of the Royce Quad encampment, UCLA intervened swiftly to prevent attempts to set up encampments and occupation of campus buildings. *See* U.S. Compl. ¶¶ 67, 70, 73.

The Complaints identify additional protests, including some that were allegedly organized by individuals affiliated with SJP after it lost its recognized status. *See* U.S. Compl. ¶ 228; IPAC ¶¶ 70–71, 101–02, 311–12, 343–45. But UCLA effectively monitored, engaged, and responded to these events: UCLA deployed trained personnel, achieved compliance or dispersal of individuals, and escalated to law enforcement when necessary. Lurie Decl. ¶¶ 14, 21 (cataloguing UCLA's responses); Gorden Decl. ¶ 10 (same). The Complaints do not allege that any of these events resulted in sustained disruption to university operations or a renewed encampment. In short, UCLA has effectively managed protest events for more than two years.

### C. UCLA's Ongoing Efforts to Combat Antisemitism

For decades, UCLA has been home to a thriving Jewish and Israeli community. Hunt Decl. ¶ 4. UCLA's long-standing commitment to its Jewish and Israeli communities is reflected in institutions like the Leve Center, the Nazarian Center, and UCLA Hillel. The Leve Center—home to 30 faculty—is a world-class research center and intellectual hub for the study of Jewish culture, religion, thought, and literature. *Id*. The Nazarian Center provides grants to UCLA faculty and students to support research and the development of course content concerning Israel. *Id*.

An array of University-supported programmatic initiatives complement the University's civil rights infrastructure, which is charged with enforcing the new systemwide A-D Policy referenced above. That policy prohibits harassment and

discrimination based on any protected category and establishes a process for reporting and investigating potential violations. Freedman Decl. ¶¶ 6–8. The University has dedicated significant resources to enhancing its capacity to respond to individual complaints of discrimination and harassment. Beginning in the 2024 academic year, UCLA implemented new programming in student orientation, as well as faculty and staff training, focused on preventing national-origin-based hate and promoting compliance with the A-D Policy. Gorden Decl. ¶ 12; Freedman Decl. ¶ 7. Additionally, in December 2024, the University entered into a Voluntary Resolution Agreement ("VRA") with the U.S. Department of Education, Office for Civil Rights to resolve certain complaints of discrimination based on actual or perceived national origin. Freedman Decl. Ex. 2.[19] The University has complied with the VRA. Freedman Decl. ¶ 5; *see also id.* Ex. 2.[20]

In January 2025, Chancellor Julio Frenk assumed leadership of UCLA and made addressing antisemitism one of his highest priorities. Frenk Decl. ¶¶ 2, 6–11. From February to May 2025, Chancellor Frenk conducted meetings with 29 schools and units and more than 5,000 faculty, staff, students, and alumni. *Id.* ¶ 11.a; Ex. 5.[21] In February 2025, Chancellor Frenk appointed Steve Lurie—a 27-year Los Angeles Police Department veteran who served as the department's liaison to Los Angeles's Jewish community—to succeed AVC Braziel as the head of OCCS. Frenk Decl. ¶ 11.b; Lurie Decl. ¶¶ 2–3. In March 2025, Chancellor Frenk announced UCLA's Initiative to Combat Antisemitism, which he tasked with implementing the Task Force's recommendations under the leadership of Task Force chair Professor Stuart Gabriel. Frenk Decl. ¶ 9, Ex. 4[22]; Gabriel Decl. ¶ 6. The Initiative worked with

---

[19] Freedman Decl. Ex. 2 (VRA (Dec. 18, 2024)).

[20] *Id.*

[21] Frenk Decl. Ex. 5 (Frenk, Reflection, Action and Our Path Forward (Apr. 28, 2025)).

[22] Frenk Decl. Ex. 4 (Frenk, Initiative to Combat Antisemitism (Mar. 10, 2025)).

administrators across the University to enhance antisemitism training, the discrimination reporting system, and enforcement of TPM policies. *See* Gabriel Decl. ¶¶ 7–8. UCLA reorganized the CRO in 2025 to streamline the process for reviewing complaints, transitioned CRO to UCLA's Compliance Office under the Office of the Chancellor, and hired a new Assistant Vice Chancellor for Civil Rights to lead CRO. Freedman Decl. ¶¶ 2, 10–19.

In May 2026, the Initiative published a comprehensive "Roadmap to Fight Discrimination," documenting the progress made to date and setting forth further recommendations with concrete goals, timelines, and accountability measures. Gabriel Decl. ¶ 8, Ex. 2.[23] Chancellor Frenk directed working groups to implement the Roadmap's recommendations. Frenk Decl. ¶ 10; Gabriel Decl. ¶ 9.

UCLA's reforms have encompassed the specific schools highlighted in the Complaints. The David Geffen School of Medicine ("DGSOM")—the workplace of four IPs—no longer offers the course that Plaintiffs raise concerns about. *See* U.S. Compl. ¶ 88; IPAC ¶¶ 53–55; Hunt Decl. ¶ 16. After a presentation that Plaintiffs highlight, *see* U.S. Compl. ¶¶ 280–81; IPAC ¶¶ 232–35, 290–91, the Psychiatry Department implemented guidelines requiring, among other things, faculty supervision of resident presentations. Hunt Decl. ¶ 16.[24] At the Luskin School—where two IPs either work or formerly worked—the Hebrew University Professor highlighted by the IP's Amended Complaint, IPAC ¶¶ 99–102, presented at a February 2026 event co-sponsored by the School. Hunt Decl. ¶ 22.

---

[23] Gabriel Decl. Ex. 2 (UCLA Initiative to Combat Antisemitism Action Group Report (May 14, 2026)).

[24] DGSOM has also: participated in UCLA's campuswide Dialogue Across Difference initiative, which trains faculty leaders on facilitating discussions about controversial issues; hosted sessions with New Ground, a local organization promoting Jewish-Muslim dialogue; partnered with a UCLA professor in Jewish history to deliver programming on the Holocaust and medicine; and worked with Hillel to develop Jewish American Heritage Month programs. Hunt Decl. ¶ 18.

UCLA's efforts have yielded measurable results. Earlier this year, the Anti-Defamation League ("ADL") released its Campus Antisemitism Report Card, which measures how institutions of higher education address antisemitism through policy and practice. Frenk Decl. ¶ 12. UCLA rose to a "B" in 2026, from an "F" in 2024. *Id*. And following the restructuring of CRO this spring, UCLA has seen measurable improvements in CRO's capacity to respond to reports, including faster average timelines between the receipt of reports to intake, assessment, and in many cases, resolution. Freedman Decl. ¶ 18.

**D. The *Frankel* Litigation**

In June 2024, three UCLA students filed a lawsuit alleging that UCLA violated the federal Constitution, Title VI of the Civil Rights Act of 1964, and certain state statutes by failing to protect its Jewish community from antisemitic activity on campus, including by allowing the Royce Quad encampment. Compl., *Frankel v. Regents of Univ. of Cal.*, No. 2:24-cv-04702 (C.D. Cal. June 5, 2024), ECF No. 1. In October 2024, UCLA faculty member Dr. Kamran Shamsa, an IP in this action, joined as a *Frankel* plaintiff. First Am. Compl., *Frankel* (C.D. Cal. Oct. 22, 2024), ECF No. 101.

In July 2025, the parties in *Frankel* reached a settlement, resolving all claims in the litigation without any admission of fault by the University. In connection with the settlement, the parties agreed to—and the Court entered—a Consent Judgment and Permanent Injunction ("Consent Judgment"), which prohibits the exclusion of Jewish "students, faculty, and/or staff" from UCLA's ordinarily available programs, activities, and campus areas. Consent Judgment, *Frankel* (July 29, 2025), ECF No. 210 at 3. Neither Plaintiffs nor any party to the *Frankel* litigation has alleged any violation of the Consent Judgment.

As part of the *Frankel* settlement, Dr. Shamsa received financial compensation and released "any precluded [Title VII or FEHA] claim that arises out of the same transaction or occurrence as the allegations set forth in paragraphs 414–33 of the

[*Frankel*] First Amended Complaint." Teleanu Decl. Ex. 14 at 4.[25] As explained below, those paragraphs address largely the same facts at issue in this complaint. *See infra* Part II.B.

