**HORVITZ & LEVY LLP**
JEREMY B. ROSEN (Bar No. 192473)
*jrosen@horvitzlevy.com*
REBECCA A. MARCYES (Bar No. 347365)
*rmarcyes@horvitzlevy.com*
505 Sansome Street, Suite 1550
San Francisco, CA 94111-3149
(415) 462-5600 • FAX (844) 497-6592

Attorneys for Amici Curiae

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No. 2:26-cv-01946-CAS-AS

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF; [PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG AND ROGER WALDINGER IN SUPPORT OF DEFENDANT**

Hearing on Motion to Dismiss
Date: February 1, 2027
Time 10:00 a.m.
Crtrm: 8D
Action Filed: Feb. 24, 2026
Judge: Hon. Christina A. Snyder

## CORPORATE DISCLOSURE STATEMENT

Amici curiae Professors David Blank, Craig R. Fox, Carole E. Goldberg, Andrea S. Goldman, Jonathan R. Hiatt, Carlos Lerner, Barney A. Schlinger, Samuel A. Skootsky, Neal Stulberg, and Roger Waldinger are individuals with no parent organizations, subsidiaries, or publicly traded ownership interests. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for a party authored the attached brief in whole or in part; no party or party's counsel contributed money intended to fund its preparation or submission; and no person other than amici or their counsel contributed money intended to fund its preparation or submission.

November 2, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
REBECCA A. MARCYES

By: Rebecca A. Marcyes

Attorneys for Amici Curiae
**PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG, AND ROGER WALDINGER**

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF ..... 1

[PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG, AND ROGER WALDINGER IN SUPPORT OF DEFENDANT ..... 2

I. INTERESTS OF AMICI CURIAE ..... 2

II. INTRODUCTION ..... 4

III. BACKGROUND FACTS ..... 4

IV. ARGUMENT ..... 8

- A. The Regents cannot be liable under Title VII unless discrimination against Jewish employees at UCLA is so severe or pervasive that it creates a hostile work environment. ..... 8
- B. Antisemitic incidents have occurred at UCLA, but antisemitism does not pervade the institution. ..... 10
  - 1. The Task Force Report ..... 10
  - 2. UCLA's decentralized structure impedes campus-wide ideological takeovers ..... 11
  - 3. UCLA has taken—and continues to take—meaningful and lawful steps to address antisemitism. ..... 12
    - a. A public university's efforts to rid its campus of antisemitic speech are circumscribed by the First Amendment. ..... 12
    - b. UCLA continues to strike a balance between respecting protected speech and protecting civil rights. ..... 12

V. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Coll. Republicans at S.F. State Univ. v. Reed*,
523 F.Supp.2d 1005 (N.D. Cal. 2007) .......... 5

*EEOC v. Sunbelt Rentals, Inc.*,
521 F.3d 306 (4th Cir. 2008) .......... 9

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) .......... 9

*Frankel v. Regents of Univ. of Cal.*,
744 F.Supp.3d 1015 (C.D. Cal. 2024) .......... 4, 5, 7, 15

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) .......... 8, 9

*Healy v. James*,
408 U.S. 169 (1972) .......... 6, 12

*Kortan v. Cal. Youth Auth.*,
217 F.3d 1104 (9th Cir. 2000) .......... 9

*Manatt v. Bank of Am.*,
339 F.3d 792 (9th Cir. 2003) .......... 9

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .......... 9

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 9

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) .......... 12

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .......... 12

*Vasquez v. County of Los Angeles*,
349 F.3d 634 (9th Cir. 2003) .......... 9

*Wooten v. Bd. of Trs., Fla. A & M Univ.*,
426 F.Supp.2d 1261 (N.D. Fla. 2006) .................... 9

## Statutes

42 U.S.C. § 2000e-2(a) .................... 8

Civil Rights Act of 1964
Title VI .................... 6, 14
Title VII .................... 4, 8, 9, 10, 14

## Rules

Fed. R. App. P. 29(a)(4) .................... 1

## Miscellaneous

*A Stand Against Violence in Our Community*, UCLA Off. of the Chancellor (Feb. 12, 2025), https://chancellor.ucla.edu/messages/a-stand-against-violence-in-our-community [https://perma.cc/QV6S-Q6ZG] .................... 13