### E. Procedural History

On June 7, 2024, a Commissioner of the United States Equal Employment Opportunity Commission ("EEOC") filed a charge of discrimination (the "Commissioner Charge") against UCLA, alleging that UC engaged in a pattern or practice of harassment against Jewish and Israeli employees in violation of Title VII of the Civil Rights Act. U.S. Compl. ¶ 6. IPs Drs. Stein, Burt, Hoftman, Holloway, Shamsa, and Astor, as well as Director Blenner, also filed charges with the EEOC (the "Individual Charges"). *Id.* ¶¶ 9–10; IPAC ¶ 442. On March 3, 2025, the Department of Justice opened an investigation facially identical to the EEOC's investigation. U.S. Compl. ¶ 14.

Shortly thereafter, on various dates from May 23 to June 25, 2025, the EEOC issued letters of determination concerning the Commissioner and Individual Charges, finding reasonable cause regarding a hostile work environment for the charging parties and for Jewish or Israeli employees generally. U.S. Compl. ¶¶ 7–8, 11–12; IPAC ¶¶ 121, 166, 210, 272, 315, 351, 398. After engaging UC in conciliation, the EEOC subsequently referred the charges to the Department of Justice. U.S. Compl. ¶ 13.

On July 31, 2025—just two days after the *Frankel* Consent Judgment was

---

[25] Teleanu Decl. Ex. 14 (*Frankel* Settlement Agreement and Release of Claims) at 4. The court may take judicial notice of this public settlement agreement. *See supra* n.4; *Millennium Lab'ys, Inc. v. Allied World Assurance Co. (U.S.), Inc.*, 165 F. Supp. 3d 931, 933 (S.D. Cal. 2016) (granting judicial notice of settlement agreements that were made public), *aff'd*, 726 F. App'x 571 (9th Cir. 2018); *see also Paramount Contractors & Devs., Inc. v. City of Los Angeles*, 805 F. Supp. 2d 977, 988 (C.D. Cal. 2011) (granting judicial notice of settlement agreement and judgment), *aff'd*, 516 F. App'x 614 (9th Cir. 2013).

entered—the Department of Justice issued its own finding that UC was engaged in a pattern or practice of discrimination against UCLA employees who are, or are perceived to be, Jewish or Israeli. U.S. Compl. ¶ 15. At the same time, the Federal Government suspended $584 million in UCLA federal funding[26]—an unlawful tactic that is subject to multiple overlapping injunctions, *see Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 945 (N.D. Cal. 2025); *Thakur v. Trump*, 176 F.4th 1187, 1199-1204 (9th Cir. 2026). The Federal Government then demanded that the University pay the federal government over $1 billion.[27]

UCLA has not acquiesced to the Federal Government's demands, and the Federal Government has escalated its attacks by pursuing affirmative litigation alongside its retaliatory defundings. On February 24, 2026, the Federal Government then filed this action, asserting six claims under Title VII: a pattern-or-practice claim for hostile work environment (Count I); hostile work environment and retaliation claims on behalf of Drs. Holloway and Shamsa (Counts II, III, IV, and V), and a hostile work environment claim on behalf of unidentified "other aggrieved individuals" (Count VI). U.S. Compl. ¶¶ 286–315. In addition to damages, the Federal Government seeks broad injunctive relief. U.S. Compl., Prayer for Relief.

Several IPs subsequently intervened and filed their own Complaint on May 19 and an Amended Complaint on September 11. ECF Nos. 52, 74. As explained below, the IPs' claims largely mirror the Federal Government's.

**LEGAL STANDARD**

Standing is jurisdictional and thus "properly raised in a motion to dismiss

---

[26] Statement from UC President James B. Milliken on UCLA Research Grant Suspensions (Aug. 6, 2025), https://perma.cc/Q2XQ-TQFB; *see also* Message from President James B. Milliken to the UC Community (Sept. 15, 2025), https://perma.cc/8XYW-7HC4.

[27] Message from President James B. Milliken to the UC Community (Sept. 15, 2025), https://perma.cc/8XYW-7HC4.

under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). When considering a Rule 12(b)(1) motion, courts are "not restricted to the face of the pleadings, but may review evidence, such as declarations and testimony" relevant to "the existence of jurisdiction." *Khan v. Johnson*, 65 F. Supp. 3d 918, 923 (C.D. Cal. 2014); *accord Americopters, LLC v. FAA*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).

Under Rule 12(b)(6), while the Court must accept all well-pleaded facts as true, it need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor is the Court "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Funke v. Sorin Grp. USA, Inc.*, 147 F. Supp. 3d 1017, 1022 (C.D. Cal. 2015) (quotation omitted). A "court may … consider … documents attached to the complaint [and] documents incorporated by reference in the complaint … without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO SEEK INJUNCTIVE RELIEF

"[A] plaintiff must demonstrate standing separately for each form of relief sought. Thus, a plaintiff who has standing to seek damages for a past injury … does not necessarily have standing to seek prospective relief." *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (citation and quotation omitted). To adequately allege standing to seek injunctive relief, a plaintiff must "clearly allege facts" demonstrating that he faces not just an "objectively reasonable likelihood" of future injury, but that a future injury is "certainly impending." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022)

(same).[28] Plaintiffs have not—and cannot—satisfy that exacting standard.

### A. Plaintiffs Fail to Allege an Imminent Likelihood of Future Injury

Neither the Federal Government nor any IP alleges a risk of "certainly impending" injury absent injunctive relief. The Complaints focus overwhelmingly on alleged incidents that occurred during the 2023 academic year, including the Royce Quad encampment. *See* U.S. Compl. ¶¶ 36–92, 148–285; IPAC ¶¶ 41, 44–47, 49, 51–70, 82–98, 130–58, 174–92, 231–62, 282–300, 321–42, 355–91. But "[p]ast wrongs are insufficient by themselves to grant standing" for prospective relief. *Wright*, 48 F.4th at 1118 (quotation omitted). Indeed, past harm is "*largely irrelevant* when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm." *Nelsen v. King County*, 895 F.2d 1248, 1251 (9th Cir. 1990) (emphasis added); *see also Harvard Coll.*, 2026 WL 2343193, at *1 (dismissing federal government's Title VI claim for injunctive relief where "isolated," "episodic," and stale allegations about the 2023 academic year did not support a "plausible inference that any institutionalized noncompliance with Title VI persists").

The Complaints largely ignore the wide-ranging actions that UCLA has taken, and they certainly do not explain how a risk of future harm survives them. *See supra* at 7-13 (describing reforms). To the contrary, the Complaints themselves demonstrate the efficacy of these reforms: While the Complaints refer to sporadic protests in the 2024, 2025, and 2026 academic years (*see, e.g.*, U.S. Compl. ¶¶ 82, 237, 228–29; IPAC ¶¶ 70–71, 343–45), neither alleges any protest resembling the Royce Quad encampment during this time period.[29] The Complaints do not—and

---

[28] The same principles apply to the United States, including where the Federal Government has a statutory right of action to sue. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *Spokeo*, 578 U.S. at 339 (same).

[29] Needless to say, the First Amendment precludes prohibiting all expressive activity on the UCLA campus, even activity that is repugnant. *See infra* at 22, 27-29. Still, UCLA's response to the protest activities referenced in the Complaints that occurred

cannot—allege any violations of the Consent Judgment to which Dr. Shamsa himself is a party. Rather, the Complaints' allegations demonstrate that after the Royce Quad encampment, UCLA has called law enforcement to respond to unauthorized protest activity that threatened to interfere with campus operations. *See supra* at 10.

Plaintiffs' allegations concerning UCLA's enforcement of its A-D Policy similarly omit the great strides UCLA has made in responding to Jewish and Israeli employee concerns. For instance, the Complaints allege that, in the past, Jewish and Israeli faculty and staff did not know to whom reports of discrimination or harassment should be directed (*see, e.g.*, U.S. Compl. ¶¶ 128–29, 195, 231; IPAC ¶¶ 104–05) and had concerns about the former Assistant Vice Chancellor for Civil Rights who oversaw CRO, the UCLA office responsible for implementing the A-D Policy (*see, e.g.*, U.S. Compl. ¶¶ 121–36).[30] But even assuming the truth of these allegations, the pleadings fail to mention that UCLA has reorganized CRO, streamlined the complaint intake process, hired a dedicated Title VI Officer, and hired a new Assistant Vice Chancellor for Civil Rights. They also fail to recognize that UCLA has implemented new training focused on ensuring compliance with the A-D Policy. The Complaints also omit that UCLA is in full compliance with the VRA that it entered into in December 2024 with the U.S. Department of Education, Office for Civil Rights, which requires the University to process certain complaints based on actual or perceived national origin. *See supra* at 11. Indeed, while the Complaints assert that CRO did not properly respond to certain historical complaints,

---

during the 2024 and 2025 academic years succeeded in preventing additional encampments from forming. *See* Lurie Decl. ¶¶ 14, 21; Gorden Decl. ¶ 10. And the geographically and temporally remote post-encampment incidents described in the Complaints, involving unidentified individuals on a publicly accessible campus, bear no resemblance to the encampment.