*A Statement from UC President Michael V. Drake, M.D., on Free Speech and Campus Protests*, U.C. (Apr. 30, 2024), https://www.universityofcalifornia.edu/press-room/statement-uc-president-michael-v-drake-md-free-speech-and-campus-protests [https://perma.cc/86L5-525H] .................... 7

*About the Center*, UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/about [https://perma.cc/LDX2-ZTDL] .................... 7

*Academic Senate - Los Angeles Division,* UCLA Acad. Senate, https://senate.ucla.edu/about/about-us [https://perma.cc/2AXE-MUQ4] .................... 11

*2026 Campus Antisemitism Report Card*, Anti-Defamation League (Mar. 10, 2026), https://www.adl.org/campus-antisemitism-report-card/university-california-los-angeles [https://perma.cc/C64S-P5RT] .................... 13

*From Los Angeles to Palestine: A Report from UCLA's Palestine Solidarity Encampment,* Positions Politics, https://positionspolitics.org/from-los-angeles-to-palestine-a-report-from-uclas-palestine-solidarity-encampment/ [https://perma.cc/98E7-VHA9] ........ 5

*Harassment*, U.S. Equal Emp. Opportunity Comm'n, www.eeoc.gov/harassment [https://perma.cc/D5JB-3CLG] ........ 8

*Impact Report*, Hillel at UCLA, https://uclahillel.org/impact/ [https:perma.cc/DD2E-WFSB] ........ 13

Jaweed Kaleem, *UCLA Bans Students for Justice in Palestine as a Campus Organization*, L.A. Times (Mar. 28, 2025), https://www.latimes.com/california/story/2025-03-28/ucla-bans-students-for-justice-in-palestine-as-a-campus-organization [https://perma.cc/Z6DZ-RL7F] ........ 14

Isaac Barnes May, *Sabbath Accommodations as a Civil Right: Jewish History, Title VII, and the Path to* Groff v. DeJoy, 19 FIU L. Rev. 873, (2025)........ 4

*Our Community Is in Deep Pain*, UCLA Newsroom (May 2, 2024), https://newsroom.ucla.edu/our-community-is-in-deep-pain [https://perma.cc/4RH7-TVEQ] ........ 7

Christina H. Paxon, *A University's Responsibility*, Sapir (May 13, 2025), https://sapirjournal.org/activism/2025/a-universitys-responsibility/ [https://perma.cc/ 4R9P-YF9G] ........ 5

Memorandum from Charles F. Robinson, General Counsel & Senior Vice President, U.C. (May 21, 2024), https://www.politico.com/f/?id=0000018f-a2d6-dccf-a9ef-f6fe55c50000 [https://perma.cc/7HYJ-K3CU] ........ 6

*Study Abroad in Israel,* UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/studyabroad [https://perma.cc/4K4Y-K7KH] ........ 7

UC Acad. Senate, *Shared Governance and Organization of the Academic Senate* 1 (Sep. 1, 2026), https://senate.universityofcalifornia.edu /_files/resources/shared-governance-academic-senate-organization.pdf [https://perma.cc/L9XG-2V4P] ........ 11

UC Off. of the President, *Frankel Settlement Fact Sheet* 1 (2025), https://www.universityofcalifornia.edu/sites/default/files/2025-07/frankel-settlement-fact-sheet.pdf [https://perma.cc/7SJU-GF25] ........ 8

UC Off. of the President, *Statement from Board of Regents Chair Richard Leib* (May 1, 2024), https://www.universityofcalifornia.edu/press-room/statement-board-regents-chair-richard-leib-0 [https://perma.cc/M6ED-BAAL] ........ 6

UC Off. of the President, *University of California Statement on Divestment* (Apr. 26, 2024), https://www.universityofcalifornia.edu/press-room/university-california-statement-divestment [https://perma.cc/24M2-RKFW] ........ 7

UC Off. of the President, *What They're Saying: California Jewish Leaders Support the University of California System* (Aug. 13, 2025), https://www.universityofcalifornia.edu/press-room/what-theyre-saying-california-jewish-leaders-support-university-california-system [https://perma.cc/WDG7-YFLC] ........ 13

UCLA Antisemitism Action Grp., *UCLA Initiative to Combat Antisemitism Action Group Report* 6–8, 23, 34 (2026), https://chancellor.ucla.edu/wp-content/uploads/2026/05/Initiative-to-Combat-Antisemitism-Roadmap-Final-1.pdf [https://perma.cc/R4TR-G3NV] ........ 14