[30] The Federal Government Complaint also alleges that it is CRO's practice not to conduct any "formal investigation" into allegations of antisemitism. *See, e.g.*, U.S. Compl. ¶ 117. That is wrong. *See, e.g.*, Freedman Decl. ¶ 19.

*see, e.g.*, U.S. Compl. ¶¶ 116–17, 247, 277; IPAC ¶¶ 92, 94, 308, 397, none of those were filed *after* UCLA instituted these changes.[31]

Both Complaints also rely extensively on a report that UCLA's Task Force published in October 2024 to provide University leaders with "evidence and analysis regarding the campus climate for Jewish and Israeli community members." *See* Teleanu Decl. Ex. 15 at 1[32]; U.S. Compl. ¶¶ 25–31, 36–38, 44–47, 75, 125–30, 139–40, 240; IPAC ¶ 72. But the Complaints ignore what happened next: UCLA appointed Chancellor Frenk, who made combating antisemitism one of his highest priorities, including by forming a UCLA Initiative to Combat Antisemitism under the leadership of the Task Force's Chair to oversee implementation of the Task Force's recommendations. *See supra* at 11. In May 2026, the Initiative published a Roadmap documenting its reforms and outlining further recommendations, which Chancellor Frenk promptly directed the campus to implement. *See supra* at 12.

Because Plaintiffs do not even attempt to engage with UCLA's successful post-encampment efforts to combat campus antisemitism, they fail their threshold burden of pleading a non-speculative likelihood of future injury. Their request for

---

[31] To the extent that the Federal Government Complaint attempts to allege ongoing harm based on the A-D Policy's purported failure to permit "victims of harassment from reporting acts that, when aggregated, would violate Title VII," it is wrong. U.S. Compl. ¶ 102. Nothing in the policy prevents victims of harassment from reporting any kind of incident—both versions permit "[a]ny individual" to "make a report or complaint." *Id*. Indeed, UCLA sends out periodic reminders to instruct members of its community on how to report potential policy violations. *See* Freedman Decl. ¶ 7.

[32] Teleanu Decl. Ex. 15 (Task Force Report) at 1. The Court may consider this exhibit because the Complaints incorporate it by reference, U.S. Compl. ¶¶ 25 & n.7, 26–28, 36–42, 44–47, 52, 56, 75, 125–30, 139–40, 240, 292, 296; IPAC ¶¶ 72, 184, 197; the document is "integral" to the Complaints and "forms the basis" of support for the Federal Government's and the IPs' hostile work environment claims. *Ritchie*, 342 F.3d at 908; *see Maxon v. Fuller Theological Seminary*, 549 F. Supp. 3d 1116, 1122 (C.D. Cal. 2020) (university's "Community Standards" policy incorporated by reference in complaint).

injunctive relief should be dismissed for that reason alone.

### B. Plaintiffs Do Not Allege Facts Clearly Demonstrating that UCLA Will Cause Them Any Future Injury

Plaintiffs also lack standing for prospective relief because they have not pleaded facts demonstrating that UCLA would be the *cause* of any hypothetical future injury, such that an injunction directed at *UCLA* would redress that harm. *See Spokeo*, 578 U.S. at 338. Plaintiffs are not entitled to an injunction if the future injury that they allege is caused by "the independent action of some third party not before the court." *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quotations omitted).

The overwhelming majority of incidents alleged in the Complaints were not directed by UCLA or sanctioned by any UCLA policy. *See, e.g.*, U.S. Compl. ¶¶ 33 n.13, 42–43, 45, 224, 271; IPAC ¶¶ 46, 238, 295, 326, 333, 371, 383; *see also infra* at 22-25, 28-31. Rather, the incidents and injuries were caused by unidentified protesters and vandals, including people whom the Complaints acknowledge were not members of the University community. *See id*. The Complaints allege no facts to support the conclusion that UCLA will fail to respond to unlawful activity in the future, particularly given the enhancements to its processes. *See supra* at 8–10.

Indeed, the possibility that future protests could result in some future harm exists despite, not because of, UCLA's extensive efforts to ensure campus safety. *See, e.g.*, *Lunn v. City of Los Angeles*, 629 F. Supp. 3d 1007, 1013 (C.D. Cal. 2022) (plaintiffs lacked standing to sue City for injuries caused by "deliberate choices" of third parties). Plaintiffs have not alleged facts supporting a different conclusion, which is the second reason why this claim for relief fails.

## II. THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE HOSTILE WORK ENVIRONMENT CLAIMS (COUNTS II, IV, AND VI OF FEDERAL GOVERNMENT COMPLAINT; COUNTS I AND III OF IP COMPLAINT)

There are approximately 48,700 faculty and staff at UCLA. Teleanu Decl. Ex.

1[33]; Hunt Decl. ¶¶ 3, 14. Yet the Federal Government asserts individual hostile work environment claims for just two employees, Drs. Shamsa and Holloway.[34] The Federal Government's and the IPs' claims for those individuals fail for multiple reasons—and because the Federal Government has not alleged a plausible hostile work environment claim on behalf of any single employee, it cannot clear its even higher burden of alleging a claim on behalf of all other Jewish and Israeli employees at UCLA.

### A. UCLA Is Not Liable Under Title VII for Harassment by Students and Unknown Third Parties

#### 1. Title VII requires plausible allegations that UCLA itself intended to discriminate, which plaintiffs cannot plead

Title VII applies only to intentional harassment by an employer, 42 U.S.C. § 2000e-2(a)(1), or its agents, *id.* § 2000e(b). Employers thus are not liable for any individual's intentionally discriminatory or harassing action unless that conduct can be imputed to the employer "based on agency principles." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998). Here, the Federal Government seeks to hold UCLA liable for conduct of *non-agents*, on the purported ground that UCLA was *negligent* in response to harassment by third parties whose conduct it could not control. That theory stretches the law beyond recognition.

While the Ninth Circuit held several decades ago that an employer's negligence in response to third-party harassment may be actionable under Title VII, it did so in the context of a highly regulated, confined private workplace (a casino). *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Other courts have likewise permitted negligence-based Title VII claims based on third-

[33] Teleanu Decl. Ex. 1 (UCLA Newsroom, About UCLA: Fast Facts).

[34] Drs. Shamsa and Holloway also bring hostile work environment claims under FEHA that are subject to the same legal standard. *See, e.g.*, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir. 1998); *Hughes v. Pair*, 46 Cal. 4th 1035, 1039 (2009).

party conduct only when the employer "*exercises a high degree of control over the behavior of the non-employee*." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 76 n.33 (2d Cir. 2021) (en banc) (quotation omitted); *Bility v. Univ. of Pittsburgh*, 2024 WL 1156625, at *5 n.1 (W.D. Pa. Mar. 18, 2024). The decisions allowing actions for negligence in some circumstances were based on EEOC guidelines noting that analysis of employee harassment by third parties must "consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." 29 C.F.R. § 1604.11(e); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (adopting this test).

Plaintiffs cannot demonstrate the requisite control here. Universities, unlike K-12 schools, "do not exercise custodial and tutelary power over their adult students," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 667 (1999) (Kennedy, J., dissenting); *see id.* at 649 (majority opinion) (noting universities' relative lack of control over students); *McAvoy v. Dickinson Coll.*, 115 F.4th 220, 231 (3d Cir. 2024) (same); *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 970 (6th Cir. 2020) (en banc) (same). They also have limited control over non-affiliates. *See Hall v. Millersville Univ.*, 22 F.4th 397, 407 (3d Cir. 2022) (it is not "likely that a university would have substantial control over all aspects of a campus which is open to the public"). Indeed, even compared to private universities, a public university's control is lessened because of the First Amendment, which protects at least some "speech that may constitute ... harassment." *Davis*, 526 U.S. at 667 (Kennedy, J., dissenting); *see Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010).