UCLA, *Important Reminders for Public Expression Activities* (2025), https://ucla.app.box.com/s/uvram5s9asgq7li2kfxf0xtaku10zo3k [https://perma.cc/S9XM-WS95] ........ 14

UCLA Off. of Equity, Diversity & Inclusion, *Free Speech on Campus: the Basics, the Myths, the Challenges* 1 (2023), https://ucla.app.box.com/v/free-speech-on-campus [https://perma.cc/JQ3M-CLKS] ........ 12, 13

*Violent Attacks Abroad*, UCLA Newsroom (Oct. 9, 2023), https://newsroom.ucla.edu/violent-attacks-abroad [https://perma.cc/D59Z-3NGR]........ 5

*Y&S Nazarian Center Sign MOU with the Hebrew University of Jerusalem*, UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/article/298375 [https://perma.cc/V6QE-QF5Y]........ 7

Timothy Zick, *New Threats to Campus Protest* First Amend. L. Rev. 355, (2024)........ 6

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), amici curiae Professors David Blank, Craig R. Fox, Carole E. Goldberg, Andrea S. Goldman, Jonathan R. Hiatt, Carlos Lerner, Barney A. Schlinger, Samuel A. Skootsky, Neal Stulberg and Roger Waldinger respectfully move for leave to file the attached proposed brief in support of Defendant's motion to dismiss. It complies with page-limit and disclosure requirements.

The proposed brief will assist the Court by illuminating the considerations facing UCLA administrators tasked with steering the university after October 7, and by widening the lens on Jewish faculty experience at UCLA. Pursuant to Local Rule 7-3, counsel for amici conferred with counsel for all parties on October 30, 2026. Defendant consents to the filing of this brief. All Plaintiffs oppose this motion.

The brief bears on the pending motion to dismiss because it explains why antisemitism is not so pervasive at UCLA as to warrant federal intervention. Plaintiffs' objection to the filing of this brief is founded on the belief that at least one amici might be a witness in the case. Amici do not believe that is correct, but even if true, amici should be permitted to share their personal perspectives in their private capacities. Amici respectfully request leave to file the attached brief.

November 2, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
REBECCA A. MARCYES

By: [signature]
Rebecca A. Marcyes

Attorneys for Amici Curiae
**PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG, AND ROGER WALDINGER**

HORVITZ & LEVY LLP
JEREMY B. ROSEN (Bar No. 192473)
*jrosen@horvitzlevy.com*
REBECCA A. MARCYES (Bar No. 347365)
*rmarcyes@horvitzlevy.com*
505 Sansome Street, Suite 1550
San Francisco, CA 94111-3149
(415) 462-5600 • FAX (844) 497-6592

Attorneys for Amici Curiae

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No. 2:26-cv-01946-CAS-AS

**[PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG, AND ROGER WALDINGER IN SUPPORT OF DEFENDANT**

Hearing on Motion to Dismiss
Date: February 1, 2027
Time 10:00 a.m.
Crtrm: 8D
Action Filed: Feb. 24, 2026
Judge: Hon. Christina A. Snyder

## I. INTERESTS OF AMICI CURIAE

Amici are Jewish scholars and professors at University of California, Los Angeles (UCLA), from different corners of academia, with varying levels of seniority. Amici have no financial stake in this case and submit this brief to assist the Court with the administrative dimensions of the issues presented.

The government's case rests on the premise that antisemitism pervades UCLA enough to warrant federal intervention. (*See* Compl. at 75–79.) Testing that

premise requires understanding not just incidents, but the institution itself, its structure, and its diverse Jewish community. Amici, with decades of academic and administrative experience across UCLA's departments, schools, centers, programs, and offices, are uniquely positioned to provide that perspective.

Distinguished Professor of Biology and Physiology **Barney A. Schlinger** began his postdoc in a UCLA psychology laboratory in 1988 and has taught there for nearly forty years. He is Associate Dean for Academic Personnel in the Division of Life Sciences, chaired his department for nine years, and co-directs UCLA's Laboratory of Neuroendocrinology.

Distinguished Research Professor and Jonathan D. Varat Distinguished Professor of Law Emerita **Carole E. Goldberg** joined the UCLA faculty in 1972. She chaired the UCLA Academic Senate and served five years as Vice Chancellor of Academic Personnel, overseeing campuswide faculty hiring and promotion. Partially retired since 2018, she still mentors senior administrators, including Vice Chancellors, Deans, and Vice Provosts. She established the joint degree program in Law and American Indian Studies, and has served as Chief Justice of the highest courts of the Pechanga Band of Indians and the Hualapai Tribe. The Federated Indians of Graton Rancheria endowed a chair in her honor: the Carole Goldberg Professor of Native American Law at UCLA School of Law.