Moreover, a negligence standard has no place at all when determining whether a public university is liable under Title VII. As noted, *Folkerson* relied on EEOC guidance to open the door to negligence claims. But courts must interpret statutes themselves following *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394–95 (2024), and "Congress … directed federal courts to interpret Title VII based on

agency principles," *Burlington Indus.*, 524 U.S. at 754, which do not allow employers to be held liable for the conduct of non-agents. Thus, the Sixth Circuit—the only court of appeals that has considered this question since *Loper Bright*—recently held that employers cannot be held liable for harassment by third parties who are not the employer's agents. *Bivens v. Zep, Inc.*, 147 F.4th 635, 644 (6th Cir. 2025). In the context of allegedly harassing conduct by non-agent third parties, such as students, an employer like UCLA could only be held "*directly* liable for its own actions," which would require alleging and proving that UCLA "*intended* for [the plaintiff's] harassment at the hands of the [third party] to occur." *Id.* at 645 (emphasis added); *see, e.g.*, *O'Neill v. Trs. of Univ. of Pa.*, 2025 WL 3047884, at *10 (E.D. Pa. Oct. 31, 2025) (finding itself "persuaded by the … Sixth Circuit's approach"). Neither the Federal Government nor the IPs allege that UCLA *intended* the harassment alleged here to occur.[35]

Whether considered through the lens of *Folkerson* or the statute itself, Plaintiffs' allegations fall short. Plaintiffs do not (and cannot) allege that UCLA had any sort of official policy that was discriminatory toward Jewish and Israeli employees, or that Jewish and Israeli employees' complaints of discrimination were treated worse than complaints from other individuals. *See, e.g.*, U.S. Compl. ¶¶ 113–15 (allegations regarding UCLA's anti-harassment procedures across the board); *id.* ¶¶ 116–18 (allegations regarding UCLA's reaction to antisemitism complaints without comparison to UCLA's reaction to other complaints). To the contrary, Plaintiffs allege that UCLA *did* consider claims of antisemitism, but that UCLA did not punish the perpetrators in some such complaints because the complaints involved

---

[35] The IP Amended Complaint asserts, "[o]n information and belief," that any person "who participated in and/or facilitated the establishment and/or maintenance of the Encampment" was an "agent[] of UCLA." IPAC ¶ 31. But neither Complaint pleads any *facts* to support the legal conclusion that anyone in the encampment was UCLA's agent, that is, was acting on UCLA's behalf or subject to its direction.

protected speech or were not clearly discriminatory, *see, e.g.*, U.S. Compl. ¶¶ 257, 275; IPAC ¶ 106, or because UCLA investigated and did not find sufficient evidence of wrongdoing by actors over whom it exercised control, *see, e.g.*, U.S. Compl. ¶ 207; IPAC ¶¶ 139, 214, 263–64, 308, 397. And Plaintiffs' hostile work environment counts are plainly pleaded based on a negligence theory alone. *See* U.S. Compl. ¶ 303 ("Defendant knew ***or should have known*** about the harassment Dr. Holloway faced and failed to take immediate and appropriate corrective action."), *id.* ¶ 309 ("Defendant knew ***or should have known*** about the harassment Dr. Shamsa faced and failed to take immediate and appropriate corrective action."), *id.* ¶ 315 ("Defendant knew ***or should have known*** about the harassment these aggrieved individuals faced and failed to take immediate and appropriate corrective action."); IPAC ¶ 452 ("Defendant," *inter alia*, "(1) Actually knew, ***or should have known***, about the hostile work environment" and "(2) Failed to take prompt and effective remedial action"). Because UCLA cannot be held liable under Title VII for an allegedly negligent response to the actions of third parties who were not under its control, Plaintiffs' hostile work environment claims must be dismissed.

### 2. The Complaints fail to plausibly allege that UCLA was negligent in response to actionable harassment

Even if a negligence standard applied, neither the Federal Government nor the IPs plausibly allege that UCLA's conduct was negligent. "[O]ur law does not require an employer to be immediately and perfectly effective in preventing all future harassment by a third party." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1018 (9th Cir. 2018); *contra* IPAC ¶ 453 (alleging hostile work environment established because "antisemitism did not stop" after IPs complained). Rather, the relevant question is: "Did the employer take steps that were *reasonably calculated* to end the harassment of which it was aware?" *Campbell*, 892 F.3d at 1018.

Here, the Complaints acknowledge that UCLA worked with the LAPD and removed the encampment within a week, U.S. Compl. ¶ 63, IPAC ¶ 69. Neither the

Federal Government nor the IPs allege that removing the encampment was an inadequate response. Instead, they allege that UCLA was negligent in failing to shut down the encampment *immediately*.

That is wrong. Title VII does not "require[] a school to behave in the most draconian way possible." *Campbell*, 892 F.3d at 1019. Indeed, as a general matter, "an employer must be permitted to respond incrementally" to alleged harassment, *id*. at 1018, but especially when it seeks to move deliberately based on a reasonable (if ultimately unsuccessful) desire to prevent violence through deescalation. *See Rodriguez*, 605 F.3d at 711; *see also Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 22 (1st Cir. 2025) (university taking "an escalating series of actions" over months "aimed at calming … turmoil without violence" was not a plausible basis for a Title VI claim). Moreover, a public university is entitled to act deliberately when evaluating whether it is dealing with speech potentially protected by the First Amendment. *See, e.g.*, *Stand With Us*, 158 F.4th at 13 (university response may "implicate students' First Amendment freedoms"). Here, UCLA ultimately determined that it could not successfully deescalate the encampment and called upon law enforcement to disband it. U.S. Compl. ¶¶ 63–64. But the Complaints do not allege anything to undermine the proposition that UC took steps that "were *reasonably calculated* to end [any] harassment of which it was aware." *Campbell*, 892 F.3d at 1018.

UCLA's actions after the encampment was removed confirm that conclusion. The Complaints allege that UCPD and LAPD arrested everyone who refused to leave the encampment and referred them for prosecution. U.S. Compl. ¶¶ 64, 68. What's more, after the Royce Quad encampment, UCLA successfully responded to attempts to form new encampments, occupy campus buildings, or vandalize property. *Id.* ¶¶ 67–68, 70 n.52, 72–74. This response extended not only to attempted takeovers of campus but to protests more generally, as UCLA's TPM "policies were tightened after the encampment." *Id.* ¶ 33 n.13. None of this can plausibly be considered a

negligent response to antisemitism on campus.

### B. Dr. Shamsa's Hostile Work Environment Claim Is Also Barred by the *Frankel* Release (Federal Government Count IV; IP Counts I and III)

Dr. Shamsa's claim also fails because of the release he executed to settle materially identical allegations about his experiences in spring 2024. When Dr. Shamsa settled his *Frankel* claims, he agreed to release any Title VII claims that "arise[] out of the same transaction or occurrence as the allegations set forth in paragraphs" of the *Frankel* complaint that are materially identical to the basis for his hostile work environment claim here. Teleanu Decl. Ex. 14 at 4[36]; *compare* U.S. Compl. ¶¶ 219–27, 230–36 *and* IPAC ¶¶ 326–39, *with* First Am. Compl. ¶¶ 414–33, *Frankel*, *supra*, ECF No. 101. That release encompasses both his individual claim and the hostile work environment claim that the United States brings on his behalf.

It makes no difference that the Federal Government purports to bring claims on Dr. Shamsa's behalf. When individual employees reach a settlement with their employer that contracts away the employees' right to bring a claim going forward, that settlement bars the Federal Government from seeking similar relief on behalf of the settling employee. *See EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1542 (9th Cir. 1987); *accord, e.g.*, *EEOC v. Jefferson Dental Clinics, PA*, 478 F.3d 690, 699 (5th Cir. 2007); *EEOC v. U.S. Steel Corp.*, 921 F.2d 489, 495 (3d Cir. 1990); *see also EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296–97 (2002) (observing that if the individual plaintiff "had accepted a monetary settlement, any recovery by the EEOC would be limited accordingly," and "it goes without saying that the courts can and should preclude double recovery by an individual" (quotation omitted)). Here, the Federal Government seeks monetary and make-whole relief for Dr. Shamsa that he already obtained through the *Frankel* settlement. *See* U.S. Compl. ¶¶ 318, 321. This prior settlement "preclude[s] double recovery." *Waffle House*, 534 U.S. at 297

---

[36] Teleanu Decl. Ex. 14 (*Frankel* Settlement Agreement and Release of Claims) at 4.

(quotation omitted). As both Complaints seek to relitigate allegations covered by Dr. Shamsa's release, Dr. Shamsa's hostile work environment claims are precluded and should be dismissed.

### C. The Complaints Fail to Allege that Drs. Shamsa and Holloway Experienced Actionable Harassment (Federal Government Counts II, IV; IP Counts I and III)

The Complaints fail to allege that Drs. Shamsa and Holloway were subjected to an actionable hostile work environment.