Both amici are Jewish and have personal experience with antisemitism. Professor Schlinger was born and raised in Texas, where his great-great-grandfather, an Austrian Jew, settled in the mid-1800s. Despite routinely encountering antisemitism, he grew up proud to be a fourth-generation Jewish Texan.

Professor Goldberg was raised in a Jewish neighborhood in Chicago, where restrictive covenants barred Jews from buying homes in an adjacent neighborhood. *See* Isaac Barnes May, *Sabbath Accommodations as a Civil Right: Jewish History, Title VII, and the Path to* Groff v. DeJoy, 19 FIU L. Rev. 873, 880 (2025). Her grandparents immigrated in the early 1900s. All but one of her relatives who

remained in Europe were murdered in the Holocaust.

Amici know antisemitism when they see it. Yet in their decades-long careers, neither Professor Schlinger nor Professor Goldberg has experienced antisemitism at UCLA. That does not mean no one else has. But it demonstrates what the government's complaint obscures: Jewish faculty experience at UCLA varies widely. A flare-up of antisemitic incidents during a turbulent moment does not establish pervasive antisemitism warranting immediate judicial and executive oversight.

This brief highlights the experiences of Professors Schlinger and Goldberg; Appendix A lists all amici who support its perspective.

## II. INTRODUCTION

The government's case depends on the premise that antisemitism so pervades UCLA that ongoing Department of Justice intervention is required. But Title VII is not triggered whenever an employee is offended at work, even when taking offense is entirely warranted. It requires discrimination severe or pervasive enough to create a hostile work environment. That demanding standard is not met here—especially given UCLA's settlement of the prior *Frankel* litigation and the new administration's aggressive efforts to combat antisemitism.

The incidents documented in the Complaint are upsetting, but they must be analyzed in the context of a public university bound by the First Amendment and home to Jewish faculty whose experiences vary widely across disciplines, departments, and individuals. This variation guards against ideological uniformity. And UCLA's new leadership should be permitted to complete its corrective work before any judicial intervention.

## III. BACKGROUND FACTS

Following October 7, 2023, UCLA—like campuses nationwide—experienced a surge of pro-Palestinian activism. Universities were unprepared. "[M]any . . . did not have experience managing a flavor of activism that most of us had neither

encountered nor even imagined: activism that set groups of students against each other." Christina H. Paxson, *A University's Responsibility*, Sapir (May 13, 2025), https://sapirjournal.org/activism/2025/a-universitys-responsibility/ [https://perma.cc/4R9P-YF9G].

UCLA initially called for calm, condemning the Hamas-led attacks as "horrific and heart-wrenching" acts of terrorism and urging the campus community to "not allow anguish over what is occurring internationally to turn into resentment or mistreatment of our fellow Bruins at home." *Violent Attacks Abroad*, UCLA Newsroom (Oct. 9, 2023), https://newsroom.ucla.edu/violent-attacks-abroad [https://perma.cc/D59Z-3NGR].

The calm did not hold. As the year progressed, the administration received numerous complaints of antisemitic harassment. In late April 2024, calls for boycott and divestment culminated in an encampment on Royce Quad, where protesters threatened to remain until UCLA met their "demands": disclose funds, divest from Israel, abolish campus police, and "acknowledge the genocide." *From Los Angeles to Palestine: A Report from UCLA's Palestine Solidarity Encampment*, Positions Politics, https://positionspolitics.org/from-los-angeles-to-palestine-a-report-from-uclas-palestine-solidarity-encampment/ [https://perma.cc/98E7-VHA9] (last visited Oct. 22, 2026). Zionists were barred from the encampment; "guards" required students to display wristbands at checkpoints. *Frankel v. Regents of Univ. of Cal.*, 744 F.Supp.3d 1015, 1021 (C.D. Cal. 2024). Three Jewish individuals were barred from crossing the quad after refusing to denounce Israel.