The standard for alleging a hostile environment is high, and necessarily individualized. A plaintiff must allege facts plausibly showing (1) that he was personally "subjected to verbal or physical conduct because of" a protected characteristic; (2) "that the conduct was unwelcome"; and (3) "that the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quotation omitted). The environment "must both subjectively and objectively be perceived as abusive." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quotation omitted). "Offensive and inappropriate" comments about a protected group do not amount to actionable harassment. *Manatt*, 339 F.3d at 798. And conduct that is not directed *at* a plaintiff is less probative of a hostile work environment. *See Campbell*, 892 F.3d at 1020.

Applying this high standard to conduct on a public university campus that involves First Amendment-protected speech requires even greater care, because First Amendment-protected speech cannot form the basis for harassment claims. The Ninth Circuit, for instance, observed that the First Amendment right to "provoke, offend and shock" is particularly strong "on college campuses" where "[i]ntellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular." *Rodriguez*, 605 F.3d at 708. To protect these constitutional interests, courts have distinguished between: (i) "racial insults or sexual advances directed at

particular individuals in the workplace," which "may be prohibited on the basis of their non-expressive qualities"; and (ii) "expression on a matter of public concern, directed to the college community," which cannot "constitute unlawful harassment." *Id.* at 710. "[A]voiding the disruption on college campuses 'that necessarily accompanies controversial speech' cannot justify the suppression of the very diversity of views that is central to the mission of higher education." *Reges v. Cauce*, 175 F.4th 1014, 1036 (9th Cir. May 14, 2026) (citation and quotation omitted).

Consistent with this precedent, courts at the pleading stage analyzing complaints of antisemitism on college campuses after October 7 have refused to treat as harassment repugnant speech about matters of public concern not directed at particular individuals. *See, e.g.*, *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401, 412–13 (E.D. Pa. 2025) (Title VI); *Garrett v. City Univ. of N.Y.*, 2025 WL 3096550, at *8, *12–13 (S.D.N.Y. Oct. 10, 2025) (Title VII); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 266 (S.D.N.Y. 2025) (Title VI); *see also Stand With Us*, 158 F.4th at 15. Courts excise such speech from the hostile work environment analysis not just to avoid constitutional concerns, but also out of recognition that a reasonable person would not consider such protected speech to constitute harassment. *See, e.g.*, *Landau*, 789 F. Supp. 3d at 413. So analyzed, the Complaints do not allege that Drs. Shamsa and Holloway experienced harassment that satisfies Title VII's high standard.

**1. Dr. Shamsa fails to allege actionable harassment in his workplace (Federal Government Count IV; IP Counts I and III)**

The Complaints fail to state a hostile work environment claim on behalf of Dr. Shamsa because the vast majority of the pertinent allegations concern incidents that did not occur in his workplace, and the rest were not directed at Dr. Shamsa and/or consisted of First Amendment-protected activity.

Nearly all of Dr. Shamsa's allegations concern incidents that have no proximity or nexus to DGSOM, his place of work. *See Candelore v. Clark Cnty.*

*Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (per curiam) (employer not liable under Title VII for harassing conduct "away from the workplace or outside business hours"). For instance, Dr. Shamsa alleges that he attended various protests and rallies, including the Royce Quad encampment, U.S. Compl. ¶¶ 221–30; IPAC ¶¶ 326–36, but doing so was not part of his job. Rather, Dr. Shamsa acknowledges that he chose to attend these events "during his work breaks," which involved leaving his workplace and walking to a different part of UCLA's large, public "main campus." U.S. Compl. ¶ 221; IPAC ¶¶ 329–32, 341, 350. Aggressive, offensive, even abusive, conduct is not actionable under Title VII when it occurs outside of the workplace. *Cronin v. Martindale Andres & Co.*, 159 F. Supp. 2d 1, 6 (E.D. Pa. 2001); *see James v. State of La. Legis. Fiscal Off.*, 822 F. Supp. 349, 352 (M.D. La. 1993).

The few allegations that pertain to DGSOM also fail to state a claim under Title VII. Many involve conduct that was not directed at Dr. Shamsa, and/or clearly involved First Amendment-protected speech. U.S. Compl. ¶¶ 228–29; IPAC ¶¶ 321–22, 343–45. For instance, Dr. Shamsa did not attend the session that UCLA hosted for first-year medical students referenced in his allegations. *See* IPAC ¶¶ 52–54. And the protests outside DGSOM, however distasteful, involved protected speech. *Id.* ¶¶ 343–45. Finally, as for the anonymous postcard mailed to Dr. Shamsa's work address, Dr. Shamsa himself acknowledges that UCLA intercepted it, and the Cardiology Department chief brought it to Dr. Shamsa, and "suggested he call UCPD." IPAC ¶¶ 346–47.

Taken together, these "isolated incidents," *Manatt*, 339 F.3d at 798 (quotation omitted), are nothing like the extreme conduct or "unrelenting barrage" of consistent mistreatment required to state a hostile work environment claim, *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001). Indeed, courts routinely reject hostile work environment claims involving egregious speech, or even physical assault, on the ground that it does not rise to the level of actionable harassment. *See, e.g.*, *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1107 (9th Cir. 2000) (referring to

women as "bitches" and "histrionics" did not rise to level of severe or pervasive because they were not directed at plaintiff); *Manatt*, 339 F.3d at 795, 799 (calling employee a "China Man," while "regrettable," did not "alter … conditions of … employment"); *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) (physical assault by supervisor was "upsetting" but not "so severe as to alter materially the plaintiff's working conditions"). UCLA does not endorse the sort of speech alleged here and strives to create a workplace where no employee feels subjectively unsafe "at conferences, meetings," or at "the hospital," IPAC ¶ 337, but Dr. Shamsa's allegations are not a basis for hostile work environment liability.

**2. Dr. Holloway fails to allege actionable harassment in his workplace (Federal Government Count II; IP Counts I and III)**

Dr. Holloway fails to allege actionable harassment for much the same reasons as Dr. Shamsa. Some of the allegations have no nexus to Dr. Holloway's workplace, U.S. Compl. ¶ 153; IPAC ¶ 153, other conduct was not directed at him, and/or he was not present during the conduct, U.S. Compl. ¶¶ 157, 162, 177; IPAC ¶¶ 151, 153.

The only allegations specific to Dr. Holloway and connected to his workplace concern his participation in a letter, published in the Jewish Journal, titled "UCLA Faculty Against Terror," which was signed by over 300 UCLA faculty, IPAC ¶ 134, and called for the University to, among other things, denounce pro-Palestinian rallies where the October 7 attack was "celebrated." *Id.* ¶¶ 42–43. Dr. Holloway alleges that after the letter was published: (i) an unknown person left a message on a classroom chalkboard to "Look up *Jewish Journal* 300+ profs against terror," U.S. Compl. ¶ 160; IPAC ¶¶ 133–34; (ii) an unspecified number of faculty members objected to the letter and questioned the integrity of those who had signed it, U.S. Compl. ¶ 168; IPAC ¶¶ 140–44; (iii) he received biased student evaluations mentioning the letter, *see* U.S. Compl. ¶¶ 96–97; and (iv) colleagues accused him of issuing a biased personnel review, IPAC ¶¶ 160–61.

UCLA could not discipline individuals who objected to the letter or Dr.

Holloway lending his name to it because such objections are protected by the First Amendment. And, in any event, none of these incidents are sufficiently severe or pervasive to reach the level of actionable harassment. *See Manatt*, 339 F.3d at 798. Accordingly, such conduct cannot give rise to a hostile work environment as a matter of law. *See Rodriguez*, 605 F.3d at 710.