UCLA faced a difficult balance. *See Coll. Republicans at S.F. State Univ. v. Reed*, 523 F.Supp.2d 1005, 1014 (N.D. Cal. 2007) ("[T]he need to accommodate important competing interests makes it difficult to draw bright line distinctions in much First Amendment jurisprudence . . . ."). As a recipient of federal funds, UCLA was bound by federal civil rights laws, including Title VI of the Civil Rights Act. *See* Memorandum from Charles F. Robinson, General Counsel & Senior Vice

President, U.C. (May 21, 2024), https://www.politico.com/f/?id=0000018f-a2d6-dccf-a9ef-f6fe55c50000 [https://perma.cc/7HYJ-K3CU]. But as a public university, UCLA was also bound by the First Amendment—a constraint private universities do not share. *Id.*; *see* Timothy Zick, *New Threats to Campus Protest*, 23 First Amend. L. Rev. 355, 367 (2024) (noting "private universities are not required to comply with the First Amendment"). As a state actor, UCLA cannot limit protected speech to enforce Title VI. Memorandum from Charles F. Robinson, *supra*; *see Healy v. James*, 408 U.S. 169, 187–88 (1972) (holding a state college "acting . . . as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by the group to be abhorrent"). UCLA must tolerate even repugnant speech.

The Regents declared that "the University of California will not tolerate violations of the law or University policy on our campuses, including unlawful encampments, hate speech, and other forms of protest not protected by the First Amendment. While we understand the passions surrounding Israel and Gaza, no cause is free from the consequences of conduct on our campuses." UC Off. of the President (hereafter, UCOP), *Statement from Board of Regents Chair Richard Leib*, (May 1, 2024), https://www.universityofcalifornia.edu/press-room/statement-board-regents-chair-richard-leib-0 [https://perma.cc/M6ED-BAAL].

UCLA did not capitulate. On April 26, 2024, the university reiterated its opposition to boycott and divestment.[1] UCOP, *University of California Statement on Divestment* (Apr. 26, 2024), https://www.universityofcalifornia.edu/press-room/university-california-statement-divestment [https://perma.cc/24M2-RKFW]. On April 30, the administration acknowledged "[t]he right to protest . . . is among the most important privileges of a democracy," but stressed that it is not "absolute . . . . [D]isruptive unlawful protests that violate the rights of our fellow citizens are unacceptable and cannot be tolerated." *A Statement from UC President Michael V. Drake, M.D., on Free Speech and Campus Protests*, U.C. (Apr. 30, 2024), https://www.universityofcalifornia.edu/ press-room/statement-uc-president-michael-v-drake-md-free-speech-and-campus-protests [https://perma.cc/86L5-525H]. The next day, campus and Los Angeles police cleared the encampment. *Our Community Is in Deep Pain*, UCLA Newsroom (May 2, 2024), https://newsroom.ucla.edu/our-community-is-in-deep-pain [https://perma.cc/4RH7-TVEQ].

The Jewish students excluded from the encampment brought federal and state constitutional claims and obtained a preliminary injunction in August 2024. *Frankel*,

[1] Far from boycotting Israeli academics, UCLA welcomes them. It is home to the Nazarian Center for Israel Studies, which offers robust programming and supports academic collaboration with Israeli academics. *See About the Center*, UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/about [https://perma.cc/LDX2-ZTDL] (last visited Oct. 23, 2026). UCLA students can study abroad in Israel at Hebrew University, the Technion, and Ben Gurion University. *Study Abroad in Israel*, UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/studyabroad [https://perma.cc/4K4Y-K7KH] (last visited Oct. 23, 2026). In September 2026, Chancellor Frenk signed a five-year-long Memorandum of Understanding with the President of Hebrew University to encourage various forms of scholarly exchange. *Y&S Nazarian Center Sign MOU with the Hebrew University of Jerusalem*, UCLA Younes & Soraya Nazarian Ctr. for Isr. Stud., https://www.international.ucla.edu/israel/article/298375 [https://perma.cc/V6QE-QF5Y] (last visited Oct. 23, 2026).

744 F.Supp.3d at 1020. UCLA did not dispute exclusions had occurred but argued third parties perpetrated them. *Id.* The court nonetheless ruled, "UCLA may not allow services to some students when [it] knows that other students are excluded on religious grounds." *Id.*

Rather than appeal, the Regents in July 2025 settled with the plaintiffs and entered a consent judgment with a fifteen-year term. Consent J. & Permanent Inj., *Frankel v. Regents of Univ. of Cal.*, 744 F.Supp.3d 1015 (C.D. Cal. 2024) (No. 2:24-cv-04702-MCS-PD). The Regents also agreed to donate $2.65 million to UCLA's Initiative to Combat Antisemitism and to eight Jewish organizations. UCOP, *Frankel Settlement Fact Sheet* 1 (2025), https://www.universityofcalifornia.edu/sites/default/files/2025-07/frankel-settlement-fact-sheet.pdf [https://perma.cc/7SJU-GF25].