### D. The Federal Government Fails to Allege a Hostile Work Environment Claim on Behalf of a Class of "Other Aggrieved" Employees (Federal Government Count VI)

Regardless of whether the Federal Government can state individual hostile work environment claims on behalf of Drs. Shamsa and Holloway, its "other aggrieved" employees class claim should be dismissed. Hostile work environment claims require plausible individualized allegations that almost all employees experienced specific severe or pervasive harassment in the workplace, and that the employer is liable for the employees' injuries. The Federal Government's failure to allege plausibly that *any* specific employees—including Drs. Shamsa and Holloway—experienced a hostile work environment attributable to UCLA necessarily forecloses its claim on behalf of other, unidentified employees. But even if the individual hostile work environment claims survived, the "other aggrieved" employees claim should still be dismissed. While the Federal Government does not need to meet Rule 23's requirements to bring a claim on behalf of a class of Jewish and Israeli employees, *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 333–34 (1980), it must put an employer "on notice" of "the scope of th[e] purported class of individuals" and "which of the alleged conduct applies to the Aggrieved Employees," *EEOC v. Il Fornaio (Am.) LLC*, 2024 WL 4003318, at *4 (C.D. Cal. Apr. 3, 2024). For instance, the Eighth Circuit recently held that the Federal Government gave an employer "adequate notice of the [classwide] charges against it" where it "limited its claims … in geography, position, and time," and "estimated the number of employees in the relevant roles and percentage of women in those roles." *EEOC v. BNSF Ry. Co.*, 150 F.4th 948, 961 (8th Cir.), *reh'g denied*, 2025 WL 3085999 (8th Cir. Nov. 5,

2025) (quotation omitted). Here, by contrast, the Federal Government provides no allegations regarding (i) the size of the purported class or (ii) the principles that would define its members. This lack of specificity is fatal to the Federal Government's Count VI.

Even if the Federal Government satisfied these basic scoping requirements, the claim should still be dismissed. UCLA is a large campus, *see* IPAC ¶ 27, but the Federal Government Complaint relies primarily on discrete incidents that occurred at very different places on campus. *See, e.g.*, U.S. Compl. ¶¶ 252–55 (research presentation disrupted); *id.* ¶ 272 (assault during counterprotest); *id.* ¶ 275 (flyers posted in political science office). These events provide no basis to infer a uniform experience for all Jewish and Israeli employees across campus. For instance, an incident in a first-year lecture at the UCLA Medical School would not impact all medical school faculty members, much less all law school professors or all employees. *Id.* ¶ 88. It is similarly implausible that a statement on two professors' chalkboards, *id.* ¶¶ 160–61; IPAC ¶¶ 85, 134, affected all employees, especially those in different schools or parts of UCLA's campus.

The Federal Government cannot rely on the survey in the Task Force's Report (the "survey") to bridge this gap. *See* U.S. Compl. ¶¶ 25–31, 36–38, 75, 125–30, 139–40, 240. Though the survey is an invaluable tool to help guide UCLA's efforts to combat antisemitism and improve the climate on campus for Jewish and Israeli community members, *see supra* at 11–12, 19, it was not designed to and does not establish the factual predicates for a Title VII class-wide or pattern-or-practice hostile work environment claim. Indeed, the Task Force Report itself notes many of the survey's limitations. Teleanu Decl. Ex. 15 at 11.[37] Only around half of the 428 survey respondents (231) were UCLA employees, out of nearly 50,000 people employed by UCLA. *Id.* And of those recruited for the survey, "selection bias may

---

[37] Teleanu Decl. Ex. 15 (Task Force Report) at 11.

have led people with more difficult or painful experiences" to participate. *Id*. at 43. Moreover, as the Task Force Report also noted, the tools it used to allow for anonymity created "the possibility of participation in the survey among those who are not part of the intended group," *id*. at 11, and thus outside the Federal Government's purported class.

The Federal Government Complaint also does not attempt to distinguish instances of employees claiming they were "victims" of threats or attacks from those who "witnessed" them. U.S. Compl. ¶ 126. While both are relevant to a hostile work environment claim, actions not directed at an employee are less probative. *See Campbell*, 892 F.3d at 1020. There is also no way to know how many of those who reported in the survey experiencing or witnessing an "offensive comment or slur," or even a physical threat or attack, may have experienced or witnessed the *same* graffiti, sign, video, or physical event. *See* Teleanu Decl. Ex. 15 at 32–33.[38] The survey likewise does not reflect how many such incidents each respondent experienced or witnessed, and thus whether potentially harassing acts were pervasive. *See generally id*.; *but see Manatt*, 339 F.3d at 798 ("isolated incidents" insufficient to prove hostile work environment (quotation omitted)). Ultimately, while the survey results suggest that some Jewish and Israeli employees felt that campus life had become hostile, lack of information about the various reported incidents makes it impossible to determine whether none, some, or all of them experienced conduct that reaches the heightened legal standard. In short, while the survey is certainly important, it does not provide a basis from which it would be reasonable to infer that *all* Jewish and Israeli employees experienced a hostile work environment.

## III. THE FEDERAL GOVERNMENT FAILS TO ALLEGE A PLAUSIBLE PATTERN-OR-PRACTICE CLAIM (FEDERAL GOVERNMENT COUNT I)

Like Plaintiffs' hostile work environment claims, the Federal Government's

[38] *Id*. at 32–33.

pattern-or-practice claim fails as a matter of law because claims under Section 707 cannot be based on alleged deficiencies in an employer's response to harassing conduct by third parties. Rather, such claims must be based on a pattern or practice of intentional discrimination *by the employer* (i.e., UCLA)—which the Federal Government does not plausibly allege.

### A. The Federal Government Cannot Bring Pattern-or-Practice Claims Based on Alleged Deficiencies in an Employer's Response to Harassment by Third Parties

The Federal Government's theory of liability under Section 707(a) is that UCLA maintained a pattern or practice of negligently responding to hostile work environments allegedly created by third parties, including students and those unaffiliated with the university. U.S. Compl. ¶¶ 287–93. That theory finds no support in Title VII. Indeed, there appear to be no cases recognizing pattern-or-practice claims based on an employer's negligent response to third-party harassment. For good reason: Section 707(a) requires a pattern or practice of *intentional discrimination* by an *employer*.[39]

The plain text of Section 707(a) only authorizes the Federal Government to pursue pattern-or-practice claims against employers "engaged" in a pattern or practice "*intended* to deny the full exercise" of the rights protected by Title VII. 42 U.S.C. § 2000e-6(a) (emphasis added). Congress adopted this language as a "safeguard" to prevent the Federal Government from pursuing pattern-or-practice claims absent "a showing" that an employer "had the *intention* to deprive others of their rights." 110 Cong. Rec. 14,270 (1964) (statement of Sen. Humphrey (emphasis

[39] Though Section 707(a) is the only provision of Title VII that references "pattern-or-practice claims," lower courts have permitted private litigants and the EEOC to pursue "pattern or practice claims" pursuant to Sections 706 and 707(e). *See, e.g.*, *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1081 (C.D. Ill. 1998). Any effort by the Federal Government to bring pattern-or-practice claims under these provisions would fail for the same reason that the Section 707(a) claim should be dismissed.

added)). Therefore, "intent to discriminate on an unlawful basis is a necessary element of an action brought by the United States Attorney General." *King v. Laborers Int'l Union of N. Am., Union Loc. No. 818*, 443 F.2d 273, 278 (6th Cir. 1971); *accord EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273–74, 1287 (11th Cir. 2000); *United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 442 (5th Cir. 1971).

That conclusion is reinforced by the framework the Supreme Court adopted to adjudicate pattern-or-practice claims in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Under *Teamsters*, the Federal Government must "establish a prima facie case" that "racial discrimination [is] *the company's* standard operating procedure." *Id.* at 336, 339 (emphasis added). To do so, plaintiffs must proffer "evidence supporting a rebuttable presumption that an employer acted with *the deliberate purpose and intent of discrimination* against an entire class." *United States v. City of New York*, 717 F.3d 72, 87 (2d Cir. 2013) (emphasis added). The *Teamsters* framework is incompatible with claims that focus on an employer's reaction to *others*' discriminatory conduct, because such allegations do not demonstrate an intentionally discriminatory "standard operating procedure" by the employer. *See Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 552 (9th Cir. 1982) ("That an employer was aware of, or totally indifferent to the racially discriminatory impact of its hiring policies is not of itself sufficient to establish a prima facie case and shift the burden of explanation to the defendant.").

As with Plaintiffs' hostile work environment claim, this threshold legal deficiency disposes of the Federal Government's pattern-or-practice claim. The Federal Government does not even attempt to allege that UCLA intentionally discriminated against *any* Jewish or Israeli employee, *see supra* at 23–24, let alone that it had a "standard operating procedure" of intentionally discriminating against Jewish and Israeli employees as a class, *Teamsters*, 431 U.S. at 336. Indeed, the Federal Government is explicit about the fact that its theory is solely one of

negligence, not of intent. In its pattern-or-practice count, the Federal Government alleges only that "Defendant was, and remains, ***negligent*** in its response to the harassment by failing to take prompt and effective action to correct the hostile work environment for Jewish and Israeli employees at UCLA." U.S. Compl. ¶ 293 (emphasis added); *see also id.* ¶ 295 ("***In failing to correct*** the harassment after notice, Defendant has adopted the harassing conduct as its own acts." (emphasis added)). The Federal Government has thus pleaded itself out of court on its pattern-or-practice claim.