Julio Frenk, who became UCLA's seventh chancellor in January 2025, has condemned antisemitism and taken concrete steps to protect Jewish students and faculty. *See infra* Part IV.B.3.

## IV. ARGUMENT

### A. The Regents cannot be liable under Title VII unless discrimination against Jewish employees at UCLA is so severe or pervasive that it creates a hostile work environment.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on, among other things, race, religion, or national origin. 42 U.S.C. § 2000e-2(a).

Workplace harassment is discrimination prohibited by Title VII, but not all offensive conduct is actionable. Harassment becomes unlawful only when "enduring the offensive conduct becomes a condition of continued employment" or when "the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive." *Harassment*, U.S. Equal Emp. Opportunity Comm'n, www.eeoc.gov/harassment

[https://perma.cc/D5JB-3CLG] (last visited Oct. 26, 2026); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (defining hostile work environment as one "permeated with 'discriminatory intimidation, ridicule, and insult'" (citation omitted)).

Courts assess the totality of the circumstances, examining "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S. at 23). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998).

Not every offensive or bigoted workplace encounter creates Title VII liability. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("Title VII [must] not become a 'general civility code.'" (citation omitted)); *Wooten v. Bd. of Trs., Fla. A & M Univ.*, 426 F.Supp.2d 1261, 1269 (N.D. Fla. 2006) ("[F]ederal courts do not sit as super-personnel boards."). Isolated incidents—unless extraordinarily severe—do not suffice. *See Manatt v. Bank of Am.*, 339 F.3d 792, 799 (9th Cir. 2003) (no hostile work environment where "regrettable incidents," though racially offensive and upsetting to the plaintiff, occurred twice in two-and-a-half years); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643–44 (9th Cir. 2003) (no hostile environment where employee was told he should work in the field because "Hispanics do good in the field" and was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (no hostile work environment where remarks, though unquestionably offensive, were "mainly made in a flurry" on one occasion); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) ("'[R]ude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a routine

difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII." (second, third, and fourth alterations in original) (citations omitted)).

### B. Antisemitic incidents have occurred at UCLA, but antisemitism does not pervade the institution.

#### 1. The Task Force Report

Within six months of October 7, 2023, UCLA's interim chancellor established a Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA. Its October 2024 report documented antisemitic incidents, chronicled campus events, and analyzed a survey of 428 Jewish and Israeli members of the UCLA community. (*See* Rep. at 11, 44.) Based on "findings of broad-based perceptions of antisemitic and anti-Israeli bias on campus," the Report made five recommendations: (1) provide relevant training and education; (2) overhaul the discrimination-reporting system; (3) clarify rules; (4) enforce laws and rules in a "consistent, timely, and effective" manner; and (5) take "specific actions to protect and support" Jews and Israelis. (Rep. at 2.)

Amici do not minimize the Report's findings. It is troubling that more than half of faculty respondents considered leaving UCLA due to antisemitism or anti-Israeli bias. (Rep. at 33, 41.) But the Report acknowledges the survey had "several limitations": an inability to generalize from the sample size, "variations of shared definition or terms," and potential "selection bias." (Rep. at 43.) "The responses may have clustered along more distinct or polarized views," and "people with more difficult or painful experiences" may have been more likely to participate. (*Id.*) Critically, the survey was administered in June 2024, just after the encampment, when tensions peaked. (Rep. at 11.)

Professor Goldberg, for example, does not regard opposition to Israeli policies as inherently antisemitic—and has herself criticized Israeli conduct. But she distinguishes between opposition to *conduct* by the State of Israel and opposition to

the establishment of any Jewish state, i.e., antizionism. Antizionism attacks the religious beliefs of some Jews, and harassing faculty, staff, or students because they are Zionist inevitably has a disparate impact on Jewish members of the UCLA community. In her view, denying the legitimacy of a *Jewish* state because it is religiously and ethnically grounded while accepting the legitimacy of other nations similarly organized reflects antipathy toward Jews. But she has not felt personally impacted by antizionist expression on campus, none of which Defendants have endorsed.