### B. The Federal Government Does Not Plausibly Allege a Pattern-or-Practice Claim

Even if a pattern-or-practice claim based on an employer's negligent response to third-party harassment were hypothetically possible, the Federal Government has not plausibly alleged facts to establish such a prima facie case here.[40]

To plausibly plead a prima facie pattern-or-practice case, the Federal Government must first plead "every element of the hostile work environment cause of action" but on a workplace-wide level—in short, that a reasonable Jewish or Israeli employee would find the work environment at UCLA as a whole to be hostile on a systemic basis. *EEOC v. Int'l Profit Assocs., Inc.,* 2007 WL 3120069, at *5, *17 (N.D. Ill. 2007); *see EEOC v. Burlington Med. Supplies, Inc.*, 536 F. Supp. 2d 647, 656 (E.D. Va. 2008); *Mitsubishi*, 990 F. Supp. at 1073–74. The Federal Government must *also* plausibly allege that UCLA knew or should have known that regular, systematic harassment was occurring but failed to take adequate steps to address the problem. *Int'l Profit Assocs.*, 2007 WL 3120069, at *5, *17; *Mitsubishi*, 990 F. Supp. at 1074. The Federal Government's allegations are insufficient on both counts.

To start, the Federal Government does not plausibly plead that *any* employee

---

[40] To the extent the Federal Government intends to pursue its Section 706 claim, Count VI, using the *Teamsters* framework, *see, e.g.*, *Serrano v. Cintas Corp.*, 699 F.3d 884, 896 (6th Cir. 2012), that claim fails for the same reasons.

actually suffered a hostile work environment to which UCLA failed reasonably to respond. *See supra* Parts II.A.2, II.C-D. To be sure, at *Teamsters* Step I, "the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer[']s discriminating policy." *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 599 F.2d 322, 332 n.24 (9th Cir. 1979), *aff'd*, 446 U.S. 318 (1980). However, the Federal Government must prove that failure to respond reasonably to actionable antisemitic harassment was UCLA's "standard operating procedure," *Teamsters*, 431 U.S. at 336, which in turn requires plausibly alleging that a sizable percentage of Jewish and Israeli employees was subjected to a hostile work environment that UCLA was obligated to, and failed to, address. The fact that the Federal Government cannot identify *any* person with a valid hostile work environment claim defeats its effort to plead that the workplace was pervasively polluted by discrimination and harassment.

Even if the Federal Government Complaint had pleaded plausible allegations of a hostile work environment as to the nine Jewish and Israeli employees whose experiences it catalogues, it would still fall short of data needed to plausibly plead a pattern-or-practice claim against an employer as large as UCLA. *See Teamsters*, 431 U.S. at 336 ("isolated" or "sporadic discriminatory acts" not enough). Here, the Federal Government chose to attempt to allege a standard policy of discrimination, not in particular workplaces within UCLA or as to particular subsets of employees, but as to UCLA as a whole. *See United States v. S.D. Dep't of Soc. Servs.*, 344 F. Supp. 3d 1055, 1066 (D.S.D. 2018) ("Courts permit an examination of discrimination both company-wide, within one or more facilities or within a single department of a business."). To sustain such a claim, the Federal Government's allegations of harassment must be correspondingly sweeping. In *Teamsters*, "in addition to substantial statistical evidence of companywide discrimination, the Government (as plaintiff) produced about 40 specific accounts of racial discrimination from particular individuals," which "represented *roughly one account for every eight members of the*

*class*." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358 (2011) (emphasis added).

Here, while the class size is unknown, it is highly implausible that the nine employees discussed in the Federal Government's Complaint represent a significant proportion of all perceived and actual Jewish and Israeli employees at UCLA. Indeed, courts routinely deem inadequate allegations of discrimination by similar numbers of employees—even when (unlike here) they are accompanied by statistical evidence. *See, e.g.*, *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 878–79 (1984) ("anecdotal evidence by three individual employees," including findings that two employees had proven individual racial discrimination claims, insufficient to find "pattern of bankwide discrimination within" specific employee grades); *Apsley v. Boeing Co.*, 691 F.3d 1184, 1203 (10th Cir. 2012) ("handful of statements" out of "workforce of over 10,000 people"); *King v. Gen. Elec. Co.*, 960 F.2d 617, 619, 627 (7th Cir. 1992) (eleven employees); *Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 405 (2d Cir. 1981) ("seven individual incidents" plus insufficiently probative statistics; two individual discrimination victims not enough for pattern-or-practice claim as to one subunit).

Nor can the survey data in the Task Force Report push the Federal Government's pattern-or-practice claim over the plausibility line. While the Task Force Report is extremely important to UCLA's ongoing efforts to combat antisemitism, its survey is an inappropriate basis to measure actionable harassment against UCLA's entire Jewish and Israeli employee population, as explained earlier. *See supra* at 32–33. Nor would the addition of the survey respondents to this case cure this claim's defect. *Teamsters*, 431 U.S. at 336. The Eighth Circuit has found, for instance, that evidence of "about 50 incidents which occurred over a ten-year period" along with "other evidence of classwide discrimination" did "not approach the oppressive work atmosphere" needed to prove a class hostile work environment claim under *Teamsters*. *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 481 (8th Cir. 1984). Another court found that "333 [employees'] statements allege[d] facts which,

if proven, could constitute sexual harassment," but that this did not show a pattern or practice when many allegations were about coworkers or low-level supervisors, many were never reported to management, and the defendant had employed over 90,000 women, so that not "even a substantial minority of Defendant's female employees experienced harassment." *EEOC v. Carrols Corp.*, 2005 WL 928634, at *4–5 (N.D.N.Y. Apr. 20, 2005). Thus, even if the Court were to take into account the survey respondents (which it should not, for the reasons explained *supra* at 32–33), the Federal Government still cannot plausibly plead a pattern or practice implicating UCLA's vast community of Jewish and Israeli employees.

## IV. DRS. SHAMSA AND HOLLOWAY'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW (FEDERAL GOVERNMENT COUNTS III, V; IP COUNTS II AND V AS TO DR. HOLLOWAY)

Neither Complaint states a viable retaliation claim on behalf of Drs. Shamsa and Holloway. To plead a retaliation claim, an employee must allege facts from which it is reasonable to infer that: (1) they engaged in a protected activity; (2) their employer subjected them to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th Cir. 2024) (Title VII); *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 472 (2005) (FEHA).

***Dr. Shamsa:*** The Federal Government asserts that Dr. Shamsa experienced "loss of promotional opportunities as a result of his complaints of antisemitism," U.S. Compl. ¶¶ 238, 311, but the Complaint fails to allege what opportunities Dr. Shamsa sought, when he sought them, or who denied them. Indeed, the Federal Government does not even allege that whoever failed to promote Shamsa was aware of his EEOC charge. *Compare Kama*, 107 F.4th at 1062; *Reed v. Avis Budget Grp., Inc.*, 472 F. App'x 525, 526 (9th Cir. 2012). Consequently, these allegations provide no plausible basis to infer that any adverse action occurred *after* Dr. Shamsa's complaints, let alone that any actions were motivated by an improper purpose. *See Kama*, 107 F.4th at 1060, 1062. Tellingly, Dr. Shamsa himself does not assert an individual retaliation

claim, and his own allegations contain nothing about retaliation, let alone a loss of alleged promotional opportunities. *See* IPAC ¶¶ 316–51.

***Dr. Holloway:*** The Complaints fail to allege that Dr. Holloway experienced any cognizable adverse employment action. The Federal Government asserts that Dr. Holloway suffered an adverse employment action when UCLA "unnecessarily informed all faculty in [his] department that he filed an EEOC charge," U.S. Compl. ¶ 305, as part of a request "to preserve any emails relating to him," *id.* ¶ 212. But courts have refused to treat standard litigation hold letters that employers are legally obligated to issue—like UCLA was here—as adverse employment actions. *Connor v. Off. of Atty. Gen. of Tex.*, 2015 WL 1004304, at *6 (W.D. Tex. Mar. 5, 2015); *accord Bradley v. Pfizer, Inc.*, 2011 WL 13168986, at *8 (N.D. Ga.), *R. & R. adopted*, 2011 WL 13175434 (N.D. Ga.), *aff'd*, 440 F. App'x 805 (11th Cir. 2011).