By contrast, Professor Schlinger—in a testament to UCLA's decentralized departmental subcultures, *see infra* Part IV.B.2—remained largely insulated from the campus-protest controversy. He has never experienced antisemitism at UCLA and does not recall hearing Jewish students or colleagues describe witnessing it on campus.

**2. UCLA's decentralized structure impedes campus-wide ideological takeovers.**

UCLA's decentralized structure prevents any trend or ideology from becoming pervasive. *See* UC Acad. Senate, *Shared Governance and Organization of the Academic Senate* 1 (Sep. 1, 2026), https://senate.universityofcalifornia.edu/_files/resources/shared-governance-academic-senate-organization.pdf [https://perma.cc/L9XG-2V4P]. Each school or division within the College operates under its own personnel bylaws and procedures. Deans hold final authority over major decisions, including many budgetary matters and some faculty promotions. There is no centralized IT department; IT and HR staff in individual schools report directly to their deans. The system promotes "consultative decision making and shared governance." *Academic Senate – Los Angeles Division*, UCLA Acad. Senate, https://senate.ucla.edu/about/about-us [https://perma.cc/2AXE-MUQ4] (last visited Oct. 27, 2026).

The university comprises highly differentiated disciplinary ecosystems, each with its own culture shaped by population and leadership. Consider Economics and

Sociology, both Departments in the Division of Social Sciences. External labor markets for economists affect salary expectations and self-selection into the field, shaping a departmental culture markedly different from departments with fewer outside opportunities. Departmental climates also vary with faculty personalities and how politically charged the subject matter is.

**3. UCLA has taken—and continues to take—meaningful and lawful steps to address antisemitism.**

**a. A public university's efforts to rid its campus of antisemitic speech are circumscribed by the First Amendment.**

After October 7, the administration confronted sudden, unprecedented vitriol at a large public university constrained by constitutional obligations private institutions do not share. *See supra* Part III. From the start, the Regents and UCLA maintained that protected speech—even deeply offensive speech—would be tolerated, but not at the expense of others' civil rights or the learning environment.

That was legally sound. Public universities "are not enclaves immune from the sweep of the First Amendment." *Healy*, 408 U.S. at 180; *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). "[T]he First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech." *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 671 (1973).

**b. UCLA continues to strike a balance between respecting protected speech and protecting civil rights.**

Two weeks after October 7, UCLA released a memo inviting "the start of a public conversation" and explaining its obligation, as a state actor, to abide by the First Amendment. UCLA Off. of Equity, Diversity & Inclusion, *Free Speech on Campus: the Basics, the Myths, the Challenges* 1 (2023), https://ucla.app.box.com/v/free-speech-on-campus [https://perma.cc/JQ3M-CLKS]. It distinguished content-based from content-neutral restrictions and identified

unprotected speech, like threats and harassment. *Id.* at 4–5.

In spring 2024, the university did not yield to protesters' demands. When a federal court found UCLA had fallen short of protecting Jewish students' civil rights, the Regents did not appeal; they entered a fifteen-year consent decree and committed $2.65 million to combating antisemitism. Under Chancellor Frenk, the institution has charted a new course.

Co-chairs of the California Legislative Jewish Caucus—Assemblymember Jesse Gabriel and State Senator Scott Wiener—credited Chancellor Frenk with UCLA's strides against antisemitism in his first year. UCOP, *What They're Saying: California Jewish Leaders Support the University of California System* (Aug. 13, 2025), https://www.universityofcalifornia.edu/press-room/what-theyre-saying-california-jewish-leaders-support-university-california-system [https://perma.cc/WDG7-YFLC]; *see 2026 Campus Antisemitism Report Card*, Anti-Defamation League (Mar. 10, 2026), https://www.adl.org/campus-antisemitism-report-card/university-california-los-angeles [https://perma.cc/C64S-P5RT] (upgrading UCLA's score from a D to a B). The campus Hillel—which receives no UCLA funding—also approves; its website states that "UCLA increasingly looks to Hillel's senior leadership as a trusted partner in efforts to confront and root out campus antisemitism." *Impact Report*, Hillel at UCLA, https://uclahillel.org/impact/ [https://perma.cc/DD2E-WFSB] (last visited Oct. 27, 2026).