Dr. Holloway's allegations, meanwhile, make no mention of the hold request. *See* IPAC ¶¶ 123–68. Instead, Dr. Holloway largely restates his hostile work environment allegations. *See supra* at 30–31. However, a retaliation claim requires an employee to allege retaliatory action in response to legally protected activity. *See Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994, amended Nov. 14, 1994); *Kama*, 107 F.4th at 1063. At most, Dr. Holloway alleges that he was "asked" to stop voting in personnel matters while on medical leave and that other faculty raised "concerns" about him when he sought to transfer departments. IPAC ¶¶ 162–63. But even assuming that "asking" Dr. Holloway to refrain from voting while on medical leave could be an adverse employment action, Dr. Holloway fails to allege that UCLA personnel made that request based on protected activity. *See Ashcroft v. S. Cal. Permanente Med. Grp.*, 763 F. Supp. 3d 1133, 1141 (S.D. Cal. 2025) ("Plaintiff fails to establish a causal nexus between her [protected activity] and subsequent adverse employment action."). And as for unidentified faculty raising "concerns" about him, Dr. Holloway fails to specify their concerns or tie them to any employment action undertaken by UCLA. *See* IPAC ¶ 163.

## V. TWO OF THE REMAINING INDIVIDUALS' CLAIMS LIKEWISE FAIL AS A MATTER OF LAW BECAUSE THEY ARE NOT UC EMPLOYEES (IP COUNTS I, III, IV)

Apart from Drs. Shamsa and Holloway, several other IPs have brought claims under Title VII and FEHA. Each is meritless, which is presumably why the Federal Government did not assert individual claims on their behalf. For example, the remaining IPs allege hostile work environment claims that involve harassment by third parties who are not UCLA agents and First Amendment protected speech. *See, e.g.*, IPAC ¶¶ 46, 58–59, 182, 238, 295, 371, 383. However, the instant motion focuses solely on cross-cutting issues that should result in dismissal of the Federal Government's Complaint, Dr. Shamsa's and Dr. Holloway's allegations, and much of the remaining IPs' allegations. The Court's rulings on the issues raised herein may narrow or dispose of many of the remaining IPs' claims. Once the Court appropriately rules on this motion, UCLA expects to move as to whatever IPs' claims remain either in motions for judgment on the pleadings or for summary judgment. Thus, with two exceptions, UC refrains from moving to dismiss the additional IPs' claims on plaintiff-specific bases.

The Court should dismiss Dr. Burt's Title VII and FEHA claims and Dr. Stein's Title VII claim because neither was an employee of the University. Dr. Burt by her own admission is a retired professor emeritus. Dr. Stein alleges she was an unpaid volunteer. Only employees are entitled to relief under Title VII, with FEHA providing certain protections for volunteers. Accordingly, Dr. Burt's Title VII and FEHA claims and Dr. Stein's Title VII claim should be dismissed as a matter of law. *See Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945 (9th Cir. 2010); *Shephard v. Loyola Marymount Univ.*, 102 Cal. App. 4th 837, 842 (2002). That is because "courts have found Title VII inapplicable" where "there is no evidence of compensation." *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 219 (4th Cir. 1993); *Mendoza v. Town of Ross*, 128 Cal. App. 4th 625, 636 (2005) (requiring "substantial benefits" under FEHA). Drs. Burt and Stein fail to allege that they

received compensation from UCLA so as to make them "employees."

As to Dr. Burt, she concedes that she retired from UCLA in 2004, IPAC ¶ 226, and fails to allege that she received any remuneration for her work in retirement. *See United States v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004). Emeritus status "is an honorific title which in itself provides few actual privileges beyond the right to add 'Emerita/us' to the job title held at the time of retirement." *See* Teleanu Decl. Ex. 16.[41] While emeritus faculty may be recalled for a paid appointment, *id.*, here, Dr. Burt fails to allege she was recalled. Dr. Burt's allegations that UCLA scheduled and supervised her clinical work, IPAC ¶¶ 226–27, do not go to compensation. And although Dr. Burt alleges that she received "pension benefits, health insurance, and malpractice insurance," *id.* ¶ 227, pension benefits are tied to prior employment, and any insurance is merely incidental to work performed. *City of New York*, 359 F.3d at 92.

Dr. Stein concedes she "did not receive a salary," IPAC ¶ 277, but alleges that she nonetheless "received valuable and substantial benefits with significant monetary value," including access to the library, UCLA's medical database, the UCLA Recreational Center, sports ticket discounts, UCLA's mail system, and malpractice coverage. *Id.* But, those "benefits" are not remuneration for her services. Nor do allegations that DGSOM billed for Dr. Stein's services or labeled volunteer faculty

[41] Teleanu Decl. Ex. 16 (UCLA Academic Affairs and Personnel, Emeriti Rights). The Court may judicially notice this publicly available webpage of a public institution. *See supra* n.4. The Court may also consider this exhibit because the IPAC incorporates it by reference by repeatedly alleging that Intervenor Plaintiff Vivien Burt's claims are grounded in her alleged status as an emeritus professor. IPAC ¶¶ 20, 224, 226–27; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted) (finding it "proper to incorporate" documents by reference "even though the complaint did not 'allege or describe [their] contents" when "the claim necessarily depended on them"); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), as amended (July 28, 1998) (incorporating by reference group health plan documents not explicitly cited in complaint when plaintiff's claims "rest[ed] on his membership in [the] plan and on the terms of the plan").

"employees," *id.* ¶¶ 275, 280, show that Stein herself received remuneration. "Unpaid employees … must make some showing of remuneration by alleging '*substantial benefits' … for services rendered*." *Woodson v. California*, 2016 WL 6568668, at *5 (E.D. Cal. Nov. 4, 2016) (emphasis added); *City of New York*, 359 F.3d at 92; *Mendoza*, 128 Cal. App. 4th at 636. *Cf. Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 471–73 (2d Cir. 1999). Here, Dr. Stein's access to various "benefits" are similar to what UCLA students also receive, or—in the case of malpractice insurance—are incidental to her work as a volunteer clinical faculty member. *See City of New York*, 359 F.3d at 92. Dr. Burt's claims and Dr. Stein's Title VII claim thus fail as a matter of law and should be dismissed.

## VI. THE IPS' FAILURE-TO-PREVENT DISCRIMINATION CLAIM UNDER FEHA SHOULD BE DISMISSED BECAUSE THEY DO NOT ASSERT UNDERLYING DISCRIMINATION CLAIMS (IP COUNT IV)

Finally, to the extent the IPs' FEHA Failure to Prevent Discrimination and/or Harassment claim is premised on discrimination, it should be dismissed. *See* IPAC ¶¶ 490–509. A FEHA failure-to-prevent claim is entirely derivative of a principal discrimination or harassment claim. *See Martin v. Bd. of Trs. of Cal. State Univ.*, 97 Cal. App. 5th 149, 173 (2023) ("An actionable claim under section 12940, subdivision (k) for failure to prevent discrimination or harassment is dependent of actual discrimination or harassment." (alterations omitted)); *Dickson v. Burke Williams, Inc.*, 234 Cal. App. 4th 1307, 1314 (2015). Because the Failure-to-Prevent claim is dependent on an underlying claim of actual discrimination, and the IPs only assert harassment and retaliation claims under FEHA, IPAC ¶¶ 474–89, 510–21, they have failed to state a FEHA failure-to-prevent claim premised on discrimination.

## CONCLUSION

The Court should dismiss the Federal Government's Complaint in full, with prejudice, and without leave to amend, and should dismiss the specific counts in the IP Amended Complaint as set forth more fully above.

Respectfully submitted,

Dated: October 26, 2026

By: /s/ Adam Karr

ADAM KARR (S.B. #212288)
akarr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2811
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

K. LEE BLALACK II (*pro hac vice*)
lblalack@omm.com
MEAGHAN VERGOW (*pro hac vice*)
mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
JENNIFER SOKOLER (*pro hac vice*)
jsokoler@omm.com
ANTON METLITSKY (*pro hac vice*)
ametlitsky@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant The Regents of The University of California*

**CERTIFICATE OF COMPLIANCE WITH THE WORD COUNT**

The undersigned, counsel of record for Defendant, certifies that this brief contains 14,492 words, which complies with the word limit set by court order dated September 18, 2026. ECF No. 76 (citing Court-ordered 15,000 word limit for Defendant's consolidated Motion to Dismiss); *see also* ECF No. 58 (setting Court-ordered 15,000 word limit for Defendant's consolidated Motion to Dismiss).

Dated: October 26, 2026

Respectfully submitted,

By: */s/ Adam Karr*
Adam Karr
*Attorney for Defendant*