In February 2025, when members of two student groups harassed a Jewish Regent and his family at home, UCLA acted swiftly. Chancellor Frenk issued a video condemning violence against the UCLA community and announcing the groups' interim suspension pending review. *A Stand Against Violence in Our Community*, UCLA Off. of the Chancellor (Feb. 12, 2025), https://chancellor.ucla.edu/messages/a-stand-against-violence-in-our-community [https://perma.cc/QV6S-Q6ZG]. UCLA ultimately banned Students for Justice in

Palestine indefinitely, and its graduate-student counterpart for four years. Jaweed Kaleem, *UCLA Bans Students for Justice in Palestine as a Campus Organization*, L.A. Times (Mar. 28, 2025), https:// www.latimes.com/california/story/2025-03-28/ucla-bans-students-for-justice-in-palestine-as-a-campus-organization [https://perma.cc/Z6DZ-RL7F].

Following the recommendations of the UCLA Initiative to Combat Antisemitism Action Group, which Chancellor Frenk commissioned, UCLA has already:

- appointed an Associate Vice Chancellor for campus safety;
- enhanced time, place, and manner rules for demonstrations;
- updated an "Important Reminders for Public Expression Activities" handout, now including a "What happens if you don't follow these rules" section, UCLA, *Important Reminders for Public Expression Activities* (2025), https://ucla.app.box.com/s/uvram5s9asgq7li2kfxf0xtaku10zo3k [https://perma.cc/S9XM-WS95] (warning that discipline may include arrest);
- evaluated the campus Civil Rights Office and redesigned its complaint system;
- appointed a dedicated Title VI/Title VII officer; and
- developed a comprehensive antisemitism training framework tailored to various UCLA communities, including faculty.

UCLA Antisemitism Action Grp., *UCLA Initiative to Combat Antisemitism Action Group Report* 6–8, 23, 34 (2026), https://chancellor.ucla.edu/wp-content/uploads/2026/05/Initiative-to-Combat-Antisemitism-Roadmap-Final-1.pdf [https://perma.cc/R4TR-G3NV].

The university's response to the encampments was imperfect, as UCLA acknowledged when it declined to appeal the injunction issued in August 2024. But

establishing that antisemitism pervades a campus as decentralized as UCLA requires more than Plaintiffs have alleged. The Regents have consistently tried, in good faith, to balance their legal obligations. And the remedy in *Frankel* differs vastly from the one sought here: ongoing interference in the operation of a major university.

UCLA's corrective steps since October 7 reflect an institution moving decisively in the right direction. Amici do not believe federal involvement would ever be needed; at minimum, it is highly premature.

## V. CONCLUSION

For these reasons and those stated by Defendant, the government's and intervenors' complaints should be dismissed.

November 2, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
REBECCA A. MARCYES

By: ______________________
Rebecca A. Marcyes

Attorneys for Amici Curiae
**PROFESSORS DAVID BLANK, CRAIG R. FOX, CAROLE E. GOLDBERG, ANDREA S. GOLDMAN, JONATHAN R. HIATT, CARLOS LERNER, BARNEY A. SCHLINGER, SAMUEL A. SKOOTSKY, NEAL STULBERG, AND ROGER WALDINGER**

## APPENDIX A

***Alphabetical List of Amici Curiae****

**David Blank**
Distinguished Professor of Classics and Philosophy, College of Letters and Science

**Craig R. Fox**
Harold Williams Professor of Management, Professor of Psychology and Medicine, Anderson School of Management

**Carole E. Goldberg**
Distinguished Research Professor, Jonathan D. Varat Distinguished Professor of Law Emerita

**Andrea S. Goldman**
Associate Professor of History;
Director of UCLA Asia Pacific Center

**Jonathan R. Hiatt, M.D.**
Emeritus Professor of Surgery,
David Geffen School of Medicine at UCLA

**Carlos Lerner, M.D., M.Phil.**
Jack H. Skirball Professor of Clinical Pediatrics,
David Geffen School of Medicine at UCLA

**Barney A. Schlinger**
Distinguished Professor of Biology and Physiology,
College of Letters and Science

**Samuel A. Skootsky, M.D.**
Professor of Medicine, David Geffen School of Medicine at UCLA

**Neal Stulberg**
Distinguished Professor of Music; Artistic Director of Lowell Milken Center for Music of the American Jewish Experience, Herb Alpert School of Music

**Roger Waldinger**
Distinguished Professor of Sociology, College of Letters and Science;

*Amici submit this brief in their personal capacities. Amici's institutional affiliations are for identification purposes only.